UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| In the Matters of | |
|---|---|
| David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, | Case No. 10-39796-svk<br>Chapter 11 |
| Debtors. | Jointly Administered |

**DEBTORS' RESPONSE IN OPPOSITION TO THE MOTION OF BNP PARIBAS FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Debtors Paul E. and Cheryl R. Olsen (the "Debtors") submit this response in opposition to BNP Paribas's (as Administrative Agent for certain Lenders) ("BNPP") *Motion for Appointment of a Chapter 11 Trustee* [Docket No. 25] dated January 18, 2011 (the "Motion"). In support hereof, the Debtors respectfully state as follows:

**I.      Preliminary Statement**

1.      There are no grounds for appointing a Chapter 11 trustee in this case. BNPP has not presented one iota of credible evidence establishing that "cause" exists to support a trustee or that such an appointment would be in the economic interests of the Debtors' estate. Simply put, BNPP's motion is a culmination of many disagreements spanning several years – hard feelings resulting from a good business relationship gone awry, retribution for the serious charges levied by David and Paul Olsen against BNPP in response to BNPP's lawsuit for breach of personal

Drafted by:

Melissa S. Blair
Kravit, Hovel & Krawczyk, s.c.
825 North Jefferson Street, Suite 500
Milwaukee, WI 53202
Phone:  414-271-7100
Facsimile: 414-271-8135
E-mail:  msb@kravitlaw.com

guaranty,[1] and the fulfillment of the promise BNPP made that if the Olsen's ever filed for bankruptcy protection, BNPP would spare no expense and do anything and everything to prevent the Olsen's from staying in the business that is their life. This motion is the execution of that promise, as BNPP continues the witch hunt it began against David and Paul Olsen more than two years ago.

2. Paul Olsen graduated from Berlin High School in Berlin, Wisconsin in 1973. He received an Associate Degree in Agribusiness from Fox Valley Technical College in 1975. From 1960 – 2010, Paul Olsen was the co-owner of Olsen Brothers Enterprises, LLP ("OBE"), headquartered in Auroraville, Wisconsin. Paul and his brother, David Olsen,[2] created this business as a 4-H project when Paul was 10 years old. Paul Olsen co-owned and managed OBE with David. OBE grew from a childhood dream into a diversified land and asset management partnership involved in farming, cattle, and hog operations, railcar ownership, and other storage and land ownership (including owning various grain elevators and grain storage facilities). OBE was formally dissolved as a limited liability partnership in July of 2010 for pre-bankruptcy planning purposes, but Paul continues to operate the business as a partnership with his brother, David. It is the assets of this partnership that are at issue in this proceeding.

3. Olsen's Mill, Inc. ("OMI"), headquartered in Auroraville, Wisconsin, was Paul Olsen's third generation family feed, seed, and fertilizer business. From 1977 – 2010, Paul Olsen was the Secretary and Treasurer of OMI. OMI was a feed, seed, and fertilizer business that Paul co-owned with his two brothers, David and Luther. Under Paul's management, OMI grew from one location to fourteen locations throughout the State of Wisconsin, with over 25

---

[1] A copy of Paul Olsen's Affidavit filed in the Supreme Court of the State of New York addressing his allegations against BNPP in response to BNPP's breach of personal guaranty lawsuit is attached hereto as Olsen Decl., Exh. A.
[2] Because of the overlapping assets and liabilities, Paul and Cheryl Olsen's Chapter 11 proceeding was ordered jointly administered with David and Becky Olsen's Chapter 11 proceeding. [Docket No. 45].

2

million bushels of grain storage and over $380 million in annual gross sales. In February of 2009, BNPP's actions (as detailed in Exhibit A to the Olsen Declaration) forced OMI into a Wis. Stat. § 100.18 receivership proceeding that remains pending in Green Lake County, Wisconsin, Case No. 2009-CV-0025 (McMonigal, J.). In the Affidavit he filed in opposition to BNPP's breach of guaranty claims, Paul Olsen detailed how BNPP's actions directly led to the downfall of OMI. (*See* Olsen Decl., Exh. A). In sum:

> As shown on OMI's Borrowing Base Certificate as of June 15, 2008, the total value of the OMI collateral was $116,992,952. As a result of BNPP's exercise of dominion and control over OMI's business, BNPP improperly and unreasonably (i) forced OMI to liquidate its hedging positions needed to protect its forward contracts, (ii) refused to accept bids to buy out its loan position at market or better (from Wells Fargo, in one case, and in another from a member of its own syndicate), and (iii) delayed contractually required delivery to OMI of warehouse receipts for grain, causing substantial losses to OMI. As a result of BNPP's improper conduct in connection with the disposition of the collateral in this and other respects, the value of the OMI collateral as shown on the Borrowing Base Certificate as of January 31, 2009 was $22,665,163. Even after BNPP forced OMI into receivership on February 11, 2009, BNPP willfully and unreasonably interfered with the receiver's efforts to market and sell OMI's business as a going concern.

