UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In the Matters of

    David A. and Becky S. Olsen, and
    Paul E. and Cheryl R. Olsen,

                    Debtors.

Case No. 10-39796-svk

Chapter 11

Jointly Administered

## DECLARATION OF PAUL E. OLSEN

Paul E. Olsen states under penalty of perjury as follows.

1.      My wife, Cheryl Olsen, and I are the debtors-in-possession in this Chapter 11 case. From 1960–2010, I was the co-owner of Olsen Brothers Enterprises, LLP ("OBE"), headquartered in Auroraville, Wisconsin. OBE was a diversified land and asset management partnership involved in farming, cattle, and hog operations, railcar ownership, and other storage and land ownership (including owning various grain elevators and grain storage facilities). OBE was formally dissolved as a limited liability partnership in July of 2010 for pre-bankruptcy planning purposes, but I continue to operate the business as a partnership with my brother, David Olsen, whose Chapter 11 bankruptcy is jointly administered with mine. It is the assets of this partnership that are at issue in this proceeding. I have personal knowledge of the facts stated in this Declaration and the exhibits attached to it. This information is offered to the best of my recollection and belief based on the records available to me to review at this time.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a document entitled *Affidavit of Paul E. Olsen in Opposition to Motion for Summary Judgment in Lieu of a Complaint and in Support of Cross-Motion to Dismiss the Action Or, Alternatively, to Stay the Action Pending Plaintiff's Receivership Action in Wisconsin* dated June 1, 2009. This document

was filed in the Supreme Court of the State of New York, County of New York, Index No. 601021/09, bearing case caption *BNP Paribas v. Olsen Brothers Enterprises, LLP et al.*

3.     The ultimate penalty imposed pursuant to the 2007 plea agreement entered into between Olsen's Mill, Inc. ("OMI") and the government was a fine imposed on OMI in the amount of $20,000, which was paid.  No charges were brought or fine or other penalty was imposed in connection with this proceeding, and none against me.

4.     OMI staunchly defended the government's allegations brought in connection with the plea agreement and, to the best of my recollection at this time, OMI incurred legal fees in the $300,000 range.  I did not personally do anything criminal in connection with the issues addressed in the plea agreement.  There are two types of grain samples within the USDA Grain Inspection service.  One type is an "official" sample, which a licensed grain inspector must take.  The other is a "submitted" sample, which the grain service will grade.  The grain sample addressed in the plea agreement was mistakenly marked as "official," when it should have been marked as "submitted."  I did not mistakenly label the grain samples.  This issue was fully disclosed in the loan agreement prior to meeting each and every participating or potential lender in the loan.

5.     Because OMI had expended so much time and money in defending these allegations, OMI agreed to enter into the corporate plea agreement to put an end to the expense of legal fees and the distraction of the case.

6.     The underlying data for the OMI Borrowing Base Certificates addressed in BNP Paribas's ("BNPP") motion was compiled by OMI's accounting staff and submitted to BNPP on behalf of OMI.

7.     Attached hereto as **Exhibit B** are true and correct copies of three OMI Borrowing Base Certificates dated July 31, 2008, August 15, 2008, and August 31, 2008.

8.     Attached hereto as **Exhibit C** are true and correct copies of two OMI Borrowing Base Certificates dated September 15, 2008 and September 30, 2008.

9.     I knew that the Borrowing Base was not in compliance as of September 15, 2008 because it had a negative balance, and that this was an Event of Default under the loan documents.  That is why I wrote the September 20, 2008 email to Dave Miller, and then removed the "No Event of Default" language from the September 15 and 30, 2008 Borrowing Base Certificates before I signed them.

10.     When OMI was asked to hold a check, it would decrease the accounts receivable on the books and hold the check until the date OMI was told it could deposit the check.  BNPP said nothing about this ongoing practice until in or about mid-May of 2008, when Chris Chapman of BNPP requested that OMI stop this practice.  OMI then changed its policy, held the checks, and did not reduce accounts receivable until the checks were to be deposited.

11.     BNPP alleges that the August 31, 2008 OMI Certificate was "fraudulent" because it "included 856,238 bushels of grain . . . as current inventory, despite that such inventory had previously been shipped to Renew Energy."  I have no recollection today as to why this may have happened, if it actually did.  The BNPP motion offers no backup documentation and I do not have access to records concerning this at this time.

12.     After a September 2008 meeting between BNPP and OMI, BNPP required OMI to hire a financial consultant.  This also was a covenant of the forbearance agreement entered into between BNPP and OMI on October 22, 2008.  OMI wanted to use a grain expert, but BNPP required OMI to choose between BBK, LTD ("BBK") and Zolfo Cooper, neither of whom were

3

grain experts. Ultimately BBK was chosen, and it began extensive work with OMI in September of 2008. At that time, BBK on behalf of BNPP began overseeing all day-to-day financial issues involving OMI.

13.      As of September 10, 2008, I left work for OMI for about four weeks due to exhaustion and stress from working long hours in the turbulence of the financial meltdown that turned grain markets unpredictable. I later returned to work for OMI on a part-time basis and had significantly less involvement with financial affairs because of BBK's takeover on behalf of the bank. Between BBK's takeover of the OMI financial affairs and the fact that I had been out of work, I have no personal recollection or information as to why $379,186.00 worth of Feed Grain inventory was or was not included in the November 30, 2008 Borrowing Base certificate. BBK and the OMI accounting staff were in charge of preparing this certificate and should have corrected any errors if any existed, and I relied on their work and expertise in executing this certificate.

14.      It was OMI's practice to include all affiliate accounts receivable in the Borrowing Base. The affiliates that regularly were included were Renew Energy, LLC, Utica Energy, LLC, Little Sprout Farms, Berlin Feed, Inc., Olsen Brothers Enterprises, LLP, Riverview Farms, and the Ponderosa Partnership. These amounts were all disclosed on the accounts receivable summary and deducted from the collateral amount.

15.      Attached hereto as **Exhibit D** is true and correct copy of a Weekly Asset Report for the week ending on November 21, 2008, which includes the November 21, 2008 Affiliates/Related Parties Accounts Report. These documents are typical of the documents provided to BNPP throughout the course of its lending relationship with OMI.

4

16.     BNPP contends that "OMI repeatedly sold corn to Renew Energy at below market prices, recorded these 'sales' as assets with values OMI knew would never be collected, thereby shifting an estimated net benefit to Renew Energy of approximately $9.5 million." I dispute that this occurred because doing so would have affected OMI's profits and losses, and my brother and I had a much greater ownership and compensation interest in OMI than we did in Renew.

17.     BNPP alleges that my brother, David Olsen, attempted to "chill" any prospective bidders in OMI's assets. I spoke with David about this, and he does not recall any conversation in which he tried to do anything of the sort.

18.     Attached hereto as **Exhibit E** is a true and correct copy of a letter dated February 26, 2009 sent from Stephen E. Kravit on behalf of Olsen Brothers Enterprises, LLP to Michael Polsky, Receiver for OMI.

19.     I was removed from my position as President of Utica in November of 2008 after I became ill. I had no significant if any management involvement in the alleged business dealings between Utica and OMI after I was no longer involved in Utica management, and while OMI was in receivership. I was on the Utica board and attended contentious board meetings from time to time.

20.     My wife and I are well aware of the independent fiduciary duty that we owe to all of the creditors in this case, including BNPP, and we intend to do everything in our power to abide by that duty.

[rest of page intentionally left blank]

5

_/s/ Paul E. Olsen_
Paul E. Olsen

Subscribed and sworn to before me
this 4th day of February, 2011.