(Olsen Decl., Exh. A, pp. 3-4).

4. On April 2, 2009, BNPP sued OBE and Paul and David Olsen in New York state court, alleging breach of personal guaranty as a result of OMI's failure to repay BNPP's loan when it was called due. On November 8, 2010, the New York state court ordered judgment against these defendants in the amount of $50,703,904.17. Unable to reach a settlement with BNPP, this bankruptcy ensued as a direct result of this judgment.

## II. **"Cause" Does Not Exist for The Appointment of A Chapter 11 Trustee.**

5. A review of BNPP's motion leads to one question: Where's the proof? BNPP's motion is rife with hazy allegations of misconduct, but no supporting documents are presented,

3

no corroborating witness testimony is proffered – the Debtors are not even able to determine from BNPP's motion where BNPP obtained the majority of the information underlying these allegations. A motion for a trustee that is based solely on a party's attorney's own uncorroborated statements containing allegations of fraud cannot be granted. *See, e.g.*, *In re Cole*, 66 B.R. 75, 76-77 (Bankr. E.D. Pa. 1986). And given that the Court is not required to conduct a full evidentiary hearing on a motion to appoint a trustee, *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) (citation omitted), BNPP should not be permitted to introduce new "evidence" at the hearing on its motion that it has not submitted concurrently with its motion.

6. This is not the only major flaw in BNPP's motion. **BNPP's allegations do not relate to wrongdoing by the actual Debtors in this case (or to their former LLP)**, but rather to alleged pre-petition actions taken by OMI (Paul's ex-employer), and even pre-petition acts of misconduct allegedly engaged in by Paul's brother and the attorneys filing this response to the motion. Moreover, not one of BNPP's allegations alleges any fraudulent post-petition wrongdoing by the Debtors, or anyone acting on their behalf. BNPP had every chance to assert these pre-petition claims against OMI in the state court receivership proceeding, or to bring a lawsuit against Paul Olsen or anyone else, but it has not done so.

7. BNPP finds itself an unsecured creditor on an island of its own creation. None of the other secured lenders or unsecured lenders (besides Ag Services) – with whom Paul Olsen has had longstanding business relationships – have joined BNPP's motion or raised similar issues with respect to Paul Olsen's character.[3] One would think that if Paul Olsen engaged in

---

[3] BNPP is the Administrative Agent with respect to the OMI loan for BNPP, Baylake Bank, and RZB Finance LLC. (BNPP Mot. at fn. 2). Baylake Bank is listed as a secured creditor on the Debtors' bankruptcy schedules by virtue of a GBSA that is subordinate to two other lenders. Baylake Bank has not submitted any separate objection to the

4

such pervasive pre-petition misconduct as BNPP alleges, numerous parties would have presented concerns to the Court. That is not the case.

8. David and Paul Olsen actually built the grain elevators at issue here, and managed them through their entities and now their partnership at all times. They have intimate knowledge of how to maintain and inspect these assets, and operate them for their highest and best commercial use. They have committed their lives to this family business, they know this business better than any outsider could, and they want nothing more than to be given the opportunity to continue their business via a plan of reorganization. They continue to maintain good business relationships with all the secured lenders in this proceeding other than BNPP, the outsider, unsecured lender. The cost to the estate of appointing a trustee is far outweighed by the benefit of allowing Paul Olsen – and the expertise he has gained since he and his brother created OBE when he was 10 years old – to remain a debtor-in-possession of this estate.

**A.  Legal Standard.**

9. BNPP requests that a Chapter 11 Trustee be appointed pursuant to 11 U.S.C. § 1104(a)(1), which provides:

> **(a)** At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> **(1)** for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; . . .

11 U.S.C. § 1104(a)(1).

---

Debtors remaining as debtors-in-possession, and it is unclear whether BNPP's motion also was submitted on behalf of Baylake Bank.