_/s/ Patricia A. Yonke_
Notary Public, Green Lake County, WI
My Commission: _06/08/14_

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BNP PARIBAS, as Administrative Agent,       :
a foreign corporation,

                                       :

                      Plaintiff,

                                       :

      - against -                           Index No. 601021/09

                                       :

OLSEN BROTHERS ENTERPRISES, LLP, a
foreign partnership, OLSEN'S LEASING, LLC.,
a foreign partnership, PAUL E. OLSEN and    :
DAVID A. OLSEN, as Guarantors,

                     Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF PAUL E. OLSEN IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT IN LIEU OF A COMPLAINT AND IN SUPPORT OF CROSS-MOTION TO DISMISS THE ACTION OR, ALTERNATIVELY, TO STAY THE ACTION PENDING <u>PLAINTIFF'S RECEIVERSHIP ACTION IN WISCONSIN</u>

STATE OF WISCONSIN   )
                      ) ss.:
COUNTY OF WAUSHARA )

       PAUL E. OLSEN, being duly sworn, deposes and says:

       1.   I am a resident of Wautoma, Wisconsin and a defendant in the above-captioned action.  I make this affidavit in opposition to the motion of plaintiff, BNP Paribas ("BNP"), as Administrative Agent, for summary judgment in lieu of complaint and in support of the appearing defendants' cross-motion to dismiss the action or, in the alternative, for a stay of the action pending BNP's related receivership proceeding in

Wisconsin.[1] I am fully familiar with the facts and circumstances set forth in this affidavit. They are true to the best of my knowledge and belief after having lived through the events in question over the last two years as well as the last thirty years during which I have been actively engaged in the Wisconsin grain business that is the subject matter of this action. I have also reviewed records and talked with present and former employees of various businesses with which I have been affiliated regarding their recollections regarding this matter to make the statements contained in this affidavit.

A. Preliminary.

2. For the reasons set forth in this affidavit and our counsel's memorandum of law, BNP's motion should be denied in its entirety and the action dismissed for the reason that (i) the loan and guaranty documents on which the motion is brought are not instruments for the payment of money only; (ii) BNP lacks standing to sue on behalf of the two other financial institutions whose claims it has asserted in this action; and (iii) BNP failed to join those institutions as necessary and indispensible parties in the action. Furthermore, given that BNP first commenced litigation in Wisconsin, instead of New York, to collect on the sums it alleges are due from me and the other defendants in this action, it would be just and appropriate to stay this action pending the outcome of the Wisconsin proceedings. In the alternative, BNP should be directed to file and serve a formal complaint joining the other two financial institutions whose claims BNP has purportedly asserted in this action.

---

[1] In addition to myself, defendant Olsen Brothers Enterprises, LLP ("OBE") and my brother, defendant David A. Olsen, reserving all of our respective defenses, oppose BNP's motion and seek a stay of this action pending the outcome of BNP's receivership action which assumed control of the business and property of the borrower under BNP's credit facility at issue in this action and of its wholly-owned subsidiary, Olsen's Leasing, LLC ("OLLLC"), the remaining defendant in this action.

2

3. In addition, BNP has failed to allege or provide any evidence regarding the commercial reasonableness of its management and disposition of the collateral securing the loan facility at issue in this action. Instead, as set forth at length in this affidavit, BNP's entirely improper conduct in dealing with the sale or other disposition of the collateral, including a receivership sale of the borrower's business, directly caused a wholesale destruction of the going concern value of the business and the liquidation or fair market value of its assets.

4. In sum, my family's third generation feed, seed and fertilizer business, Olsen's Mill, Inc. ("OMI"), headquartered in Auroraville, Wisconsin, entered into a revolving credit facility in August 2007 with BNP and Baylake Bank ("Baylake") and later with another financial institution, RZB Finance LLC ("RZB Finance") ("OMI Credit Facility"), for which the lenders received a guaranty from me and the other defendants in this action - my brother, David; a wholly-owned subsidiary of OMI, OLLLC; and OBE, a company co-owned and managed by my brother and me. As shown on the Borrowing Base Certificate for the OMI Credit Facility as of June 15, 2008, the total value of the OMI collateral was $116,992,952. As a result of BNP's exercise of dominion and control over OMI's business, BNP improperly and unreasonably (i) forced OMI to liquidate its hedging positions needed to protect its forward contracts, (ii) refused to accept bids to buyout its loan position at market or better (from Wells Fargo, in one case, and in another from a member of its own syndicate), and (iii) delayed contractually required delivery to OMI of warehouse receipts for grain, causing substantial losses to OMI. As a result of BNP's improper conduct in connection with the disposition of the collateral in this and other respects, the value of the OMI collateral as shown on the

3

Borrowing Base Certificate as of January 31, 2009 was $22,665,163. Even after BNP forced OMI into receivership on February 11, 2009, BNP willfully and unreasonably interfered with the receiver's efforts to market and sell OMI's business as a going concern.

5. Based on my many years of dealing with Wisconsin farmers and the risk management and other relevant aspects of our agribusiness, I believe that BNP's conduct, as summarized above and discussed in greater detail below, was highly improper. Indeed, I believe that BNP did not operate or liquidate OMI or its collateral in a commercially reasonable manner, either before or after the commencement of the receivership. Because of this, and because as guarantors my brother and I, and our company OBE have been dealt with in bad faith, we do not owe any monies to BNP on the asserted guaranty.[2]

B. Business and Personal Background.

6. I graduated from Berlin High School in Berlin, Wisconsin in 1973. I received an Associate Degree in Agribusiness from Fox Valley Technical College located in Appleton, Wisconsin in 1975.

7. From 1960-present, I have been the co-owner of defendant Olsen Brothers Enterprises LLP, headquartered in Auroraville, Wisconsin. As above noted, I co-own and manage OBE with my brother, David Olsen. OBE is a diversified land and asset

---

[2]   In order to prepare for trial, and to obtain discovery to confirm BNP's substantial and unreasonable conduct in this matter, defendants have substantial need to obtain testimony and documents from BNP, the two other lenders, the receiver, consultants appointed by BNP and other third-party witnesses. Moreover, defendants do not know or have access to information regarding the actual amounts that BNP has received in connection with the receivership or from its enforcement of its senior liens against OMI's accounts receivable. Thus, defendants need to obtain discovery regarding these issues at the earliest opportunity.

4

management partnership involved in farming, cattle and hog operations, railcar ownership, and other storage and land ownership with over $8 million in assets.

8. From 1977-present, I have been the Secretary and Treasurer of the borrower, OMI. OMI is a feed, seed, and fertilizer business that I co-own with my two brothers. I have been instrumental in the growth and management of this company, as it has grown from one location to fourteen locations throughout the State of Wisconsin with over 25 million bushels of grain storage and over $380 million in annual gross sales.

9. From 1985-2001, I was the President and co-owner of Olsen's Mill Direct LLC, headquartered in Oshkosh, Wisconsin. Olsen's Mill Direct, LLC was a retail mail order catalog company for children's clothing. This was the first Oshkosh B'Gosh childrens' mail order catalog. This company was the second largest purchaser of Oshkosh B'Gosh childrens' clothing, with over six million catalogs mailed and sales worldwide.

10. From 1991-present, I have been the Secretary and co-owner of Berlin Feed, Inc., headquartered in Berlin, Wisconsin. Berlin Feed, Inc. is a retail feed business with over $4.5 million in annual gross sales.

11. From 2002-present, I have been the President and co-owner of Utica Energy LLC, headquartered in Oshkosh, Wisconsin. Utica Energy LLC is a 50M Gallon Dry Mill Ethanol Plant that sells ethanol, distiller grains, and $CO_2$. I have been instrumental in the design, construction, financing, and operation of the plant.

12. From 2004-present, I have been the President of Renew LLC, headquartered in Oshkosh, Wisconsin. Renew LLC is a retail fueling station business that sells E10, E20 and E85 fuel.

5

13.    From 2004-present, I have been the President and co-owner of Utica Industries LLC, headquartered in Oshkosh, Wisconsin.  Utica Industries LLC is a real estate acquisition and management company with over $10 million in assets.

14.    From 2004-present, I have been the co-owner of Little Sprout Farms LLC, headquartered in Grand Marsh, Wisconsin.  Little Sprout Farms LLC is a farming operation that manages over 4,500 acres of irrigated land in the Central Sands area of Wisconsin.