5

10. Appointing a trustee in a Chapter 11 case is "an **extraordinary remedy**." *In re 4 C Solutions, Inc.*, 289 B.R. 354, 370-71 (Bankr. C.D. Ill. 2003) (emphasis added); *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85-87 (Bankr. S.D.N.Y. 2007); *see also In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule.").

11. The party seeking appointment of a chapter 11 trustee has the burden of showing, by **clear and convincing evidence**, "cause" under § 1104(a)(1) (or the need for a trustee under § 1104(a)(2), as addressed in the next section). *In re The 1031 Tax Group, LLC*, 374 B.R. at 85-87 (citations omitted); *see also In re Sundale, Ltd.*, 400 B.R. at 899 (citations omitted) ("Because the appointment of a trustee is such an extraordinary remedy, the moving party must show that cause for appointment of a trustee exists by clear and convincing evidence."). Evidence is "clear and convincing" when: "[it] produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re G-I Holdings, Inc.*, 295 B.R. 502, 507-08 (D.N.J. 2003) (citations omitted).

12. In *Marvel Entertainment Group, Inc.,* 140 F.3d 463, 473 (3d Cir. 1998), the court addressed the usual "presumption" against appointing a trustee:

> It is settled that appointment of a trustee should be the exception, rather than the rule. In the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because ***current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate***. Thus the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: [t]he debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization. The

6

> strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization.

140 F.3d at 471 (internal quotations and citations omitted) (emphasis added).[4]

13. The Court is vested with "wide discretion" in considering the relevant evidence and facts. *In re The 1031 Tax Group, LLC*, 374 B.R. at 85-87 (citations omitted). Appointing a trustee will cause an additional financial burden to the estate; the financial cost of appointing a trustee must be considered. *In re 4 C Solutions, Inc.*, 289 B.R. at 370-71 (citing *Schuster v. Dragone,* 266 B.R. 268 (D. Conn. 2001)). A cost-benefit analysis should be applied, "weighing the expense and time associated with the appointment of a trustee against potential benefits to the estate." *In re Stein & Day, Inc.*, 87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988).

### B. The Plain Language of Section 1104(a)(1) Dictates That BNPP's Motion Must be Denied Because It Has Presented No Evidence of Wrongdoing By The Debtors to This Action.

14. The plain language of section 1104(a)(1) dictates that even assuming all of BNPP's allegations are true, appointing a trustee here is not an appropriate remedy. Notably, a trustee can be appointed pursuant to section 1104(a)(1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement **of the affairs <u>of the debtor</u>** by current management." **All** of BNPP's allegations of misconduct (which, upon information and belief, never were pursued in any other legal proceeding) **relate to pre-petition actions allegedly undertaken by OMI, David Olsen, Attorney Stephen E. Kravit, and Utica Energy, LLC** ("Utica"). OMI,

---

[4] Indeed, "[a]bsent fraud or some other compelling reason, it is preferable to have the Chapter 11 debtor's current management operate the debtor's business, rather than to appoint a trustee. *In re Madison Management Group, Inc.,* 137 B.R. 275 (Bankr. N.D. Ill. 1992). The preference for retention of current management is stronger where the debtor is a closely-held entity whose reputation and good will is closely identified with its owners and/or management team." *In re 4 C Solutions, Inc.*, 289 B.R. 354, 370-71 (Bankr. C.D. Ill. 2003). "This presumption is based on the belief that the debtor in possession is most knowledgeable about, and best able to run, the debtor's business." *In re Sundale, Ltd.*, 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009) (citation omitted).

David Olsen, Attorney Kravit, and Utica are not the debtors here. The Debtors are Paul and Cheryl Olsen. Since none of the fraud allegations remotely relate to fraud or mismanagement of the affairs of the actual Debtors (or even of OBE, Paul and David Olsen's former limited liability partnership), the plain reading of the statute dictates that all of BNPP's allegations are not properly considered in performing a section 1104(a)(1) analysis. A plain reading of the statute upon which BNPP relies dictates only one conclusion: BNPP has not presented sufficient evidence that "cause" exists to appoint a trustee over these Debtors. Its motion should be denied.