15.    From 2006-present, I have been the President and co-owner of Renew Energy LLC, headquartered in Jefferson, Wisconsin.  Renew Energy LLC is the largest dry milling state-of-the-art ethanol plant in the world.  The plant is capable of producing 130 million gallons of ethanol per year.  As a dry mill fractionation plant, Renew produces a series of unique co-products, food grade $CO_2$, corn bran, corn, food grade corn oil, and its trademarked product, Renew Meal™.

C.    Creation of OMI Credit Facility With BNP and Other Lenders.

16.    OMI executed a Credit Agreement (the "Credit Agreement") with BNP, a French banking corporation, and Baylake, a local Wisconsin bank, on or about August 8, 2007.[3]  In addition to providing funds to OMI as one of the lenders, BNP also acted as Administrative Agent pursuant to the Credit Agreement.

17.    I personally dealt with BNP regarding the Credit Agreement and various issues stemming from the Credit Agreement.  My main contact at BNP was Christopher C. Chapman ("Chapman"), who served as Director, Commodity Finance – North

---

[3]    Copies of the Credit Agreement with BNP and Baylake, the Amendments to the Credit Agreement and certain related documents are annexed to the Affidavit of Kathryn Quinn, a Managing Director of BNP, sworn to April 2, 2009 ("Quinn Aff"), submitted in support of BNP's motion, as Exhibit C.

6

America of BNP Paribas. My brother David personally dealt with BNP regarding grain issues, and I dealt with BNP regarding the balance of the issues that arose regarding the OMI Credit Facility.

18. The Credit Agreement included a revolving credit commitment, which required each lender ("Lender") severally to make a revolving credit loan to OMI, subject to certain Borrowing Base limitations. OMI had an option, which could be exercised only once, that the aggregate revolving credit could be increased to an amount not greater than $75,000,000 (an increase that assumed that no default or event of default had occurred and required that consolidated working capital and consolidated tangible net worth met certain targeted levels). The original revolving credit commitments were as follows:

| BNP | $35,000,000 |
| Baylake Bank | $ 5,000,000 |

19. As above noted, the parties entered into various Amendments to the Credit Agreement (Quinn Aff, Exhibit C):

- Second Amendment, 9/27/07, temporarily increased the Revolving Credit Commitment to $45,000,000 for a 30 day period. A First Amendment dated the same date made certain modifications to the requirement for a Deposit Account Control Agreement with regard to three of OMI's bank accounts in Westfield, Stevens Point and Ripon, Wisconsin.

- Third Amendment, 10/27/07, temporarily increased the Revolving Credit Commitment to $50,000,000 for a 30 day period.

- Fourth Amendment, 11/30/07, temporarily increased the Revolving Credit Commitment to $50,000,000, and limited the commitment of BNP to $45,000,000 through the period ending January 31, 2008. This Amendment also allowed as a permitted indebtedness up to $55,000,000 with FCStone Merchant Services.

- Fifth Amendment, 12/17/07, temporarily increased the Revolving Credit Commitment to $55,000,000. This Amendment added RZB Finance as a

7

Lender with a commitment of $10,000,000 and reduced the commitment of BNP to $45,000,000.

- Sixth Amendment, 1/9/08, temporarily increased the Revolving Credit Commitment to $65,000,000 for the period ending March 31, 2008. This Amendment also increased the BNP commitment to $50,000,000.

- Seventh Amendment, 3/31/08, extended the above commitments through May 31, 2008.

- Eighth Amendment, 5/30/08, permanently increased the Revolving Credit Commitment to $70,000,000. This Amendment reduced the commitment of BNP to $45,000,000, while increasing the commitment of RZB Finance to $20,000,000. The Baylake commitment remained at $5,000,000. This Amendment also amended various financial condition covenants.

- Ninth Amendment and Waiver to Credit Agreement, 7/5/08, extended the revolving credit termination date to October 6, 2008. Certain covenant violations were waived.

20. Pursuant to the Credit Agreement and various security documents related to the OMI Credit Facility, BNP and the other Lenders obtained a first lien on, and a security interest in, all of OMI's grain, fertilizer and other inventories, crop input and other receivables, commodity futures, forward contracts, bank accounts and other property, virtually all of which was located in Wisconsin except for a commodity account maintained with FCStone, LLC in West Des Moines, Iowa.

21. OMI paid BNP loan origination fees for a Line of Credit to borrow up to $75,000,000, which BNP later refused to fund, despite OMI's due request therefor.[4]

22. Under Chapman's direction, BNP undertook pursuant to the Credit Agreement to provide funding, when required, to pay margin calls on the hedging accounts that OMI maintained in connection with its corn and other feed business. In

---

[4] Despite BNP's commitment in this respect, BNP refused to lend OMI beyond $65,000,000. Even as of the date on which the parties executed the Credit Agreement, BNP had not delivered the full amount required to be advanced thereunder. Thereafter, BNP continued to breach the Credit Agreement (and its Amendments) because it never fully funded the Credit Agreement. Symptomatic of other problems that arose during BNP's relationship with OMI, BNP had solicited and caused OMI to enter into a substantial credit facility that it was unable or unwilling to fully fund.

8

this regard, Chapman informed OMI personnel that BNP had the funds to cover any increase in margin calls required for a business such as OMI, as BNP was a very large bank and knew commodities and risk management. The available funds to be provided for this purpose would be at ten dollars for every one dollar of net equity OMI had going forward. OMI questioned BNP carefully on this issue, as OMI was concerned as to what would happen if the markets increased and futures had to be covered.

D. BNP Arbitrarily Forced OMI to Liquidate its Hedging
   Positions Which Resulted in Substantial Losses to OMI

23. Without any reasonable business, credit or legal basis for doing so, BNP forced OMI in May 2008 to liquidate its hedging positions that protected its forward contracts in the volatile grain markets of 2008. The futures and related positions that BNP forced OMI to liquidate were of considerable value to OMI and its ongoing operations. OMI was thus unable to perform its required risk management function concerning the 21.5 million bushels of corn forward contracted for delivery from customers that it held at that time. As a result, the value of its forward contracts substantially deteriorated resulting in over $15,000,000 in losses to OMI that would have been avoided but for BNP's instructions regarding the financing, purchase and sale of positions in OMI's hedge accounts in this regard.

24. To begin with, BNP's Director, Commodity Finance Chapman unilaterally required OMI to change the pricing methods on grain for the Borrowing Base Certificate under the Credit Agreement from current market prices to the price at which OMI could sell the grain in the future (less freight and interest). Then, Chapman changed the Borrowing Base to price the grain at current market prices to lower the amount of the collateral.

9

25. In mid May 2008, Chapman on behalf of BNP arbitrarily required OMI to offset prepaid contracts from farmers for crop inputs against forward contracts on the Borrowing Base Certificates. This requirement was not part of the original loan documentation.

26. At the same time, BNP notified OMI that BNP would not increase the Borrowing Base to allow for additional unrealized forward gains (i.e., margin calls). OMI had over $50,000,000 in unrealized gains, but BNP limited this amount to $20,000,000. OMI personnel and I objected to these instructions by BNP and Chapman, pointing out to BNP and Chapman the substantial commercial unreasonableness of their decisions and the required ensuing liquidation of OMI's hedging positions in its commodity accounts. As a direct and proximate result of BNP's decisions, OMI sold its futures contracts hedging the warehouse receipts held by BNP. BNP did nothing to protect OMI's or its position against market volatility. As a result, OMI had to abandon its risk management practice and lift its futures contracts on corn, and it was forced to react to current market conditions. This step cost OMI over $15,000,000 as of November 19, 2008, as a result of market declines after the sales.[5]

27. Between May 2008 and December 2008, BNP failed to fund the extra margin calls for forward purchase corn contracts, thus permitting OMI's position in these valuable assets to further erode.