        **C.**    **Even if BNPP's Allegations of Misconduct are Properly Considered, BNPP Presents No Credible Evidence Establishing "Cause" to Appoint a Trustee.**

15.     Even if the Court considers the allegations of fraud committed by a corporation or other parties who are not debtors here, BNPP's clumsy accusations of misconduct are insufficient to establish "cause" under section 1104(a). Each of BNPP's allegations of misconduct will be addressed here. The Debtors believe the court will conclude that BNPP's allegations are, at best, devoid of merit to establish "cause," and, at worst, downright fabricated.

            *1.*    *The OMI Plea Agreement.*

16.     BNPP argues that appointing a trustee in this case is appropriate because OMI – (Paul Olsen's former employer that currently is in a Wis. Stat. § 100.18 receivership) – entered into a plea agreement with the USDA in 2007 relating to the issuance of false inspection certificates. (BNPP Mot. at ¶ 13). The ultimate penalty pursuant to this plea agreement was a fine imposed on OMI in the amount of $20,000, which was paid. (Olsen Decl. ¶ 3). No charges were brought or fine or other penalty was imposed in connection with this proceeding, and none against Paul Olsen. (*Id.*).

17.     The Debtors do not dispute that OMI entered into a plea agreement with the United States government and that the plea agreement states: "Paul Olsen instructed employees

8

of OMI to create samples of corn in route to CPI. . . ." (BNPP Mot., Exh. A, ¶ 6). OMI staunchly defended these allegations and, upon information and belief, incurred legal fees in the $300,000 range. (Olsen Decl. ¶ 4). Paul Olsen certainly did not (and does not) agree that he did anything criminal in connection with the issues addressed in the plea agreement.[5] (*Id*.). But because OMI had expended so much time and money in defending these allegations, OMI agreed to enter into the corporate plea agreement to put an end to the expense of legal fees. (*Id*. ¶ 5).

18. The mere fact that a debtor may have had involvement in a prior adjudicated legal matter does not rise to the level of "cause" necessitating a Chapter 11 trustee: "[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct. . . . The past act on which [the objectors] rely has been the subject of a full trial and certainly requires no further investigation." *In re Sletteland*, 260 B.R. 657, 671-72 (Bankr. S.D.N.Y. 2001) (citing 7 Collier *Bankruptcy* ¶ 1104.02[3][c][i] (15th L. King. ed.)). This case is one step removed from a case involving a prior adjudication of the acts of a debtor because OMI – not Paul Olsen – was charged with wrongdoing and entered into the plea agreement. The fact that Paul Olsen's former employer entered into a plea agreement does not come close to providing the "cause" necessary to appoint a trustee in this matter.

### 2. The Borrowing Base Certificates.

19. BNPP alleges: "Olsen intentionally submitted to the Lenders written Borrowing Base Certificates . . . that contained knowing misrepresentations, in order to defraud and induce the Lenders into making further advances under the Credit Agreement." (BNPP Mot. at ¶ 15).

---

[5] There are two types of grain samples within the USDA Grain Inspection Service. (Olsen Decl. ¶ 4). One type is an "official" sample, which a licensed grain inspector must take. (*Id.*) The other is a "submitted" sample, which the grain service will grade. (*Id.*) The grain sample addressed in the plea agreement was mistakenly marked as "official," when it should have been marked as "submitted." (*Id.*) Paul Olsen did not mistakenly label the grain samples. (*Id.*)

9

20.     Even assuming BNPP's allegations are true (and it is established below that they are not), this is yet another example of BNPP relying on actions of entities and individuals besides Paul Olsen in an attempt to disparage his character.  The data underlying those borrowing base certificates was prepared by the OMI accounting staff and submitted to BNPP on behalf of OMI.  (Olsen Decl. ¶ 6).  Upon information and belief, at no time in the course of the OMI receivership or in any other proceeding did BNPP bring a claim alleging that fraudulent OMI Borrowing Base Certificates were submitted to it – despite admitting in its motion that it learned of these allegations of fraud "*[b]y the Fall of 2008*."  (BNPP Mot. at ¶ 15) (emphasis added).

### a)     The September 15 and 30, 2008 Certificates.

21.     BNPP relies on only one piece of actual documentary "evidence" of Mr. Olsen's alleged fraudulent actions with respect to the Borrowing Base Certificates.  BNPP attaches to its motion a September 20, 2008 email from Paul Olsen to Dave Miller of Baylake Bank, in which Paul states: "[BNPP wanted] me to sign the [Borrowing Base] certificate, which when I read it, I than [sic] commit myself to fraud as I know the base is not in compliance.  What do you think I should do?"  (BNPP Mot., Exh. B).