---

[5] OMI also lost over $35,000,000 as a result of unenforceable contracts with affiliates Utica Energies and Renew Energy. These contracts were prepared based on the advice from Chapman of BNP as an alternative to buying futures contracts. Based on Chapman's unreasonable requirements, Renew and Utica never signed the contracts, and thus they are unenforceable. These actions forced OMI to sell higher priced grain to Utica and Renew, putting them in financial straits.

10

28. The OMI Credit Facility was due for renewal on August 7, 2008. Chapman of BNP knew in July 2008 that OMI was at risk, but only offered a two month extension until October 7, 2008, apparently speculating that OMI would recover from the hedge losses.

29. After BNP stopped lending to OMI for margin calls, in May 2008, Baylake, one of the other Lenders in the OMI Credit Facility, offered to increase its financial commitment by $3,000,000 to provide funding for this purpose. Without justification or excuse, BNP refused to permit such a loan to occur. BNP itself did not increase the loan limit for net unrealized gains in response to Baylake's offer.

E. BNP's Breach of the Parties' Forbearance Agreement; BNP's Unreasonable Delay in Delivering Valuable Warehouse Receipts to OMI; and BNP's Appointment of Inexperienced Consultants.

30. Discussions thereafter ensued between BNP and OMI regarding a forbearance agreement. Progress was made on this agreement, but a delay occurred while BNP awaited payment by OMI for the legal fees of the Bank's attorney, Russell L. Munsch, Esq. OMI asked for detailed billing information regarding the $52,000 invoice OMI received instead of the summary description contained in the invoice for Mr. Munsch's two-weeks of work, but Mr. Munsch informed OMI that if such disclosure was necessary, the bill would be higher. Negotiations regarding the forbearance agreement did not continue until the bill was paid.

31. OMI, BNP and the other Lenders entered into a forbearance agreement on October 22, 2008 (the "Forbearance Agreement"), a copy of which is annexed to the Quinn Aff as Exhibit D. Both BNP and OMI knew that OMI would quickly be out of compliance with the terms of the Forbearance Agreement. OMI signed the Agreement

11

despite this fact, because it was the only way it could buy back one million bushels of corn on a warehouse receipt held by the bank.

32. The Forbearance Agreement stated that the forbearance period would end on December 31, 2008 if a Borrowing Base deficiency existed. The forbearance period would end on March 31, 2009 if the Borrowing Base deficiency were cured. The Forbearance Agreement included various forbearance covenants, including OMI's required cooperation with a financial advisor recommended by BNP. The Forbearance Agreement also required that warehouse receipt #032 Jefferson 1,000,000 bu Corn (with an estimated value of over $3,000,000) be "immediately returned" upon execution of the Agreement.

33. It took days for BNP to return the Forbearance Agreement following its execution of the Agreement. BNP told me that a warehouse receipt would be returned to OMI at that time, as required by the terms of the Forbearance Agreement itself. Due to BNP's delay in delivering the warehouse receipt, however, the price of corn dropped before OMI could utilize the receipted corn for its purposes, causing OMI to lose approximately $750,000.

34. BNP further breached the Forbearance Agreement by failing to return warehouse receipt #033. In this connection, OMI and BNP reached an agreement that BNP would split the last warehouse receipt into five $200,000 warehouse receipts so that OMI could purchase it back. OMI needed to do this so it could sell corn to Renew Energy, LLC for grinding over the holiday season. The warehouse receipt was not returned to OMI, however, until about one week after the related wire transfer had been made. During that time, the grain in question substantially declined in value. BNP did

12

not timely return the warehouse receipt, putting OMI in a position to violate the rules of the US Department of Agriculture ("USDA") regarding company-owned grain and OMI's daily position report. BNP eventually returned the warehouse receipt after misrepresenting the date that it would be sent.

35. OMI made a wire transfer to BNP on December 31, 2008 for 400,000 bushels of corn. The warehouse receipt (#48) did not arrive at OMI until Tuesday, January 6, 2009. BNP alleged that FedEx missed its pick-up on December 31. Fed Ex records show, however, that a pick-up did occur from that box on that day, as well as on January 2. BNP's substantial delay in the return of the warehouse receipt caused OMI's daily position reports with USDA to be wrong and for two of OMI's major customers, Utica and Renew, to be undersupplied during that period.[6]

36. The Forbearance Agreement required OMI's "cooperation with financial advisor." After a September 2008 meeting between BNP and OMI, BNP required OMI to hire a financial consultant. OMI wanted to use a grain expert, but BNP required OMI to choose between BBK, LTD ("BBK") and Zolfo Cooper. Ultimately BBK was chosen, and the BBK consultants BNP directed us to use (James Connor and Marcus Hudson) had no expertise in grain. During the time that BBK was acting as financial consultant to OMI, the assets of OMI continued to decline, a matter that I believe would not have

---

[6] Consistent with its other improper practices, BNP misused and misapplied numerous payments or transfers during the period following the date of the Forbearance Agreement. As examples: (i) OMI paid BNP approximately $750,000 concerning a specified warehouse receipt, but BNP placed the funds in a low interest account and did not apply the payment to the loan balance. (ii) In December 2008, OBE wired $3,000,000 to OMI as a payment on account for Utica Energies. The payment was not applied to the account receivable, but instead was recorded as a note payable to OBE. The receiver in the receivership instituted by BNP now refuses to repay the note, while demanding payment on the account receivable. (iii) In another incident, OMI sent payment to BNP in the amount of $150,000 for BNP's expenses. OMI sent this money to BNP with a remittance advice explaining that it was a principal payment on the loan facility. BNP never applied the payment to the loan, but instead used it to pay a legal bill generated in preparing the Forbearance Agreement. Further, BNP did not notify the participating banks of this action.

occurred had consultants with experience in grain been retained. Fees from BBK for its services exceeded $500,000.

37. When BNP forced OMI to lift the hedges on forward contracts, OMI also lifted the 3-1 million corn bushel warehouse receipt of BNP. BNP Commodity Director Chapman told me and my brother, David to forward the contract to the ethanol plants to show, for purposes of the Credit Agreement, that OMI maintained a position of less than 500,000 bushels unhedged. The ethanol plants refused to sign the related contracts, causing OMI a $12 million loss during the period July-November 2008.

F. BNP Unreasonably Refused to Negotiate A Buyout of
   its Loan Position by Unaffiliated Third-Party Institutions.

38. BNP was unwilling to negotiate a buyout of OMI's Line of Credit. Efforts led by BBK, its own appointed consultant, beginning in October 2008, were unsuccessful due to BNP's categorical refusal to negotiate terms with parties who provided a term sheet (as did Wells Fargo) or otherwise expressed interest. OMI needed to work out such an arrangement in order to provide OMI's Financial Statement to USDA to obtain a grain license renewal. If OMI did not receive such renewal, OMI would have been forced out of business.

39. On numerous occasions beginning on September 15, 2008, OMI itself offered BNP a buyout to be arranged using funds from unaffiliated third parties. In November 2008, OMI offered BNP $40,0000,000 for a buyout using funding from Wells Fargo, but BNP refused to negotiate terms. In January 2009, OMI offered BNP $20,000,000 based on a proposal from another unaffiliated third-party source, and this proposal too was turned down out of hand by BNP. At or about the same time, Baylake, one of BNP's own participating institutions, made a buyout proposal to BNP, which was

14

likewise rejected. On the one visit to OMI headquarters by Michael Polsky, the receiver appointed in BNP's receivership action, an offer was made for a buyout in the sum of $18,000,000, but BNP and Mr. Polsky refused the offer.

40. BNP's wrongful and improper actions caused OMI to breach its grain contracts with Renew Energy, LLC and Utica Energy, LLC, thus jeopardizing OMI's relations with its major customers. As a further result of BNP's actions, I and the other owners of OMI invested substantial additional funds in OMI in an attempt to keep OMI in business. The OMI owners, including myself, continued to fund the cash requirements subsequent to the expiration of the Forbearance Agreement through February 11, 2009. The owners were left with no significant assets remaining with which to obtain additional credit.