22.     BNPP alleges in its motion with respect to this email: "After Dave Miller's response that he has no thoughts on the issue, Paul Olsen proceeded to certify the September 15th and 30th, 2008 Certificates, despite his knowledge that they were materially inaccurate, and his admission that his execution thereof constituted fraud upon the Lenders."  (BNPP Mot. at ¶ 16).

23.     BNPP unsurprisingly fails to attach the September 15th and 30th, 2008 Borrowing Base Certificates to its motions.  Had BNPP done so, the answer to what Mr. Olsen did in response to his query of "What do you think I should do?" is clear. Prior to September 15, 2008,

each OMI Borrowing Base Certificate (which generally were submitted to BNPP twice monthly) contained the following disclaimer above the signature line:

> Pursuant to Sections 7.1(c) and 7.2(c) of the Credit Agreement, dated as of June ___, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill, Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate, **that there exists no Event of Default under any Loan Documents** and that the undersigned is authorized to execute this certificate.

24. As examples of OMI Borrowing Base Certificates containing this language, copies of the July 31, 2008, August 15, 2008, and August 31, 2008 OMI Borrowing Base Certificates are attached hereto as Exhibit B to the Olsen Declaration.

25. Copies of the September 15 and 30, 2008 OMI Borrowing Base Certificates referenced in BNPP's motion also are attached hereto. The disclaimer on those documents states:

> Pursuant to Sections 7.1(c) and 7.2(c) of the Credit Agreement, dated as of June ___, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill, Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate and that the undersigned is authorized to execute this certificate.

(Olsen Decl. ¶ 8, Exh. C).

11

26. The September 15 and 30, 2008 OMI Borrowing Base Certificates that BNPP now complains about do NOT contain any representation "**that there exists no Event of Default under any Loan Documents.**" Paul Olsen knew that the Borrowing Base was not in compliance as of September 15, 2008 because it had a negative balance, and that this was an Event of Default under the loan documents. (Olsen Decl. ¶ 9). That is why he wrote the September 20, 2008 email to Dave Miller, and then removed the "No Event of Default" language from the September 15 and 30, 2008 Borrowing Base certificates before he signed them. (*Id.*). In fact, no false statement was made to BNPP. The numbers were accurate, and they showed that the borrowing base was not in compliance. BNPP cares little for the whole truth, preferring to offer this Court only the September 20, 2008 email from Paul Olsen to Dave Miller, then cry "fraud" without presenting the rest of the story. The truth is the opposite of what BNPP says: Paul Olsen removed the "No Event of Default" language precisely so he would not be defrauding anyone.

27. Then, without citing any documents or corroborating witness testimony, BNPP alleges that Mr. Olsen submitted four additional fraudulent OMI Certificates to BNPP. Again, these allegedly fraudulent OMI certificates were prepared by the OMI accounting department and submitted on behalf of OMI, not the Debtors, and this issue was not brought before the Court during the OMI receivership or as affirmative claims against Mr. Olsen.

### b) The April 30, 2008 Certificate.

28. BNPP alleges that the April 30, 2008 OMI Certificate was "fraudulent" because "Olsen included $4.3 million in cash comprised of checks issued by Renew Energy, an entity partially owned by Paul Olsen and David Olsen . . . . In reality, these 'checks' had not been deposited by OMI because Olsen knew that Renew Energy had insufficient cash to cover them." (BNPP Mot. at ¶ 16(a)).

12

29.     Although Paul Olsen did not personally gather the underlying data for the certificates, he does have knowledge of the pattern and practice that OMI followed. It is curious that BNPP points to the particular April 30, 2008 Certificate as problematic, when this had been OMI's practice for many years throughout the course of its relationship with BNPP. When OMI was asked to hold a check, it would decrease the accounts receivable on the books and hold the check until the date OMI was told it could deposit the check. (Olsen Decl. ¶ 10). BNPP said nothing about this ongoing practice until in or about mid-May of 2008, when Chris Chapman of BNPP requested that OMI stop this practice. (*Id.*). OMI then changed its policy, held the checks, and did not reduce accounts receivable until the checks were to be deposited. (*Id.*). An accounting practice that is not fraud was changed at BNPP's request. Nothing BNPP offers on this issue shows that Paul Olsen attempted to or actually committed any fraud. There is no clear and convincing evidence that Paul Olsen himself was involved in this practice or that it was fraudulent. BNPP apparently did not agree with OMI's general accounting methods,[6] and here unsuccessfully tries to bootstrap that disagreement into a fraud allegation against Paul Olsen.