G. Wisconsin Circuit Court Receivership for OMI.

41. In an action BNP brought in Circuit Court, Green Lake County, Wisconsin on February 11, 2009, OMI was placed into voluntary receivership.[7] At BNP's request, Michael Polsky was named the receiver. Marcus Hudson ("Hudson") of BBK, handpicked by BNP, has acted as the Chief Operating Officer of OMI during the receivership. OMI entered into a voluntary receivership after being told that the receiver would work with both BNP and the OMI owners to avoid further deterioration in the value of OMI and its assets and that he would work to reach a new financing plan to benefit both parties.

---

[7] The case, entitled "BNP Paribas, as Agent, plaintiff, against Olsen's Mill, Inc., defendant," (Case No. 09CV25), was brought, and remains pending before Circuit Court Judge William M. McMonigal.

15

42. I offered to work for free to assist BNP's designated personnel from BBK with running the receivership. I believed that my background and knowledge would have been valuable assistance at that point. I had been engaged in the grain business for my entire business career, whereas Hudson became so engaged only several months earlier when he was originally appointed a consultant to OMI. Despite the reasonableness of having someone intimately familiar with the grain business on site, Hudson, with the approval of BNP, had me barred from the office.

43. Moreover, contrary to the agreement reached between the parties at the outset of the receivership, Hudson entered into large transactions with FCStone, OMI's futures commission merchant, without conferring with me, my brother, David or, to my knowledge, Judge McMonigal. These transactions resulted in the liquidation of all of OMI's remaining futures contracts. Pursuant to the parties' agreement, my brother and I were to have had an opportunity to review the terms, and the Court was to have approved the terms of the transactions prior to the execution of the liquidating orders. In further violation of the arrangements established at the outset of the case, neither BNP nor Hudson shared the terms of these transactions with me or my brother or, to my knowledge, with the Court. Nor was a proper accounting provided. Given the improper and peremptory manner in which BNP's representatives arranged for the execution of these transactions, OMI lost approximately $2,500,000 that could have and should have been avoided.

44. Sadly, Hudson appears not to have understood the details of futures transactions of this nature. Even the basics of futures trading and account administration he did not grasp. In connection with the large liquidating transactions

16

referred to above, Hudson agreed to give FCStone free storage and no loadout fees on the grain that was under warehouse receipt. This means that OMI was required to maintain the quality of the grain and all costs associated with the grain on OMI's account, with no reimbursement to OMI. In addition, Hudson sold futures contracts with FCStone, and replaced them at Midco, another futures commission merchant, with contracts in the same quantity and commodity. Instead of simply transferring the contracts to Midco, he sold the existing positions at FCStone and bought new positions at Midco, generating unwarranted brokerage costs of $39,500 to OMI.

45. During the receivership Hudson gave contradictory information to the farmers in the community who did business with OMI. Regarding farmer prepaid contracts for agricultural inputs, Hudson told some farmers that the prepaids would not be honored. Hudson later issued a letter saying the prepaids would be honored. He also told some farmers that forward contracts would not be honored. He later issued a letter saying the contracts would be honored. The impact that such amateurish and commercially incompetent administration of OMI's business by BNP's appointee is devastating and substantial.

46. Further demonstrating the improper and commercially unreasonable means by which BNP and Hudson administered the receivership are the following:

      (a) The unjustified and unwarranted increase in the receivable from Utica, which was allowed to go from zero to over $3,000,000 during the course of the receivership.

      (b) Hudson's refusal to Little Sprout, an affiliated company of OMI, to pay $1,400,000 for a shipment of corn, in violation of Wisconsin law.

(c)  On more than one occasion, Hudson sent drivers home during the work week, and then required them to work on Saturday and Sunday, at time and one-half to haul corn to Utica and Renew.

(d)  Hudson let OMI checks bounce and swept the accounts to pay money to BNP.

(e)  After the sale of OMI's principal assets was ordered, Hudson told the BNP attorneys that if he had a week and a day he would have had OMI closed down and out of business.  We have witnesses to this comment and it proves the only agenda BNP had was to run OMI out of business.  James Connor, one of the BBK consultants whom BNP pulled from the prior pre-receivership assignment, informed me on December 23, 2008 that the BNP officials had told him that BNP was "just looking at the value in a liquidation and have a particular focus on the guaranty of David and you, this is why they have so many questions on the related businesses."

47.  It is thus no surprise that, during the ensuing receivership, BNP made no substantial effort to preserve the going concern values of OMI and its assets and operations, provided no other funding to OMI to keep it running as an ongoing business and impeded the marketing and sale of OMI and otherwise hampered its operations. Thus, Hudson was forced into compromising situations with others doing business with OMI for cash management purposes.  This included negotiations with FCStone on the sale of the futures contracts referred to above.  It also included the decision to not pay or delay payment to long-time vendors of OMI.  Additionally, some grain elevators were paid later than others, some getting immediate payment via wire transfer, and others being paid by cashier's check.  As a consequence, FCStone put a mortgage in the

18

amount of $4 million on two of OBE's grain elevators to secure the repos on grain for OMI. To this day, FCStone has not released these mortgages. Moreover, the farming operations gave up about $3 million because they had to sell corn to OMI at the cash price instead of at the contract price.

48. During March 2009, when the receiver organized and solicited bids for the sale of OMI, BNP sought directly and through Hudson to ensure the success of the bid from BNP's affiliate, PRM Wisconsin, LLC ("PRM"), and to discourage unaffiliated third party bidders. For example, all materials needed or requested by bidders were not made available in the due diligence website data room. When one of the bidders was not given all the information he wanted, he asked OMI representatives to meet with him to review information on forecasted cash needs and inventory levels, and OMI obliged. When Hudson learned of the meeting, he called and demanded that the meeting end immediately, as this was inconsistent with his desire (and that of BNP) to avoid getting all relevant information to the bidders to maximize the sale price. Hudson went so far as to have his agent physically come to the property and require everyone to leave.

49. The receiver held an auction for the purchase of OMI on April 10, 2009. After all offers were received, BNP (through its alter ego, PRM) offered a credit bid to outbid all other bidders. Ultimately the Court, by Order dated April 27, 2009, approved a slightly higher bid by an unaffiliated party, Olsen's Mill Acquisition Company LLC ("OMAC"), pursuant to which OMAC (a) purchased OMI's inventory for $9,000,000 and all real estate, rolling stock, and leased and owned equipment for $6,500,000 and (b) committed to honor various checks and other obligations for at least $4,947,000, committed to honor all forward contracts of producers with a then current estimated

19

value of $4,500,000, committed to honor inventory of producers of $2,500,000 as of a then current date and a commitment to honor all pre- and post-petition trade accounts then estimated to be $1,500,000. Currently, the receiver is being paid every two weeks for sales of the inventories OMAC purchased. Among other things, the receiver will continue to receive payments until all of the $9,000,000 of inventory that was purchased is paid, or until October 14, 2009 whichever comes first.

50. By reason of the commercially unreasonable, improper and self-serving conduct by BNP and Hudson enumerated above, OMI's assets on the Borrowing Base went from $40,000,000 when BNP and Hudson, its appointed representative, began managing OMI under the receivership on February 11, 2009, to $9,000,000 when OMI's principal assets were sold on April 14, 2009.

H. This Action Should be Stayed Pending the Conclusion of the Receivership.

51. BNP's receivership action assumed control over the business and assets of OMI as well as its wholly-owned subsidiary, OLLLC, one of the defendants in this action. Thus, BNP has sought recovery against OLLLC in two different forums for the same relief at the same time. My Wisconsin counsel requested BNP's counsel to rectify this situation by discontinuing this action as to OLLLC, but BNP has failed and refused to do so. Due to the pendency of the Wisconsin receivership action, the fact that this action and the Wisconsin action are inextricably intertwined and BNP's ongoing efforts through Hudson and the receiver to marshal and collect assets in the later proceeding, it would be more efficient, just and appropriate for this Court to stay this action pending the conclusion of the receivership which BNP instituted prior to the commencement of this action.