### c)    The August 31, 2008 Certificate.

30.     BNPP alleges that the August 31, 2008 OMI Certificate was "fraudulent" because Olsen "included 856,238 bushels of grain . . . as current inventory, despite that such inventory had previously been shipped to Renew Energy." (BNPP Mot. at ¶ 16(b)). Mr. Olsen has no independent recollection today as to why any of this may have happened, if it actually did, and he does not have access to records concerning this issue at this time. (Olsen Decl. ¶ 11). This is a perfect example of one of the flaws in BNPP's overall motion presentation – BNPP didn't

---

[6] Even an allegedly improper accounting practice is not sufficient evidence to warrant appointment of a Chapter 11 trustee. *See, e.g.*, *In re Sundale, Ltd.*, 400 B.R. at 902 (denying a motion for appointment of a trustee despite allegations of mismanagement stemming from the debtors' prior accounting practices that allowed money to flow from and to various corporations and partnerships without legal formalities)

13

present any actual proof to permit the Debtors the opportunity to determine the truth or falsity of these allegations, much less to prove that cause exists to appoint a trustee on this ground.

### d) The November 30, 2008 Certificate.

31. BNPP alleges that the November 30, 2008 OMI Certificate was "fraudulent" because "Olsen failed to include $379,186.00 of Feed Grain Inventory, in excess of the Borrowing Base cap." (BNPP Mot. at ¶ 16(c)). What BNPP omits is much more telling than what it alleges. After a September 2008 meeting between BNPP and OMI, BNPP required OMI to hire a financial consultant. (Olsen Decl. ¶ 12). This also was a covenant of the forbearance agreement entered into between BNPP and OMI on October 22, 2008. (*Id.*). OMI wanted to use a grain expert, but BNPP required OMI to choose between BBK, LTD ("BBK") and Zolfo Cooper, neither of whom were grain experts. (*Id.*). Ultimately BBK was chosen, and it began extensive work with OMI in September of 2008. (*Id.*). At that time, BBK began overseeing all day-to-day financial issues involving OMI. (*Id.*).

32. As of September 10, 2008, Paul Olsen left work for OMI for about four weeks due to exhaustion and stress from working long hours in the turbulence of the financial meltdown that turned grain markets unpredictable. (*Id.* ¶ 13). He later returned to work for OMI on a part-time basis and had significantly less involvement with financial affairs because of BBK's takeover on behalf of the bank. (*Id.*). Between BBK's takeover of the OMI financial affairs and the fact that Paul Olsen was out of work, Paul Olsen has no recollection or information as to why $379,186.00 worth of Feed Grain inventory was not included in the November 30, 2008 Borrowing Base certificate. (*Id.*). BBK and the OMI accounting staff were in charge of preparing this certificate and should have corrected any errors if any existed, and Paul Olsen relied on their expertise in executing this certificate. (*Id.*). This is another example

14

of BNPP making unsupported allegations directly about Mr. Olsen, when BNPP has no evidence that Mr. Olsen was even involved with the process.

### e) "Multiple Borrowing Base Certificates."

33. Last, BNPP broadly alleges that "[i]n multiple Borrowing Base Certificates" (without attaching any such certificates or even referencing the dates of any such certificates), "Olsen included Renew Energy[7] accounts receivable in the Borrowing Base, with knowledge that Renew Energy did not have the financial resources to meet its obligations, thereby inflating the Borrowing Base availability." (BNPP Mot. at ¶ 16(e)). Had BNPP attached any documentation supporting this allegation, the documentation would reveal that it was OMI's practice to include all affiliate accounts receivable in the Borrowing Base. (Olsen Decl. ¶¶ 14, 15, Exh. D). The affiliates that regularly were included were Renew Energy, LLC, Utica Energy, LLC, Little Sprout Farms, Berlin Feed, Inc., Olsen Brothers Enterprises, LLP, Riverview Farms, and the Ponderosa Partnership. (*Id.* ¶ 14). These amounts were all disclosed on the accounts receivable summary and deducted from the collateral amount. (*Id.*). BNPP fails to explain how this practice constitutes "cause" necessitating appointment of a trustee. BNPP offers no evidence (much less clear and convincing) of what exactly Paul Olsen knew about the financial situation at Renew.