20

52.  From the perspective of OBE, my brother, David and myself, this lawsuit bears no relationship to New York.  Indeed, virtually all of OMI's remaining assets and many of the relevant witnesses and documents are located in Wisconsin.

53.  The witnesses that OBE, my brother and I may call at any trial or evidentiary hearing regarding the issues giving rise to this action, including those concerning BNP's failure to marshal and dispose of OMI's assets in a reasonable manner, and the remaining issues regarding the collection and distribution of assets in the Wisconsin receivership include: Paul Olsen, resident of Wautoma, WI; David Olsen, resident of Auroraville, WI; Dave Miller, resident of Green Bay, WI; Scott Sitter, resident of Oshkosh, WI; Liza Fritz, resident of Auroraville, WI; Chuck Kemper, resident of Janesville, WI; James Connor, resident of Michigan; Matt Bone, resident of Seymor, WI; Dave Ruedinger, resident of Omro, WI; Al Patz, resident of Green Bay, WI; Phil Martini, resident of Oshkosh, WI; Joan Wade Olsen, resident of Ripon, WI; Ty Rolloff, resident of Jefferson, WI; Luther Olsen, resident of Ripon, WI; Connie Klettke, resident of Ripon, WI; Jeff White, resident of Jefferson, WI; Dan Clark, resident of Oshkosh, WI; Steve Bolen, resident of Berlin, WI; Dave Kossel, resident of Oshkosh, WI; Mike Knobbe, resident of Des Moines, IA; Steve Krentz, resident of Berlin, WI; Paul Kujawa, resident of Berlin, WI; Pat Vollmuth, resident of Pickett, WI; Eric Hansen, resident of Madison, WI; and Dick Braun, resident of Madison, WI.

54.  Requiring each of these witnesses to travel to New York to testify at any trial in this matter would impose an undue hardship on each witness.

55.  The cities where OMI, OBE, Renew, and Utica are headquartered and/or do business include Auroraville, WI, Oshkosh, WI, Ripon, WI, Stevens Point, WI, Westfield,

WI, Grand Marsh, WI, Milwaukee, WI, Janesville, WI, Belmont, WI, Viroqua, WI, Boscobel, WI, Jefferson, WI, Stillwater, MN, and Pickett, WI. Substantially all of the documents and records relating to the issues in this action and the OMI receivership action are located in one or more of those cities.

I. Conclusion.

56. For the reasons set forth above and in the accompanying memorandum of law, it is respectfully requested that BNP's motion be denied in all respects and that this action be dismissed or, in the alternative, that the action be stayed pending the outcome of BNP's receivership action in Wisconsin.

Paul E. Olsen

Subscribed and sworn to before me this 1st day of June, 2009.

Notary Public, WAUSHARA County, WISCONSIN
My Commission EXPIRES: MAY 16, 2010

22

# Olsen's Mill Borrowing Base Certificate
### Date: July 31, 2008

| | Amount | Advance Rate | Availability Value | Availability Limitation |
|---|---|---|---|---|
| Cash Accounts | $8,920,522 | 100% | $8,920,522 | |
| Accounts Receivable | 11,518,356 | 85% | 9,790,603 | |
| Crop Inputs Receivables | 949,315 | 75% | 711,987 | 4,000,000 |
| Receipted Grain Inventory | 11,200,000 | 90% | 10,080,000 | |
| Non-receipted Grain Inventory | 21,755,849 | 90% | 19,580,264 | 20,000,000 |
| Grain In Transit | 1,740,249 | 85% | 1,479,211 | |
| Prepaid Inventory | 351,793 | 80% | 281,434 | 5,000,000 |
| Fertilizer Inventory | 6,066,375 | 75% | 4,549,781 | 5,000,000 |
| Feed Grain Inventory | 408,088 | 75% | 306,066 | 3,000,000 |
| Agricultural Inputs Inventory | 1,443,286 | 50% | 721,643 | 2,000,000 |
| Commodity Futures Accounts | 3,127,955 | 90% | 2,815,160 | |
| Net Unrealized Forward Gain | 28,771,517 | 70% | 20,140,062 | 20,000,000 |
| **Total Borrowing Base Collateral** | 96,253,305 | | 79,376,733 | |
| Less Offsets and Reserves | | -100% | -10,059,623 | |
| **Total Borrowing Base Availability** | | | 69,317,109 | |
| | | | | |
| Total Loans | | | 69,000,000 | |
| Total L/C Obligations | | | 0 | |
| **Total** | | | 69,000,000 | |
| | | | | |
| **Excess Borrowing Base Value (Availability)** | | | 317,109 | |

Pursuant to Sections 7.1(c) and 7.2(c) of the Credit Agreement, dated as of June ____, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate, that there exists no Event of Default under any Loan Documents and that the undersigned is authorized to execute this certificate.

Olsen's Mill, Inc.


By _____
Authorized Signer

## Olsen's Mill Borrowing Base Certificate

Date: August 15, 2008

| | Amount | Advance Rate | Availability Value | Availability Limitation |
|---|---|---|---|---|
| Cash Accounts | $14,610,376 | 100% | $14,610,376 | |
| Accounts Receivable | 13,631,634 | 85% | 11,586,889 | |
| Crop Inputs Receivables | 958,096 | 75% | 718,572 | 4,000,000 |
| Receipted Grain Inventory | 10,900,000 | 90% | 9,810,000 | |
| Non-receipted Grain Inventory | 12,508,021 | 90% | 11,257,219 | 20,000,000 |
| Grain In Transit | 2,420,455 | 85% | 2,057,387 | |
| Prepaid Inventory | 599,800 | 80% | 479,840 | 5,000,000 |
| Fertilizer Inventory | 6,567,834 | 75% | 4,925,875 | 5,000,000 |
| Feed Grain Inventory | 440,589 | 75% | 330,442 | 3,000,000 |
| Agricultural Inputs Inventory | 1,284,002 | 50% | 642,001 | 2,000,000 |
| Commodity Futures Accounts | 4,110,043 | 90% | 3,699,039 | |
| Net Unrealized Forward Gain | 18,430,379 | 70% | 12,901,266 | 20,000,000 |
| **Total Borrowing Base Collateral** | 86,461,229 | | 73,018,905 | |
| Less Offsets and Reserves | | -100% | -3,866,735 | |
| **Total Borrowing Base Availability** | | | 69,152,170 | |
| | | | | |
| Total Loans | | | 69,000,000 | |
| Total L/C Obligations | | | 0 | |
| Total | | | 69,000,000 | |
| | | | | |
| **Excess Borrowing Base Value (Availability)** | | | 152,170 | |

Pursuant to Sections 7.1(e) and 7.2(e) of the Credit Agreement, dated as of June _____, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent" the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate, that there exists no Event of Default under any Loan Documents and that the undersigned is authorized to execute this certificate.

Olsen's Mill, Inc.