34. BNPP also makes general allegations pertaining to the relationship between OMI and Renew Energy. (BNPP Mot. at ¶ 18-19). Beyond the fact that these very broad allegations are not supported by evidence of wrongdoing by the Debtors (but for the simplistic, unsupported conclusion that "Paul Olsen made these relevant decisions for OMI"), there is no relevance to these allegations here. BNPP contends that "OMI repeatedly sold corn to Renew Energy at

---

[7] Paul Olsen was the President and one of the directors of Renew Energy, LLC. Renew Energy has filed for bankruptcy pursuant to Chapter 11 in the Western District of Wisconsin, Case No. 3-09-10491rdm.

15

below market prices, recorded these 'sales' as assets with values OMI knew would never be collected, thereby shifting an estimated net benefit to Renew Energy of approximately $9.5 million." (*Id.* ¶ 19). Beyond the fact that Mr. Olsen disputes that this occurred because doing so would affect OMI's profits and losses, and Paul and David Olsen had a much greater ownership and compensation interest in OMI than they did in Renew Energy (Olsen Decl. ¶ 16), this is an issue that is between Renew Energy and OMI and that should have been addressed in their respective bankruptcy and receivership proceedings. BNPP presents only speculation, not evidence, of Paul Olsen's involvement in any of this and therefore has not met its burden to establish the "cause" necessary to appoint a trustee.

### 3. The OMI Receivership Proceeding.

35. BNPP next alleges that the Olsen's conduct during the OMI receivership proceeding (which is still ongoing) constitutes cause for appointment of a Chapter 11 trustee. Consistent with its theme, the majority of BNPP's allegations in this regard do not relate to Paul Olsen.

36. First, BNPP alleges that Paul Olsen's brother, David Olsen, attempted to "chill" any prospective bidders in OMI's assets. (BNPP Mot. at ¶ 23). David Olsen does not recall any conversation in which he tried to do anything of the sort. (Olsen Decl. ¶ 17). David Olsen also has filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code and his case is jointly administered with this case, yet BNPP did NOT move for a trustee in David Olsen's case. In BNPP's world, Paul Olsen is the devil.

37. Second, BNPP alleges that: "On February 26, 2009, the [OMI] Receiver received a letter purportedly sent on behalf of OBE and the Olsens relating to the Lease Agreements between OBE and OMI. The letter stated that on February 27, 2009, OBE, as landlord, was declaring a default on certain of these grain storage facility leases. . . ." (BNPP Mot. at ¶ 24).

16

BNPP again did not attach a copy of this "evidence"; this letter is attached hereto as Exhibit E to the Olsen Declaration. Paul Olsen did not send this letter to BNPP; his attorney, Stephen E. Kravit, did. This issue was disposed of in the ordinary course of the receivership proceeding without any allegations of actual misconduct on the part of Attorney Kravit in sending this letter. How the Kravit letter could be clear and convincing evidence showing cause to appointment a trustee based on Paul Olsen's misconduct is a mystery.

38. Last, BNPP alleges that "OMI was party to a sale contract with [Utica], partially owned by Paul Olsen, for OMI to supply all of Utica's needs for corn. On February 19, 2009, the Receiver received a letter from Utica asserting insecurity as to OMI's future performance, by virtue of the Receivership. Despite the fact that Utica at the time owed over $2.1 million to OMI, under Paul Olsen's authority Utica then demanded adequate assurance of performance by OMI, attempted to unilaterally alter the terms of Utica's payment obligations to OMI, and refused to perform otherwise." (BNPP Mot. at ¶ 25). Once again, BNPP presents no evidence of Paul Olsen's involvement in these allegations, because none exists. Paul Olsen was removed from his position as President of Utica in November of 2008 after he became ill. (Olsen Decl. ¶ 19). He had no significant if any management involvement in the alleged business dealings between Utica and OMI after he was no longer involved in Utica management, and while OMI was in receivership. (*Id.*).

### 4. *Mismanagement versus fraud.*

39. Without any actual proof presented by BNPP of any wrongdoing by Mr. Olsen, it is difficult to see how a trustee could be appointed in this case.[8] But even assuming that Mr.