By _~~signature~~_

Authorized Signer

# Olsen's Mill Borrowing Base Certificate

Date: August 31, 2008

| | Amount | Advance Rate | Availability Value | Availability Limitation | |
|---|---|---|---|---|---|
| Cash Accounts | $5,889,155 | 100% | $5,889,155 | | |
| Accounts Receivable | 11,928,326 | 85% | 10,139,077 | | |
| Crop Inputs Receivables | 971,070 | 75% | 728,302 | 4,000,000 | |
| Receipted Grain Inventory | 11,600,000 | 90% | 10,440,000 | | |
| Non-receipted Grain Inventory | 15,267,618 | 90% | 13,740,856 | 20,000,000 | |
| Grain In Transit | 2,147,422 | 85% | 1,825,309 | | |
| Prepaid Inventory | 1,216,929 | 80% | 973,543 | 5,000,000 | |
| Fertilizer Inventory | 6,584,231 | 75% | 4,938,173 | 5,000,000 | |
| Feed Grain Inventory | 311,509 | 75% | 233,632 | 3,000,000 | |
| Agricultural Inputs Inventory | 1,062,073 | 50% | 531,036 | 2,000,000 | |
| Commodity Futures Accounts | 2,288,821 | 90% | 2,059,939 | | |
| Net Unrealized Forward Gain | 23,430,594 | 70% | 16,401,416 | 20,000,000 | |
| **Total Borrowing Base Collateral** | 82,697,747 | | 67,900,438 | | |
| Less Offsets and Reserves | | -100% | -2,816,191 | | |
| **Total Borrowing Base Availability** | | | 65,084,247 | | |
| | | | | | |
| Total Loans | | | 65,000,000 | | |
| Total L/C Obligations | | | 0 | | |
| **Total** | | | **65,000,000** | | |
| | | | | | |
| **Excess Borrowing Base Value (Availability)** | | | 84,247 | | |

Pursuant to Sections 7.1(e) and 7.2(c) of the Credit Agreement, dated as of June ____, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate, that there exists no Event of Default under any Loan Documents and that the undersigned is authorized to execute this certificate.

**Olsen's Mill, Inc.**

By

Authorized Signer

# Olsen's Mill Borrowing Base Certificate

Date: September 15, 2008

| | Amount | Advance Rate | Availability Value | Availability Limitation |
|---|---|---|---|---|
| Cash Accounts | $8,390,763 | 100% | $8,390,763 | |
| Accounts Receivable | 10,082,133 | 85% | 8,569,813 | |
| Crop Inputs Receivables | 976,305 | 75% | 732,229 | 4,000,000 |
| Receipted Grain Inventory | 10,590,000 | 90% | 9,531,000 | |
| Non-receipted Grain Inventory | 3,428,166 | 90% | 3,085,349 | 20,000,000 |
| Grain In Transit | 1,511,440 | 85% | 1,284,724 | |
| Prepaid Inventory | 837,829 | 80% | 670,263 | 5,000,000 |
| Fertilizer Inventory | 6,957,660 | 75% | 5,218,245 | 5,000,000 |
| Feed Grain Inventory | 404,359 | 75% | 303,269 | 3,000,000 |
| Agricultural Inputs Inventory | 1,074,389 | 50% | 537,195 | 2,000,000 |
| Commodity Futures Accounts | 2,473,502 | 90% | 2,226,152 | |
| Net Unrealized Forward Gain | 17,032,923 | 70% | 11,923,046 | 20,000,000 |
| **Total Borrowing Base Collateral** | 63,759,470 | | 52,472,048 | |
| Less Offsets and Reserves | | -100% | -1,957,934 | |
| **Total Borrowing Base Availability** | | | 50,514,114 | |
| | | | | |
| Total Loans | | | 63,000,000 | |
| Total L/C Obligations | | | 0 | |
| Total | | | 63,000,000 | |
| | | | | |
| **Excess Borrowing Base Value (Availability)** | | | -12,485,886 | |

Pursuant to Sections 7.1(e) and 7.2(c) of the Credit Agreement, dated as of June____, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate and that the undersigned is authorized to execute this certificate.

Olsen's Mill, Inc.

By
Authorized Signer

**Exhibit C**

Case 10-39796-svk    Doc 58-1    Filed 02/04/11    Page 32 of 39

## Olsen's Mill Borrowing Base Certificate

Date: September 30, 2008

| | Amount | Advance Rate | Availability Value | Availability Limitation | |
|---|---|---|---|---|---|
| Cash Accounts | $6,787,166 | 100% | $6,787,166 | | |
| Accounts Receivable | 11,529,414 | 85% | 9,800,002 | | |
| Account Receivable - Offset | 13,063,635 | | | | |
| Crop Inputs Receivables | 943,077 | 75% | 707,308 | 4,000,000 | |
| Receipted Grain Inventory | 10,000,000 | 90% | 9,000,000 | | |
| Non-receipted Grain Inventory | 8,701,765 | 90% | 7,831,588 | 20,000,000 | |
| Grain In Transit | 1,057,954 | 85% | 899,261 | | |
| Prepaid Inventory | 723,148 | 80% | 578,518 | 5,000,000 | |
| Fertilizer Inventory | 7,303,480 | 75% | 5,477,610 | 5,000,000 | |
| Feed Grain Inventory | 1,741,847 | 75% | 1,306,386 | 3,000,000 | |
| Agricultural Inputs Inventory | 1,068,867 | 50% | 534,434 | 2,000,000 | |
| Commodity Futures Accounts | 3,576,254 | 90% | 3,218,629 | | |
| Net Unrealized Forward Gain | 6,192,639 | 70% | 4,334,847 | 20,000,000 | |
| Net Affiliated Unrealized Forward Gains | 17,673,810 | | | | |
| Net Unrealized Forward Gain - Over 12 Months | 312,150 | | | | |
| Total Borrowing Base Collateral | 90,675,205 | | 50,475,748 | | |
| Less Offsets and Reserves | | -100% | -1,008,119 | | |
| Total Borrowing Base Availability | | | 49,467,629 | | |
| | | | | | |
| Total Loans | | | 63,000,000 | | |
| Total L/C Obligations | | | 0 | | |
| Total | | | 63,000,000 | | |
| | | | | | |
| Excess Borrowing Base Value (Availability) | | | -13,532,371 | | |

Pursuant to Sections 7.1(e) and 7.2(c) of the Credit Agreement, dated as of June _____, 2007 (as amended, supplemented or otherwise modified from time to time the "Credit Agreement"), among Olsen's Mill Inc., a Wisconsin corporation (the "Borrower"), the several lenders from time to time parties thereto (collectively, the "Lenders"), and BNP Paribas, as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), the undersigned officers hereby certify on behalf of the Borrower to the Administrative Agent and the Lenders that this Borrowing Base Certificate and its supporting schedules are true and accurate and that the undersigned is authorized to execute this certificate.

Olsen's Mill, Inc.

By _____
Authorized Signer

## WEEKLY ASSET REPORT

Reference is made to the Credit Agreement, dated as of August 8, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill, Inc. (the "Borrower"), the lenders from time to time party thereto (the "Lenders") and BNP Paribas, as administrative agent to the Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used and not otherwise defined herein shall have the respective meaning given to such terms in the Credit Agreement.

The undersigned officer, as authorized representative of the Borrower, hereby represents and warrants that the following assets of the Borrower have the corresponding balances set forth below, in each case, for the week ending on November 21, 2008:

| Asset | Balance (in Dollars) |
|---|---|
| Cash Accounts | $8,202,704 |
| Accounts Receivable | $27,121,030 |
| Crop Inputs Receivables | $681,948 |
| Receipted Grain Inventory to the Administrative Agent | $3,440,000 |
| Receipted Grain Inventory to FCStone Merchant Services LLC and/or Affiliates thereof | $16,912,750 |
| Non-receipted Grain Inventory | $12,724,213 |
| Grain in Transit | $779,474 |
| Prepaid Inventory | $996,041 |
| Fertilizer Inventory | $8,431,078 |
| Feed Grain Inventory | $3,994,827 |
| Agricultural Inputs Inventory | $1,120,463 |
| Commodity Futures Accounts | $2,670,590 |
| Net Unrealized Forward Gains Aging (including transactions with the Borrower's Affiliates and Related Parties) | $22,448,534 |
| Fixed Assets | $11,673,600 |
| Additional Assets of Value – Rolling Stock | $3,186,500 |

| Accounts Payable | |
|---|---|
| -- Grain Checks Outstanding | $(14,126,475) |
| -- Position Report | - |
| -- Repo Amounts Owed by FCStone Merchant Services LLC and/or Affiliates thereof | $(17,553,804) |
| **TOTAL** | $92,703,473 |

The undersigned officer of the Borrower hereby certifies, on behalf of the Borrower, that (i) it is duly authorized to execute and deliver this Weekly Asset Report to the Administrative Agent and the Lenders, (ii) that this Weekly Asset Report is true and correct in all material respects and (iii) there exists no Event of Default under any Loan Documents (other than those Events of Default specifically waived in, or designated as "Designated Defaults" under, the Forbearance Agreement, dated as of October 22, 2008, among the Borrower, the Guarantors, the Administrative Agent and each Lender.