---

[8] Notably, between 2006 and 2008, Paul Olsen drew a salary of $50,000 per year from OMI, and no salary from OBE. The fact that Paul Olsen was not using his business to "line his pockets" militates against appointing a trustee. *See, e.g.*, *In re 4 C Solutions, Inc.*, 289 B.R. at 371 (refusing to appoint a trustee in part because no evidence was

17

Olsen wasn't the best businessman or accountant, BNPP's allegations fall into the realm of mismanagement as opposed to fraud. "Cause" for appointment of a trustee does not exist solely upon management's incompetence or gross mismanagement. *In re Cardinal Indus., Inc.*, 109 B.R. 755, 765 (Bankr. S.D. Ohio 1990). Some mismanagement will exist "in virtually every insolvency case . . . mere mismanagement does not, by itself constitute cause. The philosophy of chapter 11 is to give the debtor a 'second chance' at business success." 7 Collier on Bankruptcy ¶ 1104.02[3][c][i] (15th L.King. ed.); *see also In re Anchorage Boat Sales, Inc.,* 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980) ("[O]ne would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11."). What Paul Olsen is "accused" of by BNPP is at worst the type of mismanagement inherent in any chapter 11 proceeding.

40. Generally, mismanagement occurring post-petition is grounds for the appointment of a trustee. *In re Stein and Day, Inc.*, 87 B.R. 290, 294 (Bankr. S.D.N.Y. 1988). Indeed, "[w]hile a certain amount of mismanagement of the debtor's affairs prior to the filing date may not be sufficient grounds for the appointment of a trustee, continuing mismanagement of the affairs of a debtor after the filing date is evidence of the need for the appointment of a trustee." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citations omitted). Neither BNPP nor any secured creditor has asserted even one instance of alleged post-petition misconduct or mismanagement on behalf of the Debtors.

41. BNPP has failed to meet its burden of clear and convincing evidence to prove that "cause" exists to appoint a trustee pursuant to section 1104(a)(1). Its motion should be denied.

---

presented that the principals "used their power to line their own pockets," and their compensation and benefits package was reasonable at all times).

18

**III.     Appointing a Trustee Is Not in the Interests of Creditors.**

42.     BNPP alternatively requests that a Chapter 11 Trustee be appointed pursuant to 11 U.S.C. § 1104(a)(2), which provides that a court shall order a trustee appointed "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; . . ."[9]

43.     In determining whether this appointment is in the interests of the parties and Debtors, a court "engages in a fact-driven analysis, principally balancing the advantages and disadvantages of taking such a step, and mindful of the many cases . . . that have held that appointment of a trustee is an extraordinary remedy, and should be the exception, rather than the rule."  *In re Adelphia Communs. Corp., et al.,* 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (internal citations omitted).

44.     "[A] creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests.  It must show that the appointment is in the interests of all those with a stake in the estate, which in this case would include the Debtor."  *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001).

45.     BNPP doesn't attempt to, and cannot make, any showing of how the appointment of a trustee is in the interests of all creditors with a stake in this estate, including Paul and Cheryl Olsen, as opposed to simply its own interest.  Appointing a trustee is not in the best interests of the estate because Paul Olsen's familiarity with the ongoing business operations far outweighs the cost to the estate of appointing a trustee.  Paul and Cheryl Olsen are well aware of the independent fiduciary duty that they owe to the creditors in this case and intend to do everything

---

[9] Section 1104(a)(2) does not require a showing of cause; it "reflects the practical reality that a trustee is needed." *In re Sundale, Ltd.*, 400 B.R. at 901 (citations omitted).

19

in their power to abide by that duty. (Olsen Decl. ¶ 20). Appointing a trustee in this case is not in the interests of any interested party, including BNPP itself.

## IV. Conclusion

46. For the foregoing reasons, the Debtors, Paul and Cheryl Olsen, respectfully request that BNP Paribas's *Motion for Appointment of a Chapter 11 Trustee* be denied.

Dated in Milwaukee, Wisconsin this 4th day of February, 2011.

Kravit, Hovel & Krawczyk s.c.

*s/ Melissa S. Blair*
Stephen E. Kravit
Melissa S. Blair
*Attorneys for Paul E. Olsen and Cheryl R. Olsen*

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee WI, 53202
Phone: 414-271-7100
Fax: 414-271-8135

E-mail: msb@kravitlaw.com