OLSEN'S MILL, INC.

By: _____

Name: Paul E. Olsen

Title:  Secretary/Treasurer

## AFFILIATES / RELATED PARTIES ACCOUNTS REPORT

Reference is made to the Credit Agreement, dated as of August 8, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Olsen's Mill, Inc. (the "Borrower"), the lenders from time to time party thereto (the "Lenders") and BNP Paribas, as administrative agent to the Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used and not otherwise defined herein shall have the respective meaning given to such terms in the Credit Agreement.

The undersigned officer, as authorized representative of the Borrower, hereby represents and warrants that the following total aggregate amount of Accounts owed to the Borrower by the following Persons have the corresponding balances set forth below, in each case, for the week ending on November 21, 2008:

| Affiliate / Related Party of the Borrower | Balance (in Dollars) |
| --- | --- |
| Renew Energy, LLC | $18,814,071 |
| Utica Energy, LLC | $0 |
| Berlin Feed Inc. | $170,278 |
| Ponderosa Partnership | $0 |
| Olsen Brothers Enterprises LLP | ($501,405) |
| Little Sprout Farms | ($4,187) |
| Riverview Farms | $(33,895) |
| TOTAL | $18,444,862 |

The undersigned officer of the Borrower hereby certifies, on behalf of the Borrower, that (i) it is duly authorized to execute and deliver this Affiliates / Related Parties Accounts Report to the Administrative Agent and the Lenders and (ii) this Affiliates / Related Parties Accounts Report is true and correct in all material respects.

OLSEN'S MILL, INC.

By:

Name: Paul E. Olsen
Title: Secretary/Treasurer

MHDocs 1683518_8 2577.65



KRAVIT ▪ HOVEL & KRAWCZYK s.c.
ATTORNEYS

TELEPHONE 414 ▪ 271 ▪ 7100
825 NORTH JEFFERSON
MILWAUKEE WISCONSIN
53202 ▪ 3737

FACSIMILE 414 ▪ 271 ▪ 8135

www.kravitlaw.com

STEPHEN E. KRAVIT
kravit@kravitlaw.com

February 26, 2009

<u>VIA ELECTRONIC MAIL</u>

Mr. Michael Polsky
Beck, Chaet, Bamberger & Polsky, S.C.
Two Plaza East, Suite 1085
330 East Kilbourn Avenue
Milwaukee, WI 53202

Re:   *Olsen Brothers Enterprises, LLP, et al.*

Dear Mr. Polsky:

We represent Olsen Brothers Enterprises, LLP ("OBE" or "Landlord") and its members Paul and David Olsen with respect to Lease Agreements between OBE and Olsen's Mill, Inc. ("OMI" or "Tenant"). You are hereby notified that on February 27, 2009, OBE/Landlord is declaring a Default pursuant to Paragraph 19 its Lease Agreement with respect to the properties listed in Exhibit A, attached to this letter. On February 27, 2009, the Lease Agreement is not terminated, however Tenant's right to possession of the Leased Property is terminated.

February 27, 2009 is the 30th day after the institution of proceedings for the appointment of a receiver of the property of OMI/Tenant, *BNP Paribas v. Olsen's Mill, Inc.*, Case No. 2009 CV 25 (Green Lake County, Wisconsin). Paragraph 19 of the Lease Agreement states, in relevant part, "(f) if proceedings are instituted in a court of competent jurisdiction...for the appointment of a receiver of the property of Tenant, and said proceedings are not dismissed and any receiver, trustee or liquidator appointed therein is not discharged within thirty (30) days after the institution of said proceedings...the Landlord may elect by written notice to the Tenant, to terminate this Lease and the Tenant's right to the Leased Property as of the date set forth in the notice, or without terminating the Lease, to terminate the

Tenant's right to possession of the Leased Property as of the date set forth in the notice. Upon such termination, the Landlord may re-enter the Leased Property with or without process of law using such force as may be necessary, and remove all persons and chattels therefrom and the Landlord shall not be liable..."

You are further notified that OMI/Tenant does not have the right to show Landlord's property for sale, assignment or sublease, and should cease and desist from doing so. OBE/Landlord does NOT give consent to Tenant to engage in any sale, assignment or sublease of the Leased Property.

Please advise whether OMI will voluntarily vacate in an orderly manner.

Very truly yours,

Stephen E. Kravit

SEK:aas
Enclosures

cc:    Paul Olsen
       David Olsen
       Olsen Bros. LLP

KRAVIT · HOVEL & KRAWCZYK S.C.

# Olsen's Mill, Inc.
## Location Summary

| Loc Code | Elevator | Elevator Loc. (full address) | County | Federal/ State License no | License Capacity, bu | Daily Loadout Rate | Rail Link | Agronomy Center | Ownership |
|---|---|---|---|---|---|---|---|---|---|
| 101 | Jefferson | N5355 Junction Rd Jefferson WI 53549 | Jefferson | 187926-GL | 7,795,949 | 100 cars | UP | No | Leased from Renew Energy    10,000 BPH Dryer Owned by OMI |
| 102 | Milwaukee | 375 Ember Lawn Mimwaukee WI 53233 | Milwaukee | 2008/09 Federal: 03-09829 | 3,112,000 | 25 cars | CP | No | Leased from Olsen Brothers Capital Improvements by OMI |
| 104 | Boscobel | 6250 Borden Rd Boscobel WI 53805 | Grant | 2008/09 Federal: 03-09829 | 1,572,000 | 50 cars | WSOR | No | Leased from Olsen Brothers Rail Loadout by OMI |
| 105 | Belmont | 898 First Capital Drive  Belmont WI 53510 | Lafayette | 2008/09 Federal: 03-09829 | 1,535,000 | 100,000 bu | No | No | Leased from Olsen Brothers |
| 120 | Viroqua | 700 East Power Drive  Viroqua WI 54665 | Vernon | 2008/09 Federal: 03-09829 | 1,535,000 | 100,000 bu | No | No | 1.1M bu Bin Owned by OMI Balance Owned by Olsen Brothers |
| 300 | Oshkosh | 2550 Clairville Rd Oshkosh WI 54904 4995 State Rd 91 Oshkosh WI 54904 | Winnebago | 2008/09 Federal: 03-09829 | 5,108,000 | 50 cars | WSOR | No | Owned by OMI Leased from Utica Energy LLC |
| 400 | Auroraville | W2018 Highway 21 Auroraville WI 54923 | Waushara | 2008/09 Federal: 03-09829 | 1,405,000 | 30,000 bu | No | Yes | Owned by OMI |
| 700 | Westfield | N7081 County Highway E Westfiled WI 53 | Marquette | 2008/09 Federal: 03-09829 | 2,660,000 | 50,000 bu | No | Yes | Owned by OMI |
| 800 | Stevens Point | 2417 Stockton Rd Stevens Point WI 54481 | Portage | 2008/09 Federal: 03-09829 | 1,957,000 | 25 cars | CN | Yes | Owned by OMI |
| 950 | Ripon | W13134 County Road KK Ripon WI 54971 | Fond du lac | 2008/09 Federal: 03-09829 | 3,507,000 | 50 cars | WSOR | No | Leased from Olsen Brothers Capital Improvements by OMI |

Total Bushel Capacity  30,186,949
USDA Licensed Capacity  22,391,000

2,000,000  bu Storage at Clairville
3,000,000  bu Flat Storage at Utica (Leased)

1,250,000  gal Tank for 32%
500,000  gal Tank for 10-34-0

2/26/2009

G:\Docs\olsen\bnp\AAS2850