THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: August 30, 2011



Honorable Susan V. Kelley
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re

DAVID A. and BECKY S. OLSEN, and      Case No. 10-39796
PAUL E. and CHERYL R. OLSEN,      Chapter 11

     Debtors.      Jointly Administered

## ORDER CONFIRMING CREDITORS' SECOND AMENDED PLAN OF REORGANIZATION AS MODIFIED FOR DAVID A. AND BECKY S. OLSEN, AND PAUL E. AND CHERYL R. OLSEN, PROPOSED BY AG SERVICES OF WISCONSIN, LLC, PHILMAR, LLC, OLSEN'S MILL ACQUISITION COMPANY, LLC, WEST POINTE BANK, BNP PARIBAS, AS <u>ADMINISTRATIVE AGENT, AND THE STATE OF WISCONSIN</u>

Drafted by:

Timothy F. Nixon
Carla O. Andres
GODFREY & KAHN, S.C.
333 Main Street, Suite 600
Green Bay, Wisconsin 54301
Telephone: (920) 432-9300
Facsimile: (920) 436-7988
Email: tnixon@gklaw.com
candres@gklaw.com

Russell L. Munsch
Joseph J. Wielebinski
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: rmunsch@munsch.com
jwielebinski@munsch.com

Thomas M. Olejniczak
Colleen M. Kelly
LIEBMANN, CONWAY, OLEJNICZAK & JERRY, S.C.
231 South Adams Street
Green Bay, Wisconsin 54301
Telephone: (920) 437-0476
Email: tmo@lcojlaw.com
cmk@lcojlaw.com

Paul A. Croake
Denis Bartell
DeWitt Ross & Stevens, S.C.
2 East Mifflin Street, Suite 600
Madison, Wisconsin 53073
Telephone: (608) 255-8891
Email: pac@dewittross.com
dpb@dewittross.com

Maria S. Lazar, Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, Wisconsin 53707
Telephone: (608) 266-1221
Email: lazarms@doj.state.wi.us

CAME ON FOR CONSIDERATION, on August 30, 2011 (the "Confirmation Hearing"), the confirmation of the *Creditors' Second Amended Plan of Reorganization for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, Proposed by AG Services of Wisconsin, LLC, Philmar, LLC, Olsen's Mill Acquisition Company, LLC, West Pointe Bank, BNP Paribas, as Administrative Agent, and the State of Wisconsin* [Docket No. 181] (as may be amended, supplemented or modified, the "Plan"), filed by AG Services of Wisconsin, LLC ("AG Services"), Philmar, LLC ("Philmar"), Olsen's Mill Acquisition Company, LLC ("OMAC"), West Pointe Bank ("West Pointe"), BNP Paribas, as Administrative Agent ("BNPP"), and the State of Wisconsin Department of Transportation ("State of Wisconsin" and collectively with Ag Services, Philmar, OMAC, West Pointe and BNPP, the "Plan Proponents"), creditors and parties in interest in the above-referenced, jointly administered Chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases").[1]

The Court, having considered the Plan, any objections thereto, the evidence admitted at the Confirmation Hearing, the arguments announcements and representations of counsel, and the entire record of the Chapter 11 Cases[2], and after due deliberation thereon and good cause appearing therefore, hereby finds, concludes and orders as follows:

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan.
[2] This Court takes judicial notice of the docket in the Chapter 11 Cases, including, without limitation: (i) all pleadings, notices, and other documents filed; (ii) all orders entered; and (iii) all hearings conducted by this Court in the Chapter 11 Cases, including, without limitation, the hearing to consider this Court's approval of the Disclosure Statement.

# I. FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]

1. **Background**

    A.    Jurisdiction and Venue.  This Court has jurisdiction to confirm the Plan pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. § 1408.  Consideration of confirmation of the Plan is a core proceeding under 28 U.S.C. § 157.

    B.    On December 16, 2010 (the "Petition Date"), Debtors Paul E. Olsen and Cheryl R. Olsen jointly filed their petition for relief under Chapter 11 of title 11 of the United States Code, §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court, Eastern District of Wisconsin (this "Bankruptcy Court"), thereby initiating their Chapter 11 case assigned Case No. 10-39799-svk.  On that same date, Debtors David A. Olsen and Becky S. Olsen also jointly filed a petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Case No. 10-39796-svk.

    C.    On February 2, 2011, this Court ordered the joint administration of the Debtors' Chapter 11 Cases under Case No. 2:10-bk-39796.  No official committee of unsecured creditors, nor any trustee, has been appointed in the Chapter 11 Cases.

2. **Plan and Disclosure Statement Proposals**

    D.    On June 13, 2011, this Court entered its *Order (1) Terminating the Debtors' Exclusive Period to Solicit Acceptances of their Plan, and (2) Setting Procedures for the Administration of the Debtors' Cases* [Docket No. 135], which provided that: (i) the Debtors and any parties in interest must file any Chapter 11 plans proposed by such parties, with companion disclosure statements under Section 1125 of the Bankruptcy Code, by no later than July 20,

---

[3] The following findings of fact and conclusions set forth herein are made pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure, and supplement any findings of fact and conclusions of law stated on the record by the Court at the Confirmation Hearing.  Where appropriate, any and all findings of fact shall be construed as and constitute conclusions of law, and any and all conclusions of law shall constitute findings of fact.

2011; and (ii) a hearing to consider the approval of any such proposed disclosure statements would be held July 28, 2011, with a further Confirmation Hearing tentatively scheduled for August 26, 2011.[4]

E.    On June 20, 2011, the following competing Chapter 11 plans and disclosure statements were filed in the Chapter 11 Cases: (i) a First Amended Joint Plan [Docket No. 143] and related Disclosure Statement in Support of Debtors' First Amended Joint Plan [Docket No. 144], filed by the Debtors; (ii) a Creditor Plan of Reorganization for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, proposed by BNPP, in its capacity as Administrative Agent [Docket No. 141] ("BNPP Plan"), and related Disclosure Statement [Docket No. 142] ("BNPP Disclosure Statement"); and (iii) a third competing Plan of Reorganization for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen [Docket No. 145] and related Disclosure Statement [Docket No. 146], filed by certain of the Plan Proponents, but excluding BNPP (the "OMAC Group").

F.    On July 26, 2011, certain of the members of the OMAC Group, BNPP and the Debtors participated in mediation ordered by this Court to attempt to resolve their disputes and disagreements underlying the foregoing competing plan proposals, pursuant to its Order on Request for Mediation entered on June 13, 2011 [Docket No. 136].  In connection therewith, BNPP, the OMAC Group, and the Debtors reached an accomodation as set forth in the Memorandum of Understanding ("MOU") attached to the Plan under which, *inter alia*, BNPP agreed to serve as a proponent of, and the Debtors agreed to support, the plan structure that has now been detailed in the Plan.  As memorialized in the MOU, Archer Daniels Midland Company ("ADM") has agreed to serve as Stalking Horse bidder for the Lot 1 Grain Facility Assets Auction, but subject to OMAC's agreement to also sell to ADM the assets of OMI acquired by

---

[4]  The Confirmation Hearing was subsequently adjourned to August 30, 2011.

OMAC in the OMI Receivership proceedings. Because BNPP asserts certain claims against OMAC, including claims encumbering OMAC's assets, which claims OMAC disputes, OMAC and BNPP have reached an accomodation under which OMAC will pay to BNPP a portion of the purchase price for the OMAC assets sold to ADM. In exchange, BNPP has agreed to release OMAC and all encumbrances asserted by BNPP on OMAC's assets. This accomodation will also allow the parties to the OMI Receivership proceeding, and those parties have agreed, to dismiss all related litigation among the parties pending in the Circuit Court of Green Lake County, Wisconsin once the sale of the Grain Facility Assets and the sale by OMAC of OMAC's assets to ADM are consummated.

G. Thereafter, on July 27, 2011, the Plan Proponents filed their First Amended versions of the Plan [Docket No. 172] ("First Amended Plan") and Disclosure Statement [Docket No. 173] ("First Amended Disclosure Statement"), pursuant to the foregoing accomodation reached among BNPP the OMAC Group and the Debtors.

H. Pursuant thereto, at a hearing held on July 28, 2011 ("Disclosure Statement Hearing"), by this Court to consider the adequacy of the proposed, competing disclosure statements, BNPP and the Debtors announced on the record that they each agreed to hold their respective plans and disclosure statements in abeyance, in order to allow the parties to pursue confirmation of the Plan.

**3.      Solicitation and Voting**

I. At the conclusion of the Disclosure Statement Hearing, this Court provisionally approved the First Amended Disclosure Statement as containing adequate information within the meaning of Section 1125 of the Bankruptcy Code, subject to the filing of a Second Amended Disclosure Statement memorializing certain revisions and amendments agreed upon by the parties in attendance, by no later than July 29, 2011.

J.    On July 29, 2011, the Plan Proponents filed the Plan and Disclosure Statement, and on that same date, this Court entered its *Order Approving the Disclosure Statement, Scheduling the Confirmation Hearing, and Shortening the Time for Notice* [Docket No. 180] ("Disclosure Statement Order").  The Disclosure Statement Order further: (i) set the Voting Deadline applicable to the Plan for 5:00 P.M. (CST) on August 24, 2011; (ii) scheduled the Confirmation Hearing for August 26, 2011 at 11:00 a.m.; and (iii) ordered that any objections to confirmation of the Plan must be filed with the Court no later than 5:00 P.M. (CST) on or before August 24, 2011.[5]

K.    Solicitation and Notice.  As evidenced by the Certificate of Service filed by Gena Nass of Godfrey & Kahn, S.C., on August 3, 2011 ("Solicitation Affidavit") Docket No. 184, timely and proper notice of the Plan, Disclosure Statement, the Confirmation Hearing, and the Auction of the Lot 1 Grain Facility Assets conducted by this Court at the Confirmation Hearing and other transactions contemplated under the Plan, has been provided to all creditors and parties in interest entitled to receive same, consistent with and pursuant to this Court's Disclosure Statement Order and Notice Order, and in accordance with Fed. R. Bankr. P. 2002 and 9006.

L.    Adequate and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Hearing, the Auction of the Lot 1 Grain Facility Assets, other transactions contemplated under the Plan and relevant to confirmation of the Plan, the Voting Deadline and deadline for filing objections to the Plan, has been given in accordance with the Disclosure Statement Order and Notice Order and in accordance with 11 U.S.C. §§ 1125, 1127

---

[5] On August 2, 2011, BNPP filed its *Motion to Further Shorten Notice of the Confirmation Hearing* [Docket No. 182], seeking this Court's authorization for the Notice Documents to be served on certain Creditors that are not entitled to vote on the Plan and other parties-in-interest, by August 2, 2011, via First Class U.S. Mail.  On August 4, 2011 [Docket No. 188], this Court entered its Order granting this request.

and 1128, Fed. R. Bankr. P. 2002, 3020 and 9006, and applicable local rules of this Court. Accordingly, this Court further finds that no further notice of such matters is required.

M.      As further discussed below, all Creditors entitled to vote whether to accept or reject the Plan were timely and duly solicited by the Plan Proponents, and all Entities having an interest in the Lot 1 Auction or Grain Facility Assets to be sold pursuant thereto, were provided timely and adequate notice of such proposed Auction in order to assert any objections thereto. The time periods provided for solicitation and voting on the Plan, for objections to the Plan, and for objecting to the sale of the Grain Facility Assets, were sufficient to comply with the Bankruptcy Code and Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and due process.

**4.      Compliance With Bankruptcy Code Provisions**

N.      Compliance with 11 U.S.C. § 1122.   In addition to Administrative Expense Claims and Priority Tax Claims, which need not be classified, the Plan classifies Claims into five (5) distinct Classes, including a Class 3 of Secured Creditors containing eight (8) subclasses, each comprised of a single Secured Creditor.   The Court finds that valid business, legal, and factual reasons exist for the separate classification of each of these classes of Claims, and there is no unfair or inequitable discrimination or gerrymandering between or among the holders of Claims.   The division and separate treatment of Class 3 Creditors through subclasses is reasonable, appropriate and non-discriminatory because of the differing rights to different Collateral held by such Creditors.

O.      All Claims within each Class under the Plan are substantially similar and are afforded equal and reasonable treatment other than to the extent that the claimant has agreed to same.   Accordingly, the classification of Claims under the Plan satisfies the requirements of Section 1122 of the Bankruptcy Code.

P.       Compliance with 11 U.S.C. § 1123(a)(1)-(7).   In accordance with Sections 1123(a) and (b) of the Bankruptcy Code, the Plan: (i) designates Classes of Claims, other than Claims of a kind specified in Bankruptcy Code §§ 507(a)(2), 507(a)(3), or 507(a)(8); (ii) specifies Classes of Claims that are not impaired under the Plan; (iii) specifies the treatment of Classes of Claims that are impaired under the Plan; (iv) provides the same treatment for each Claim of a particular Class, unless the holder of a particular Claim has agreed to less favorable treatment of their Claim classified thereunder; (v) provides adequate means for the Plan's implementation by liquidating all nonexempt Assets of the Debtors' Estates, including through public auction as appropriate, and otherwise transferring such Assets to the Liquidating Trust for liquidation and payment of Allowed Claims in accordance with the Plan; (vi) does not implicate the provisions of Section 1123(a)(6); and (vii) contains only provisions that are consistent with the interests of holders of Claims and with public policy with respect to the manner of selection of the Liquidating Trustee, and any successor thereto.

Q.       Compliance with 11 U.S.C. § 1123(b).   Consistent with Section 1123(b) of the Bankruptcy Code, the Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code, including provisions for (i) the rejection and treatment of executory contracts and unexpired leases and corresponding Claims; and (ii) treatment of the rights of holders of Administrative Claims and Priority Tax Claims.  The relief provided in the Plan is fair, equitable and necessary for the orderly implementation of the Plan and the administration of the Estates.  Therefore, the Plan satisfies the requirements of Bankruptcy Code § 1123(a) and (b).

R.       Compliance with 11 U.S.C. §§ 1125 and 1126 – Solicitation and Acceptance of Plan. As set forth hereinabove, votes to accept or reject the Plan were solicited by the Plan

Proponents after this Court's entry of the Disclosure Statement Order. The Plan Proponents solicited and tabulated votes on the Plan, and performed any other activities described in Section 1125 of the Bankruptcy Code, in good faith, consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules and all other applicable laws, rules, and regulations, and are entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code. All Creditors entitled to vote on the Plan were solicited.

S.     The Balloting Agent has duly attested to, and certified the results of the tabulation of Ballots submitted by Creditors entitled to vote on the Plan. The Plan leaves unimpaired the rights of Creditors whose Claims are classified in Classes 1 through 3 under the Plan, including subclasses, and therefore, Classes 1 through 3 under the Plan are deemed to have accepted the Plan. As attested by the Balloting Agent, Class 4 of General Unsecured Claims has voted to accept the Plan, and Class 5, comprised of a single insider Claim, has voted to reject the Plan.

T.     Compliance with Section 1129 (subsections (a)(1) and (2)). As set forth herein, the Plan complies, and the Plan Proponents have complied, with all relevant sections of the Bankruptcy Code, Bankruptcy Rules and applicable law, including, without limitation:

(i)     Section 1129(a)(3): Plan Proposed in Good Faith. Based on the totality of the circumstances surrounding the Plan, the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law.

(ii)     Section 1129(a)(4): Payment for Services and Expenses. All payments made or to be made by the Plan Proponents or Debtors for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection

with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to approval of, this Court as reasonable.

(iii)    Section 1129(a)(5):  Directors, Officers, and Insiders.  Because the Debtors are individuals and the Plan contemplates the liquidation of all nonexempt property of the Estates, no individuals are proposed to serve as director, officer, or voting trustee of the Debtors, and, as a result, Section 1129(a)(5) of the Bankruptcy Code is inapplicable.  Michael S. Polsky has been proposed to serve as the initial Liquidating Trustee under the Plan, and has agreed to serve in such capacity pursuant to the Plan and the Liquidating Trust Agreement.  Mr. Polsky is disinterested, and well qualified, experienced, and appropriate to serve as the Liquidating Trustee, the terms and provisions for his service and compensation as Liquidating Trustee have been duly disclosed in the Plan, the Disclosure Statement and the Liquidating Trust Agreement, and such terms are customary, reasonable and appropriate under the circumstances.  Accordingly, the appointment of Mr. Polsky as Liquidating Trustee is consistent with the interests of Creditors and with public policy.

(iv)    Section 1129(a)(6):  Governmental Regulatory Rate Change.  No governmental regulatory commission has jurisdiction over the approval of any rates of the Debtors and, as a result, Section 1129(a)(6) of the Bankruptcy Code is not applicable.

(v)    Section 1129(a)(7):  "Best Interests" of Creditors.  The "best interests" test is satisfied as to all impaired Classes.  Specifically, no holder of a Claim within impaired Classes receives worse treatment under the Plan than it would receive

under a liquidation of the Estates under Chapter 7 of the Bankruptcy Code. In fact, a Chapter 7 liquidation may adversely affect the ultimate proceeds available for distribution to all holders of Claims in the Chapter 11 Cases. The Plan embodies certain compromises and agreements among the major Creditors of the Estates and the Debtors, including but not limited to an arrangement reached among OMAC, Ag Services, BNPP, West Pointe, the State of Wisconsin and ADM that maximizes the value obtained for the Estates' primary Assets. Absent the approval of this Plan, such accommodations may be lost, and substantial, protracted, and costly litigation in or in connection with these Chapter 11 Cases is likely to ensue among the major constituents of these cases. Accordingly, liquidation under Chapter 7 of the Bankruptcy Code may result in smaller distributions to Creditors than provided for under the Plan. Accordingly, the Plan provides each holder of a Claim with a greater recovery than it would receive pursuant to the Debtors' liquidation under Chapter 7 of the Bankruptcy Code. Therefore, the consensual Plan satisfies the "best interests" test as to all impaired Classes.

(vi)    Section 1129(a)(8):    Acceptance by Impaired Classes.    Pursuant to evidence adduced at the Confirmation Hearing, the Court finds that Class 4 has voted to accept the Plan, but that Class 5 has rejected the Plan. The Plan Proponents have duly modified the Plan's proposed treatment of Class 5, to provide for payment in full of the Class 5 Claim to the extent that it is Allowed as a Secured Claim. Therefore, Class 5 is unimpaired under the Plan.

(vii)    Section 1123(a)(9):  Treatment of Administrative Expense and Priority Tax Claims.  Except as otherwise agreed by the holders of such Claims, the Plan provides for the payment in cash promptly upon the later of the Effective Date, or upon Allowance, of Claims of a kind specified in Section 507(a)(1), (3) and (4)-(8) of the Bankruptcy Code.  As its sole and exclusive contribution with respect to Administrative Expense and Priority Tax Claims, ADM has agreed to deposit the amount of $350,000 into an account held by counsel for the Debtors for the payment of such claims, following Allowance by this Court.  After allowance and payment of such fees as approved by the Court, any remaining balance shall be returned to ADM.  Accordingly, the Plan satisfies the  requirements set forth in Section 1129(a)(9) of the Bankruptcy Code.

(viii)    Section 1129(a)(10):  Acceptance by Impaired Class.   As set forth hereinabove, the Plan has been accepted by at least one impaired Class of Claims.

(ix)    Section 1129(a)(11):  Feasibility.  Confirmation of the Plan is not likely to be followed by the need for further reorganization or liquidation of the Debtors not otherwise proposed in the Plan.  Therefore, the Plan is feasible.

(x)    Section 1129(a)(12):  Payment of Fees.  Pursuant to Section 18.3 of the Plan, all fees payable pursuant to Section 1930 of title 28 of the United States Code and arising prior to the Effective Date shall be paid on the Effective Date if not previously paid, and otherwise as and when due by the Liquidating Trustee as required by law.  The Plan satisfies the requirements of Section 1129(a)(12) of the Bankruptcy Code.

(xi) Sections 1129(a)(13)-(16): Other Provisions. Sections 1129(a)(13)-(16) are not applicable to the Plan, because the Debtors: (i) have no retiree benefits to account for or to continue; (ii) have no domestic support obligations; and (iii) are individuals.

(xii) Section 1129(a)(15). The value of property to be distributed under the Plan is substantially greater than the projected disposable income of the Debtors either during the five (5) year period commencing on the Effective Date, or during the proposed time period for payments under the Plan. Accordingly, the Plan satisfies the requirements of Section 1129(a)(15) of the Bankruptcy Code.

U. Section 1129(b): Cramdown. The Plan does not discriminate unfairly, and is fair and equitable, with respect to Class 5 under the Plan, which constitutes the lone impaired Class that did not accept the Plan. Class 5 is comprised of the asserted Secured Claim of Vivadell Olsen. Vivadell Olsen has not consented to the treatment proposed for Class 5. The Plan Proponents and Liquidating Trustee believe that such Claim is subject to subordination, avoidance or disallowance, at least in part, as a Secured Claim. With the $200,000.00 deposit pursuant to paragraph 25 of this Order, the Liquidating Trust has ample resources to prosecute such objections or requests for relief, and to otherwise fully reserve appropriate Liquidating Trust Assets to pay the Class 5 Claim in cash upon allowance, if Allowed. Accordingly, approval of the Plan, as modified, as to Class 5, is fair and equitable to Vivadell Olsen, pursuant to section 1129(b)(2)(A).

V. Section 1129(d): Principal Purpose of Plan. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Article 5 of the Securities Act of 1933, as amended. Any tax attributes of any Debtor succeeded to by his or her Estate pursuant to

Section 1398(g) of the Internal Revenue Code of 1986, as amended (the "IR Code"), will not be reduced under Sections 108(b)(1) and (2) of the IR Code (to the extent applicable) until the taxable income of such Estate has been determined for the Estate's tax year during which it obtains a discharge of indebtedness.

       W.    <u>Conditions Precedent to Confirmation</u>.  Upon entry of this Confirmation Order, this Order is immediately effective and enforceable, no stay thereof shall apply.  Upon the first date that is fourteen (14) days following the Confirmation Date, all conditions precedent to confirmation of the Plan contained in Article XIV of the Plan are deemed satisfied.

       X.    <u>Plan Provisions Valid and Binding</u>.  Upon entry of this Confirmation Order, each term and provision of the Plan is valid, binding and enforceable pursuant to its terms.

## 5.    Lot 1 Auction of Grain Facility Assets

       Y.    This Court has, at the Confirmation Hearing, concluded that the Successful Bidder for the Lot 1 Grain Facility Assets is ADM, whose final bid in the amount of $16,700,854.56 this Court finds to be the highest and best offer for the Lot 1 Grain Facility Assets, and is in the Estates' best interests.  The proposed consideration provided by this prevailing bid constitutes reasonably equivalent value and fair consideration for the Lot 1 Grain Facility Assets.

       Z.    The form of Stalking Horse Asset Purchase Agreement included in the Amended Plan Supplement ("ADM APA") is hereby approved in all material respects as customary and reasonable.

       AA.    ADM, as Successful Bidder for the Grain Facility Assets will acquire and ultimately terminate the leases between Ag Services and the Debtors. ADM has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the executory contracts and unexpired leases that

ADM has designated for assumption by the Estates and assignment to ADM or its designee under the ADM APA, including through guarantees of all obligations of any assignee of any such executory contracts and unexpired leases.

BB.    The transactions contemplated by the ADM APA constitute a legal, valid, enforceable and effective sale and transfer of the Grain Facility Assets and shall vest ADM (or its designee) with title to the Grain Facility Assets free and clear of all Liens, Claims, encumbrances and liabilities, other than Permitted Encumbrances (as defined in the ADM APA) or as otherwise expressly set forth in this Confirmation Order.

CC.    ADM has not engaged in any conduct that would cause or permit the ADM APA or the consummation of the transactions thereunder to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code or otherwise.  ADM is a good faith purchaser of the Grain Facility Assets and entitled to all of the protections afforded to same, including pursuant to Section 363(m) of the Bankruptcy Code.

## II. <u>ORDER</u>

Based on the foregoing findings of fact and conclusions of law, it is hereby ORDERED that:

1.    Pursuant to section 1127 of the Bankruptcy Code, the Plan is hereby approved, and, pursuant to section 1129 of the Bankruptcy Code, hereby **CONFIRMED**.  A copy of the Plan, as modified by certain nonmaterial provisions announced on the record on August 30, 2011, and by that certain *Notice of Nonmaterial Modification of Second Amended Plan of Reorganization for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, Proposed by AG Services of Wisconsin, LLC, Philmar, LLC, Olsen's Mill Acquisition Company, LLC, West Pointe Bank, BNP Paribas, as Administrative Agent, and the State of Wisconsin* [Docket

No. 235], is attached hereto as **Exhibit "A"** to this Confirmation Order along with the Final Plan Supplement attached hereto as **Exhibit "B"**.

2.     To the extent not previously withdrawn, all objections to the Plan are hereby overruled for the reasons stated by the Court at the Confirmation Hearing.

3.     As of the Effective Date of the Plan, the Liquidating Trustee, the Debtors, the Plan Proponents and their representatives, attorneys, professionals, and agents are authorized and empowered to carry out all of the provisions of the Plan and to perform any act necessary to implement, effectuate, or consummate the Plan and this Confirmation Order, and to issue, execute, deliver, file, and record, as appropriate, such other contracts, agreements, documents, and to perform such other acts and execute and deliver such other documents as are consistent with and necessary or appropriate to implement, effectuate, or consummate the Plan and this Order and the transactions contemplated thereby and hereby, all without the requirement of further application to, or order of, this Court or further action by any other party.

**A.     Approval of the Sale of the Grain Facility Assets**

4.     The sale of the Lot 1 Grain Facility Assets to ADM or its designee is hereby approved for all purposes, and the Debtors are hereby authorized and directed to proceed in good faith to promptly close and consummate the sale transaction consistent with such terms (the "Grain Facility Assets Sale"). The ADM APA is hereby deemed to be binding upon the Debtors, their Estates, Creditors, any subsequent Chapter 11 or Chapter 7 trustee, and in any subsequent proceeding under these Chapter 11 Cases in the event these Chapter 11 Cases are transferred to another Court of competent jurisdiction.

5.     To the maximum extent permitted by applicable law, except as otherwise expressly provided in the ADM APA and this Confirmation Order, the buyer of the Grain Facility Assets, whether ADM / its designee, is not a successor to any Debtor or Estate by reason

of any theory of law or equity, and shall not assume or in any way be responsible for any liabilities of the Debtors or their Estates except as otherwise expressly provided in the ADM APA and this Confirmation Order.

6.     Upon closing, title to the Grain Facility Assets shall hereby vest in ADM, or its designee, free and clear of all Liens, Claims, encumbrances and liabilities, other than Permitted Encumbrances (as defined in the ADM APA) or as otherwise expressly set forth in this Confirmation Order.  If any entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens, Claims, encumbrances, and liabilities in or on the Grain Facility Assets shall not have delivered to the Debtors prior to the Effective Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all claims and liens which the entity has with respect to the Grain Facility Assets, then (a) it shall be deemed that the Court shall have ordered, pursuant to 1142(b), such entity to execute and file such statements, instruments, releases, and other documents as soon as practical, and (b) ADM or the Liquidation Trustee are hereby authorized to file, register, or otherwise record a certified copy of this Confirmation Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, encumbrances, and liabilities in or on the Grain Facility Assets of any kind or nature whatsoever, including the mortgages, deeds of trust, financing statements and other documents creating or reflecting liens. Each federal, state, and local governmental agency or department is authorized to accept for filing and/or recording any and all documents and instruments to evidence the release of all Liens, Claims, encumbrances, and liabilities in or on the Grain Facility Assets or otherwise necessary and appropriate to consummate the transactions

contemplated by the APA, MOU, and all other documents related thereto reflecting the terms of the successful bid.

7.    ADM, or its designee, as buyer of the Grain Facility Assets, is a good faith purchaser thereof and is hereby granted all of the protections afforded to same, including the protections of Section 363(m) of the Bankruptcy Code.

**B.    Executory Contracts**

8.    The Debtors are hereby authorized to assume and assign to ADM (and/or any designee of ADM), as buyer of the Grain Facility Assets, each of the executory contracts and unexpired leases identified in the ADM APA as Assumed Contracts and/or Assumed Leases. As of the closing of the sale of the Lot 1 Grain Facility Assets, the Assumed Contracts and Assumed Leases are hereby deemed to have been duly assigned to ADM (or its designee) in accordance with Section 365 of the Bankruptcy Code, notwithstanding any provision in any such Assumed Contract or Assumed Lease or any requirement of applicable law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer. Subsequent to such transfer and assignment, the Assumed Contracts and the Assumed Leases shall remain in full force and effect for the benefit of the buyer. All undisputed cure costs associated with the Assumed Contracts and Assumed Leases shall be paid upon the closing of the sale of the Grain Facility Assets.

9.    Nondebtor parties to the Assumed Contracts and Assumed Leases are hereby enjoined and forever barred from asserting against ADM, the buyer of the Grain Facility Assets, or any of such Grain Facility Assets:  (A) any default, claim, liability or other cause of action existing as of the Closing Date whether asserted or not; and/or (B) any objection to the assumption and assignment of such non debtor party's Assumed Contract and Assumed Lease.

10.     Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all other executory contracts and unexpired leases of the Debtors' Estates are hereby deemed rejected by the Debtors, as of the Petition Date, except for any executory contract or unexpired lease: (i) that has been assumed pursuant to an order of this Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, and (iii) that is specifically designated as a contract or lease to be assumed on the Cure Schedule contained in the Plan Supplement, as amended.

11.     Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 13.1 of the Plan must be filed with this Court and served upon the Liquidating Trustee no later than thirty (30) days following the Confirmation Date. All such Claims not filed within such time will be deemed disallowed, discharged, and forever barred from assertion against the Debtors and their Estates.  The Plan Proponents shall provide notice of the rejection claim bar date to such Claimants, if any.

12.     Subject to the occurrence of the Effective Date, but as of the Confirmation Date, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the Estates' assumption of the executory contracts and unexpired leases identified in the Plan Supplement is hereby approved.

13.     Except as may otherwise be agreed to by the parties, within thirty (30) days following the Effective Date, ADM shall cure any and all remaining, undisputed defaults under any executory contract or unexpired lease assumed by the Debtors and assigned to ADM pursuant to the Plan, in accordance with Section 365(b) of the Bankruptcy Code.  As to any nondebtor parties whose executory contracts or unexpired leases are included in the Cure

Schedule, and who did not object to the cure amounts set forth therein prior to the Confirmation

Hearing, the payment of the cure amounts listed in the Cure Schedule is hereby determined to be

adequate and sufficient to fulfill the Estates' obligations arising under Section 364(b)(1)(A) and

(B), with respect to same. All disputed defaults that are required to be cured and disputed cure

amounts shall be cured either within thirty (30) days of the entry of a Final Order determining

the amount, if any, of the Estates' liability with respect thereto, or as otherwise may be agreed to

by the parties.

## C.      The Liquidating Trust

14.      The Liquidating Trust Agreement is approved substantially in the form attached

to the Plan Supplement. The provisions for compensation and the reimbursement of out-of-

pocket expenses of the Liquidating Trustee and any professionals and other Persons employed by

the Liquidating Trust to assist in the administration of the Plan and Liquidating Trust, as forth in

the Plan and Liquidating Trust Agreement, are hereby approved as appropriate and reasonable.

15.      Immediately following the entry of this Confirmation Order, the Debtors and the

Liquidating Trustee shall execute the Liquidating Trust Agreement, and are hereby be deemed to

have so executed the Liquidating Trust Agreement.

16.      On the Effective Date, the Liquidating Trust shall be established and become

effective for the benefit of the holders of Allowed and unpaid Administrative Expense Claims

(including Professional Compensation and Reimbursement Claims), Priority Tax Claims, and

Claims in Classes 1, 2, 4 and 5, and other express liabilities of the Liquidating Trust set forth in

the Plan.

17.      Except as otherwise provided in the Plan, upon the Effective Date, all property of

the Debtors' Estates, other than the Exempt Assets, the Grain Facility Assets and the Retained

Assets (until said time as the Debtors' option to acquire such Retained Assets expires), shall

transfer to, and be deemed to vest in, the Liquidating Trust, free and clear of all Liens, Claims, charges, or other encumbrances (except as otherwise expressly provided in the Plan), together with all liability of the Debtors or their Estates on account of any unpaid Administrative Expense Claims (including Professional Compensation and Reimbursement Claims), Priority Tax Claims, and Claims in Classes 1, 2, 4 and 5, and other express liabilities of the Liquidating Trust set forth in the Plan. The Liquidating Trustee shall administer the Liquidating Trust for the benefit of its beneficiaries in accordance with the pertinent provisions of the Plan and Liquidating Trust Agreement, and subject thereto, distribute Net Available Liquidating Trust Proceeds in the Liquidating Trust to such beneficiaries in the order of their priority and Pro Rata in relation to other beneficial interests in the trust of the same priority.

18. As of the Effective Date of the Plan, Michael S. Polsky is hereby appointed to serve as the Liquidating Trustee of the Liquidating Trust and is hereby authorized to exercise all rights and powers of such position to effectuate the Plan and the Liquidating Trust Agreement and perform the duties of the Liquidating Trustee thereunder. As of the Effective Date of the Plan, representatives of Ag Services, BNPP, and West Pointe Bank are hereby appointed to serve as the members of the Liquidating Trust Advisory Board.

19. Notwithstanding the confirmation of the Plan and the entry of the Confirmation Order, and notwithstanding any principle of preclusion, *res judicata* or otherwise, and unless specifically and explicitly released, waived, compromised, or otherwise treated in this Plan, the Debtors and the Estates hereby retain, other than the Released Actions, any and all Claims, actions and Causes of Action held or assertable by the Debtors or their Estates immediately prior to the Confirmation Date, for transfer and vesting in the Liquidating Trust, regardless of whether they are disclosed or specifically addressed in the Plan or Disclosure Statement, and regardless

of whether such Claims, actions or Causes of Action are or were scheduled, filed, or asserted prior to the Confirmation Hearing, including, without limitation, all: (i) Claims, actions and Causes of Action against any Creditor or Person whatsoever, whether arising at law or in equity, and whether for affirmative, administrative or declaratory relief or to reduce any liability; (ii) defenses and affirmative defenses to Claims; (iii) setoffs and recoupments against any Claim, Creditor, or other Person; (iv) rights to turnover, accounting contribution, indemnification, or reimbursement against any Creditor or other person; (v) rights arising or modified by this Plan (but only as so modified); (vi) rights to any tax refund; (vii) Avoidance Actions and other Causes of Action that may arise under other applicable law against the recipients of payments reflected on the Statement of Financial Affairs filed by or for any Debtor(s) in the Chapter 11 Cases; (viii) Claims, actions and Causes of Action set forth in, or relating to any accounts receivables set forth in, any Schedules filed by or for any Debtor(s) in the Chapter 11 Cases; (ix) Claims, actions and Causes of Action listed under the Lot 3 Remaining Assets; (x) Claims, actions and Causes of Action comprising, arising in, arising under, or otherwise relating to the OMI Receivership proceeding pending in the Circuit Court of Green Lake County, Wisconsin (Cause No. 2009-CV-0025); (xi) Claims, actions and Causes of Action against Vivadell Olsen, or relating to the Class 5 Claim; and (xii) any and all other Claims or Causes of Action referenced in the Plan, or in the Disclosure Statement. As described in Paragraph F hereinabove, upon the closing of the sale by OMAC of its assets to ADM (or its designee), the parties to the OMI Receivership proceedings and related litigation pending in Green Lake County, Wisconsin, have agreed to promptly dismiss all such claims and proceedings, including those against the Debtors.

20.     As of the Effective Date of the Plan, and except as otherwise expressly provided in the Plan, all of the foregoing Claims, actions and Causes of Action shall transfer to, and be

deemed to vest in, the Liquidating Trust, for all purposes. On and following the Effective Date, the Liquidating Trustee shall have authority and standing to prosecute, enforce, pursue, sue on, settle or compromise (or decline to do any of the foregoing) any and all Liquidating Trust Claims, including the foregoing, and is hereby appointed as of the Effective Date, and in accordance with Section 1123(b)(3) of the Bankruptcy Code, as the representative of the Estates for the purpose of prosecuting, enforcing, pursuing, and settling such Causes of Action. No defense of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Claims, actions or Causes of Action as a consequence of the Plan or the entry of this Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Liquidating Trustee, the Plan Proponents, as applicable, will not pursue any and all available Causes of Action against them.

21.     In accordance with section 1146 of the Bankruptcy Code, neither the transfer and vesting of Assets in the Liquidating Trust, nor the making and/or delivery of any instrument of transfer under, or pursuant to the terms of, the Plan shall be taxed under any law imposing a stamp tax or similar tax.

**D.      Claims Administration**

22.     Professional Compensation and Reimbursement Claims. All holders of Professional Compensation and Reimbursement Claims (Claims for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date of the Plan pursuant to sections 503(b)(2), (3), (4), or (5) of the Bankruptcy Code) shall (i) file their respective applications for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days following the Effective Date.

Any such final fee application shall conform to, and comply with, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court.

23. <u>Secured Claims</u>. In full and final satisfaction of Allowed Secured Claims held by any of the Class 3 Secured Claims, each such Allowed Secured Claim shall, unless otherwise agreed, be paid in full in Cash upon the later to occur of: (i) the closing of the sale of the Grain Facility Assets or the Collateral securing such Claims; or (ii) within thirty (30) days following the Effective Date of the Plan.

i. <u>West Point Bank Claim</u>. Class 3.A is Allowed in the amount of $7,357,451.21, as of the Confirmation Date, plus the amount of attorneys fees determined by the Court to be reasonable. The first and second mortgages on the Estates' Real Estate located in Ripon, Belmont, Boscobel and Viroqua, and any other pre-petition Liens on Collateral of West Pointe securing the Class 3.A Claim and sold in Lot 1 are hereby released and transferred to the proceeds of the Lot 1 Grain Facility Assets corresponding to such Collateral. Upon the Effective Date, ADM shall escrow the sum of $173,471.77 with the Liquidating Trustee for payment of attorneys fees determined by the Court to be reasonable; provided however, that to the extent the amount of the attorneys fees determined to be reasonable by the Court is less than $173,471.77 such difference shall be returned to ADM; or if the amount of attorneys fees determined by the Court to be reasonable exceeds $173,471.77, such excess shall be payable out of the proceeds of the Liquidating Trust and distributed to West Pointe until the Allowed Claim of Class 3.A has been paid in full. After payment

by ADM, all Liens and security interests securing this Claim shall be deemed waived, released and discharged.

ii.    <u>Citizens First Bank Claim</u>. The Class 3.B Claim is Allowed in the amount of $919,467.00, as of the Confirmation Date. The first Lien mortgage on the Estates' property located in Viroqua securing the Class 3.B Claim is hereby released and transferred to the proceeds of the sale of the Lot 1 Grain Facility Assets corresponding to such Collateral. Upon the Effective Date, such cash proceeds (net of superior liens) of said Collateral shall be turned over and distributed to Citizens First Bank until the Allowed Claim of Class 3.B has been paid in full. At such time, all Liens and security interests securing this Claim shall be deemed waived, released and discharged.

iii.    <u>Farmers and Merchants Bank Claim</u>. Class 3.C holds a first lien mortgage on the real estate referred to as the School House Apartments, located in Aurora, Wisconsin. In the event Debtors purchase the School House Apartments, the Debtors shall fully assume and pay the Class 3.C Allowed Secured Claim pursuant to the loan documents that existed as of the Petition Date, and any delinquent payments on the Effective Date shall be paid, unless otherwise agreed, by extending the term of the note to the extent necessary so that the Class 3.C Creditor is fully paid with interest at the rate specified in the loan documents. Class 3.C shall retain its Liens on the Collateral pending such payment in full. In the event the Debtors do not purchase the School House Apartments within the time frame set forth

in Section 7.4 of the Plan, the School House Apartments will be transferred into the Liquidating Trust as of the forty sixth (46th) day following the Effective Date. Farmers and Merchants' shall retain the lien on its Collateral until such time as the Liquidating Trustee sells the School House Apartments to the Successful Bidder at the Auction of the Remaining Assets pursuant to the Auction Terms and Procedures, and closes such transaction. At such time, Farmers and Merchants Bank shall be deemed to have released its Lien on such Collateral. In exchange for release of its lien, the Liquidating Trustee shall pay Farmers and Merchants from the cash proceeds, up to the amount of its Allowed Secured Claim, derived from the sale of the School House Apartments.

iv. <u>State of Wisconsin Department of Transportation Claim</u>. The Class 3.D Claim is Allowed in the amount of $2,400,642.32, as of the Confirmation Date. The Liens securing this Claim, including the first priority Liens on the rail spur tracks and other personal property located at the grain facility in Oshkosh, and the lien on the Estates' storage bins, rail spur tracks and other personal property located at the "Boscobel Grain Facility," are hereby released and transferred to the proceeds of sale of the Lot 1 Grain Facility Assets corresponding to such Collateral. Upon the Effective Date, such cash proceeds (net of superior liens) of said Collateral shall be turned over and distributed to the State of Wisconsin until the Allowed Claim of Class 3.D has been paid in full. At such time, all Liens and security

interests securing this Claim shall be deemed waived, released and discharged.

v.  FCStone Claim. The Class 3.E Claim is Allowed in the amount of $369,474.00, as of the Confirmation Date. The second priority mortgages on the Estates' real estate located in Belmont, and Viroqua, are hereby released and transferred to the proceeds of sale of the Lot 1 Grain Facility Assets corresponding to such Collateral, to the same extent and priority. Upon the Effective Date, ADM or its designee, as the approved buyer of the Grain Facility Assets, shall pay FCStone an amount of cash equal to $160,000.00 in full satisfaction of its Allowed Secured Claim.  At such time, all Liens and security interests securing this Claim shall be deemed waived, released and discharged.

vi.  Alliant Claim. The Class 3.F Claim is Allowed in the amount of $125,415.05, as of the Confirmation Date.  The purchase money security interest on the M-C Tower Dryer Model 4000 ("Dryer") located at the Belmont Grain Facility is hereby released and transferred to the proceeds of sale of the Lot 1 Grain Facility Assets corresponding to such Collateral. On the Effective Date, ADM or its designee, as the approved purchaser of the Grain Facility Assets, shall pay the total amount of the Allowed Class 3.F Claim to Alliant. At such time, all Liens and security interests securing this Claim shall be deemed waived, released and discharged.

vii.  M2 Leasing Claim. The claim of Class 3.G is Allowed in the amount of $167,353.96, as of the Confirmation Date.  The Liens securing this Claim,

including the purchase money security interest on the Grain Systems including 2 105' Grain Bins, 2-48' Grain Bins and related accessories located at the Boscobel Grain Facility, are hereby released and transferred to the proceeds of sale of the Lot 1 Grain Facility Assets corresponding to such Collateral. On the Effective Date, ADM or its designee, as the approved purchaser of the Grain Facility Assets, shall pay to the 3.G Creditor an amount of cash equal to its Allowed Secured Claim. At such time, all Liens and security interests securing this Claim shall be deemed waived, released and discharged.

viii.  Philmar / West Pointe Bank Claim. The Class 3.H Claim is Allowed in the amount of $5,020,525.02 as of the Confirmation Date. The Liens securing such Claim, including the first mortgage on the Milwaukee Grain Facility, are hereby released and transferred to the proceeds of sale of the Lot 1 Grain Facility Assets corresponding to such Collateral. On the Effective Date, ADM or its designee, as the approved purchaser of the Grain Facility Assets, shall pay to the Class 3.H Creditor an amount of cash equal to its Allowed Secured Claim. At such time, all Liens and security interests securing this Claim shall be deemed waived, released and discharged.

24.  General Unsecured Claims. All General Unsecured Claims are, on the Effective Date, transferred to the Liquidating Trust. All holders of such General Unsecured Claims against the Debtors or the Estates shall have recourse exclusively to the Liquidating Trust for any recovery on such Claims. Following the satisfaction of all Allowed Administrative Expense

Claims, United States Trustee fees (including an appropriate reserve for future United States Trustee fees until the Chapter 11 Cases are closed), all Allowed Priority Tax Claims, and all Allowed Claims in Classes 2 and 3, (or in the case of Disputed Claims, have been reserved for in accordance with the pertinent provisions of the Plan and Liquidating Trust Agreement), all holders of Allowed General Unsecured Claims shall have beneficial interests in the Liquidating Trust calculated Pro Rata in relation to all other Allowed Unsecured Claims, provided, however, that the maximum aggregate amount of distributions to be made in relation to an Allowed General Unsecured Claim pursuant to this section shall be the Allowed amount of such General Unsecured Claim, without interest.

25. <u>Claim of Vivadell Olsen</u>. The alleged secured lien claim of Class 5 is a Disputed Claim. The Liquidating Trustee shall make appropriate reserve in the Liquidating Trust in order to pay such Secured Claim in full, with interest, if Allowed. Within five business days of the Effective Date, ADM shall deposit the sum of $200,000 in an escrow account held by the Liquidating Trustee for the benefit of the Class 5 Claimant until such claim is Allowed as a Secured Claim. To the extent such claim is not allowed as a Secured Claim or allowed in an amount less than $200,000, the difference between the allowed amount and $200,000 shall be reimbursed to ADM from the escrow account provided that the Liquidating Trustee shall object to such claim and seek its avoidance, subordination, disallowance and/or any other appropriate objections; provided further that any settlement of such claim that exceeds $100,000 shall be subject to the consent of ADM. Such Claim shall thereafter be treated under the provisions of the Bankruptcy Code and the Plan, to the extent and in such priority as Allowed by this Court, if any.

**E.** **Discharge, Injunction and Exculpation**

26.     The injunctions, releases, discharges, and exculpations set forth in the Plan are hereby approved as fair, equitable, reasonable, and in the best interests of the Debtors and the Estates.  Except as otherwise provided herein or in the Plan, all liens and security interests against property of the Estates are released, terminated, and nullified.

27.     Upon the Effective Date and in consideration of the distributions to be made pursuant to the Plan, except as otherwise expressly provided herein, the Debtors are hereby discharged of all Claims, rights, and liabilities that arose prior to the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Upon the transfer of the Debtors' Assets to the Liquidating Trust or to ADM as required by the Plan, the Debtors are deemed to have completed all payments required of them under the Plan, as required by Section 1141 (d)(5)(A) of the Bankruptcy Code.  The Debtors will engage in the business of farming on their respective farms after the Effective Date.  Upon the Effective Date, all Persons and Entities are forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from asserting against the Debtors, the Plan Proponents, the Liquidating Trust, ADM, their respective successors or assigns, or their respective interests in property, any discharged Claim against the Debtors, any other or further Claims, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefore were known or existed prior to the Confirmation Date regardless of whether a proof of Claim was filed, whether the holder thereof voted to accept or reject the Plan, or whether the Claim is an Allowed Claim.

28.     As of the Effective Date of the Plan, and except as otherwise expressly provided in the Plan, all pre-petition Claims and liabilities of the Debtors shall be satisfied solely and exclusively from the Liquidating Trust in accordance with the provisions of the Plan, and none of

the Debtors or their Estates shall have any liability for or on account of any such pre-petition Claims and liabilities.

29.     Except as otherwise provided in the Plan or in this Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder are deemed to be in exchange for and in complete satisfaction and discharge of all existing debts and Claims, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their Assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, on the Effective Date, all existing Claims against the Debtors are deemed to be satisfied and discharged, and all Holders of Claims are precluded and enjoined from asserting against the Debtors or the Liquidating Trust, or any of their respective assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a proof of Claim.

30.     In accordance with section 15.7 of the Plan, none of the Plan Proponents, the Liquidating Trustee, ADM, the Debtors, or any of their respective directors, officers, employees, members, attorneys, consultants, advisors, and agents (but solely in their capacities as such), shall have or incur any liability to any holder of a Claim of any other Entity for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, confirmation, approval, or administration of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the property to be distributed under the Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions shall

not affect the liability of (a) any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, (b) the professionals of the Debtors, or the Liquidating Trustee, to their respective clients pursuant to applicable codes of professional conduct, (c) any of such Persons with respect to any act or omission prior to the Petition Date, except as otherwise expressly set forth elsewhere in the Plan or (d) any Entity with respect to their obligations pursuant to the Plan. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## F. General

31.     Notwithstanding the entry of this Confirmation Order, the automatic stay provided by section 362(a) of the Bankruptcy Code shall continue to be effective and enforceable until the Effective Date of the Plan.

32.     Notwithstanding the entry of this Order and the occurrence of the Effective Date of the Plan, the Court shall retain jurisdiction, to the fullest extent legally permitted, over the Chapter 11 Cases, all proceedings arising under, arising in, or related to the Chapter 11 Cases, the Plan, this Order, and administration of the Liquidating Trust, including, without limitation, the matters set forth in Section 16.1 of the Plan.  Such retention does not affect the finality of this Confirmation Order.

33.     Promptly upon entry of this Confirmation Order, the Debtors, at the Estates' expense, shall serve on all known parties-in-interest and holders of Claims notice of the entry of this Confirmation Order and all relevant deadlines and dates under the Plan.

34.     The provisions of this Confirmation Order are nonseverable and mutually dependent.

35.     Notwithstanding Rules 3020(e) 6004(h) and/or 6006(d), of the Federal Rules of Bankruptcy Procedure, this Confirmation Order shall be effective and enforceable immediately upon entry and the Debtors, Plan Proponents and Liquidating Trustee are authorized to consummate the Plan immediately after entry of this Confirmation Order.

36.     Upon the Effective Date of the Plan, the Liquidating Trustee shall promptly file a notice with the Court indicating that the Plan has become effective, specifying the date of the Effective Date and the date of each of the deadlines established by this Order in reference to the Effective Date, and shall further serve a copy of such notice on all parties in interest identified on the court-approved Official Service List maintained in the Chapter 11 Cases and all holders of Claims.

#####

6752427_7

# EXHIBIT "A"

**Creditors' Second Amended Plan of Reorganization with Nonmaterial Modifications as Stated on the Record on August 30, 2011 and Set Forth in Such Notice of Nonmaterial Modification of Second Amended Plan of Reorganization [Docket No. 235] for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, Proposed by Ag Services of Wisconsin, LLC, Philmar, LLC, Olsen's Mill Acquisition Company, LLC, West Pointe Bank, BNP Paribas, as Administrative Agent, and the State of Wisconsin**

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re

DAVID A. and BECKY S. OLSEN, and      Case No. 10-39796
PAUL E. and CHERYL R. OLSEN,      Chapter 11

          Debtors.           Jointly Administered

---

### CREDITORS' SECOND AMENDED PLAN OF REORGANIZATION WITH NONMATERIAL MODIFICATIONS AS STATED ON THE RECORD ON AUGUST 30, 2011 AND SET FORTH IN SUCH NOTICE OF NONMATERIAL MODIFICATION OF SECOND AMENDED PLAN OF REORGANIZATION [DOCKET NO. 235] FOR DAVID A. AND BECKY S. OLSEN, AND PAUL E. AND CHERYL R. OLSEN, PROPOSED BY AG SERVICES OF WISCONSIN, LLC, PHILMAR, LLC, OLSEN'S MILL ACQUISITION COMPANY, LLC, WEST POINTE BANK, BNP PARIBAS, AS ADMINISTRATIVE AGENT, AND THE STATE OF WISCONSIN

---

Drafted by:                          Dated: August 30, 2011
Russell L. Munsch               Thomas M. Olejniczak
Joseph J. Wielebinski          Colleen M. Kelly
Munsch Hardt Kopf & Harr, PC   Liebmann, Conway, Olejniczak & Jerry, S.C.
3800 Lincoln Plaza           231 S. Adams St.
500 North Akard Street         Green Bay, WI 54301
Dallas, TX 75201-6659         Telephone: (920) 437-0476
Telephone: (214) 855-7500

                             *ATTORNEYS FOR AG SERVICES OF*
Timothy Nixon               *WISCONSIN, LLC, PHILMAR, LLC and OMAC,*
Carla Andres                *LLC*
Godfrey Kahn
333 Main Street, Suite 600       Paul A. Croake
Green Bay, WI 54301          Denis Bartell
Telephone: (920) 432-9300       DeWitt Ross & Stevens, S.C.
                               2 E. Mifflin Street, Suite 600
                               Madison, WI 53073
*ATTORNEYS FOR BNP PARIBAS,*
*AS ADMINISTRATIVE AGENT*       *ATTORNEYS FOR WEST POINTE BANK*

Maria S. Lazar, Assistant Attorney General
Wisconsin Department of Justice
17 W. Main Street
Madison, WI 53707

*ATTORNEYS FOR STATE OF WISCONSIN*
*DEPARTMENT OF TRANSPORTATION*

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................. 1
1.1     Administrative Expense Claim ...................................................................... 1
1.2     ADM ............................................................................................................. 1
1.3     Allowed ........................................................................................................ 1
1.4     Allowed Secured Claim ............................................................................... 1
1.5     Allowed Unsecured Claim ........................................................................... 2
1.6     Assets ........................................................................................................... 2
1.7     Asset Purchase Agreement ........................................................................... 2
1.8     Auction(s) .................................................................................................... 2
1.9     Avoidance Actions ....................................................................................... 2
1.10    Backup Bid ................................................................................................... 2
1.11    Bankruptcy Code .......................................................................................... 2
1.12    Belmont Grain Facility ................................................................................ 2
1.13    Berlin Feed ................................................................................................... 2
1.14    Bid Deadline ................................................................................................ 2
1.15    Boscobel Grain Facility ............................................................................... 2
1.16    Break-Up Fee ............................................................................................... 2
1.17    Breathing Room Farm .................................................................................. 2
1.18    Business Day ................................................................................................ 3
1.19    Cash .............................................................................................................. 3
1.20    Cash Equivalent ........................................................................................... 3
1.21    Causes of Action .......................................................................................... 3
1.22    Chapter 11 Cases .......................................................................................... 3
1.23    Claim ............................................................................................................ 3
1.24    Class ............................................................................................................. 3
1.25    Claim Holder ................................................................................................ 3
1.26    Collateral ..................................................................................................... 3
1.27    Collateral Proceeds ...................................................................................... 3
1.28    Confirmation Date ........................................................................................ 3
1.29    Confirmation Hearing .................................................................................. 3
1.30    Confirmation Order ...................................................................................... 3
1.31    Creditor ........................................................................................................ 4
1.32    Creditors' Plan or Plan ................................................................................. 4
1.33    Cure Schedule .............................................................................................. 4
1.34    Debtors ......................................................................................................... 4
1.35    Debtors in Possession .................................................................................. 4
1.36    Deficiency Claim .......................................................................................... 4
1.37    Disbursement Account(s) ............................................................................. 4
1.38    Disbursing Agent ......................................................................................... 4
1.39    Disclosure Statement ................................................................................... 4
1.40    Disclosure Statement Order ......................................................................... 4
1.41    Disputed ....................................................................................................... 4
1.42    Disputed Claim Amount ............................................................................... 4
1.43    Disputed Claims Reserve ............................................................................. 5
1.44    Earnest Money Deposit ................................................................................ 5

i

1.45 Effective Date .......................................................................................................... 5
1.46 Entity....................................................................................................................... 5
1.47 Exempt Assets ........................................................................................................ 5
1.48 Excess Cash ............................................................................................................ 5
1.49 FCStone ................................................................................................................... 5
1.50 Final Order.............................................................................................................. 5
1.51 General Unsecured Claim ....................................................................................... 6
1.52 Grain Facility Assets............................................................................................... 6
1.53 Grain Facility Assets Auction Procedures ............................................................. 6
1.54 Grain Facility Assets Auction ................................................................................ 6
1.55 Grain Facility Assets MOU .................................................................................... 6
1.56 Holder ..................................................................................................................... 6
1.57 Insider and Affiliate Claims................................................................................... 6
1.58 IRS .......................................................................................................................... 6
1.59 Lease Agreement and Option ................................................................................. 6
1.60 Lien ......................................................................................................................... 6
1.61 Liquidating Trust .................................................................................................... 6
1.62 Liquidating Trust Agreement ................................................................................. 7
1.63 Liquidating Trust Assets......................................................................................... 7
1.64 Liquidating Trust Advisory Board.......................................................................... 7
1.65 Liquidating Trust Claims ........................................................................................ 7
1.66 Liquidating Trust Fund Reserve Amount ............................................................... 7
1.67 Liquidating Trust Funds .......................................................................................... 7
1.68 Liquidating Trust Interests ...................................................................................... 7
1.69 Liquidating Trustee.................................................................................................. 7
1.70 Lot 1 ........................................................................................................................ 7
1.71 Lot 2 ........................................................................................................................ 7
1.72 Lot 3 ........................................................................................................................ 7
1.73 Milwaukee Grain Facility ....................................................................................... 7
1.74 Net Available Liquidating Trust Proceeds .............................................................. 8
1.75 Non-Exempt Assets ................................................................................................. 8
1.76 OMAC ..................................................................................................................... 8
1.77 OMAC Business ...................................................................................................... 8
1.78 OMI Receivership.................................................................................................... 8
1.79 Oshkosh Personal Property ..................................................................................... 8
1.80 Person ...................................................................................................................... 8
1.81 Petition Date ........................................................................................................... 8
1.82 Philmar, LLC or Philmar ........................................................................................ 8
1.83 Plan Cash ................................................................................................................ 8
1.84 Plan Currency .......................................................................................................... 8
1.85 Plan Proponents ...................................................................................................... 8
1.86 Plan Supplement ..................................................................................................... 8
1.87 Ponderosa Partnership ............................................................................................ 8
1.88 Priority Non-Tax Claim .......................................................................................... 8
1.89 Priority Tax Claim ................................................................................................... 9
1.90 Pro Rata Share ........................................................................................................ 9
1.91 Professional Compensation and Reimbursement Claim.......................................... 9
1.92 Qualifying Bid ........................................................................................................ 9
1.93 Qualifying Bidder ................................................................................................... 9

ii

| | | |
|---|---|---|
| 1.94 | Released Actions | 9 |
| 1.95 | Remaining Assets | 9 |
| 1.96 | Remaining Asset Auction Procedures | 9 |
| 1.97 | Remaining Assets Auction | 9 |
| 1.98 | Remaining Assets Bid Deadline | 9 |
| 1.99 | Retained Assets | 9 |
| 1.100 | Ripon Grain Facility | 9 |
| 1.101 | Sale Order | 10 |
| 1.102 | Schedules | 10 |
| 1.103 | School House Apartments | 10 |
| 1.104 | Secured Claim | 10 |
| 1.105 | Secured Tax Claim | 10 |
| 1.106 | Stalking Horse APA | 10 |
| 1.107 | Stalking Horse Bidder | 10 |
| 1.108 | Stevens Point Personal Property | 10 |
| 1.109 | Successful Bid | 10 |
| 1.110 | Successful Bidder | 10 |
| 1.111 | Tax Code | 10 |
| 1.112 | Unsecured Claim | 10 |
| 1.113 | Utica Energy, LLC Interest | 10 |
| 1.114 | Utica Industries Interest | 11 |
| 1.115 | Viroqua Grain Facility | 11 |
| 1.116 | WP Belmont Note | 11 |
| 1.117 | WP Personal Notes | 11 |
| 1.118 | WP Ripon Note | 11 |
| 1.119 | WP Grain Facility Notes | 11 |
| 1.120 | Interpretation; Application of Definitions; Rules of Construction | 11 |

ARTICLE II TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS, PRIORITY TAX CLAIMS ........... 11

| | | |
|---|---|---|
| 2.1 | Administrative Expense Claims Other than Professionals | 11 |
| 2.2 | Professional Compensation and Reimbursement Claims | 12 |
| 2.3 | Priority Tax Claims | 12 |

ARTICLE III CLASSIFICATION OF CLAIMS ........................................................ 12

ARTICLE IV TREATMENT OF CLAIMS ............................................................. 13

| | | |
|---|---|---|
| 4.1 | Class 1: Priority Non-Tax Claims | 13 |
| 4.2 | Class 2: Secured Tax Claims | 13 |
| 4.3 | Class 3: Secured Claims | 14 |
| 4.4 | Class 4: General Unsecured Claims | 18 |
| 4.5 | Class 5: Vivadell Olsen | 19 |

ARTICLE V IDENTIFICATION OF CLAIMS IMPAIRED AND NOT IMPAIRED BY THE CREDITORS' PLAN ............................................................................................ 19

| | | |
|---|---|---|
| 5.1 | Controversy Concerning Impairment | 19 |

ARTICLE VI ACCEPTANCE OR REJECTION OF CREDITORS' PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS ...................................... 19

| | 6.1 | Impaired Classes to Vote on Plan | 19 |
| | 6.2 | Acceptance by Class of Creditors | 19 |
| | 6.3 | Cramdown | 20 |

ARTICLE VII IMPLEMENTATION OF THE PLAN ............................................................ 20
| | 7.1 | Non-Substantive Consolidation | 20 |
| | 7.2 | Vesting of Assets in the Liquidating Trust | 20 |
| | 7.3 | Auction Terms and Procedures | 20 |
| | 7.4 | Purchase of Retained Assets by the Debtors | 28 |
| | 7.5 | Satisfaction of Claims from Liquidating Trust | 29 |
| | 7.6 | Post Confirmation Action | 30 |
| | 7.7 | Settlement of Green Lake County Litigation | 30 |
| | 7.8 | Cancellation of Debt and Related Obligations | 30 |
| | 7.9 | Effectuating Documents and Further Transactions | 30 |

ARTICLE VIII PRESERVATION AND PROSECUTION OF CAUSES OF ACTION HELD
BY THE DEBTORS ............................................................................................................ 31
| | 8.1 | Preservation and Prosecution of Causes of Action | 31 |

ARTICLE IX RELEASE OF DEBTORS AND CERTAIN INSIDERS ..................................... 31
| | 9.1 | Release | 31 |

ARTICLE X PROVISION FOR TREATMENT OF DISPUTED CLAIMS OR ASSERTED
ADMINISTRATIVE EXPENSES UNDER THE PLAN ........................................................ 31
| | 10.1 | Objections to Claims; Prosecution of Disputed Claims or Asserted Administrative Expenses | 31 |
| | 10.2 | No Distributions Pending Allowance | 32 |
| | 10.3 | Estimation of Claims | 32 |
| | 10.4 | Payments and Distributions on Disputed Claims | 32 |

ARTICLE XI THE LIQUIDATING TRUST ........................................................................... 33
| | 11.1 | Establishment of the Liquidating Trust | 33 |
| | 11.2 | Purpose of the Liquidating Trust | 34 |
| | 11.3 | Funding Expenses of the Liquidating Trust | 34 |
| | 11.4 | Transfer of Assets | 34 |
| | 11.5 | Litigation; Responsibilities of Liquidating Trustee | 34 |
| | 11.6 | Investment Powers | 35 |
| | 11.7 | Annual Distribution; Withholding | 35 |
| | 11.8 | Reporting Duties | 36 |
| | 11.9 | Liquidating Trust Implementation | 37 |
| | 11.10 | Registry of Beneficial Interests | 37 |
| | 11.11 | Termination | 37 |
| | 11.12 | Powers of the Liquidating Trustee as Disbursing Agent | 37 |
| | 11.13 | Exculpation | 37 |

ARTICLE XII PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN ............ 38
| | 12.1 | Delivery of Distributions | 38 |
| | 12.2 | Interim and Final Distributions of Net Available Funds | 38 |
| | 12.3 | Conditions to Distributions; Warranty of Entitlement | 38 |

iv

| | | |
|---|---|---|
| 12.4 | Undeliverable Distributions | 39 |
| 12.5 | Time Bar to Cash Payments | 39 |
| 12.6 | Distributions After Effective Date | 39 |
| 12.7 | Setoffs | 39 |
| 12.8 | Allocation of Plan Distributions Between Principal and Interest | 40 |
| 12.9 | Limited Recoveries | 40 |

ARTICLE XIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................ 40

| | | |
|---|---|---|
| 13.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases | 40 |
| 13.2 | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 41 |
| 13.3 | Inclusiveness | 41 |
| 13.4 | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 41 |
| 13.5 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 41 |
| 13.6 | Insurance Policies | 41 |

ARTICLE XIV CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN; IMPLEMENTATION PROVISIONS ........................ 42

| | | |
|---|---|---|
| 14.1 | Conditions Precedent to Effective Date of the Plan | 42 |
| 14.2 | Waiver of Conditions Precedent | 42 |
| 14.3 | Notice of the Effective Date | 42 |

ARTICLE XV EFFECT OF CONFIRMATION ........................ 42

| | | |
|---|---|---|
| 15.1 | Binding Effect of Plan | 42 |
| 15.2 | Title to and Vesting of Assets | 43 |
| 15.3 | Discharge of Claims | 43 |
| 15.4 | Discharge of Debtors | 43 |
| 15.5 | Injunction on Claims | 43 |
| 15.6 | Term of Existing Injunctions or Stays | 44 |
| 15.7 | Exculpation | 44 |
| 15.8 | Preservation of Causes of Action / Reservation of Rights. | 45 |
| 15.9 | Injunction on Causes of Action | 45 |
| 15.10 | Releases by the Debtors | 45 |
| 15.11 | Releases by Claim Holders | 45 |

ARTICLE XVI RETENTION OF JURISDICTION ........................ 46

| | | |
|---|---|---|
| 16.1 | Retention of Jurisdiction | 46 |

ARTICLE XVII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 47

| | | |
|---|---|---|
| 17.1 | Modification of the Plan | 47 |
| 17.2 | Revocation or Withdrawal of the Plan | 48 |

ARTICLE XVIII MISCELLANEOUS PROVISIONS ........................ 48

| | | |
|---|---|---|
| 18.1 | Effectuating Documents and Further Transactions | 48 |
| 18.2 | Withholding and Reporting Requirements | 48 |
| 18.3 | Payment of Statutory Fees | 48 |
| 18.4 | Expedited Tax Determination | 48 |

v

| 18.5 | Post-Confirmation Date Fees and Expenses | 48 |
|------|------------------------------------------|-----|
| 18.6 | Substantial Consummation | 49 |
| 18.7 | Severability | 49 |
| 18.8 | Governing Law | 49 |
| 18.9 | Time | 49 |
| 18.10 | Binding Effect | 49 |
| 18.11 | Exhibits/Schedules | 49 |
| 18.12 | Notices | 49 |
| 18.13 | Closing of the Chapter 11 Cases | 51 |
| 18.14 | Section Headings | 51 |
| 18.15 | Exemption from Registration | 51 |
| 18.16 | Exemption from Transfer Taxes | 51 |
| 18.17 | Inconsistencies | 51 |

West Pointe Bank, Olsen's Mill Acquisition Company, LLC, Ag Services of Wisconsin, LLC ("Ag Services"), the State of Wisconsin, BNP Paribas ("BNPP") and Philmar, LLC, creditors in the above-captioned Chapter 11 bankruptcy cases (the "Chapter 11 Cases") filed by Paul E. and Cheryl R. Olsen, and David A. and Becky S. Olsen, individually (together, "Olsens" or the "Debtors"), hereby propose the following Second Amended Creditors' Plan of Reorganization (as defined herein, "Creditors' Plan" or "Plan") for the resolution of all outstanding Claims against and Interests in all of the Debtors in the Chapter 11 Cases.

## ARTICLE I
## DEFINITIONS

As used in the Creditors' Plan, the following terms shall have the respective meanings specified below:

**1.1     Administrative Expense Claim** means (a) any Claim constituting a cost or expense of administration of the Chapter 11 Cases asserted or authorized to be asserted in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code during the period up to and including the Effective Date and (b) any fees or charges assessed against the Debtors' estates pursuant to section 1930, chapter 123, Title 28, United States Code.

**1.2     ADM** means Archer Daniels Midland Company, the stalking horse bidder for the Grain Facility Assets of Lot 1.

**1.3     Allowed** means, with reference to any Claim, (i) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed or objection thereto interposed, (ii) any Claim that is not Disputed, (iii) any Claim that is compromised, settled, or otherwise resolved pursuant to a Final Order of the Bankruptcy Court, or (iv) any Claim that has been allowed hereunder or by Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, an "Allowed Administrative Expense Claim" (other than of the kind specified in section 503(b)(1)(B) of the Bankruptcy Code which shall be afforded interest at a rate determined under applicable non-bankruptcy law in accordance with section 511 of the Bankruptcy Code) or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

**1.4     Allowed Secured Claim** means all or that portion of a Secured Claim which (a) is or becomes an Allowed Claim secured by a valid, perfected, enforceable and unavoidable Lien on Collateral, or that is subject to setoff under Section 553 of the Bankruptcy Code, and (b) has been or hereafter is duly established in the Chapter 11 Cases as a Secured Claim, but only to the extent of the value of the interest of the holder of such Secured Claim in the Debtors' interest in the assets which the Bankruptcy Court finds to be valid Collateral for such Claim (except if the Class in which such Claim is classified validly and timely makes the election provided in Section 1111(b)(2) of the Bankruptcy Code, in which case the entire amount of the Allowed Claim shall be an Allowed Secured Claim).

1

**1.5** **Allowed Unsecured Claim** means all or that portion of an Unsecured Claim which is or becomes an Allowed Claim.

**1.6** **Assets** means all right, title and interest in and to any and all property of every kind of nature, whether tangible or intangible, owned by the Debtors as of the Effective Date, including, but not limited to, all Causes of Action.

**1.7** **Asset Purchase Agreement** means the agreement to be included in the Plan Supplement subject to approval of the Liquidating Trustee, the Bankruptcy Court, or the Plan Proponents, as applicable, that all interested parties shall execute and deliver to the Liquidating Trustee or Bankruptcy Court prior to any of the various Auctions, as applicable, as part of the process to be deemed a Qualifying Bidder.

**1.8** **Auction(s)** shall have the meanings set forth in Article VII herein.

**1.9** **Avoidance Actions** means Causes of Action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, Causes of Action arising under sections 502(d), 510, 542, 543, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

**1.10** **Backup Bid** means the second place bidder as described in Article VII of the Creditors' Plan.

**1.11** **Bankruptcy Code** means chapter 11 of title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases. Bankruptcy Court means the United States Bankruptcy Court for the Eastern District of Wisconsin having jurisdiction over the Chapter 11 Cases. Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under title 28 of the United States Code, and any local rules of the Bankruptcy Court, as amended, as applicable to the Chapter 11 Cases.

**1.12** **Belmont Grain Facility** shall mean the Debtors' interests in the real and personal property and any leasehold interest on the property located at 898 First Capital Drive, Belmont, Wisconsin 53510.

**1.13** **Berlin Feed** means Berlin Feed, Inc., a feed mill operating in Berlin, Wisconsin in which each of the sets of Debtors hold a 25% ownership interest.

**1.14** **Bid Deadline** shall mean the date five (5) days prior to the Confirmation Hearing by which any interested party must submit the information set forth in Article VII of the Creditors' Plan necessary to be eligible to receive the Qualifying Bidder designation.

**1.15** **Boscobel Grain Facility** shall mean the Debtors' interest in the real and personal property and any leasehold interests on the property located at 6250 Borden Road, Boscobel, Wisconsin 53805.

**1.16** **Break-Up Fee** has the meaning as described in Article VII of the Creditors' Plan.

**1.17** **Breathing Room Farm** shall mean the approximately 160 acres of farmland located in the Town of Aurora, Wisconsin.

**1.18** **Business Day** means any day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

**1.19** **Cash** means the lawful currency of the United States of America.

**1.20** **Cash Equivalent** means securities or instruments of the type permitted under section 345 of the Bankruptcy Code.

**1.21** **Causes of Action** means, without limitation, any and all actions, causes of action, proceedings, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, objections to Claims, benefits of subordination of Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

**1.22** **Chapter 11 Cases** means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, styled In The Matters of David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, Chapter 11 Case No. 10-39796-svk (Jointly Administered), currently pending before the Bankruptcy Court.

**1.23** **Claim** shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

**1.24** **Class** means a category of Claims as set forth in Article IV of the Plan.

**1.25** **Claim Holder** means the Holder of an Allowed Claim.

**1.26** **Collateral** means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.27** **Collateral Proceeds** means any and all Cash and non-Cash proceeds generated from the sale of other disposition of Collateral.

**1.28** **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases.

**1.29** **Confirmation Hearing** means the date on which the Bankruptcy Court decides whether or not the proposed Chapter 11 plan is feasible and meets legal requirements. Confirmation Hearing shall also be the date on which the Bankruptcy Court conducts the Grain Facility Assets Auction as provided for in Article VII of the Creditors' Plan.

**1.30** **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

3

**1.31** **Creditor** means any Entity holding a Claim against the Debtors' estates or, pursuant to section 102(2) of the Bankruptcy Code, against property of the Debtors, that arose or is deemed to have arisen prior to or as of the Petition Date.

**1.32** **Creditors' Plan or Plan** means the Second Amended Plan of Reorganization dated July 29 2011 as proposed by the State of Wisconsin, Philmar, LLC, West Pointe Bank, Ag Services, BNPP, and OMAC.

**1.33** **Cure Schedule** means the Schedule of Executory Contracts to be assumed as set forth in the Plan Supplement.

**1.34** **Debtors** means David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen.

**1.35** **Debtors in Possession** means the Debtors as debtors in possession pursuant to sections 1101(1) and 1107(a) of the Bankruptcy Code.

**1.36** **Deficiency Claim** means the amount of a Secured Claim which is not an Allowed Secured Claim; provided, however, that if the Secured Claim is within a Class that validly and timely makes the election provided in section 1111(b)(2) of the Bankruptcy Code, there shall be no Deficiency Claim with respect to such Secured Claim.

**1.37** **Disbursement Account(s)** means the account(s) to be established by the Liquidating Trust on the Effective Date in accordance with Section 10.12 of the Plan, together with any interest earned thereon.

**1.38** **Disbursing Agent** means, solely to effectuate distributions pursuant to the Creditors' Plan, the Liquidating Trustee or such other Entity as may be designated in the Confirmation Order.

**1.39** **Disclosure Statement** means the disclosure statement for the Creditors' Plan approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code.

**1.40** **Disclosure Statement Order** means the Final Order of the Bankruptcy Court approving the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code.

**1.41** **Disputed** means, with reference to (a) any Claim, proof of which was timely and properly filed, or an Administrative Expense Claim, which is disputed under the Plan or as to which a timely objection has been filed pursuant to section 502(d) or 510 of the Bankruptcy Code, or otherwise, and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018 has been interposed, and which objection and/or request for estimation has not been withdrawn or determined by a Final Order or (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. A Claim that is Disputed by the Plan Proponents as to its amount only shall be deemed Allowed in the amount the Plan Proponents admit owing, if any, and Disputed as to the excess.

**1.42** **Disputed Claim Amount** means the lesser of (a) the liquidated amount set forth in the proof of claim filed with the Bankruptcy Court relating to a Disputed Claim, (b) if the Bankruptcy Court has estimated such Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, the amount of a Disputed Claim as estimated by the Bankruptcy Court, and (c)

4

the amount of such Disputed Claim allowed by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code, or zero, if such Disputed Claim is disallowed by the Bankruptcy Court pursuant to such section, in either case, regardless of whether the order or judgment allowing or disallowing such Claim has become a Final Order; provided, however, that, in the event that such Claim has been disallowed, but the order of disallowance has not yet become a Final Order, the Bankruptcy Court may require the Disbursing Agent to reserve Plan Currency in an amount that would be attributed to such Claim if it were an Allowed Claim, or a lesser amount, to the extent that the Bankruptcy Court, in its sole and absolute discretion, determines such reserve is necessary to protect the rights of such holder under all of the facts and circumstances relating to the order of disallowance and the appeal of such holder from such order.

      **1.43**    **Disputed Claims Reserve** means the reserve on account of Disputed Claims.

      **1.44**    **Earnest Money Deposit** shall mean funds that Interested Parties shall deposit along with their executed Asset Purchase Agreement pursuant to the applicable Auction Terms and Procedures in Article VII of the Creditors' Plan to be held in a separate interest-bearing account administered by the Liquidating Trustee until consummation of the subject transaction.

      **1.45**    **Effective Date** means the first (1st) Business Day following the Confirmation Date on which (a) the conditions to effectiveness of the Plan set forth in Section 14.1 of the Plan have been satisfied or otherwise waived in accordance with Section 14.2 of the Plan and (b) the effectiveness of the Confirmation Order shall not be stayed.

      **1.46**    **Entity** means a Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the Office of the United States Trustee, or any other entity.

      **1.47**    **Exempt Assets** shall mean those Assets of the Debtors that were claimed exempt by each of the Debtors on  Schedule C of the Debtors' Schedules and Statement of Financial Affairs, including the full value of the homestead of each of the Debtors.  Such assets shall conclusively be deemed exempt pursuant to § 522(b) of the Bankruptcy Code and Chapter 815 of the Wisconsin Statutes.

      **1.48**    **Excess Cash** shall mean the surplus cash left over in the Debtors' accounts from the monthly lease payments received by the Debtors from Ag Services after reasonable living expenses and after distributions are made to the secured creditors, as well as all non-exempt Cash and Cash Equivalents of the Debtors' estates on the Effective Date.

      **1.49**    **FCStone** means, collectively, FCStone Financial Inc. and FCStone Merchant Services, LLC.

      **1.50**    **Final Order** means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of

5

competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

      **1.51**   **General Unsecured Claim** means an Unsecured Claim not otherwise classified under this Creditors' Plan.

      **1.52**   **Grain Facility Assets** shall mean the Viroqua Grain Facility, Boscobel Grain Facility, Belmont Grain Facility, Ripon Grain Facility, Milwaukee Grain Facility, Breathing Room Farm, real property known as McGregor Shed, the Debtors' ownership interests in Ponderosa Partnership and Berlin Feed, and all associated machinery, equipment, fixtures and personal property, including but not limited to, the Oshkosh Personal Property and Stevens Point Personal Property.

      **1.53**   **Grain Facility Assets Auction Procedures** shall have the meaning described in Article VII of the Creditors' Plan.

      **1.54**   **Grain Facility Assets Auction** shall mean the sale conducted on the Confirmation Date, supervised by the Bankruptcy Court, for the sale of the Grain Facility Assets.

      **1.55**   **Grain Facility Assets MOU** shall mean the agreement dated July 22, 2011 between Olsen's Mill Acquisition Company, LLC, Ag Services, BNPP, and ADM for the purchase of the Lot 1 Grain Facility Assets, and the grain and agronomy business of OMAC and Ag Services.

      **1.56**   **Holder** means any person or entity holding a Claim.

      **1.57**   **Insider and Affiliate Claims** means any claim of an Entity which qualifies as an Insider (as that term is defined in section 101(31) of the Bankruptcy Code) or Affiliate (as that term is defined in section 101(2) of the Bankruptcy Code) of the Debtors.

      **1.58**   **IRS** means the Internal Revenue Service, an agency of the United States Department of Treasury.

      **1.59**   **Lease Agreement and Option** shall mean the contract between the Debtors and M2 Leasing as fully described in Article IV. Amounts outstanding under the contract shall be paid by the Successful Bidder for the Grain Facility Assets on the Effective Date.

      **1.60**   **Lien** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

      **1.61**   **Liquidating Trust** means the Entity to be created on the Effective Date in accordance with Section 10.1 of the Plan and the Liquidating Trust Agreement for the benefit of holders of Allowed Secured Claims and Allowed Unsecured Claims.

**1.62**   **Liquidating Trust Agreement** means the trust agreement, substantially in the form contained in the Plan Supplement.

**1.63**   **Liquidating Trust Assets** means all Non-Exempt Assets of the Debtors' estates, the Liquidating Trust Funds, and any other assets acquired by the Liquidating Trust after the Effective Date or pursuant to the Plan.

**1.64**   **Liquidating Trust Advisory Board** means the group of three (3) Persons consisting of Ag Services, BNPP and one (1) other selected by the Plan Proponents, and approved prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the Liquidating Trust Agreement, who shall have the authority set forth in the Liquidating Trust Agreement.

**1.65**   **Liquidating Trust Claims** means all Causes of Action asserted, or which may be asserted, by or on behalf of the Debtors or the Debtors' estates, in respect of matters arising prior to the Effective Date, including, but not limited to, Causes of Action in respect of Avoidance Actions, but specifically excluding the Released Actions.

**1.66**   **Liquidating Trust Fund Reserve Amount** means a reserve in an amount to be fixed from time to time by the Liquidating Trust Advisory Board, which reserve shall be in place to fund all expenses of the Liquidating Trust, including, but not limited to, the fees and expenses of the professionals selected pursuant to the Liquidating Trust Agreement.

**1.67**   **Liquidating Trust Funds** means the Excess Cash contributed by the Debtors upon formation of the Liquidating Trust used to initially fund the Liquidating Trust pursuant to Section 10.3 of the Plan and the amount to be contributed by the Successful Bidder for the Grain Facility Assets on the Effective Date.

**1.68**   **Liquidating Trust Interests** means the beneficial interests in the Liquidating Trust to be deemed distributed to holders of Allowed Unsecured Claims and Classes 3.C and 5.

**1.69**   **Liquidating Trustee** means the Entity, solely in its capacity as Liquidating Trustee, approved prior to the Effective Date by the Bankruptcy Court to administer the Liquidating Trust in accordance with the terms and provisions of Article X of the Creditors' Plan and the Liquidating Trust Agreement.

**1.70**   **Lot 1** shall consist of the Grain Facility Assets as more specifically detailed in Section 7.3.1(a) of the Creditors' Plan.

**1.71**   **Lot 2** shall consist of the Non-Exempt Assets of the Debtors as more specifically detailed in Section 7.3.1(b) of the Creditors' Plan.

**1.72**   **Lot 3** shall consist of the Assets of the Debtors as more specifically detailed in Section 7.3.1(c) of the Creditors' Plan.

**1.73**   **Milwaukee Grain Facility** shall mean the Debtors' interests in the real and personal property and any leasehold interests on the property located at 920 R.W. Bruce Street, Milwaukee, Wisconsin 53233.

**1.74    Net Available Liquidating Trust Proceeds** means at any given time, the Cash on hand in the Liquidating Trust, constituting Liquidating Trust Funds but excluding Collateral Proceeds.

**1.75    Non-Exempt Assets** shall mean those assets in Lots 1, 2 and 3, as more specifically set forth in Article VII of the Creditors' Plan.

**1.76    OMAC** means Olsen's Mill Acquisition Company, LLC.

**1.77    OMAC Business** shall mean the grain and agronomy business operated by Olsen's Mill Acquisition Company, LLC and Ag Services which is comprised of the OMAC Assets, receivables, inventory (including, without limitation, grain inventory) and other additional assets.

**1.78    OMI Receivership** shall mean the proceeding filed under Chapter 128 of the Wisconsin Statutes, in the Circuit Court for Green Lake County, Wisconsin, Case Number 09-CV-0025 for the assets of Olsen's Mill, Inc.

**1.79    Oshkosh Personal Property** shall mean the Debtors' interest in property located at 2550 Clairville Road, Oshkosh, Wisconsin 54904.

**1.80    Person** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.81    Petition Date** means December 16, 2010, the date on which the Debtors filed their voluntary petitions for relief commencing the Chapter 11 Cases.

**1.82    Philmar, LLC or Philmar** is a Wisconsin Limited Liability Company.

**1.83    Plan Cash** means the amount paid by the Successful Bidder for the Grain Facility Assets on the Effective Date as well as all non-exempt Cash and Cash Equivalents of the Debtors on the Effective Date.

**1.84    Plan Currency** means the mixture of Plan Cash and Liquidating Trust Interests to be distributed to holders of Allowed Claims pursuant to the Plan.

**1.85    Plan Proponents** means Philmar, Ag Services, Olsen's Mill Acquisition Company, LLC, West Pointe Bank, BNPP, and the State of Wisconsin.

**1.86    Plan Supplement** means the supplement to the Plan to be filed within ten (10) days of the Confirmation Hearing which contains, *inter alia*, the Asset Purchase Agreement, the Stalking Horse APA, Liquidating Trust Agreement, the Cure Schedule and the Causes of Action.

**1.87    Ponderosa Partnership** means the 2/5 interests of the Debtors in 400 acres of farm land and shed in Waushara County, Wisconsin.

**1.88    Priority Non-Tax Claim** means any Claim against the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with sections 507(a)(4), (5), (7), or (9) of the Bankruptcy Code, but only to the extent entitled to such priority.

**1.89** __Priority Tax Claim__ means any Claim of a governmental unit against the Debtors entitled to priority of payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.90** __Pro Rata Share__ means, with respect to distributions to holders of Allowed Claims and reserves established on account of Disputed Claims, a proportionate share, such that a distribution of a Pro Rata Share with respect to an Allowed Claim of a particular Class shall bear the same ratio to all distributions and reserves on account of such Class as the dollar amount that such Allowed Claim bears to the dollar amount of all Allowed Claims and Disputed Claims in such Class, and that the reserve of a Pro Rata Share with respect to a Disputed Claim of a particular Class shall bear the same ratio to all distributions and reserves on account such Class as the dollar amount of such Disputed Claim bears to the dollar amount of all Allowed Claims and Disputed Claims in such Class.

**1.91** __Professional Compensation and Reimbursement Claim__ means a Claim for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b)(2), (3), (4), or (5) of the Bankruptcy Code.

**1.92** __Qualifying Bid__ shall have the meaning as set forth in Article VII of the Creditors' Plan.

**1.93** __Qualifying Bidder__ means any Interested Party that fulfills the requirements set forth in Article VII of the Creditors' Plan to place bids at or in connection with an Auction.

**1.94** __Released Actions__ means all Causes of Action, if any, against each of the Plan Proponents or ADM based in whole or in part on any act, omission, transaction, event, or other circumstance and arising under, in connection with, or related to their relationships with the Debtors or otherwise arising under, in connection with, or related to the provision of services to, or transactions conducted with, any Debtor or non-Debtor affiliate.

**1.95** __Remaining Assets__ shall mean those assets in Lots 2 and 3, as more specifically set forth in Article VII of the Creditors' Plan.

**1.96** __Remaining Asset Auction Procedures__ shall have the meaning described in Article VII of the Creditors' Plan, and collectively with the Grain Facility Assets Auction Procedures, the "Auction Procedures."

**1.97** __Remaining Assets Auction__ shall mean the sale conducted by the Liquidating Trustee of Lots 2 and 3 as further described in Article VII of this Creditors' Plan.

**1.98** __Remaining Assets Bid Deadline__ shall mean the date five days prior to the Remaining Assets Auction by which an Interested Party must submit information set forth in Article VII to the Liquidating Trustee necessary to be deemed a "Qualifying Bidder".

**1.99** __Retained Assets__ shall mean those assets to be purchased and retained by the Debtors, other than the Exempt Assets, pursuant to Article VII of the Creditors' Plan.

**1.100** __Ripon Grain Facility__ means the real and personal property and any leasehold interests on the property located at W13134-6 County Road KK, Ripon, Wisconsin 54791.

**1.101** __Sale Order__ shall mean the Final Order of the Bankruptcy Court approving the sale of the Grain Facility Assets or the Remaining Assets, as applicable, free and clear of all liens, claims and encumbrances.

**1.102** __Schedules__ means the schedules of assets and prepetition liabilities, and the statements of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented on or prior to the Confirmation Date.

**1.103** __School House Apartments__ shall mean the 4-unit apartment building located at N2133-35 State Road 49, Aurora, Wisconsin.

**1.104** __Secured Claim__ means a Claim against the Debtors (a) secured by a Lien on Collateral or (b) subject to setoff under sections 553, 555, 556, 559, 560, and 561 of the Bankruptcy Code, in each case to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as otherwise agreed to, in writing, by the Plan Proponents and the holder of such Claim; provided, however, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**1.105** __Secured Tax Claim__ means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

**1.106** __Stalking Horse APA__ shall have the meaning as set forth in Article VII of the Creditors' Plan.

**1.107** __Stalking Horse Bidder__ shall mean ADM.

**1.108** __Stevens Point Personal Property__ shall mean the Debtors' interests in property located at 2417 Stockton Road, Stevens Point, Wisconsin 54482.

**1.109** __Successful Bid__ shall have the meaning as set forth in Article VII of the Creditors' Plan.

**1.110** __Successful Bidder__ shall have the meaning as set forth in Article VII of the Creditors' Plan.

**1.111** __Tax Code__ means the Internal Revenue Code of 1986, as amended from time to time.

**1.112** __Unsecured Claim__ means any Claim against the Debtors, other than an Administrative Expense Claim, a Secured Claim, a Professional Compensation and Reimbursement Claim, or a Priority Tax Claim.

**1.113** __Utica Energy, LLC Interest__ means the 45% combined ownership interest of the Debtors in Utica Energy, LLC.

**1.114** **Utica Industries Interest** means the 25% ownership interest of Paul Olsen in Utica Industries.

**1.115** **Viroqua Grain Facility** shall mean the Debtors' interest in the real and personal property and any leasehold interest on the property located at 700 East Power Drive, Viroqua, Wisconsin, 54665.

**1.116** **WP Belmont Note** means that certain promissory note dated as of October 14, 2008, in favor of West Pointe Bank secured by the Belmont Grain Facility, and with a payoff amount of $1,477,211.63 as of the Petition Date.

**1.117** **WP Personal Notes** means (i) that certain promissory note dated as of October 1, 2008, granted in favor of West Pointe Bank by Paul and Cheryl Olsen, and with a payoff of $2,894,677.27 as of the Petition Date; and (ii) that certain promissory note dated as of October 1, 2008, granted in of West Pointe Bank by David and Becky Olsen, and with a payoff of $2,754,669.16 as of the Petition Date.

**1.118** **WP Ripon Note** means that certain promissory note dated as of February 23, 2007, in favor of West Pointe Bank, secured by the Ripon Grain Facility, and with a payoff amount of $875,712.29 as of the Petition Date.

**1.119** **WP Grain Facility Notes** means, collectively, the WP Belmont Note and WP Ripon Note.

**1.120** **Interpretation; Application of Definitions; Rules of Construction** Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in the Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, (a) all article, section, schedule, or exhibit references in the Creditors' Plan are to the respective article of, section in, schedule to, or exhibit to the Creditors' Plan, as the same may be altered, amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof and (b) all references to dollars are to the lawful currency of the United States of America. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Creditors' Plan as a whole and not to any particular section, subsection, or clause contained in the Creditors' Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Creditors' Plan. In computing any period of time prescribed or allowed by the Creditors' Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. The headings in the Creditors' Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Creditors' Plan.

## ARTICLE II
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS, PRIORITY TAX CLAIMS

**2.1** **Administrative Expense Claims Other than Professionals**. On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim (including an Unsecured Claim entitled to priority under section 503(b)(9) of the Bankruptcy

11

Code) shall become an Allowed Claim, the Liquidating Trustee shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the Claimant than as may be agreed upon by and between the Claimant and the Debtors or the Liquidating Trustee, as the case may be; provided, however, that Allowed Administrative Expense Claims, except for (x) taxes attributable to income received by the Debtors for their personal benefit and not for the benefit of creditors, and (y) reasonable and necessary liabilities incurred by the Debtors during the Chapter 11 Cases shall be paid by the Debtors in accordance with the terms and conditions of the particular transaction and any agreements relating thereto, and further provided, that Administrative Expense Claims included in Section 2.2 of the Plan for professionals will be paid pursuant to Section 2.2 and not this Section 2.1.

2.2    **Professional Compensation and Reimbursement Claims**.  All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b)(2), (3), (4), or (5) of the Bankruptcy Code shall (i) file their respective applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date that such Professional Compensation and Reimbursement Claim becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon thereafter as is reasonably practicable or (B) upon such other terms as may be mutually agreed upon between such holder of a Professional Compensation and Reimbursement Claim and the Debtors.

2.3    **Priority Tax Claims**.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option and discretion of the Plan Proponents, (i) Cash in an amount equal to such Allowed Priority Tax Claim 45 days after the Effective Date, or  (ii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## ARTICLE III
## CLASSIFICATION OF CLAIMS

Claims (other than Administrative Expense Claims, Professional Compensation and Reimbursement Claims, and Priority Tax Claims) are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|-------|--------|-------------|------------|------------------|
| 1. | Paul and Cheryl Olsen David and Becky Olsen | Priority Non-Tax Claims | Unimpaired | No |
| 2. | Paul and Cheryl Olsen David and Becky Olsen | Secured Tax Claims | Unimpaired | No |
| 3. | Paul and Cheryl Olsen David and Becky Olsen | Secured Claims | Unimpaired | No |

| Class | Debtor | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| 3.A. | Paul and Cheryl Olsen David and Becky Olsen | West Pointe Bank | Unimpaired | No |
| 3.B. | Paul and Cheryl Olsen David and Becky Olsen | Citizen First Bank | Unimpaired | No |
| 3.C. | Paul and Cheryl Olsen David and Becky Olsen | Farmers and Merchants Bank | Unimpaired | No |
| 3.D. | Paul and Cheryl Olsen David and Becky Olsen | State of Wisconsin Department of Transportation | Unimpaired | No |
| 3.E. | Paul and Cheryl Olsen David and Becky Olsen | FC Stone | Impaired | Yes |
| 3.F | Paul and Cheryl Olsen David and Becky Olsen | Alliant | Unimpaired | No |
| 3.G | Paul and Cheryl Olsen David and Becky Olsen | M2 Leasing | Unimpaired | No |
| 3.H | Paul and Cheryl Olsen David and Becky Olsen | West Pointe / Philmar | Unimpaired | No |
| 4. | Paul and Cheryl Olsen David and Becky Olsen | General Unsecured Creditors | Impaired | Yes |
| 5. | Paul and Cheryl Olsen David and Becky Olsen | Vivadell Olsen | Impaired | Yes |

**ARTICLE IV**
**TREATMENT OF CLAIMS**

### 4.1 Class 1: Priority Non-Tax Claims

4.1.1 <u>Impairment and Voting</u>. Class 1 is unimpaired by the Creditors' Plan. Each holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Creditors' Plan and is not entitled to vote to accept or reject the Creditors' Plan.

4.1.2 <u>Distributions</u>. Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and Plan Proponents, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of their Claims against the Debtors and their estates, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

### 4.2 Class 2: Secured Tax Claims

4.2.1 <u>Impairment and Voting</u>. Class 2 is unimpaired by the Creditors' Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Creditors' Plan.

4.2.2 <u>Distributions</u>. Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an of an Allowed Secured Tax Claim shall receive, at the sole option of the Plan Proponents, the Liquidating Trustee or the Debtors as to any Retained Assets that they

13

obtain pursuant to Section 7.4 of the Plan or that are Exempt Assets, (i) Cash in an amount equal to such Allowed Secured Tax Claim on the Effective Date, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (ii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim. In addition, as to any Retained or Exempt Assets that the Debtors in fact retain, the Debtors have the option to pay Allowed Secured Tax Claims with those Assets in equal semi-annual Cash Payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at a rate determined under applicable non-bankruptcy law in accordance with section 511 of the Bankruptcy Code over a period ending not later than five (5) years after the Petition Date.

**4.3**     **Class 3: Secured Claims**

4.3.1     Treatment.  In full and final satisfaction of Allowed Secured Claims held by any of the Class 3 Secured Claims, each such Allowed Secured Claim shall, unless otherwise agreed, be satisfied in one of the following ways:

(a)     the Allowed Secured Claim shall be paid in full in Cash within thirty (30) days after the Effective Date; or

(b)     the Successful Bidder for the Grain Facility Assets, where applicable, shall execute a written acknowledgment pursuant to which the Successful Bidder for the Grain Facility Assets assumes the Allowed Secured Claim and leaves unaltered the legal, equitable and contractual rights to which such Allowed Secured Claim entitles the holder of such Allowed Secured Claim; provided that amounts assumed by the Successful Bidder for the Grain Facility Assets shall not exceed the amount set forth in the Grain Facility Assets MOU; or

(c)     notwithstanding any contractual provision or applicable law that entitles the holder of the Allowed Secured Claim to demand or receive accelerated payment of such Allowed Secured Claim after the occurrence of a default, (i) the Successful Bidder for the Grain Facility Assets, as applicable, shall cure any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) the maturity of such Allowed Secured Claim, as such maturity existed before such default, shall be reinstated, (iii) the holder of such Allowed Secured Claim shall be compensated by the Successful Bidder for the Grain Facility Assets, as applicable, for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (iv) if such Allowed Secured Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, the holder such Allowed Secured Claim shall be compensated by the Successful Bidder for the Grain Facility Assets for any actual pecuniary loss incurred by such holder as a result of such failure, and (v) the legal, equitable and contractual rights to which such Allowed Secured Claim entitles the holder of such Allowed Secured Claim shall not otherwise be altered; provided that amounts paid by the Successful Bidder for the Grain Facility Assets pursuant to provisions (c)(i)-(v) shall not exceed the amount set forth in the Grain Facility Assets MOU; or

(d)     the holder of the Allowed Secured Claim shall receive the Collateral Proceeds upon the sale or other disposition of the Collateral attributable to such Allowed Secured Claim; or

(e)     the Liquidating Trustee shall transfer to the holder of the Allowed Secured Claim the Collateral securing the Allowed Secured Claim attributable to such Allowed Secured Claim.

4.3.2   <u>Retention of Liens</u>.  Notwithstanding the transfer of the Collateral and Collateral Proceeds to the Liquidating Trust, holders of Allowed Secured Claims shall retain their respective Liens in the Collateral and Collateral Proceeds until such Allowed Secured Claim is paid or satisfied in full as provided herein.

4.3.3   <u>Class 3. A West Pointe Bank</u>.

(a)     <u>Claim Amount</u>. Class 3.A holds a claim in the amount of $8,046,843.07 as of the Petition Date.  The Claim of Class 3.A represents the total amount of the Debtors' indebtedness on the four notes comprised of the WP Grain Facility Notes, secured by the Ripon and Belmont Grain Facilities, as well as the WP Personal Notes.  The Claim of Class 3.A shall include post-filing interest and recoverable costs and fees to the extent that the value of the Collateral securing the Claim of Class 3.A, as determined by the liquidation of the Collateral, as provided for in Article VII herein, exceeds $8,046,843.07.

(b)     <u>Collateral</u>. The claim of Class 3.A is secured by (i) first and second mortgages on real estate owned by the Debtors in Ripon and Belmont, (ii) second mortgages on real estate owned by the Debtors in Boscobel and Viroqua, and (iii) mortgages and liens on other real and personal property of the Debtors.

(c)     <u>Impairment and Voting: Class 3</u>.A is unimpaired under this Plan, and is not entitled to vote to accept or to reject this Plan.

(d)     <u>Treatment/Distribution</u>. The collateral of the Class 3.A creditor shall be sold, as provided for in Article VII herein, at the Auction supervised by the Bankruptcy Court or under the authority granted to the Liquidating Trustee hereunder.  At such Auction/s, the Class 3.A creditor may "credit bid" all or any portion of its claim. Except as otherwise provided herein, the cash proceeds (net of superior liens) of such Auction/s shall be turned over and distributed to the Class 3.A creditor on the Effective Date until the Claim of Class 3.A as such date has been paid in full, including all post-filing interest, fees and costs. The Successful Bidder for the Grain Facility Assets shall receive title to the Grain Facility Assets, including, but not limited to the Belmont and Ripon Grain Facilities.  Class 3.A shall release its liens on the Grain Facility Assets.  In exchange, the Successful Bidder for the Grain Facility Assets shall on the Effective Date pay an amount of cash to Class 3.A equal to its Allowed Secured Claim under the WP Grain Facility Notes and the WP Personal Notes.

4.3.4   <u>Class 3.B Citizens First Bank</u>.

(a)     <u>Claim Amount</u>.  Class 3.B holds a claim in the amount of $1,184,362.00 as of the Petition Date that is fully secured.

(b)    <u>Impairment and Voting</u>.  Class 3.B holds a first lien mortgage on the Real Estate owned by the Debtors located in Viroqua.  Class 3.B is unimpaired under the Plan and is not entitled to vote to accept or to reject the Creditors' Plan.

(c)    <u>Treatment / Distributions</u>.  The Successful Bidder for Lot 1 shall receive title to the Grain Facility Assets, including, but not limited to the Viroqua Grain Facility.  Class 3.B shall release its liens on the Viroqua Grain Facility.  In exchange, ADM or the Successful Bidder for the Grain Facility Assets shall on the Effective Date pay an amount of cash to Class 3.B equal to its Allowed Secured Claim.

4.3.5    <u>Class 3.C Farmers and Merchants Bank</u>.

(a)    <u>Claim Amount</u>.  Class 3.C holds a claim in the amount of $184,155 as of the Petition Date.

(b)    <u>Impairment and Voting</u>.  Class 3.C holds a first lien mortgage on the real estate referred to as the School House Apartments, located in Aurora, Wisconsin.  Class 3.C is unimpaired under the Plan and not is entitled to vote to accept or to reject the Creditors' Plan.

(c)    <u>Treatment / Distributions</u>.  Class 3.C shall retain the lien on its collateral subject to the following:

(i)    In the event that the Debtors purchase the School House Apartments pursuant to Section 7.4, the Debtors shall fully assume and pay the Class 3.C Allowed Secured Claim pursuant to the loan documents that existed as of the Petition Date, and any delinquent payments on the Effective Date shall be paid, unless otherwise agreed, by extending the term of the note to the extent necessary so that the Class 3.C Creditor is fully paid with interest at the rate specified in the loan documents.

(ii)    In the event the Debtors do not purchase the School House Apartments within the time frame set forth in Section 7.4, the School House Apartments will be transferred into the Liquidating Trust. The Liquidating Trustee shall sell the School House Apartments to the Successful Bidder at the Auction pursuant to the Remaining Asset Auction Procedures. In exchange for release of its lien, the Liquidating Trustee shall pay Class 3.C from the cash proceeds, up to the amount of its Allowed Secured Claim, derived from the sale of the School House Apartments.

4.3.6    <u>Class 3.D State of Wisconsin Department of Transportation</u>.

(a)    <u>Claim Amount</u>. Class 3.D holds a claim in the amount of $2,479,926.07 as of the Petition Date.  The basis for the Class 3.D claim is two promissory notes, one with payoff of approximately $935,000 and the other with a payoff of approximately $1,544,926.

(b)    <u>Impairment and Voting</u>.  To secure the promissory note in the amount of $935,000, Class 3.D holds a first priority lien on rail spur tracks and other personal property located at the grain facility in Oshkosh.  To secure the promissory note with an unpaid

16

balance of $1,544,926, Class 3.D holds a lien on the personal property located at the Boscobel Grain Facility. The Boscobel Grain Facility is also encumbered by the second mortgage of West Pointe Bank. Class 3.D. holds a first priority lien on the storage bins, rail spur tracks and other personal property located in Boscobel. Class 3.D is unimpaired and is not entitled to vote to accept or to reject the Creditors' Plan.

(c) <u>Treatment / Distributions</u>. The Successful Bidder for Lot 1 shall receive title to the Grain Facility Assets, including, but not limited to the personal property at the Oshkosh and Boscobel Grain Facilities. Except as otherwise specifically provided herein, Class 3.D shall release its liens on the personal property at the Oshkosh and Boscobel Grain Facilities. In exchange, the Successful Bidder shall on the Effective Date pay an amount of cash to Class 3.D equal to its Allowed Secured Claim.

### 4.3.7 Class 3.E FCStone.

(a) <u>Claim Amount</u>. Class 3.E asserts a secured claim for $369,474.00 as of the Petition Date.

(b) <u>Impairment and Voting</u>. Class 3.E is impaired under the Creditors' Plan and is entitled to vote to accept or to reject the Creditors' Plan. FCStone holds a mortgage on real estate owned by the Debtors located in Belmont, second in priority to the first lien mortgage of West Pointe Bank. FC Stone also holds a mortgage on real estate owned by the Debtors located in Viroqua, second in priority to the first mortgage of Citizens First Bank.

(c) <u>Treatment / Distributions</u>. Upon the Effective Date and pursuant to Grain Facility Assets Auction, the Successful Bidder shall receive title to the Belmont and Viroqua Grain Facilities. In exchange for release of FC Stone's liens, the Successful Bidder shall on the Effective Date, pay FC Stone an amount of cash equal to $160,000.00 in full satisfaction of its Allowed Secured Claim. FC Stone will dismiss all claims, including those against the Debtors, in the litigation currently pending in Green Lake County Circuit Court, case number 09-cv-289.

### 4.3.8 Class 3.F Alliant.

(a) <u>Claim Amount</u>. Class 3.F holds a secured claim for $147,383.28 as of the Petition Date.

(b) <u>Impairment and Voting</u>. Class 3.F is unimpaired under the Creditors' Plan and is not entitled to vote to accept or to reject the Creditors' Plan. Alliant holds a purchase money security interest on the M-C Tower Dryer Model 4000 ("<u>Dryer</u>") located at the Belmont Grain Facility.

(c) <u>Treatment / Distributions</u>. The Successful Bidder for the Grain Facility Assets shall receive title to the Grain Facility Assets, including, but not limited to the M-C Tower Dryer Model 4000. Class 3.F shall release its lien on the M-C Tower Dryer Model 4000. In exchange, the Successful Bidder for the Grain Facility Assets shall on the Effective Date pay an amount of cash to Class 3.F equal to its Allowed Secured Claim.

### 4.3.9 Class 3.G M2 Leasing.

(a)    <u>Claim Amount</u>. The claim of Class 3.G is $453,767 as of the Petition Date.

(b)    <u>Impairment and Voting</u>.  Class 3.G is unimpaired under the Creditors' Plan and is not entitled to vote to accept or to reject the Creditors' Plan.  Class 3.G holds a purchase money security interest on the Grain Systems including 2 105' Grain Bins, 2-48' Grain Bins and related accessories located at the Boscobel Grain Facility.

(c)    <u>Treatment / Distributions</u>.  The Successful Bidder for the Grain Facility Assets  shall receive title to the Grain Facility Assets, including, but not limited to the 2 105' Grain Bins, 2-48' Grain Bins and related accessories located at the Boscobel Grain Facility.  Class 3.G shall release its liens on such property.  In exchange, the Successful Bidder for the Grain Facility Assets shall on the Effective Date pay an amount of cash to Class 3.G equal to its Allowed Secured Claim.

4.3.10  <u>Class 3.H Philmar / West Pointe Bank</u>.

(a)    <u>Claim Amount</u>.  Class 3.H holds a claim in the amount of $5,000,000.00 as of the Petition Date, secured as described below. The Class 3.H secured claim shall include post filing interest and recoverable costs and fees to the extent the value of the collateral securing said claim, as determined by the liquidation said collateral, as provided herein, exceeds said $5,000,000.00, and is sufficient to pay such post filing interest, costs and fees.

(b)    <u>Collateral</u>.  The Class 3.H claim stems from a loan from West Pointe Bank to Philmar, guaranteed by the Debtors. The guarantees are secured by a first mortgage on the Milwaukee Grain Facility, as well as security interests and guarantees.

(c)    <u>Impairment and Voting</u>.  Class 3.H is unimpaired under this Creditors' Plan, and is not entitled to vote to accept or to reject this Plan.

(d)    <u>Treatment/Distribution</u>.  The Successful Bidder for the Grain Facility Assets shall receive title to the Grain Facility Assets, including, but not limited to the Milwaukee Grain Facility.  Class 3.H shall release its liens on the Milwaukee Grain Facility.  In exchange, the Successful Bidder for the Grain Facility Assets shall on the Effective Date pay an amount of cash to Class 3.H equal to its Allowed Secured Claim.

### 4.4    Class 4: General Unsecured Claims

4.4.1  <u>Treatment</u>.  In full and final satisfaction of Allowed Unsecured Claims, each Allowed Unsecured Claim shall be satisfied as follows:

(a)    If and when (i) all Allowed Administrative Claims, including fees due to the United States Trustee pursuant to 28 U.S.C. § 1930 and an appropriate reserve for future United States Trustee fees until the Chapter 11 Cases are closed, all Allowed Priority Tax Claims, and all Allowed Claims in Classes 2 and 3 (including subclasses) have been fully satisfied in accordance with the terms of the Creditors' Plan (or in the case of Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Claims in Classes 2 and 3, have been reserved for in accordance with the provisions of Section 9.4 of the Plan), and (ii) there remain Net Available Liquidating Trust Proceeds in the Liquidating Trust for distribution

18

to Creditors, then as soon as practicable thereafter each holder of an Allowed Unsecured Claim, unless otherwise agreed, shall be paid on account of such Allowed Unsecured Claim a Pro Rata Share of the Net Available Liquidating Trust Proceeds in the Liquidating Trust, calculated in relation to all other Allowed Unsecured Claims; provided, however, that the maximum aggregate amount of distributions to be made in relation to an Allowed Unsecured Claim pursuant to this section shall be the Allowed amount of the Unsecured Claim, without interest. Distributions of Net Liquidating Trust Proceeds shall be made in accordance with Section 11.2 of the Creditors' Plan.

4.4.2   <u>Impairment and Voting</u>.  Class 4 is impaired under the Plan and is entitled to vote.

**4.5   <u>Class 5: Vivadell Olsen</u>**

(a)   <u>Claim Treatment</u>.  The alleged secured lien claim of Class 5 is a Disputed Claim.  The Liquidating Trustee shall make appropriate reserve in the Liquidating Trust in order to pay such Secured Claim in full, with interest, if Allowed.  Within five business days of the Effective Date, ADM shall deposit the sum of $200,000 in an escrow account held by the Liquidating Trustee for the benefit of the Class 5 Claimant until such claim is Allowed as a Secured Claim.  To the extent such claim is not allowed as a Secured Claim or allowed in an amount less than $200,000, the difference between the allowed amount and $200,000 shall be reimbursed to ADM from the escrow account provided that the Liquidating Trustee shall object to such claim and seek its avoidance, subordination, disallowance and/or any other appropriate objections; provided further that any settlement of such claim that exceeds $100,000 shall be subject to the consent of ADM.  Such Claim shall thereafter be treated under the provisions of the Bankruptcy Code and the Plan to the extent and in such priority as Allowed by this Court.

**ARTICLE V**
**IDENTIFICATION OF CLAIMS IMPAIRED AND NOT IMPAIRED BY THE CREDITORS' PLAN**

**5.1   <u>Controversy Concerning Impairment</u>**.  In the event of a controversy as to whether any Class of Claims is impaired under the Creditors' Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

**ARTICLE VI**
**ACCEPTANCE OR REJECTION OF CREDITORS' PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS**

**6.1   <u>Impaired Classes to Vote on Plan</u>**.  Each holder of a Claim in an impaired Class, not otherwise deemed to have rejected the Creditors' Plan, shall be entitled to vote separately to accept or reject the Creditors' Plan.  The Claims included in Classes 3.E, 4 and 5 are impaired and therefore are entitled to vote to accept or reject the Creditors' Plan.

**6.2   <u>Acceptance by Class of Creditors</u>**.  An impaired Class of holders of Claims shall have accepted the Creditors' Plan if the Creditors' Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Creditors' Plan.

**6.3**    **Cramdown**.  In the event that any impaired Class of Claims fails to accept the Creditors' Plan in accordance with section 1129(a) of the Bankruptcy Code, the Plan Proponents reserve the right to request that the Bankruptcy Court confirm the Creditors' Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ARTICLE VII
## IMPLEMENTATION OF THE PLAN

**7.1**    **Non-Substantive Consolidation**.  On the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for purposes of the Creditors' Plan. Any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety, or otherwise, of Claims against another Debtor shall be treated as separate and distinct Claims against the estates of the respective Debtors and shall be entitled to the treatment provided for under the Creditors' Plan's provisions concerning distributions.

**7.2**    **Vesting of Assets in the Liquidating Trust**.  Except as otherwise provided in the Creditors' Plan or any agreement, instrument, or other document incorporated therein, upon the Effective Date, all property of the Debtors' estates, other than the Exempt Assets and Grain Facility Assets listed below in Lot 1, and any property acquired by any of the Debtors pursuant to the Creditors' Plan shall vest in the Liquidating Trust, and as the case may be, free and clear of all Liens, Claims, charges, or other encumbrances (except for Allowed Secured Claims).

**7.3**    **Auction Terms and Procedures**

7.3.1    Assets.  The Court will supervise the Grain Facility Assets Auction in Lot 1 at the Confirmation Hearing and the Liquidating Trustee will subsequently, upon his appointment, conduct a separate auction ("Remaining Assets Auction") of the Non-Exempt Assets and Other Assets all as more particularly described below. The Non-Exempt Assets, and Other Assets shall be referred to collectively herein as the "Remaining Assets."  The Assets will be sold in lots (each, a "Lot") as described below:

(a)    LOT 1:  Grain Facility Assets

(i)    Boscobel Grain Facility

(ii)    Ripon Grain Facility

(iii)    Belmont Grain Facility

(iv)    Viroqua Grain Facility

(v)    Milwaukee Grain Facility

(vi)    Breathing Room Farm

(vii)    McGregor Shed

(viii)    Stevens Point Personal Property

(ix)    Oshkosh Personal Property

20

(x)     Leases on the Viroqua, Boscobel, Ripon, Milwaukee and Belmont Grain Elevators

(xi)    Ownership Interest in Ponderosa Partnership

(xii)   Receivable Ag Services (100% interest)

(b)     LOT 2: Subject to the provisions of Section 7.4, Lot 2 shall include the following "Non-Exempt Assets" (the Liquidating Trustee in his or her discretion may accept bids for each individual asset or for the entire lot as a whole):

(i)     Corn and Bean Crops

(ii)    1977 Excalibur

(iii)   Apartment N2097

(iv)    Oxford Apartment

(v)     Almond Feedlot

(vi)    Aurora Feed Mill and Dam

(vii)   Town of Leon 17 AC

(viii)  Huser Building

(ix)    Amherst Shop

(x)     Sunflower Farm 1/6 partnership interest

(xi)    Riverview Farm 1/3 partnership interest and equipment (sprayer, tractor, mower, nitrogen side dress applicator, grain drill and telehandler skytrack)

(xii)   School House Apartments

(xiii)  Elizabeth Street Property

(xiv)   Willow Creek Farmland

(xv)    Crivitz Property

(xvi)   Berlin Feed, including Debtors' collective 50% interest in Berlin Feed, Inc. and any associated real and personal property assets therein.

(xvii)  60 acres of real estate contiguous to the homestead  of David and Becky Olsen

21

(c)     LOT 3: Shall include the following Other Assets which the Liquidating Trustee in his or her discretion may accept bids for each individual asset or for the entire lot.

    (i)     Utica Energy, LLC 45% combined interest of the Debtors'

    (ii)    Utica Industries, LLC 1/4 interest of Paul Olsen

    (iii)   Little Sprout Farms, LLC 40% interest

    (iv)   Litte Sprout Farms II, LLC 40% interest

    (v)    Accounts Receivable that remain unpaid as of the Effective Date:

        (1)  Olsen's Mill Inc. - $580,000 (100% interest)

        (2)  R. Digman - $20,000 (100% interest)

        (3)  Little Sprout Farms, LLC (100% interest)

        (4)  First National Bank of Platteville / Spensley lawsuit - $19,000 (100% interest)

        (5)  Kirschner Equipment Rental - $2,500 (100%) interest)

    (vi)   All Remaining Nonexempt Assets of the Debtors

(d)     <u>As Is, Where Is</u>.  The Assets will be sold free and clear of all Liens, Claims, and encumbrances and on an "as is," "where is" basis, without any representations or warranties by the Debtors, the Liquidating Trustee, counsel for the Debtors, or counsel for the Liquidating Trustee, the Plan Proponents or counsel for the Plan Proponents. Each of the Qualifying Bidders shall represent and warrant that it has relied solely upon its own independent review, investigation, and/or inspection of any documents, and/or Assets in making its bid and has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection with the Assets, the Creditors' Plan, the Disclosure Statement, Auction Terms and Procedures, or the Auction, except as expressly stated in the executed Asset Purchase Agreement.

(e)     <u>Free and Clear of Liens</u>.  Except as otherwise provided herein, all sales of the Assets shall be free and clear of all liens, claims and encumbrances, with any and all liens, claims and encumbrances attaching to the proceeds of sale in the order of their priority, pursuant to 11 U.S.C. § 363.

(f)     <u>Notice of Remaining Assets Auction</u>.  Following the Effective Date, the Liquidating Trustee shall serve notice of the Remaining Assets Auction by first class mail on the following parties:  (1) the Office of the United States Trustee for the Eastern District of Wisconsin; (2) the parties included on the Master Service List; (3) all parties with liens,

claims or encumbrances on or against the Remaining Assets; (4) counsel for the Stalking Horse Bidder; and (5) counsel for any other Qualifying Bidder.

(g) <u>Due Diligence</u>. The Debtors have marketed the Grain Facility Assets throughout the Chapter 11 proceedings, as evidenced by the Debtors' stalking horse bid (contained in Debtors' previously filed plan), and may continue to solicit any other bids.

7.3.2 <u>Grain Facility Assets Auction Procedures</u>. At the Confirmation Hearing, the Bankruptcy Court shall supervise the Grain Facility Assets Auction which consists of Lot 1.

(a) <u>Stalking Horse Bidder</u>. To establish a floor price for the Grain Facility Assets of Lot 1 and the terms of sale, ADM will submit an Asset Purchase Agreement which will be attached as an exhibit to the Plan Supplement within 10 days of the Confirmation Hearing consistent with the Grain Facility MOU ("<u>Stalking Horse APA</u>"), which shall include a purchase price of $15,846,839.

(i) ADM owns and operates more than 300 grain elevators located throughout North America and has substantial experience in operating businesses similar to the business of OMAC, Ag Services and the Debtors.

(ii) The Bankruptcy Court shall designate ADM as the Stalking Horse Bidder for the Grain Facility Assets and approve the Break-Up Fee in the amount of 3% of its bid in the event ADM is (1) not the Successful Bidder at the Auction and (2) the Debtors close a transaction with respect to any of the Grain Facility Assets with any entity other than ADM. The bidding for the Grain Facility Assets shall start at the purchase price offered by ADM plus the sum of the Break-Up Fee and $100,000.00. Bid increments thereafter shall be in an amount of at least $100,000.00.

(iii) The Stalking Horse APA submitted by ADM is not contingent on financing and the proceeds of the closing shall provide the majority of the funds to implement the Creditors' Plan.

(b) All Interested Parties must execute and deliver to the Bankruptcy Court an Asset Purchase Agreement in the form satisfactory to the Plan Proponents and the Bankruptcy Court. The Bankruptcy Court shall disqualify any APAs which contain a contingency other than Bankruptcy Court approval. In order for an Interested Party to be deemed a "Qualifying Bidder" it must submit the following to the Bankruptcy Court by the Bid Deadline.

(i) Interested Parties shall submit an executed Asset Purchase Agreement, in a form similar to that in the Plan Supplement, which proposes a purchase price, for the Grain Facility Assets that provides cash at the Effective Date, in immediately available funds and/or written agreements by the various secured parties which hold liens against the Grain Facility Assets that they have consented to an assumption of the debt securing those Grain Facility Assets. The Asset Purchase Agreement shall propose a purchase price in an amount equal to the purchase price provided for under the Stalking Horse APA and the amount of all other obligations to be incurred by the Stalking Horse Bidder under the Plan

23

and the Stalking Horse APA, plus an additional cash value of the Break-Up Fee and an additional $100,000.

   (ii) All Interested Parties shall make an Earnest Money Deposit of certified funds in the amount of $160,000 (or approximately 1% of the purchase price) to be held in the trust account of counsel for BNPP, who shall hold all such deposits in a separate interest-bearing account for benefit of the Debtors' estates, ultimately administered by the Liquidating Trustee until consummation of a transaction involving any other bidder for the Grain Facility Assets, to be returned within fourteen (14) days following the closing of the sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale because of its own breach or failure to perform, the Liquidating Trustee will not have the obligation to return the Earnest Money Deposit, and such funds shall become property of the Debtors' Estate without affecting or reducing any of the Liquidating Trustee's other rights or claims against the breaching party;

   (iii) In the event the Interested Party is a corporate entity, it shall proffer documents sufficient to prove its corporate existence and good standing, any resolutions providing its agent necessary authority to bind the entity and take all actions necessary to consummate the proposed transaction, and disclosure of the identity of each entity or individual that will be bidding or otherwise participating in connection with the "Qualifying Bid" ("Qualifying Bid" shall mean a bid deemed acceptable by the Bankruptcy Court or Liquidating Trustee as applicable) as well as documents revealing the identity of any equity interest holder or owner of the prospective purchaser, specifically advising the Bankruptcy Court if any principal of the entity includes or will include one or both of the Debtors;

   (iv) The Interested Party shall proffer evidence that it possesses the requisite financial means to close on the proposed transaction, including but not limited to confirmation that its bid is not contingent upon financing but rather it has unrestricted cash on hand to fund the transaction.

   (v) The Interested Party shall agree that its offer is irrevocable until the earlier of the date that the transaction is consummated involving another, higher bidder or ninety (90) days after entry of the Sale Order.

  (c) <u>Designation of Qualifying Bids</u>. The Bankruptcy Court shall designate those submitted bids, if any, that are Qualifying Bids three days prior to Confirmation Hearing and shall inform the Qualifying Bidders of their status as such on that date. The Bankruptcy Court shall have the right to reject any bid that it deems inadequate or insufficient or that is not in compliance with the requirements set forth above or the Bankruptcy Code. If the Bankruptcy Court does not certify an Interested Party as a Qualifying Bidder and that Interested Party submitted an Earnest Money Deposit, the Bankruptcy Court or the Liquidating Trustee shall return such funds to the Interested Party within 14 days following the closing of the sale to the Successful Bidder.

   (i) In the event that the Bankruptcy Court is unable to deem any prospective purchasers Qualifying Bidders for the Grain Facility Assets, other

24

than the Stalking Horse Bidder as more fully described below, the Plan Proponents shall move the Bankruptcy Court at the Confirmation Hearing to approve the sale of the Grain Facility Assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA. The Debtors and the Stalking Horse Bidder shall close on or the next business day that the Bankruptcy Court's Confirmation Order approving the sale and this Creditors' Plan becomes final and non-appealable; provided that the Stalking Horse Bidder may waive the requirement that the order becomes final and non-appealable.

(ii)     All Qualifying Bids shall be unconditional upon approval at the Confirmation Hearing.  Without limiting the generality of the foregoing, no bid after the Confirmation Hearing, shall be conditioned upon acceptance of one or more other bids, financing, or additional due diligence.  Bids must contemplate sales that may be consummated on or soon after the Confirmation Hearing.  Only Qualifying Bidders shall be permitted to participate in the Grain Facility Assets Auction.  All bids are subject to the qualification and approval by the Bankruptcy Court.

(d)     <u>Auction</u>.  At the beginning of the Grain Facility Assets Auction, the Bankruptcy Court will advise all Qualifying Bidders of the highest and best Qualifying Bid with respect to the Grain Facility Assets. Only Qualifying Bidders and the Stalking Horse Bidder are eligible to participate in the Grain Facility Assets Auction.

(i)     The Auction shall proceed in rounds.  Bidding at the Auction shall begin with an initial minimum overbid of the best Qualifying Bid in an amount of the Break-Up Fee plus $100,000, and shall subsequently continue in $100,000.00 minimum overbid increments.  Bidders shall have fifteen (15) minutes in each round to consider the current bid and to provide the Bankruptcy Court with their decision. Bidding will continue until the Bankruptcy Court determines that it has received the highest and best bid for the Grain Facility Assets ("<u>Successful Bid</u>").

(ii)     ADM is authorized to "credit bid" the amount of the Break-Up Fee at the Grain Facility Assets Auction.

(iii)     After the Bankruptcy Court determines the Successful Bid, the Auction will be closed. The Bankruptcy Court will then determine and announce which bid has been determined to be the second highest bid (the "<u>Backup Bid</u>"). The Successful Bid will be deemed to have been accepted only when the bid has been approved by the Bankruptcy Court at the Confirmation Hearing.

(iv)     If for any reason the entity or entities that submit(s) the Successful Bid ("<u>Successful Bidder</u>") fails to consummate the purchase of the Grain Facility Assets, the offeror of the Backup Bid will automatically be deemed to have submitted the highest and best bid, and the Debtors and/or the Liquidating Trustee shall be authorized and directed to effect the sale of the Assets to such Backup Bidder as soon as is commercially reasonable. Following the Confirmation Hearing (a) if such failure to consummate the purchase is the result

25

of a breach by the Successful Bidder, the Debtors, Liquidating Trustee and Plan Proponents reserve the right to seek all available damages from the defaulting Successful Bidder as modified by the terms of the Asset Purchase Agreement reached pursuant to the Successful Bid and (b) if such failure to consummate the purchase is the result of a breach by a Debtor, the Successful Bidder shall have all recourse against the Debtors as permitted by applicable law.

(e)     <u>Necessity of Confirmation</u>.  No Asset Purchase Agreement or Successful Bid shall be binding on the Debtors or their estates until the Creditors' Plan is confirmed by the Court, which includes meeting all requirements to confirm a plan such as payment of Allowed Administrative Expense Claims and Allowed Priority Tax Claims.

(f)     <u>Modification of Bidding Procedures</u>.  Except as expressly provided herein, the procedures set forth herein cannot be amended or modified without the express written consent of the Plan Proponents and the Stalking Horse Bidder.

### 7.3.3   <u>Auction Procedures for Remaining Assets</u>

Following the Confirmation Date, an Auction of the Remaining Assets Auction shall be held, at a date, location and time set by the Liquidating Trustee.

(i)     All Interested Parties must execute and deliver to the Liquidating Trustee an Asset Purchase Agreement in the form satisfactory to the Liquidating Trustee.  The Liquidating Trustee shall disqualify any Asset Purchase Agreements which contain a contingency other than Bankruptcy Court approval. In order for an Interested Party to be deemed a "Qualifying Bidder" it must submit the following to the Liquidating Trustee five (5) days prior to the Auction ("<u>Remaining Assets Bid Deadline</u>"):

(ii)    An executed Asset Purchase Agreement, in the form acceptable to the Liquidating Trustee, which proposes a purchase price, itemized by each Lot, or each item, for the Assets that provides cash at closing, in immediately available funds.

(iii)   Earnest Money Deposit of certified funds in the amount 1% of the purchase price to be held in a separate interest-bearing account for benefit of the Debtors' Estate until consummation of a transaction involving any other bidder for the Assets, to be returned within fourteen (14) days following the closing of the sale to the Successful Bidder.  If a Successful Bidder fails to consummate an approved sale because of its own breach or failure to perform, the Liquidating Trustee will not have the obligation to return the Earnest Money Deposit, and such funds shall become property of the Liquidating Trust without affecting or reducing any of the Liquidating Trustee's rights or claims against the breaching party;

(iv)    In the event the Interested Party is a corporate entity, it must proffer documents sufficient to prove its corporate existence and good standing, any resolutions providing its agent necessary authority to bind the entity and take all actions necessary to consummate the proposed transaction, and disclosure of the identity of each entity or individual that will be bidding or

26

otherwise participating in connection with the Qualifying Bid as well as documents revealing the identity of any equity interest holder or owner of the prospective purchaser, specifically advising the Liquidating Trustee if a principal of the entity includes or will include one or both of the Debtors;

(v)     The Interested Party must proffer evidence that it possesses the requisite financial means to close on the proposed transaction, including but not limited to confirmation that its bid is not contingent upon financing but rather it has unrestricted cash on hand to fund the transaction; and

(vi)     The Interested Party shall agree that its offer is irrevocable until the earlier of the date that a transaction is consummated involving another higher bidder or ninety (90) days after entry of the Sale Order.

(a)     <u>Designation of Qualifying Bids</u>. The Liquidating Trustee shall designate those submitted bids, if any, that are Qualifying Bids, at least two (2) days prior to the Remaining Assets Auction, and shall inform the Qualifying Bidders of their status as such on that date.

(i)     The Liquidating Trustee reserves the right to reject any bid that it deems inadequate or insufficient or that is not in compliance with the requirements set forth above or the Bankruptcy Code. If the Liquidating Trustee does not certify an Interested Party as a Qualifying Bidder and that Interested Party submitted an Earnest Money Deposit, the Liquidating Trustee shall promptly return such funds to the Interested Party.

(ii)     All Qualifying Bids shall be unconditional. Without limiting the generality of the foregoing, no bid shall be conditioned upon acceptance of one or more other bids, financing, or additional due diligence. Bids must contemplate sales that may be consummated within 10 days of the hearing to approve the Sale. Only Qualifying Bidders shall be permitted to participate in the Remaining Assets Auction. All bids are subject to approval of the Bankruptcy Court.

(b)     <u>Auction</u>. At the beginning of the Auction, the Liquidating Trustee will advise all Qualifying Bidders of the highest and best Qualifying Bid with respect to the Remaining Assets, or each lot, if applicable. Only Qualifying Bidders are eligible to participate in the Remaining Assets Auction. The Debtors, Plan Proponents and their respective counsel shall be permitted to attend the Remaining Assets Auction.

(i)     The Remaining Assets Auction shall proceed in rounds. The Lots shall be offered for sale in such order and in such manner as the Liquidating Trustee deems appropriate in the Liquidating Trustee's sole discretion. If applicable, bidding at the Auction shall begin with an initial minimum overbid of the best Qualifying Bid in an amount at least equal to any Break Up Fee, if applicable, and shall subsequently continue in overbid increments to be determined by the Liquidating Trustee at least two (2) days prior to the Remaining Assets Auction. Bidders shall have fifteen (15) minutes in each

27

round to consider the current bid and to provide the Liquidating Trustee with their decision.

(ii)     Bidding will continue until the Liquidating Trustee determines that it has received the highest and best bid(s) for the Remaining Assets. After the Liquidating Trustee so determines the Successful Bid(s), the Remaining Assets Auction will be closed. The Liquidating Trustee will then determine and announce which bid has been determined to be the Backup Bid.

(iii)     Subject to the provisions of the Bidding Procedures, the selection of a Successful Bidder shall be within the reasonable business judgment of the Liquidating Trustee, and subject to the approval of the Bankruptcy Court. The Liquidating Trustee will be deemed to have accepted the bid only when the bid has been approved by the Bankruptcy Court in connection with the sale hearing.

(iv)     If for any reason the entity or entities that submit(s) the Successful Bid(s) fails to consummate the purchase of the Remaining Assets, the Backup Bidder(s) will automatically be deemed to have submitted the highest and best bid, and the Liquidating Trustee and such Backup Bidder are authorized to effect the sale of the Remaining Assets to such Backup Bidder as soon as is commercially reasonable. Following the Confirmation Hearing (a) if such failure to consummate the purchase is the result of a breach by the Successful Bidder, the Debtors, Liquidating Trustee and Plan Proponents reserve the right to seek all available damages from the defaulting Successful Bidder as modified by the terms of the Asset Purchase Agreement reached pursuant to the Successful Bid and (b) if such failure to consummate the purchase is the result of a breach by the Liquidating Trustee, the Successful Bidder shall have recourse against the Debtors permitted by law, including but not limited to recovery of its Earnest Money Deposit.

(c)     <u>Modification of Bidding Procedures</u>.  Except as expressly provided in this Article 7.3.3, the procedures set forth herein cannot be amended or modified without the express written consent of the Liquidating Trustee.

**7.4     <u>Purchase of Retained Assets by the Debtors</u>**.  Within 45 days of the Effective Date, the Debtors shall have the option to purchase the Debtors' interests in the following Retained Assets for the sum of $1,000,000 cash payable to the Liquidating Trustee:

(i)     Apartment N2097

(ii)     Oxford Apartment

(iii)     Almond Feedlot

(iv)     Aurora Feed Mill and Dam

(v)     Town of Leon 17 AC

(vi)     Huser Building

28

(vii)     Amherst Shop

(viii)     Sunflower Farm 1/6 partnership interest

(ix)     Riverview Farm 1/3 partnership interest and equipment (sprayer, tractor, mower, nitrogen side dress applicator, grain drill and telehandler skytrack)

(x)     School House Apartments

(xi)     Elizabeth Street Property

(xii)     Willow Creek Farmland

(xiii)     60 acres of real estate contiguous to the homestead of David and Becky Olsen

(xiv)     1977 Excalibur

(xv)     Crivitz Property; and

(xvi)     Berlin Feed, including Debtors' collective 50% interest in Berlin Feed, Inc. and any associated real and personal property assets therein.

The Retained Assets will be sold free and clear of all Liens, Claims and encumbrances in the Debtors' interests in such Retained Assets (but not the Liens, Claims or encumbrances of any underlying entity that may own such assets), with any and all Liens, Claims and encumbrances in the Debtors' interests attaching to the proceeds of the sale in the order of their priority pursuant to section 363 of the Bankruptcy Code; provided, however, that the School House Apartments shall be sold to the Debtors subject to the Liens and encumbrances on them and the Debtors will assume the payment of such obligations.

If on the 46th day after the Effective Date, the Debtors have failed to close and pay the $1,000,000 purchase price for the Retained Assets described above, then the Retained Assets described above shall immediately vest in the Liquidating Trust to be sold and marketed by the Liquidating Trustee pursuant to the procedures set forth in Section 7.3.3.

**7.5    Satisfaction of Claims from Liquidating Trust**.  On the Effective Date, all Claims against the Debtors or their estates, and all distribution rights conferred by the Creditors' Plan on account thereof, shall be transferred to the Liquidating Trust.  Similarly, on the Effective Date, all objections, counterclaims, rights of setoff, rights of recoupment, and any and all other defenses held by the Debtors or their estates in relation to such Claims, in relation to such distribution rights, and in relation to the holders of such Claims, shall be preserved and transferred to the Liquidating Trust, and from and after the Effective Date the Liquidating Trustee shall have standing to assert, prosecute and settle any and all of such objections, counterclaims, rights of setoff, rights of recoupment, and other defenses, subject only to any limitations set forth in the Creditors' Plan or the Liquidating Trust Agreement.  Following the Effective Date, Claims which are or become Allowed Claims shall be satisfied solely and

29

exclusively from the Liquidating Trust in accordance with the provisions of the Creditors' Plan, and the Debtors shall have no liability on any Claims.

**7.6** **Post Confirmation Action**.  Upon the Effective Date, all actions contemplated by the Creditors' Plan shall be deemed authorized and approved in all respects, including (i) the execution and entry into the Liquidating Trust Agreement, (ii) selection of the Liquidating Trust Advisory Board, and (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

**7.7** **Settlement of Green Lake County Litigation**.  If ADM is the Successful Bidder for the Grain Facility Assets and the sale of the Grain Facility Assets is approved by a final, non-appealable order of the Bankruptcy Court confirming this Plan and the purchase and sale of the Grain Facility Assets is closed and funded, then OMAC and Ag Services have irrevocably agreed to sell to ADM, and ADM has irrevocably agreed to purchase from OMAC and Ag Services, their business operations, as well as their real and personal property ("OMAC Business"),in accordance with the terms of the Grain Facility Assets MOU attached hereto as **Exhibit "A"**.  As set forth in the Grain Facility Assets MOU, the proceeds from the sale of the Grain Facility Assets would be distributed to those creditors holding Allowed Secured Claims secured by the Grain Facility Assets.  BNPP and OMAC have agreed to settle all claims in the ongoing litigation in Green Lake County relating to the OMI Receivership.  BNPP asserts it has a claim against the OMAC Business, which OMAC disputes. Nevertheless, in the interests of settling all claims between the parties and to avoid further litigation, OMAC has agreed to pay a portion of the purchase price it receives from ADM upon the sale of the OMAC Business to BNPP.

**7.8** **Cancellation of Debt and Related Obligations**.  Except as otherwise expressly provided in the Creditors' Plan (a) with respect to executory contracts or unexpired leases that have been assumed by the Liquidating Trust, (b) for purposes of evidencing a right to distributions under the Creditors' Plan, or (c) with respect to any Claim that is Allowed under the Creditors' Plan, on the Effective Date, any instruments or documents evidencing any Claims shall be deemed automatically cancelled and deemed surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under the agreements, instruments, and other documents, indentures, and certificates of designations governing such Claims, shall be discharged; underlined_provided, however, that such instruments or documents shall continue in effect solely for the purpose of (x) allowing the holders of such Claims to receive their distributions under the Creditors' Plan and (y) allowing the Liquidating Trustee to make such distributions to be made on account of such Allowed Claims.

**7.9** **Effectuating Documents and Further Transactions**.  On and after the Effective Date, the Plan Proponent or the Liquidating Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Creditors' Plan and the securities, if any, issued pursuant to the Creditors' Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Creditors' Plan.

## ARTICLE VIII
## PRESERVATION AND PROSECUTION OF
## CAUSES OF ACTION HELD BY THE DEBTORS

**8.1    Preservation and Prosecution of Causes of Action**.  In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust may enforce all rights to commence and pursue, as appropriate, any and all Liquidating Trust Claims. No Entity may rely on the absence of a specific reference in the Creditors' Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Liquidating Trustee, the Plan Proponent, as applicable, will not pursue any and all available Causes of Action against them. The Plan Proponents expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Creditors' Plan or a Bankruptcy Court order, the Liquidating Trustee or the Plan Proponent, as the case may be, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Order. The Liquidating Trustee reserves and shall retain the Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Creditors' Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Liquidating Trust, as the case may be. As of the Effective Date, the Debtors shall have assigned the Liquidating Trust Claims to the Liquidating Trust.

## ARTICLE IX
## RELEASE OF DEBTORS AND CERTAIN INSIDERS

**9.1    Release**.  In consideration of the agreements herein (i) the bankruptcy estates of the Debtors, (ii) all Creditors voting to accept the Plan, including the Plan Proponents, (iii) ADM, and (iv) any of the officers, directors, agents and professionals of the foregoing, release and discharge any Claims, Causes of Action, and Avoidance Actions relating to any disclosed transfers that they may have against the Debtors, Vivadell Olsen, and any of the Assets that they receive or retain pursuant to the Plan, except as specifically stated in the Plan or any asset purchase agreement executed by the Debtors.

## ARTICLE X
## PROVISION FOR TREATMENT OF DISPUTED CLAIMS OR ASSERTED
## ADMINISTRATIVE EXPENSES UNDER THE PLAN

**10.1    Objections to Claims; Prosecution of Disputed Claims or Asserted Administrative Expenses**.  The Liquidating Trustee shall have the sole right and authority to object to the allowance of Claims filed with the Bankruptcy Court with respect to which it may dispute liability, priority, and/or amount; provided, however, that the foregoing shall not in any way limit the ability or the right of the Liquidating Trustee to assert, commence, or prosecute any Cause of Action that is a Liquidating Trust Claim against any holder of such Claim. All objections, affirmative defenses, and counterclaims shall be litigated to Final Order. Unless otherwise ordered by the Bankruptcy Court, the Liquidating Trustee shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than 180 days

31

following the Confirmation Date or such later date as may be approved by the Bankruptcy Court. All orders of the Bankruptcy Court regarding procedures to resolve certain Claims or Administrative Expenses that have been entered prior to the Effective Date shall continue to govern the resolution of such Claims and Administrative Expenses after the Effective Date. Except as otherwise provided in the Creditors' Plan, a Claim may not be filed with the Bankruptcy Court or amended after the Confirmation Date without the prior authorization of the Bankruptcy Court. Except as otherwise provided in the Creditors' Plan, any new or amended Claim filed with the Bankruptcy Court after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Liquidating Trustee.

**10.2    No Distributions Pending Allowance**.  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**10.3    Estimation of Claims**.  Unless otherwise limited by an order of the Bankruptcy Court, the Liquidating Trustee may at any time request that the Bankruptcy Court estimate for final distribution purposes any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that if the estimate constitutes the maximum limitation on such Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim, and; provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

**10.4    Payments and Distributions on Disputed Claims**.

        10.4.1 Disputed Claims Reserve. From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Liquidating Trustee, shall reserve and hold in escrow for the benefit of each holder of a Disputed Claim and any dividends, gains, or income attributable thereto, in an amount equal to distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim ultimately may become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Liquidating Trustee. Any Plan Currency reserved and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in other Plan Currency in the event the Disputed Claim ultimately becomes an Allowed Claim. In the event that a Disputed Claim is not

Allowed, in whole or in part, the holders of Allowed Claims in the same Class as the holder of the Claim that is not Allowed shall receive their Pro Rata Share of any Plan Currency reserved on account of the Claim that is not Allowed. Such Cash and any dividends, gains, or income paid on account of other Plan Currency reserved for the benefit of holders of Disputed Claims shall be either (x) held by the Liquidating Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such holders pending determination of their entitlement thereto under the terms of the Creditors' Plan. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

10.4.2 <u>Allowance of Disputed Claims</u>. At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Liquidating Trustee, shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Creditors' Plan, together with any interest which has accrued on the amount of Cash and any dividends or distributions attributable to the Plan Currency so reserved (net of any expenses, including any taxes on the escrow, relating thereto), but only to the extent that such interest is attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing or disallowing such Disputed Claim becomes a Final Order but in no event more than ninety (90) days thereafter. The balance of any Cash previously reserved shall be included in Plan Cash and the balance of any Plan Currency previously reserved shall be included in future calculations of Plan Currency to holders of Allowed Claims in accordance with the terms and provisions of the Creditors' Plan.

## ARTICLE XI
## THE LIQUIDATING TRUST

**11.1** **<u>Establishment of the Liquidating Trust</u>**. Immediately following the Confirmation Date, the Debtors, and the Liquidating Trustee, on behalf of Allowed Secured Claims, and Allowed General Unsecured Claims, including Class 5, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust in accordance with and pursuant to the terms of the Creditors' Plan. Upon the Effective Date, the Debtors shall transfer to the Liquidating Trust all of their right, title, and interest in the Liquidating Trust Assets. The Plan Supplement will include a list of all Causes of Action being prosecuted as of the date thereof that will be transferred to the Liquidating Trust. To the extent necessary to pursue a Cause of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the above-described rights and Causes of Action shall be transferred to the Liquidating Trust and shall vest in the Liquidating Trustee and its representatives. The Liquidating Trustee shall pay the reasonable fees and expenses of any professional to provide this information. The Debtors and the Liquidating Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges. The Confirmation Order shall provide that the Liquidating Trustee's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates. The Liquidating Trust shall be deemed an independent entity and shall have standing to sue and be sued in its own name in any court and to otherwise appear before any administrative body, tribunal or other proceeding.

**11.2    Purpose of the Liquidating Trust**.  The Liquidating Trust shall be established for the sole purpose of liquidating the Liquidating Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

**11.3    Funding Expenses of the Liquidating Trust**.   In accordance with the Liquidating Trust Agreement, and following Confirmation, upon the creation of the Liquidating Trust, the Debtors shall transfer their Excess Cash to the Liquidating Trust to fund Administrative Expense Claims as well as the operations of the Liquidating Trust.  Upon the closing of any sale to any Successful Bidder, an amount consisting of (a) a contribution from the Successful Bidder in an amount to be agreed upon by the Successful Bidder, (b) the proceeds from the sale of the Retained Assets, and (c) the proceeds of the Remaining Assets Auction shall be transferred to the Liquidating Trust for payment of Administrative Expense Claims, Priority Tax Claims, and Professional Compensation and Reimbursement Claims) and for the operation of the Liquidating Trust. Any excess funds remaining after payment of Administrative Expense Claims and operations not covered by the amounts received and Excess Cash of the Debtors shall be distributed to Unsecured Creditors pursuant to the Liquidating Trust Agreement.   The Successful Bidder for the Grain Facility Assets shall have no further obligation to provide any additional funding with respect to the Liquidating Trust.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Liquidating Trustee from and after the Effective Date, including, without limitation, reasonable fees and expenses of counsel, and fees owed to the United States Trustee, shall be paid from the Liquidating Trust Assets without further order of the Bankruptcy Court within twenty (20) days of receipt by the Liquidating Trust Advisory Board of an invoice by the Liquidating Trustee.  In the event that the Trust Advisory Board objects to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid.  The compensation of the Liquidating Trustee will be consistent with the standards customary in the Eastern District of Wisconsin.

**11.4    Transfer of Assets**.   The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made, as provided herein, for the benefit of the holders of Allowed Claims.  Immediately upon the Effective Date of the Creditors' Plan, the Debtors shall transfer such Liquidating Trust Assets to the Liquidating Trust in exchange for Liquidating Trust Interests for the benefit of holders of Allowed Secured Claims, and Allowed General Unsecured Claims in accordance with the Creditors' Plan.  Upon the transfer of the Liquidating Trust Assets, the Debtors, as the case may be, shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer.  To the extent that any Liquidating Trust Assets cannot be transferred to the Liquidating Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Liquidating Trustee shall be deemed to have been designated as a representative of the Debtors, as applicable, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Liquidating Trust Assets on behalf of the Debtors.

**11.5    Litigation; Responsibilities of Liquidating Trustee.**

34

11.5.1 The Liquidating Trustee, upon direction by the Liquidating Trust Advisory Board and in the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Liquidating Trust, make timely distributions, and not unduly prolong the duration of the Liquidating Trust. The liquidation of the Liquidating Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment, or dismissal of any or all claims, rights, or causes of action, or otherwise. The Liquidating Trustee, upon direction by the Liquidating Trust Advisory Board, shall have the absolute right to pursue or not to pursue any and all Liquidating Trust Assets as it determines is in the best interests of the beneficiaries of the Liquidating Trust, and consistent with the purposes of the Liquidating Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. The Liquidating Trustee may incur any reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to Cash and shall be reimbursed in accordance with the provisions of the Liquidating Trust Agreement.

11.5.2 No later than fifteen (15) days prior to the date of the hearing to confirm the Creditors' Plan, the Liquidating Trustee shall be selected by the Plan Proponents, named in the Confirmation Order or in the Liquidating Trust Agreement and, upon the Effective Date, shall have the power to (i) prosecute for the benefit of the Liquidating Trust all Claims, rights, and Causes of Action transferred to the Liquidating Trust (whether such suits are brought in the name of the Liquidating Trust or otherwise) and (ii) otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Liquidating Trustee pursuant to the Creditors' Plan. Any and all proceeds generated from the Liquidating Trust Assets shall be the property of the Liquidating Trust.

11.5.3 On and after the Effective Date the Liquidating Trustee may operate its business and may use, acquire, or dispose of property and compromise or settle any interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**11.6    Investment Powers**.  The right and power of the Liquidating Trustee to invest assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 10.6 of this Creditors' Plan) only in Cash and Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; provided, however, that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, and (b) the Liquidating Trustee may expend the assets of the Liquidating Trust (i) as reasonably necessary to meet contingent liabilities and maintain the value of the assets of the Liquidating Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Liquidating Trust (or to which the assets are otherwise subject) in accordance with the Creditors' Plan or the Liquidating Trust Agreement.

**11.7    Annual Distribution; Withholding**.  The Liquidating Trustee shall distribute at least semi-annually to the holders of the Claims, all net Cash income plus all net Cash proceeds

35

from the liquidation of the Liquidating Trust Assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Liquidating Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Liquidating Trust during liquidation, (ii) to pay reasonable administrative expenses (including fees owed to the United States Trustee and any taxes imposed on the Liquidating Trust or in respect of the assets of the Liquidating Trust), (iii) to satisfy other liabilities incurred or assumed by the Liquidating Trust (or to which the assets are otherwise subject) in accordance with the Creditors' Plan or the Liquidating Trust Agreement, and (iv) as determined by the Liquidating Trust Advisory Board, to fund the operations of the Liquidating Trust. All such distributions to be made under the Liquidating Trust Agreement shall be made by the Liquidating Trustee. The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidating Trustee's reasonable sole discretion, to be required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

**11.8    Reporting Duties**.

11.8.1  Federal Income Tax Treatment of the Liquidating Trust.

(a)    Liquidating Trust Assets Treated as Owned by Creditors. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the beneficiaries of the Liquidating Trust) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the beneficiaries of the Liquidating Trust, whether their Claims are Allowed on or after the Effective Date, as (a) a transfer of the Liquidating Trust Assets directly to those holders of Allowed Claims receiving Liquidating Trust Interests (other than to the extent allocable to Disputed Claims), followed by (b) the transfer by such Persons to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust (and in respect of the Liquidating Trust Assets allocable to the Disputed Claims Reserve, as a transfer to the Disputed Claims Reserve). Accordingly, those holders of Allowed Claims receiving Liquidating Trust Interests shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Liquidating Trust Assets. The foregoing treatment also shall apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b)    Tax Reporting.

(i)    The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 10.8. The Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns. The Liquidating Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental unit.

(ii)    The Liquidating Trustee shall be responsible for payments, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or its assets.

36

(iii)    The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

**11.9    Liquidating Trust Implementation.**  On the Effective Date, the Liquidating Trust shall be established and become effective for the benefit of the holders of Allowed Secured Claims and Allowed General Unsecured Claims and Insider Claims. The Liquidating Trust Agreement shall be included in the Plan Supplement and shall contain provisions similar to those contained in trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust for federal income tax purposes. All parties (including the Debtors, the Liquidating Trustee, and holders of Allowed Secured Claims, and Allowed General Unsecured Claims and Insider Claims) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Liquidating Trust.

**11.10    Registry of Beneficial Interests.**  The beneficial interests in the Liquidating Trust will not be represented by certificates and will not be transferable except pursuant to the laws of descent and distribution or otherwise by operation of law; provided, however, that such prohibition on transferability of beneficial interests is not intended to impair the ability of holders of Claims to assign their Claims pursuant to and in accordance with the Bankruptcy Rules and applicable law. The Liquidating Trustee shall maintain a registry of the holders of Liquidating Trust Interests as set forth in the Liquidating Trust Agreement. The Liquidating Trust Interests may not be transferred or assigned, except by operation of law or by will or the laws of descent and distribution.

**11.11    Termination.**  The Liquidating Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, on or prior to the date that is ninety (90) days prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust if it is necessary to the liquidation of the Liquidating Trust Assets. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least 90 days prior to the expiration of each extended term; provided, however, that in no event shall the term of the Liquidating Trust extend past the tenth (10th) anniversary of the Effective Date.

**11.12    Powers of the Liquidating Trustee as Disbursing Agent.**  The Liquidating Trustee shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Creditors' Plan, (b) establish the Disbursement Account and make distributions contemplated by the Creditors' Plan, (c) comply with the Creditors' Plan and the obligations hereunder, (d) file all tax returns and pay taxes in connection with the reserves created pursuant to the Creditors' Plan, and (e) exercise such other powers as may be vested in the Liquidating Trustee pursuant to an order of the Bankruptcy Court, pursuant to the Creditors' Plan, or as deemed by the Liquidating Trustee to be necessary and proper to implement the provisions of the Creditors' Plan.

**11.13    Exculpation.**  From and after the Effective Date, except as otherwise expressly provided in the Liquidating Trust Agreement, the Liquidating Trustee shall be exculpated by all persons and Entities, including, without limitation, holders of Claims and other parties in interest from any and all Claims, Causes of Action, and other assertions of liability arising out of the

37

discharge of the powers and duties conferred upon such Liquidating Trustee by the Creditors' Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Creditors' Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Liquidating Trustee. No holder of a Claim or other party in interest shall have or pursue any Claim or Cause of Action against the Liquidating Trustee for making payments in accordance with the Creditors' Plan or for implementing the provisions of the Creditors' Plan.

## ARTICLE XII
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**12.1** **Delivery of Distributions**. Subject to the provisions of Bankruptcy Rule 9010, distributions and deliveries to holders of Allowed Claims shall be made at the address of such holders as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on proofs of claim filed by such holders, or at the last known address of such holders if no proof of claim is filed or if the Liquidating Trustee and/or Debtors have been notified in writing of a change of address.

**12.2** **Interim and Final Distributions of Net Available Funds**.

12.2.1 Distributions of Net Available Collateral Proceeds. The Liquidating Trustee shall administer, sell or otherwise dispose of all of the Collateral. Subject to the provisions of the Creditors' Plan, the Trustee shall deposit all Collateral Proceeds realized from such disposition into a segregated Collateral Proceeds Account of the Liquidating Trust, and shall regularly report to the respective holders of the Allowed Claims on the amount of Collateral Proceeds held within said account. Following the Effective Date, the Trustee shall, from time to time, make distributions of Collateral Proceeds to the Allowed Secured Claims in accordance with the provisions of Section 4.3.1 of the Creditors' Plan. Each such distribution to the holder of the Allowed Secured Claim shall be made upon the earlier of (a) a written request from the holder of the Allowed Secured Claim for the Liquidating Trustee to make a distribution, or (b) the Liquidating Trustee's determination, in the exercise of reasonable discretion, that such a distribution is warranted.

12.2.2 Distributions of Net Available Liquidating Trust Proceeds. As soon as practicable after the Effective Date, the Liquidating Trustee shall make an initial distribution of Net Available Liquidating Trust Proceeds to the holders of Allowed General Unsecured Claims in accordance with the provisions of Section 4.4.1 of the Creditors' Plan. Thereafter, the Liquidating Trustee shall, from time to time as he deems warranted in his reasonable discretion, make additional distributions of Net Available Liquidating Trust Proceeds to the holders of Class 5 Insider Claims and Allowed General Unsecured Claims as Disputed Claims within Class 4 are finally determined and/or as Net Available Liquidating Trust Proceeds are made available for further distributions. Prior to making each additional or the final distribution, the Liquidating Trustee shall recalculate each holder's Pro Rata Share to ensure that each such holder will have received, in the aggregate, a Pro Rata Share of the distributions consistent with the treatment provisions of Article IV of the Creditors' Plan.

**12.3** **Conditions to Distributions; Warranty of Entitlement**. No holder of an Allowed Claim shall be entitled to a distribution under the Creditors' Plan unless and until such holder provides to the Liquidating Trustee such holder's taxpayer identification number. Each

38

and every Creditor who receives and accepts a distribution under the Creditors' Plan on account of an Allowed Claim is deemed to have warranted to the Liquidating Trustee and the Liquidating Trust that such Creditor is the lawful holder of the Allowed Claim, such Creditor is authorized to receive the distribution, and that there are no outstanding commitments, agreements or understandings, express or implied, that may or can, in any way, defeat or modify the right of the Creditor to receive the distribution.

**12.4    Undeliverable Distributions**.

12.4.1  <u>Holding of Undeliverable Distributions</u>.  If any distribution to any holder is returned to the Liquidating Trustee as undeliverable, no further distributions shall be made to such holder unless and until the Liquidating Trustee is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Liquidating Trustee until such time as a distribution becomes deliverable. All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Creditors' Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

12.4.2  <u>Failure to Claim Undeliverable Distributions</u>. Any holder of an Allowed Claim that does not assert its rights pursuant to the Creditors' Plan to receive a distribution within five (5) years from and after the Effective Date shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan against the Debtors or their respective property. In such case, any consideration held for distribution on account of such Claim shall revert to the Liquidating Trust.

**12.5    Time Bar to Cash Payments**.  Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within 180 days from and after the date of issuance thereof. Requests for re-issuance of any check shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the fifth (5th) anniversary of the Effective Date or (b) 180 days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Liquidating Trust shall retain all monies related thereto.

**12.6    Distributions After Effective Date**.  Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Section 11.2 of the Creditors' Plan.

**12.7    Setoffs**.  Other than respect to the Claims of the Plan Proponents, the Liquidating Trustee may, pursuant to applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Creditors' Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights, and causes of action of any nature the Debtors may hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trustee of any such claims, rights, and causes of action that the Debtors or the Liquidating Trustee may possess against such holder, and; provided, further, that, unless otherwise provided by order of the Bankruptcy Court,

nothing contained in the Creditors' Plan is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 556, 559, 560, or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment.

**12.8** <u>**Allocation of Plan Distributions Between Principal and Interest**</u>. To the extent that any Allowed Claim entitled to a distribution under the Creditors' Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**12.9** <u>**Limited Recoveries**</u>. Notwithstanding anything contained herein to the contrary, in the event that the sum of distributions from Plan Currency, including distributions from the Liquidating Trust, are equal to or in excess of one hundred percent (100%) of any holder's Allowed Claim, then distributions from the Liquidating Trust to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Liquidating Trust Interests for and on behalf of holders of other Liquidating Trust Interests and accordingly shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Liquidating Trust Interests and the Bankruptcy Code.

# ARTICLE XIII
# EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**13.1** <u>**Assumption or Rejection of Executory Contracts and Unexpired Leases**</u>. The Successful Bidder for the Grain Facility Assets, will acquire and ultimately terminate the leases between Ag Service and the Debtors. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all other executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be assumed on the Cure Schedule contained in the Plan Supplement; <u>provided</u>, <u>however</u>, that the Plan Proponents reserve the right, on or prior to the Confirmation Date, to amend the Cure Schedule to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, assumed or rejected. The Plan Proponents shall provide notice of any amendments to the Cure Schedule to the parties to the executory contracts and unexpired leases affected thereby. Nondebtor parties to executor or unexpired leases appearing on the Cure Schedule who object to or dispute the assumability of their contract or lease, or who dispute the proposed cure amounts specified in the Cure Schedule, must file their objections and provide notice to the Plan Proponents of such objections prior to the Confirmation Hearing. All such objections not timely filed and served within such time will be forever barred from assertion against the Debtors and their estates. The listing of a document on the Cure Schedule shall not constitute an admission by the Plan Proponents that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

**13.2    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases**.  Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 12.1 of this Creditors' Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Liquidating Trustee may assume, assume and assign, or reject the unexpired leases specified in Section 12.1 of this Creditors' Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 12.1 of this Creditors' Plan.

**13.3    Inclusiveness**.  Unless otherwise specified on the Cure Schedule, each executory contract and unexpired lease listed or to be listed on the Cure Schedule shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on the Cure Schedule.

**13.4    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**. Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Liquidating Trustee shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Creditors' Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto, or as otherwise may be agreed to by the parties.

**13.5    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 12.1 of the Creditors' Plan must be filed with the Bankruptcy Court and served upon the Liquidating Trustee no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule 1(A) or 1(B). All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates.

**13.6    Insurance Policies**.  Notwithstanding anything contained in the Creditors' Plan to the contrary, unless subject to a motion for approval or rejection that has been filed and served prior to the Confirmation Date, all of the Debtors' insurance policies, if any, on the Collateral and any agreements, documents or instruments relating thereto, or that insure the life of a Debtor or Insider (which may be assumed by the Debtors), shall be treated as executory contracts under the Plan and shall be assumed pursuant to the Plan, effective as of the Effective Date. Nothing contained in this Section 13.6 shall constitute or be deemed a waiver of any Cause of Action that the Liquidating Trustee may hold against any Entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

41

## ARTICLE XIV
## CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN;
## IMPLEMENTATION PROVISIONS

**14.1** <u>**Conditions Precedent to Effective Date of the Plan**</u>. The occurrence of the Effective Date and the substantial consummation of the Creditors' Plan are subject to satisfaction of the following conditions precedent:

14.1.1 <u>Entry of the Confirmation Order</u>. The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Plan Proponents and the Successful Bidder for the Grain Facility Assets, the effectiveness of which shall not have been stayed fourteen (14) days following the entry thereof; provided that the Successful Bidder for the Grain Facility Assets may waive this fourteen (14) day period and consummate the purchase of the Grain Facility Assets prior to the date the Confirmation Order becomes a Final Order.

14.1.2 <u>Execution of Documents; Other Actions</u>. All other actions and documents necessary to implement the Creditors' Plan shall have been effected or executed in accordance with the terms of the Creditors' Plan.

14.1.3 <u>Liquidating Trust</u>. The Liquidating Trust Agreement shall have been executed and all steps necessary to establish the Liquidating Trust in accordance with the terms of the Creditors' Plan.

**14.2** <u>**Waiver of Conditions Precedent**</u>. The Plan Proponents, to the extent not prohibited by applicable law, may waive one (1) or more of the conditions precedent to effectiveness of the Creditors' Plan set forth in Section 13.1 hereof.

**14.3** <u>**Notice of the Effective Date**</u>. On or before ten (10) Business Days after occurrence of the Effective Date, the Liquidating Trustee shall mail or cause to be mailed to all holders of Claims a Notice that informs such holders of (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the rejection of the Executory Contracts of the Debtors pursuant to the Creditors' Plan, as well as the deadline for the filing of Claims arising from such rejection; (d) the deadline established under the Creditors' Plan for the filing of Administrative Expense Claims; (e) the procedures for requesting certain notices; (f) the procedures for changing an address of record; and (g) such other matters as the Liquidating Trustee deems to be appropriate.

## ARTICLE XV
## EFFECT OF CONFIRMATION

**15.1** <u>**Binding Effect of Plan**</u>. Upon the Effective Date, the Creditors' Plan and each of its provisions shall be binding on the Plan Proponents, the Debtors, the Liquidating Trust, the Liquidating Trustee, all Creditors, and all Persons acquiring property under the Creditors' Plan, whether or not they voted to accept the Creditors' Plan, whether or not they had a right to vote on the Creditors' Plan, whether or not any Claim or Interest held by any of them is impaired under the Creditors' Plan, whether or not any Claim or Interest held by any of them is Allowed in full, only in part, or disallowed in full, and whether or not a distribution is made to any of them under the Creditors' Plan.

**15.2** **Title to and Vesting of Assets**.  On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the estates of the Debtors, with the exception of the Exempt Assets, shall vest in the Liquidating Trust, free and clear of all Claims, Liens, encumbrances, and other interests, except for Allowed Secured Claims, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors except as provided in the Creditors' Plan. From and after the Effective Date, the Debtors may utilize their Exempt Assets and may use, acquire, and dispose of property free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

**15.3** **Discharge of Claims**.  Except as otherwise provided in the Creditors' Plan or in the Confirmation Order, the rights afforded in the Creditors' Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction and discharge of all existing debts and Claims, of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Creditors' Plan, on the Effective Date, all existing Claims against the Debtors shall be deemed to be satisfied and discharged, and all holders of Claims shall be precluded and enjoined from asserting against the Debtors or the Liquidating Trust, or any of their respective assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim.

**15.4** **Discharge of Debtors**.  Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, the Debtors shall be discharged of all Claims, rights, and liabilities that arose prior to the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code. Upon the Effective Date, all Persons and Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from asserting against the Debtors, the Liquidating Trust, or their respective successors or assigns, including, without limitation, the Debtors, the Liquidating Trust, or their respective asset properties or interests in property, any discharged Claim against the Debtors, any other or further Claims, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefore were known or existed prior to the Confirmation Date regardless of whether a proof of Claim was filed, whether the holder thereof voted to accept or reject the Creditors' Plan, or whether the Claim is an Allowed Claim.

**15.5** **Injunction on Claims**.  Except as otherwise expressly provided in the Creditors' Plan, the Confirmation Order, or such other order of the Bankruptcy Court that may be applicable, all Persons or Entities who have held, hold, or may hold Claims, or other debt or liability that is discharged pursuant to the Creditors' Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim, or other debt or liability that is terminated or cancelled pursuant to the Creditors' Plan against the Debtors, the Debtors' estates, or properties or interests in properties of the Debtors, the Successful Bidder for the Grain Facility Assets, properties or interests in the properties of the Successful Bidder for the Grain Facility Assets or the Grain Facility Assets, the Liquidating Trustee, or the Liquidating Trust, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or

43

order against the Debtors, the Debtors' estates or properties, the Successful Bidder for the Grain Facility Assets, properties or interests in the properties of the Successful Bidder for the Grain Facility Assets or the Grain Facility Assets, the Liquidating Trustee, the Liquidating Trust, or interests in properties of the Debtors, or the Liquidating Trust, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors' estates or properties, the Successful Bidder for the Grain Facility Assets, properties or interests in the properties of the Successful Bidder for the Grain Facility Assets or the Grain Facility Assets, the Liquidating Trustee, the Liquidating Trust, or interests in properties of the Debtors, or the Liquidating Trust, (d) except to the extent provided, permitted, or preserved by sections 553, 555, 556, 559, 560 or 561 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Debtors' estates or properties, the Successful Bidder for the Grain Facility Assets, properties or interests in the properties of the Successful Bidder for the Grain Facility Assets or the Grain Facility Assets, the Liquidating Trustee, the Liquidating Trust, or interests in properties of the Debtors, or the Liquidating Trust with respect to any such Claim or other debt or liability that is discharged pursuant to the Creditors' Plan, and (e) taking any actions to interfere with the implementation or consummation of the Creditors' Plan. The Successful Bidder for the Grain Facility Assets shall be entitled to enforce the injunction set forth in Section 14.5 as it applies to the Successful Bidder for the Grain Facility Assets, properties or interests in the properties of the Successful Bidder for the Grain Facility Assets, or the Grain Facility Assets. To the extent permitted by applicable law, the Successful Bidder for the Grain Facility Assets is not a successor to any of the Debtors or its bankruptcy estate by reason of any theory of law or equity, and the Successful Bidder for the Grain Facility Assets shall not assume or in any way be responsible for any Liability of a Debtor and/or its bankruptcy estate, except as otherwise expressly provided in the Grain Facility Assets APA.

**15.6** **Term of Existing Injunctions or Stays**. Unless otherwise provided in the Creditors' Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

**15.7** **Exculpation**. None of the Plan Proponents, the Liquidating Trustee, the Debtors, and any of their respective directors, officers, employees, members, attorneys, consultants, advisors, and agents (but solely in their capacities as such), shall have or incur any liability to any holder of a Claim of any other Entity for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, confirmation, approval, or administration of this Creditors' Plan or any compromises or settlements contained therein, the Disclosure Statement related thereto, the property to be distributed under the Creditors' Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Creditors' Plan; provided, however, that the foregoing provisions of this Section 14.7 shall not affect the liability of (a) any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, (b) the professionals of the Debtors, or the Liquidating Trustee, to their respective clients pursuant to applicable codes of professional conduct, (c) any of such Persons with respect to any act or omission prior to the Petition Date, except as otherwise

44

expressly set forth elsewhere in the Creditors' Plan or (d) any Entity with respect to their obligations pursuant to the Creditors' Plan. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Creditors' Plan.

### 15.8 Preservation of Causes of Action / Reservation of Rights.

15.8.1 Except with respect to Released Actions, nothing contained in the Creditors' Plan or the Confirmation Order shall be deemed to be a waiver, release, or the relinquishment of any rights or Causes of Action that the Debtors or the Liquidating Trust may have or which the Debtors or the Liquidating Trust may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, and (ii) the turnover of any property of the Debtors' estates.

15.8.2 Except with respect to Released Actions and the discharge of the Debtors and the release of Vivadell Olsen as specified in the Creditors' Plan, nothing contained in the Creditors' Plan or the Confirmation Order shall be deemed to be a waiver, release, or relinquishment of any Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Creditors' Plan. The Debtors or the Liquidating Trust, as the case may be, shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced or the Liquidating Trust Claims had not been transferred to the Liquidating Trust in accordance with the Creditors' Plan, and all of the Debtors' legal and equitable rights respecting any Claim left unimpaired by the Creditors' Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 15.9 Injunction on Causes of Action. Except as provided in the Creditors' Plan, as of the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Causes of Action, whether directly, derivatively, on account of or respecting any debt or Cause of Action (i) which the Liquidating Trust retain sole and exclusive authority to pursue in accordance with Section 8.1 of the Creditors' Plan or (ii) which has been released pursuant to the Creditors' Plan, including, without limitation, pursuant to Sections 14.10 or 14.11 of the Creditors' Plan and the Confirmation Order shall provide for such injunctions, or (iii) against ADM.

### 15.10 Releases by the Debtors. On the Effective Date, effective as of the Confirmation Date, to the fullest extent permissible under applicable law, the Debtors and all Entities claiming by and through the Debtors shall release and be permanently enjoined from any prosecution or attempted prosecution of the Released Actions, or any Cause of Action, liability, or Claim against ADM.

### 15.11 Releases by Claim Holders. On the Effective Date, effective as of the Confirmation Date, to the fullest extent permissible under applicable law, each Person who votes to accept the Creditors' Plan, any Person who receives a distribution under the Creditors' Plan

45

shall be deemed to (i) consensually forever release and be permanently enjoined from any prosecution or attempted prosecution of any Released Actions which such Person has or may have against the Plan Proponents.

## ARTICLE XVI
## RETENTION OF JURISDICTION

**16.1** **Retention of Jurisdiction**. The Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Creditors' Plan, or that relates to the following purposes:

(a)   to resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Creditors' Plan, to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

(b)   to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Creditors' Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Creditors' Plan;

(c)   to determine any and all motions, adversary proceedings, applications, and contested or litigation matters that may be pending on the Effective Date or that, pursuant to the Creditors' Plan, may be instituted by the Debtors or the Liquidating Trust prior to or after the Effective Date (which jurisdiction shall be non-exclusive as to any non-core matters);

(d)   to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(e)   to hear and determine any timely objections to Administrative Expense Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

(f)   to resolve any Disputed Claims;

(g)   to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(h)   to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(i)   to consider any modifications of the Creditors' Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

46

(j)      to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(k)      to hear and determine disputes arising in connection with or relating to the Creditors' Plan or the interpretation, implementation, or enforcement of the Creditors' Plan or the extent of any Entity's obligations incurred in connection with or released under the Creditors' Plan;

(l)      to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Creditors' Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(m)      to determine any other matters that may arise in connection with or are related to the Creditors' Plan, the Disclosure Statement, the Confirmation Order, or any other contract, instrument, release, or other agreement or document created in connection with the Creditors' Plan or the Disclosure Statement;

(n)      to recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(o)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(p)      to determine the scope of any discharge of any Debtor under the Creditors' Plan or the Bankruptcy Code;

(q)      to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

(r)      to enforce the terms of the Liquidating Trust Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Liquidating Trust Agreement, any breach or default under the Liquidating Trust Agreement, or the transactions contemplated by the Liquidating Trust Agreement; and

(s)      to enter a final decree closing the Chapter 11 Cases.

## ARTICLE XVII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**17.1    Modification of the Plan**.  The Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Creditors' Plan, or any exhibits to the Creditors' Plan at any time prior to entry of the Confirmation Order, including, without limitation, to exclude one (1) or more Debtors from the Creditors' Plan. Upon entry of the Confirmation Order, the Plan Proponents may, upon order of the Bankruptcy Court, amend or modify the Creditors' Plan, in accordance with section 1127(b) of the Bankruptcy Code, including, without limitation, to exclude one (1) or more Debtors from the Creditors; Plan, or remedy any defect or omission or reconcile any inconsistency in the Creditors' Plan in such

47

manner as may be necessary to carry out the purpose and intent of the Creditors' Plan. A holder of a Claim that has adopted the Creditors' Plan shall be deemed to have accepted the Creditors' Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

**17.2** **Revocation or Withdrawal of the Plan**.

17.2.1 The Creditors' Plan may be revoked or withdrawn prior to the Confirmation Date by the Plan Proponents.

17.2.2 If the Creditors' Plan is revoked or withdrawn prior to the Confirmation Date, or if the Creditors' Plan does not become effective for any reason whatsoever, the Creditors' Plan shall be deemed null and void.

## ARTICLE XVIII
## MISCELLANEOUS PROVISIONS

**18.1** **Effectuating Documents and Further Transactions**. Each of the Debtors shall be required to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Creditors' Plan and any securities issued pursuant to the Creditors' Plan.

**18.2** **Withholding and Reporting Requirements**. In connection with the consummation of the Creditors' Plan, Liquidating Trustee , shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Creditors' Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Creditors' Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**18.3** **Payment of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid as and when due by the Liquidating Trustee or otherwise pursuant to an agreement between the Liquidating Trustee and the United States Department of Justice, Office of the United States Trustee, until such time as a Chapter 11 Case for a Debtor shall be closed.

**18.4** **Expedited Tax Determination**. The Liquidating Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for all taxable periods through the Effective Date.

**18.5** **Post-Confirmation Date Fees and Expenses**. From and after the Confirmation Date, the Liquidating Trust shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, (a) retain professionals and (b) pay the reasonable fees and expenses (including reasonable professional fees and expenses) incurred by the Liquidating

Trust and the Debtors, as the case may be, related to implementation and consummation of or consistent with the provisions of the Creditors' Plan.

**18.6** **Substantial Consummation**.  On the Effective Date and after payment of all Allowed Administrative Expense Claims, including United States Trustee Fees, and specifically excluding Priority Tax Claims not yet due, the Creditors' Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**18.7** **Severability**.  If, prior to the Confirmation Date, any term or provision of the Creditors' Plan shall be held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Creditors' Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Creditors' Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**18.8** **Governing Law**.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or document contained in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under this Creditors' Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Wisconsin, without giving effect to principles of conflicts of laws.

**18.9** **Time**.  In computing any period of time prescribed or allowed by the Creditors' Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**18.10** **Binding Effect**.  The Creditors' Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims, the Liquidating Trust, and their respective successors and assigns.

**18.11** **Exhibits/Schedules**.  All exhibits and schedules to the Creditors' Plan, including the Plan Supplement, are incorporated into and are a part of the Creditors' Plan as if set forth in full herein.

**18.12** **Notices**.  All notices, requests, and demands to or upon the Plan Proponents, Liquidating Trustee, Debtors, Stalking Horse Bidder for the Grain Facility Assets, or the Debtors in Possession, to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

OMAC, LLC, Ag Services, LLC and Philmar, LLC
895 W. 20th Avenue
Oshkosh, WI 54902
Attention:  Phillip J. Martini

49

With a copy to:

Liebmann, Conway, Olejniczak & Jerry, S.C.
231 S. Adams Street
Green Bay, WI 54301
Attention:  Thomas M. Olejniczak

BNP Paribas, as Administrative Agent
787 Seventh Avenue
New York, NY  10019
Attention:  Kathryn B. Quinn

With a copy to:

Munsch Hardt Kopf & Harr, P.C.
3800 Lincoln Plaza
500 N. Akard Street
Dallas, TX  75201
Attention:  Russell L. Munsch

West Pointe Bank
c/o Denis Bartell
Dewitt Ross & Stevens
Two East Mifflin Street, Suite 600
Madison, WI 53703-2599

Maria S. Lazar (WI Bar No. 1017150)
Assistant Attorney General
J.B. Van Hollen
Attorney General
17 W. Main Street
Madison, WI  53707

Archer-Daniels-Midland Company
Attn: Jim Shafter
4666 Faries Parkway
Decatur, IL 62526

With a copy to:

Kirkland & Ellis LLP
Attn:  James H.M. Sprayregen, Ryan B. Bennett, and William A. Guerrieri
300 North LaSalle
Chicago, IL 60654
Email:  james.sprayregen@kirkland.com, ryan.bennett@kirkland.com, and
will.guerrieri@kirkland.com

50

**18.13    <u>Closing of the Chapter 11 Cases</u>**.  The Liquidating Trustee shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court.

**18.14    <u>Section Headings</u>**.  The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

**18.15    <u>Exemption from Registration</u>**.  Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of the Plan Currency on account of, and in exchange for, the Claims against the Debtors shall be exempt from registration pursuant to section 5 of the Securities Act of 1933 and any other applicable nonbankruptcy law or regulation.

**18.16    <u>Exemption from Transfer Taxes</u>**.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of Plan Currency pursuant to the Creditors' Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Creditors' Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**18.17    <u>Inconsistencies</u>**.  To the extent of any inconsistencies between the information contained in the Disclosure Statement and the terms and provisions of the Creditors' Plan, the terms and provisions contained herein shall govern.

Dated: August 30, 2011.

**LIEBMANN, CONWAY, OLEJNICZAK & JERRY, S.C.**

/s/ Colleen M. Kelly

_____

Thomas M. Olejniczak (Bar No. 1015820)
Colleen M. Kelly (Bar No. 1066300)
231 South Adams Street
Post Office Box 23200
Green Bay, Wisconsin  54305-3200
Phone: (920) 437-0476
Facsimile: (920) 437-2868
E-mail: tmo@lcojlaw.com
        cmk@lcojlaw.com

*ATTORNEYS FOR OMAC, LLC PHILMAR, LLC, AND AG SERVICES OF WISCONSIN, LLC*

**DEWITT, ROSS & STEVENS, S.C.**

/s/ Paul Croake

_____

Paul Croake (WI Bar No. 1015052)
Denis Bartell (WI Bar No. 1014532)
Two East Mifflin Street, Suite 600
Madison, WI 53703-2599
E-mail: pac@dewittross.com
        dpb@dewittross.com

*ATTORNEYS FOR WEST POINTE BANK*

**WISCONSIN DEPARTMENT OF JUSTICE**

/s/ Maria S. Lazar

_____

Maria S. Lazar (WI Bar No. 1017150)
Assistant Attorney General
J.B. Van Hollen
Attorney General
17 W. Main Street
Madison, WI  53707
Email:  lazarms@doj.state.wi.us

*ATTORNEYS FOR STATE OF WISCONSIN DEPARTMENT OF TRANSPORTATION*

52

**GODFREY & KAHN, S.C.**

_____
Carla O. Andres (WI Bar No. 1020997)
Timothy F. Nixon (WI Bar No. 1013753)
333 Main Street, Suite 600
Post Office Box 13067-3067
Green Bay, Wisconsin 54307-3067
Phone: (920) 432-9300
Facsimile: (920) 436-7988
E-mail: candres@gklaw.com
tnixon@gklaw.com

**MUNSCH HARDT KOPF & HARR, P.C.**
Russell L. Munsch (TX Bar No. 14671500)
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7555
Facsimile: (214) 978-4369
E-mail: rmunsch@munsch.com

*ATTORNEYS FOR BNP PARIBAS*

6646205_5

53

# EXHIBIT A

**Memorandum of Understanding**

## MEMORANDUM OF UNDERSTANDING

**THIS MEMORANDUM OF UNDERSTANDING** (this "MOU") entered into this 22 day of July, 2011 by and between BNP Paribas, as administrative agent for a syndicate of lenders (in such capacity, the "Administrative Agent"); Olsen's Mill Acquisition Company, LLC ("OMAC"), Ag Services of Wisconsin, LLC ("Ag Services"); Philip Martini ("Martini") and Archer-Daniels-Midland Company ("ADM").

### Recitals:

**WHEREAS**, OMAC purchased certain assets previously owned by Olsen Mills, Inc. ("OMI") through a receivership ("Receivership") proceeding in the Circuit Court ("Circuit Court") for Green Lake County, Wisconsin, such assets are described in Exhibit 1 hereto (the "OMAC Assets"). Since April of 2009, OMAC and Ag Services have operated a grain and agronomy business which is comprised of the OMAC Assets, receivables, inventory (including, without limitation, grain inventory) and other additional assets (the "OMAC Business");

**WHEREAS**, the Administrative Agent objected to OMAC's proposed acquisition of the OMAC Assets in the Receivership proceedings, alleging that the Circuit Court lacked the authority to order the sale of the OMAC Assets free and clear of the Administrative Agent's liens over the Administrative Agent's objection, and that the proposed sale contravened the order of distribution of proceeds required under Wis. Stat. § 128.17(1). OMAC disputed such allegations;

**WHEREAS**, pursuant to the Administrative Agent's appeal of the Circuit Court's order approving the sale of the OMAC Assets to OMAC, the Supreme Court of Wisconsin entered its opinion on July 8, 2011, ruling that the Circuit Court lacked the authority to order the sale of the OMAC Assets free and clear of the Administrative Agent's secured liens over the Administrative Agent's objection, that the sale contravened the order of distribution of proceeds required under Wis. Stat. § 128.71(1), and remanded the proceedings to the Circuit Court in order to fashion an appropriate remedy for the Administrative Agent. The Administrative Agent asserts that such remedies may include, without limitation, money damages, the Administrative Agent's retention of its liens over the OMAC Assets, and/or other relief. OMAC disputes such assertions;

**WHEREAS**, subsequent to purchasing the OMAC Assets, OMAC entered into certain lease arrangements with Paul and David Olsen to lease certain assets which were previously owned by Olsen Brothers Enterprise ("OBE");

**WHEREAS**, Paul and David Olsen, and their wives (collectively, the "Olsens"), filed for bankruptcy protection in the U.S. Bankruptcy Court for the Eastern District Court of Wisconsin during December of 2010 (the "Olsens Bankruptcy Proceeding");

**WHEREAS**, the Administrative Agent has filed claims in the Olsens Bankruptcy Proceeding exceeding $50 million;

**WHEREAS**, the Olsens own certain grain assets described in Exhibit 2 hereto (the "Lot 1 Grain Facility Assets" and, together with the OMAC Business are called the "Designated Assets" herein);

**WHEREAS**, ADM desires, in accordance with the terms and subject to the conditions herein, to purchase substantially all of (a) the Lot 1 Grain Facility Assets from the Olsens' bankruptcy estate pursuant to the Amended Plan (as such term is defined below), and (b) the OMAC Business from OMAC; and

**WHEREAS**, the Administrative Agent, OMAC, Ag Services and ADM have met and agreed to work together to present a plan to allow ADM to purchase the Lot 1 Grain Facility Assets and the OMAC Business free and clear of all liens, claims and encumbrances and to resolve the claims of OMAC and the Administrative Agent in the Receivership.

WITNESSETH:

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Purchase Price</u>. Subject to satisfaction or waiver of the conditions specified in the definitive purchase and sale agreement, and in accordance with the terms set forth herein, ADM agrees to pay, in US dollars and in immediately available funds, a total aggregate amount equal to the Purchase Price (as such term is defined below) in exchange for the Designated Assets at the closing for the purchase and sale of the respective Designated Assets. In connection with the foregoing, each of the parties agrees as follows:

   (a) ADM shall undertake all reasonable actions and undertakings to serve as the stalking horse bidder for the Lot 1 Grain Facility Assets under the Amended Plan and, in connection therewith, place a minimum bid therefor in the amount of $15,846,839.00, (the "<u>Lot 1 Grain Facility Assets Purchase Price</u>") (such amount is based on the estimated claims secured by such assets), for such assets; provided that in no event shall ADM be required to increase such minimum bid and such purchase shall be free and clear of all liens, claims, encumbrances and liabilities; and

   (b) If ADM's bid for the Lot 1 Grain Facility Assets is approved as the successful bid by a final, non-appealable order of the bankruptcy court approving the Amended Plan and the purchase and sale of the Lot 1 Grain Facility Assets by ADM is closed (any of the foregoing under this clause (b), the "<u>Closing of the Lot 1 Grain Facility Assets Sale</u>"), then:

      (i) OMAC irrevocably agrees to sell to ADM, and ADM irrevocably agrees to purchase from OMAC, the OMAC Business, in exchange for the amount of $30,403,161.00 (the "<u>OMAC Business Purchase Price</u>" and, together with the Lot 1 Grain Facility Assets Purchase Price, the "<u>Purchase Price</u>"); provided, that such purchase is free and clear of all liens, claims and encumbrances; provided, further, that the Closing of the Lot 1 Grain Facility Assets Sale may be waived by ADM in its sole and absolute discretion; and

      (ii) ADM agrees to pay in full the total amount of the Lot 1 Grain Facility Assets Purchase Price when and as required by the Amended Plan.

2. <u>Additional Agreements Relating to the Purchase Price</u>. The parties hereto agree that the Purchase Price for the Designated Assets is fair and reasonable and has been negotiated at arm's

length and in good faith. ADM will obtain good title to all of the Designated Assets free and clear of all claims, liens and encumbrances, all of which will be satisfied from the proceeds of the sale. ADM will assume operating expenses and liabilities of the OMAC Business, but solely to the extent agreed by ADM in the purchase and sale agreement for the OMAC Business.

3.  <u>Settlement and Compromise of Administrative Agent Claims; Timing of Transaction</u>. (a) The parties hereto agree that upon payment to OMAC of the OMAC Business Purchase Price, OMAC shall promptly and irrevocably pay to the Administrative Agent a total aggregate amount of $7,250,000, in US dollars and in immediately available funds (the "<u>Settlement Amount</u>") in exchange for the settlement and releases described in Section 3(b) hereof.

    (b)     Upon the Administrative Agent's receipt of the Settlement Amount, each of the parties hereto agree that (i) the Administrative Agent, on behalf of itself and each lender, and each of their respective assigns, affiliates, predecessors and successors in interest shall irrevocably release and discharge any and all claims, damages, liens or encumbrances, whether seen or unforeseen, known or unknown, that such party has or may have against (A) OMAC and each of its assigns, affiliates predecessors and successors in interest, (B) Ag Services and each of its assigns, affiliates predecessors and successors in interest, or (C) Martini, in each case, relating to, or in connection with, the sale of any of the OMAC Assets, the Receivership and the Olsens Bankruptcy Proceedings, and (ii) each of (A) OMAC, on behalf of itself and its assigns, affiliates, predecessors and successors in interest, (B) Ag Services, on behalf of itself and its assigns, affiliates, predecessors and successors in interest, and (C) Martini, shall irrevocably release and discharge any and all claims, damages, liens or encumbrances, whether seen or unforeseen, known or unknown, that each such party has or may have against the Administrative Agent or any lender or any of their respective assigns, affiliates predecessors and successors in interest, in each case, relating to, or in connection with, the sale of any of the OMAC Assets, the Receivership and the Olsens Bankruptcy Proceedings.

    (c)     Notwithstanding anything to the contrary contained in this Agreement, unless ADM waives the Closing of the Lot 1 Grain Facility Assets Sale, each of the parties hereto agrees that the closing of the transactions contemplated hereunder, including without limitation, (i) the payment by ADM of the Lot 1 Grain Facility Assets Purchase Price and the OMAC Business Purchase Price, (ii) the purchase (and the corresponding transfer of title) of each of the Lot 1 Grain Facility Assets and the OMAC Business, (iii) the payment by OMAC to the Administrative Agent of the Settlement Amount, and (iv) the release of all claims, damages, liens and encumbrances described in Section 3(b) hereof, shall occur substantially simultaneously on the day of closing and that all the payments of the various funds relating to the transactions hereunder shall all be funded pursuant to an agreed upon funds flow arrangement on such day of closing.

4.  <u>Amended Plan</u>. OMAC, Ag Services and the Administrative Agent agree to promptly take all reasonable efforts to file and support an amended Creditors' Plan of Reorganization in the Olsens Bankruptcy Proceeding which substitutes ADM as the stalking horse bidder for the Lot 1 Grain Facility Assets (the "<u>Amended Plan</u>"). Upon execution of this MOU, the parties agree to meet with the other secured creditors to gain their support for the Amended Plan. The parties shall work together in good faith in the preparation and filing of the Amended Plan.

5. <u>Contingencies</u>. This MOU and the transactions contemplated hereby shall not be binding on ADM until it completes due diligence that is typically undertaken in similar transactions including, but not necessarily limited to, further site visits by engineers and environmental consultants, environmental audits, a thorough review of all pending contracts, hedge positions, examination of inventories, a "timely closing" (see below), etc. and the results of such due diligence investigation are satisfactory to ADM in its sole and absolute discretion. In addition, the consummation of the transactions contemplated hereby are conditioned upon transfer of clear title to all of the Designated Assets to ADM as contemplated hereunder free and clear of all liens, claims, encumbrances and liabilities and execution and delivery of purchase and sale agreements with respect to the Designated Assets, as applicable.

6. <u>Time of the essence</u>. ADM has made the other parties aware that time is of the essence in this matter and in order for ADM to pay the Purchase Price it must have effective control of all of the Designated Assets through a lease and/or sublease, or some other arrangement, by August 1, 2011 and must then close on the purchase of the Designated Assets on or before September 15, 2011.

7. <u>Consulting Agreement</u>. The Administrative Agent is aware that ADM entered into a Consulting Agreement with OMAC and Ag Services on or about July 21, 2011.

8. <u>Cooperation</u>. The parties agree that in order for each of them to obtain the benefits they contemplate from this transaction that it will require the parties to cooperate diligently and in good faith with each other as they move forward. Each of the parties pledge to the others that they will take all reasonable steps to diligently bring this matter to a successful conclusion. The parties do not believe it is possible to set forth each instance such cooperation may be required, however, by way of example the parties agree they will all appear as may be required to present the matter to the Circuit Court for Green Lake County Wisconsin, meet with secured creditors, etc.

9. <u>Fees and expenses</u>. Each party hereto shall be solely responsible for, and bear all of its own fees and expenses, including, without limitation, expenses of legal counsel, accountants, and other advisors, incurred at any time prior to, or in connection with, this MOU and the transactions contemplated hereunder.

10. <u>Closing</u>. The parties agree they shall close as soon as reasonably possible after all requisite approvals have been obtained, e.g. court approvals, and all contingencies have been satisfied. ADM agrees to pay the applicable portions of the Purchase Price above in cash at closing of the respective transactions.

11. <u>Controlling Law</u>. This MOU shall be construed in accordance with the laws of the State of Wisconsin.

12. <u>Confidentiality</u>. Except as required by law or otherwise in the context of the Olsens Bankruptcy Proceeding or the Receivership, the parties agree to keep confidential, on and after the date hereof, all financial and business information of OMAC and Ag Services that (i) has been or will be disclosed in connection with this MOU or the transactions contemplated hereunder and (ii) which has been or will be expressly identified as confidential by the disclosing party. The

Administrative Agent further agrees that it will keep OMAC's outstanding debt as of September 2011 and the B&I loan documents confidential from and after the date hereof.

13. <u>Successors and Assigns</u>. This MOU shall inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this MOU nor any of the rights, interests or obligations hereunder shall be assigned (by merger, sale of stock, operation of law or otherwise) by any party hereto (including its successors and permitted assigns) without the prior written consent of the other parties, and any attempted assignment without such consent shall be null and void; provided that, without limiting ADM's obligations hereunder, ADM may assign its rights to acquire all or a portion of the Designated Assets to an affiliate of ADM without the prior written consent of any other party hereto.

14. <u>Counterparts; Facsimile or Other Electronic Signatures</u>. This MOU may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this MOU by facsimile or other electronic transmission shall be equally as effective as delivery of a manually executed counterpart of this MOU.

15. <u>Amendment; Waiver</u>. No amendment, modification, rescission, waiver or release of any provision of this MOU nor consent to any departure therefrom shall in any event be effective unless the same shall be in writing and signed by each of the parties hereto. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

16. <u>No Third-Party Beneficiaries</u>. This MOU is for the sole benefit of the parties hereto and their permitted assigns, and nothing herein expressed or implied shall give or be construed to give any Person (other than the parties hereto and such permitted assigns) any legal or equitable rights hereunder.

*[Signature page begins on next page]*

**IN WITNESS WHEREOF**, this Memorandum of Understanding has been executed and delivered by each of the parties below as of the day and year first set forth above.

BNP PARIBAS, as Administrative Agent

By: _____
KATHRYN B. QUINN
MANAGING DIRECTOR

Its: _____

By: _____
Albert A. Young, Jr.

Its: _____
Managing Director


OLSEN'S MILL ACQUISITION COMPANY, LLC

By: _____

Its: _____ MEMBER _____


AG SERVICES OF WISCONSIN, LLC

By: _____

Its: _____ MEMBER. _____


_____
Philip Martini


ARCHER-DANIELS-MIDLAND COMPANY

By: _____

Its: _____ ADM Corp VP _____


1031075-2

Exhibit 1 to the Memorandum
of Understanding

[Description of the OMAC Assets begins on next page]

**EXHIBIT 2**

Please see 7.3.1 of Creditors' First Amended Plan for Description of Assets.

**EXHIBIT "B"**

**Creditors' Second Amended Plan of Reorganization with Nonmaterial Modifications as Stated on the Record on August 30, 2011 and Set Forth in Such Notice of Nonmaterial Modification of Second Amended Plan of Reorganization [Docket No. 235] for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, Proposed by Ag Services of Wisconsin, LLC, Philmar, LLC, Olsen's Mill Acquisition Company, LLC, West Pointe Bank, BNP Paribas, as Administrative Agent, and the State of Wisconsin**

# FINAL PLAN SUPPLEMENT

Addendum 1:          Liquidating Trust Agreement

Addendum 2:          Causes of Action

Addendum 3:          Cure Schedule

Addendum 4:          Stalking Horse Asset Purchase Agreement

Addendum 5:          Asset Purchase Agreement

1059767

**ADDENDUM 1**

**OLSENS' LIQUIDATING TRUST AGREEMENT**

DATED: AUGUST 30, 2011

# Table of Contents

Page

ARTICLE I
DEFINITIONS; INTERPRETIVE RULES ............................................................ 2
    1.1.  "Administrative Claim and Tax Reserve" ................................ 2
    1.2.  "Bankruptcy Cases".................................................................. 2
    1.3.  "Bankruptcy Court" ................................................................... 2
    1.4.  "Beneficiaries" .......................................................................... 2
    1.5.  "Disputed Claims Reserve"...................................................... 2
    1.6.  "Distribution Record Date" ....................................................... 2
    1.7.  "Net Available Liquidating Trust Proceeds"............................. 3
    1.8.  "Permitted Investments" ........................................................... 3
    1.9.  "Plan" ..................................................................................... 3
    1.10. "Registry" ................................................................................. 3
    1.11. "Successor Trustee" ................................................................ 3
    1.12. "Termination Date" ................................................................... 3
    1.13. "Undeliverable and Unclaimed Reserve" ................................ 3

ARTICLE II
CREATION OF THE TRUST ........................................................................... 3
    2.1.  Purpose of the Liquidating Trust............................................. 3
    2.2.  Acceptance by Liquidating Trustee......................................... 3
    2.3.  Name of Trust .......................................................................... 4
    2.4.  Transfer of Liquidating Trust Assets ....................................... 4
    2.5.  Issuance of Liquidating Trust Interest ..................................... 4
    2.6.  Funding Expenses of the Liquidating Trust............................. 5
    2.7.  Termination of the Liquidating Trust ....................................... 5

ARTICLE III
RIGHTS, POWERS, AND DUTIES OF LIQUIDATING TRUSTEE.................. 6
    3.1.  Declaration Acknowledging Beneficial Interest ..................... 6
    3.2.  Management of the Liquidating Trust ..................................... 6
    3.3.  Standing to Pursue Causes of Action, Other Claims, Objections
          and Defenses ........................................................................... 8
    3.4.  Reserves .................................................................................. 8
    3.5.  Distributions ............................................................................. 8
    3.6.  Delivery of Distributions ........................................................... 8
    3.7.  Consultation with Liquidating Trust Advisory Board ............... 9
    3.8.  Records and Reporting............................................................ 9
    3.9.  Trustee's Compensation and Reimbursement of Expenses.............. 10
    3.10. Selection and Compensation of Attorneys and Agents ..................... 10
    3.11. Exercise of Power .................................................................... 10
    3.12. Liability of Liquidating Trustee. ............................................... 10
    3.13. Indemnification ........................................................................ 12
    3.14. Bond    .................................................................................... 12
    3.15. Resignation .............................................................................. 12
    3.16. Removal of Liquidating Trustee ............................................... 12
    3.17. Obligations Upon Death, Resignation or Discharge.................. 13
    3.18. Tax Returns and Payment of Taxes. ....................................... 13

i

ARTICLE IV
RIGHTS, POWERS, AND DUTIES OF THE LIQUIDATION TRUST ADVISORY
BOARD ............................................................................................................ 14
    4.1.    Members. .................................................................................. 14
    4.2.    Function, Duties, and Responsibilities. ....................................... 14
    4.3.    Quorum ..................................................................................... 15
    4.4.    Duration .................................................................................... 15
    4.5.    Compensation and Expenses .................................................... 15
    4.6.    Selection and Compensation of Attorneys and Advisors ............ 15
    4.7.    Liability ..................................................................................... 15
    4.8.    Third-Party Beneficiaries ........................................................... 16
    4.9.    Indemnification ......................................................................... 16

ARTICLE V
RIGHTS, POWERS AND DUTIES OF BENEFICIARIES .............................. 16
    5.1.    Interests of Beneficiaries .......................................................... 16
    5.2.    Evidence of Beneficial Interest .................................................. 16
    5.3.    Exemption from Registration ..................................................... 16
    5.4.    Transferability ........................................................................... 17
    5.5.    Distribution to Beneficiaries ...................................................... 17
    5.6.    Warranty of Entitlement ............................................................. 17
    5.7.    Tax Identification Numbers ........................................................ 17
    5.8.    Effect of Death, Incapacity, or Bankruptcy of Beneficiary .......... 17
    5.9.    Conflicting Claims ..................................................................... 17

ARTICLE VI
MISCELLANEOUS ..................................................................................... 18
    6.1.    Interpretation ............................................................................ 18
    6.2.    Filing Documents ...................................................................... 18
    6.3.    Privilege ................................................................................... 18
    6.4.    Valuation of Liquidating Trust Assets ........................................ 18
    6.5.    Applicable Law ......................................................................... 18
    6.6.    Forum for the Resolution of Disputes ........................................ 18
    6.7.    Amendment of the Agreement ................................................... 18
    6.8.    Conflict of Provisions ................................................................ 19
    6.9.    Partial Invalidity ........................................................................ 19
    6.10.   Entire Agreement ..................................................................... 19
    6.11.   No Waiver ................................................................................ 19
    6.12.   Relationship Created ................................................................ 19
    6.13.   Counterparts ............................................................................ 19
    6.14.   Notices .................................................................................... 19
    6.15.   WAIVER OF JURY TRIAL ........................................................ 20
    6.16.   Exculpatory Provisions, Indemnities and Survival Thereof ........ 20
    6.17.   Further Assurances .................................................................. 20
    6.18.   Retained Jurisdiction ................................................................ 21

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 108 of 190

# OLSENS' LIQUIDATING TRUST AGREEMENT
## AND DECLARATION OF TRUST

This Olsens' Liquidating Trust (this "**Agreement**") dated August 30, 2011, by and among Paul E. Olsen and Cheryl R. Olsen (collectively, "**Paul/Cheryl Olsen**") and David A. Olsen and Becky S. Olsen (collectively, "**David/Becky Olsen**"; Paul/Cheryl Olsen and David/Becky Olsen are, collectively, the "**Debtors**") and Michael S. Polsky (the "**Liquidating Trustee**"), in his capacity as the initial liquidating trustee of the Olsens' Liquidating Trust (the "**Liquidating Trust**"), which is established pursuant to that certain Second Amended Creditors' Plan of Reorganization for David A. and Becky S. Olsen and Paul E. and Cheryl R. Olsen, proposed by Ag Services of Wisconsin, LLC, Philmar, LLC, Olsen's Mill Acquisition Company, LLC, Westpointe Bank, BNP Paribas, as Administrative Agent and the State of Wisconsin (as amended, modified, or supplemented from time to time, the "**Plan**").

## RECITALS:

**WHEREAS**, on the Petition Date, Paul and Cheryl Olsen jointly filed a petition for relief under Chapter 11 of Title 11 of the United States Code, Case No. 10-39799-svk (the "**Paul/Cheryl Olsen Case**") with the United States Bankruptcy Court for the Eastern District of Wisconsin (the "**Bankruptcy Court**");

**WHEREAS**, on the Petition Date, David and Becky Olsen jointly filed a petition for relief under Chapter 11 of Title 11 of the United States Code, Case No. 10-39796-svk (the "**David/Becky Olsen Case**"; the Paul/Cheryl Olsen Case and the David/Becky Olsen Case are, collectively referred to as the "**Bankruptcy Cases**") with the Bankruptcy Court;

**WHEREAS**, on February 2, 2011, the Bankruptcy Court ordered the joint administration of the Bankruptcy Cases under the case number of the David/Becky Olsen Case;

**WHEREAS**, no Chapter 11 trustee was appointed by the Bankruptcy Court in their Bankruptcy Cases, and the Debtors have continued in possession and management of their assets until the Bankruptcy Court's approval and confirmation of the Plan on August 30, 2011 pursuant to its Order Confirming Plan (the "**Confirmation Order**");

**WHEREAS**, the Plan and the Confirmation Order provide for, among other things, (a) the creation of the Liquidating Trust for the benefit of the Beneficiaries, (b) the transfer of the Liquidating Trust Assets to the Liquidating Trust, (c) the appointment of the Liquidating Trustee as the initial trustee of the Liquidating Trust, (d) the management and orderly liquidation of the Liquidating Trust Assets by the Liquidating Trustee, (e) the initiation and/or prosecution of claims and Causes of Action against third parties by the Liquidating Trustee, and (f) the distribution of the proceeds from the liquidation of the Liquidating Trust Assets to the Beneficiaries of the Liquidating Trust;

**WHEREAS,** the Liquidating Trust is created pursuant to, and in order to effectuate, the Plan;

**WHEREAS**, members of the Liquidating Trust Advisory Board have been selected and such selection has been approved by the Bankruptcy Court, and each member has agreed to serve under the terms and conditions hereinafter set forth in this Agreement;

1

**WHEREAS**, Michael S. Polsky has agreed to act as Liquidating Trustee under this Agreement for purposes herein provided;

**WHEREAS**, the Liquidating Trust is established for the sole purpose of liquidating the Debtors' remaining assets and resolving Claims for the benefit of the Beneficiaries, in accordance with Treasury Regulations Section 301.7701-4(d), with no objective or authority to continue or engage in the conduct of a trade or business; and

**WHEREAS**, the Liquidating Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is treated as "grantor trust" for federal income tax purposes; and

**WHEREAS**, all capitalized terms not otherwise defined herein shall have the meaning set forth in the Plan.

**NOW, THEREFORE**, for and in consideration of the promises and mutual covenants herein contained, pursuant to the Plan, the parties hereto do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETIVE RULES

Unless the context otherwise requires, capitalized terms within this Agreement shall have the meanings assigned to them in this Article of the Agreement. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any capitalized term used in this Agreement which is not defined herein shall have the meaning assigned to such term in the Plan or, if not defined in the Plan, in the Bankruptcy Code. The Plan is hereby incorporated into this Agreement and made a part hereof by this reference. The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

1.1.   **"Administrative Claim and Tax Reserve"** shall have the meaning given such term in **Section 3.4(i)** of this Agreement.

1.2.   **"Bankruptcy Cases"** shall have the meaning given such term in the Recitals of this Agreement.

1.3.   **"Bankruptcy Court"** shall have the meaning given such term in the Recitals of this Agreement.

1.4.   **"Beneficiaries"** means the holders of Allowed Secured Claims and Allowed General Unsecured Claims against the Debtor as of the Distribution Record Date.

1.5.   **"Disputed Claims Reserve"** shall have the meaning given such term in **Section 3.4** of this Agreement.

1.6.   **"Distribution Record Date"** means that date, which shall be no earlier than the Effective Date, established by the Bankruptcy Court as the record date for the making of Distributions or reserving of Distributions, as applicable, to the Beneficiaries.

2

1.7. **"Net Available Liquidating Trust Proceeds"** means at any given time, the Cash on hand in the Liquidating Trust, constituting Liquidating Trust Proceeds, but excluding Collateral Proceeds.

1.8. **"Permitted Investments"** means investments in the form of the deposit of funds into interest-bearing accounts or the acquisition of demand or time deposits, such as short-term certificates of deposit, maintained at banks or other savings institutions providing adequate protection for such investments, or in the form of the acquisition of United States Treasury Bills; **provided**, **however**, that in each such case such investments shall be prudent and appropriate under the circumstances, and in such amounts and upon such terms as a reasonable and prudent fiduciary would select with a view toward sufficient liquidity to make distributions to the Beneficiaries within the time frames, and under the terms and conditions, dictated by this Agreement and the Plan.

1.9. **"Plan"** shall have the meaning given such term in the introductory paragraph of this Agreement.

1.10. **"Registry"** shall have the meaning given such term in **Section 5.2** of this Agreement.

1.11. **"Successor Trustee"** means an individual appointed to serve as trustee of the Liquidating Trust in the event of the death, resignation or discharge of the previously-appointed Liquidating Trustee. From and after the appointment of a Successor Trustee, all references herein to the Liquidating Trustee shall apply to the Successor Trustee.

1.12. **"Termination Date"** shall have the meaning given such term in **Section 2.5** of this Agreement.

1.13. **"Undeliverable and Unclaimed Reserve"** shall have the meaning given such term in **Section 3.4** of this Agreement.

## ARTICLE II
## CREATION OF THE TRUST

2.1. **Purpose of the Liquidating Trust**. The Debtors, in compliance with the Plan and the Confirmation Order, hereby constitute and create this Liquidating Trust for the purpose of effecting an orderly disposition and liquidation of the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), distributing the Net Available Liquidating Trust Proceeds to the Beneficiaries, and to make the other payments called for in the Plan and this Agreement, with no objective to continue or engage in the conduct of a trade or business. The activities of the Liquidating Trust shall be those reasonably necessary to, and consistent with, the accomplishment of that purpose, and shall not include the conduct of a trade or business. All activities of the Liquidating Trustee shall be reasonably necessary to, and consistent with, the accomplishment of these purposes; all of such purposes benefit the Liquidating Trust. Except as set forth herein, nothing contained herein shall be deemed to limit the authority of the Liquidating Trustee.

2.2. **Acceptance by Liquidating Trustee**. In accordance with the provisions of the Plan, the Liquidating Trust Advisory Board has selected Michael S. Polsky as the initial Liquidating Trustee, and Michael S. Polsky shall be designated as the initial Liquidating Trustee in the Confirmation Order. Michael S. Polsky hereby accepts the appointment to act and serve

3

as Liquidating Trustee of the Liquidating Trust and to hold and administer the Liquidating Trust Assets under the terms of this Agreement and the Plan. The Liquidating Trustee shall be deemed the Debtors' estates' representative in accordance with Section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan and the Agreement, including, without limitation, the powers of a trustee under Sections 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

2.3. **Name of Trust**. The Liquidating Trust established hereby shall bear the name "Olsens Liquidating Trust," in which name the Liquidating Trustee may, among other things, administer the Liquidating Trust, make and execute contracts on behalf of the Liquidating Trust, sue and be sued on behalf of the Liquidating Trust, and take such other actions as the Liquidating Trustee is authorized hereunder to take. In connection with the exercise of the powers of the Liquidating Trustee provided hereunder, the Liquidating Trustee may use this name or such variation thereon as he sees fit, or the Liquidating Trustee may use his own name, as trustee of the Liquidating Trust.

2.4. **Transfer of Liquidating Trust Assets**. Immediately following the Confirmation Date, the Debtors, and the Liquidating Trustee, for the benefit of the Beneficiaries hereunder (the Allowed Secured Claims, and Allowed General Unsecured Claims, including, without limitation, Class 5), shall execute the Agreement and shall take all other steps necessary to transfer to the Liquidating Trustee possession, custody and control of the Liquidating Trust Assets in accordance with and pursuant to the terms of this Agreement and the Plan. Upon the Effective Date, the Debtors shall transfer to the Liquidating Trust all of their right, title, and interest in the Liquidating Trust Assets. The Plan Supplement will include a list of all Causes of Action being prosecuted as of the date thereof that will be transferred to the Liquidating Trust. To the extent necessary to pursue a Cause of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the above-described rights and Causes of Action shall be transferred to the Liquidating Trust and shall vest in the Liquidating Trustee and its representatives. The Liquidating Trustee shall pay the reasonable fees and expenses of any professional to provide this information. The Debtors and the Liquidating Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges. Consistent with the Plan, the Liquidating Trustee's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates. The Liquidating Trust shall be deemed an independent entity and shall have standing to sue and be sued in its own name in any court and to otherwise appear before any administrative body, tribunal or other proceeding.

2.5. **Issuance of Liquidating Trust Interest**. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made, as provided herein, for the benefit of the Beneficiaries hereunder—the holders of Allowed Claims. Immediately upon the Effective Date of the Plan, the Debtors shall transfer such Liquidating Trust Assets to the Liquidating Trust in exchange for Liquidating Trust Interests for the benefit of holders of Allowed Secured Claims, and Allowed General Unsecured Claims—all in accordance with the Plan. Upon the transfer of the Liquidating Trust Assets, the Debtors, as the case may be, shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets

4

to the Liquidating Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. To the extent that any Liquidating Trust Assets cannot be transferred to the Liquidating Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Liquidating Trustee shall be deemed to have been designated as a representative of the Debtors, as applicable, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Liquidating Trust Assets on behalf of the Debtors.

2.6. **Funding Expenses of the Liquidating Trust**. Following Confirmation, upon the creation of the Liquidating Trust, the Debtors shall transfer their Excess Cash to the Liquidating Trust to fund Administrative Expense Claims as well as the administration of the Liquidating Trust. Upon the closing of any sale to any Successful Bidder, an amount consisting of (a) a contribution from the Successful Bidder in an amount to be agreed upon by the Successful Bidder, (b) the proceeds from the sale of the Retained Assets, and (c) the proceeds of the sale of the Remaining Assets Auction shall be transferred to the Liquidating Trust for payment of Administrative Expense Claims, Priority Tax Claims, and Professional Compensation and Reimbursement Claims) and for the administration of the Liquidating Trust. Any excess funds remaining after payment of Administrative Expense Claims and administration not covered by the amounts received and Excess Cash of the Debtors shall be distributed to General Unsecured Creditors in accordance with the terms of this Agreement. The Successful Bidder for the Grain Facility Assets shall have no further obligation to provide any additional funding with respect to the Liquidating Trust. Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Liquidating Trustee from and after the Effective Date, including, without limitation, reasonable fees and expenses of counsel, and fees owed to the United States Trustee, shall be paid from the Liquidating Trust Assets without further order of the Bankruptcy Court within twenty (20) days of receipt by the Liquidating Trust Advisory Board of an invoice by the Liquidating Trustee. In the event that the Liquidating Trust Advisory Board objects to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid. The compensation of the Liquidating Trustee will be consistent with the standards customary in the Eastern District of Wisconsin.

2.6.1. With respect to the transfer of any Liquidating Trust Assets, the Liquidating Trust shall be deemed to have taken at such time: (a) an assignment, bill of sale, deed and/or release covering such Liquidating Trust Assets; and (b) an assignment of all Causes of Action against third parties for obligations or claims existing on or created by virtue of the Effective Date, if not previously (x) transferred to the Liquidating Trust, or (y) expressly released herein. At such time as the Liquidating Trust Assets are transferred to the Liquidating Trust, the Liquidating Trust shall also be deemed to have taken assignments of Excess Cash in the possession of the Debtors.

2.7. **Termination of the Liquidating Trust**. The Liquidating Trust shall terminate upon the earlier of five (5) years or the fulfillment of the Liquidating Trust's purpose by the liquidation of the Liquidating Trust Assets and the distribution of Net Available Liquidating Trust Proceeds (the "**Termination Date**"). Every effort shall be made to see to it that termination shall be not later than the time reasonably necessary to accomplish the Liquidating Trust's purpose of liquidating Liquidating Trust Assets and discharging liabilities. Notwithstanding the foregoing, in the event that the Liquidating Trustee determines that the Liquidating Trust will be unable, after continuing reasonable efforts, to fully administer the Liquidating Trust by the

5

Termination Date, then by written agreement between the Liquidating Trustee and the Liquidating Trust Advisory Board, executed prior to the Termination Date, the Termination Date may be extended for an additional finite period of time, which extended deadline shall then constitute the Termination Date for purposes of this provision; **provided**, **however**, the Termination Date shall never exceed ten (10) years from the Effective Date.

## ARTICLE III
## RIGHTS, POWERS, AND DUTIES OF LIQUIDATING TRUSTEE

3.1. **Declaration Acknowledging Beneficial Interest**. The Liquidating Trustee hereby acknowledges that, on and after the Effective Date, the Beneficiaries and their successors and assigns, as permitted in **Article V** below, will have beneficial interests in all Liquidating Trust Assets.

3.2. **Management of the Liquidating Trust**. The Liquidating Trustee shall have and retain all the rights, powers, and duties necessary to carry out his responsibilities under the Plan, the Liquidating Trust, the Confirmation Order, and except as otherwise provided for under this Agreement, shall be vested with all rights, powers, privileges and benefits afforded to the Debtors' estates and/or a "trustee" under Sections 704 and 1106 of the Bankruptcy Code, including, without limitation, attorney-client and work product privilege, and [he/she] shall be vested with any such rights, powers, privileges and benefits of the Debtors and their estates. The Liquidating Trustee shall endeavor to take charge of the Liquidating Trust Assets and shall collect, conserve, protect, and liquidate, or otherwise convert into Cash, all Liquidating Trust Assets, including, without limitation, Causes of Action and Claims against third parties, and all such other property incidental thereto as may hereafter be acquired from time to time by the Liquidating Trust. Except as otherwise provided in this Agreement, the Liquidating Trustee may control and exercise authority over the Liquidating Trust Assets and the acquisition, management and disposition thereof, and over the management and conduct of the administration of the Liquidating Trust to the fullest extent permitted by law. No Person dealing with the Liquidating Trust shall be obligated to inquire into the authority of the Liquidating Trustee in connection with the acquisition, management, or disposition of the Liquidating Trust Assets. In connection with the management and use of the Liquidating Trust Assets, the Liquidating Trustee, without limitation of his power and authority, may do the following:

(i) To accept the Liquidating Trust Assets transferred to the Liquidating Trust pursuant to this Agreement and the Plan;

(ii) To sell at public or private sale, or exchange, transfer, or convey, on such terms and conditions, and at such time or times as the Liquidating Trustee shall determine, any or all of the Liquidating Trust Assets; to that end, grant options, make contracts, retain brokers, and sign, seal, acknowledge, and deliver any and all proper deeds, bills of sale, assignments, or other instruments of conveyance or transfer thereof; and delegate to an attorney-in-fact the power to execute all documents necessary to accomplish a sale, lease, transfer, or exchange of such property;

(iii) Obtain and maintain such space, facilities, equipment, supplies and personnel as shall be reasonably necessary for the performance of the Liquidating Trustee's duties hereunder and under the Plan and Confirmation Order;

6

(iv)    To abandon any Liquidating Trust Asset that is determined by the Liquidating Trustee to be of inconsequential, or negative, value to the Liquidating Trust and the Beneficiaries;

(v)    To enter into agreements and covenants binding the Liquidating Trust;

(vi)    To endorse the payment of notes or other obligations of any Person or make contracts with respect thereto;

(vii)    To establish such bank accounts as required under the Plan and as otherwise deemed necessary or appropriate, and draw checks on and otherwise transfer funds from such accounts consistent with provisions of this Agreement and the Plan;

(viii)    To invest Liquidating Trust Assets in Permitted Investments;

(ix)    To pay all lawful expenses, debts, charges and liabilities of the Liquidating Trust;

(x)    To pay all taxes, make all tax withholdings, file all tax returns and tax information returns, and make all tax elections by and on behalf of the Liquidating Trust, to the extent required or deemed necessary or appropriate by the Liquidating Trustee;

(xi)    To establish such reserves as are required or permitted under the terms of this Agreement and the Plan;

(xii)    To purchase insurance coverage in such amounts, if any, as deemed advisable by the Liquidating Trustee to protect the Liquidating Trust and the Liquidating Trust Assets;

(xiii)    To participate in and initiate any proceedings before the Bankruptcy Court or any other court, or in any administrative, arbitrative or other non-judicial proceeding, to pursue claims by or on behalf of or involving, or to defend in response to claims against, the Liquidating Trust, including, without limitation, (a) Causes of Action transferred to the Liquidating Trust, and (b) objections to Secured Claims and General Unsecured Claims;

(xiv)    To settle objections to any Secured Claims and General Unsecured Claims, Causes of Action, and any and all other disputes involving the Liquidating Trust, the Liquidating Trust Assets and any and all matters related thereto;

(xv)    To select and employ such counsel or special counsel, financial advisors or accountants, professionals, agents or employees as the Liquidating Trustee deems necessary to assist in the administration of the Liquidating Trust, and to compensate such Persons and reimburse such Persons for out-of-pocket expenses incurred by them on reasonable terms agreed to by the Liquidating Trustee;

(xvi)    To distribute Liquidating Trust Assets to Beneficiaries in accordance with the terms of this Agreement, the Confirmation Order, and the Plan;

(xvii)    To enforce the provisions of this Agreement, the Plan and the Confirmation Order;

7

(xviii) To cause the Liquidating Trust to indemnify the Liquidating Trustee against actual or asserted liability in connection with his administration of the Liquidating Trust, except to the extent that his actions or omissions constitute gross negligence or willful misconduct; and

(xix) To take any and all other actions as are necessary or deemed appropriate in the Liquidating Trustee's discretion to accomplish the purposes of the Liquidating Trust, this Agreement, the Confirmation Order, and the Plan.

3.3. **Standing to Pursue Causes of Action, Other Claims, Objections and Defenses**. Pursuant to the Plan, the Confirmation Order and Section 1123(b)(3) of the Bankruptcy Code, the Liquidating Trustee shall have independent standing (a) to assert, prosecute and settle any and all Causes of Action transferred to the Liquidating Trust; and (b) to assert, prosecute and settle any and all objections, counterclaims, rights of setoff, rights of recoupment, and other defenses to Secured Claims and General Unsecured Claims. Without limiting the generality of the foregoing, the Liquidating Trustee shall also have standing as the appointed representative of the Debtors' Estates to assert any rights, claims or causes of action belonging to those Estates.

3.4. **Reserves**. The Liquidating Trustee shall hold as reserve, either in the form of Cash or securities, sufficient funds to pay:

(i) Allowed Administrative Expense Claims, Priority Non-Tax Claims and Secured Tax Claims ("**Administrative Claim and Tax Reserve**");

(ii) a *Pro Rata* Distribution for all Disputed Allowed Secured Claims and Allowed General Unsecured Claims which have not been Disallowed and not yet paid (the "**Disputed Claims Reserve**"), taking into account sums which have already been paid to holders of Allowed Secured Claims and Allowed General Unsecured Claims; and

(iii) the appropriate reserve for undeliverable or unclaimed distributions (collectively, the "**Undeliverable and Unclaimed Reserve**") as required by the Plan.

3.5. **Distributions**. After funding the Administrative Claim and Tax Reserve, the Disputed Claims Reserve and the Undeliverable and Unclaimed Reserve, subsequent *Pro Rata* Distributions of Net Available Liquidating Trust Proceeds may be made to the Beneficiaries. The Liquidating Trustee shall consult with the Liquidating Trust Advisory Board as to the timing of Distributions to the Beneficiaries; **provided, however**, if the Liquidating Trustee intends to make its final Distribution, such Distribution shall be made regardless of the amount of available Cash. Subject to **Section 5.2** of this Agreement, the Liquidating Trustee shall make Distributions on account of Allowed Secured Claims and Allowed General Unsecured Claims as of the Distribution Record Date.

3.6. **Delivery of Distributions**. When making Distributions, the Liquidating Trustee may rely exclusively upon the addresses contained in: (a) a Debtor's Bankruptcy Schedules, if a Beneficiary did not file a Proof of Claim; (b) a Beneficiary's filed Proof of Claim; or (c) if after the Effective Date, any written notice provided to the Liquidating Trustee. The Liquidating Trustee shall have no obligation to search for new addresses of Beneficiaries whose Distributions are returned as undeliverable. The administration of undeliverable or unclaimed Distributions shall be governed by Section 12.4 of the Plan.

8

3.7. **Consultation with Liquidating Trust Advisory Board**. As provided in **Section 4.2** of this Agreement, the Liquidating Trustee shall consult with the Liquidating Trust Advisory Board on a regular basis, either in person or in writing, regarding the management of the Liquidating Trust, the distribution of Net Available Liquidating Trust Proceeds, and the conduct of the Liquidating Trust's affairs. The Liquidating Trustee shall not agree to the allowance or settlement of a Claim that exceeds fifty thousand dollars ($50,000.00), or pay an expense that exceeds twenty-five thousand dollars ($25,000.00), without the Liquidating Trust Advisory Board's specific approval. If the Liquidating Trust Advisory Board does not approve an action proposed by the Liquidating Trustee within ten (10) business days of the Liquidating Trustee's consultation with the Liquidating Trust Advisory Board, the Liquidating Trustee may seek Bankruptcy Court authority for the action.

3.8. **Records and Reporting**.

3.8.1. The Liquidating Trustee shall maintain good and sufficient records of receipts, disbursements and reserves of the Liquidating Trust, including the Registry described in **Section 5.2** of this Agreement, and such books and records shall be open to inspection at reasonable times upon reasonable request of the Trust Advisory Board. The Liquidating Trustee shall maintain separate records and accounts for each Debtor.

3.8.2. Not later than forty-five (45) days after the end of each calendar year, and as soon as practicable after termination of the Liquidating Trust, the Liquidating Trustee shall submit to the Liquidating Trust Advisory Board an unaudited written report and account showing:

> (i) the Liquidating Trust Assets and liabilities of the Liquidating Trust at the end of each taxable year and upon termination of the Liquidating Trust;

> (ii) any changes in the Liquidating Trust Assets which have not been previously reported; and

> (iii) any material action taken by the Liquidating Trustee in the performance of his duties under the Agreement which has not been previously reported.

3.8.3. Not less than thirty (30) days before the commencement of each year, the Liquidating Trustee shall submit to the Liquidating Trust Advisory Board a proposed budget for the year, which the Liquidating Trust Advisory Board may either approve or disapprove. If the Liquidating Trust Advisory Board disapproves the budget, the Liquidating Trustee may either make a new budget proposal or seek approval from the Bankruptcy Court for his budget.

3.8.4. Not less often than fifteen (15) days after the end of each calendar quarter, the Liquidating Trustee shall submit to the Liquidating Trust Advisory Board a report of Trust activities during the quarter, including, without limitation:

> (i) the Liquidating Trust's current financial status and budget;

> (ii) allowance and payments of Allowed Secured Claims and Allowed General Unsecured Claims;

9

(iii)    progress in litigation of all types in which the Liquidating Trust is involved; and

(iv)    any other matters which the Liquidating Trustee either wishes to, or is required to, raise with the Liquidating Trust Advisory Board for its consideration and direction.

3.8.5.  The Liquidating Trustee shall furnish to the Beneficiaries such information with respect to any federal or state tax as shall be required by law.

3.9.    **Trustee's Compensation and Reimbursement of Expenses.**  The Liquidating Trustee shall be paid on an hourly basis plus actual out-of-pocket expenses, to be paid monthly from the Liquidating Trust Assets, pursuant to this **Section 3.9** and related provisions of this Agreement.  Following the Effective Date, any changes to the terms of the Liquidating Trustee's compensation shall be specifically approved in writing by the Liquidating Trust Advisory Board.  The Liquidating Trustee shall further be reimbursed for all reasonable out-of-pocket expenses incurred in the performance of his duties hereunder.  The compensation and reimbursement of the Liquidating Trustee shall be made solely from the Liquidating Trust Assets after approval by the Liquidating Trust Advisory Board.

3.10.   **Selection and Compensation of Attorneys and Agents**.  The Liquidating Trustee may select and employ attorneys, accountants, brokers, consultants, employees, and other agents, including, without limitation, any Person or professional retained by either the Debtors or the Plan Proponents, as the Liquidating Trustee deems necessary to assist him in the performance of his duties.  These individuals and groups may be employed without regard to their prior employment in the Bankruptcy Cases.  In addition, after consultation with the Liquidating Trust Advisory Board, the Liquidating Trustee may employ former employees of the Debtors; **provided, however**, such former employees were not an officer or director of any of the Debtors or any entity owned by the Debtor.  After consultation with the Liquidating Trust Advisory Board, the Liquidating Trustee may pay the salaries, fees, and expenses of attorneys, accounts, brokers, consultants, employees, and other agents out of the Liquidating Trust Assets without further order of the Bankruptcy Court.  The compensation and reimbursement of any attorney, accountant, brokers, consultant, employee, or other agent employed by the Liquidating Trustee shall be made solely from the Liquidating Trust Assets, after approval by the Liquidating Trust Advisory Board.

3.11.   **Exercise of Power**.  Except to the extent otherwise expressly provided by this Agreement, the Liquidating Trustee shall not be required to procure the authorization of any court in the exercise of any of the powers conferred upon him by this Agreement.  No Person dealing with the Liquidating Trust shall be obligated to inquire into the authority of the Liquidating Trustee in connection with the acquisition, management or disposition of Liquidating Trust Assets.

3.12.   **Liability of Liquidating Trustee.**

3.12.1. *Standard of Care.*  The Liquidating Trustee shall not personally be liable for any of his actions or omissions in the administration of the Liquidating Trust, except for those actions or omissions amounting to [his/her] gross negligence, willful misconduct, fraud, or a criminal act in the performance of [his/her] duties under the Plan, Confirmation Order, or this Agreement, as determined by the findings of a court of competent jurisdiction.  The Liquidating Trustee shall at all times act in good faith

10

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 118 of 190

pursuant to the discretion, powers, and authority conferred on him by the Plan and this Agreement.

3.12.2. *Reliance on Documents or Advice of Counsel or Other Persons.* Except as otherwise provided in this Agreement, the Liquidating Trustee may rely upon, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimile or e-mail transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission, or receipt. In the absence of bad faith, willful misconduct, gross negligence, willful disregard of its duties, or material breach of this Agreement, the Liquidating Trustee may rely on the truth of statements and correctness of facts and opinions expressed therein and shall be fully protected personally in acting thereon. The Liquidating Trustee may also engage and consult with legal counsel and shall not be liable for any action taken or suffered by the Liquidating Trustee in reliance upon the advice or opinions of his counsel. Notwithstanding the foregoing, the Liquidating Trustee shall be under no obligation to consult with attorneys, accountants or his agents, and his determination not to do so should not result in imposition of liability on the Liquidating Trustee unless such determination is based on willful misconduct or gross negligence.

3.12.3. *No Implied Obligations.* The Liquidating Trustee shall not be liable except for the performance of the duties and obligations specifically set forth in the Plan, the Confirmation Order, this Agreement, or specified in written instructions or directions delivered to the Liquidating Trustee by the Liquidating Trust Advisory Board, and there shall be no implied duties, obligations, or covenants. The Liquidating Trustee shall have no obligations to Beneficiaries except pursuant to and as set forth in this Agreement; **provided, that**, without limiting the foregoing, the Trustee shall not be precluded by any reason of his appointment as Liquidating Trustee, from being, or representing interests adverse to the interests of Beneficiaries or any Beneficiary in matters unrelated to the Liquidating Trust.

3.12.4. *Recourse for Trust Obligations Limited to Trust.* No recourse shall ever be had, directly or indirectly, against the Liquidating Trustee, in his individual capacity, by legal or equitable proceedings or otherwise, by virtue of any contract, agreement, promise, undertaking, covenant, instrument or other writing executed by the Liquidating Trustee for any authorized purpose in the administration of the Liquidating Trust, it being expressly understood and agreed that all such liabilities, whether in writing or otherwise, shall be enforceable, to the extent valid, only against, and shall be satisfied only from, the Liquidating Trust Assets.

3.12.5. *No Liability for Acts of Predecessors.* No Successor Trustee shall be in any way responsible for the acts or omissions of any Liquidating Trustee in office prior to the date on which such person becomes a Liquidating Trustee, nor shall he be obligated to inquire into the validity or propriety of any such act or omission, unless such Successor Trustee expressly assumes such responsibility. Any Successor Trustee shall be entitled to accept as conclusive any final accounting and statement of the Liquidating Trust Assets furnished to such Successor Trustee by such predecessor Liquidating Trustee and shall further be responsible only for those Liquidating Trust Assets included in such statement.

11

3.13.   **Indemnification**.   The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee against any and all Claims, Causes of Action, and liability (including all related expenses and defense costs) arising from or relating to, his service as Liquidating Trustee and his actions and omissions in administering the Liquidating Trust, except to the extent that such actions or omissions are found to constitute gross negligence, willful misconduct, fraud, or a criminal act by a court of competent jurisdiction (the "**Indemnified Claims**").   In the event that any legal proceeding is instituted against the Liquidating Trustee, whether in his individual or representative capacity, on account of any Indemnified Claims, then as soon as practicable following the commencement of such action, the Liquidating Trustee shall be entitled to have the Liquidating Trust advance to the Liquidating Trustee such fees and costs as are reasonably incurred by the Liquidating Trustee in defending against such action; **provided, however**, the Liquidating Trustee first (a) executes an affidavit attesting to the fact that he has acted in good faith and has not taken any actions constituting gross negligence or willful misconduct, and (b) executes an instrument whereby he promises to reimburse to the Liquidating Trust such advanced amounts in the event that the final disposition of such action includes a finding that the Liquidating Trustee failed to act in good faith, was grossly negligent, or took any action constituting willful misconduct, fraud, or a criminal act in connection with administration of the Liquidating Trust, upon the finding of a court of competent jurisdiction.  Any dispute regarding such indemnification of the Liquidating Trustee shall be resolved only by the Bankruptcy Court, which shall retain jurisdiction over matters relating to the indemnification provided under this **Section 3.13**.   The Liquidating Trustee shall act in good faith with regard to all aspects of the administration of the Liquidating Trust.

3.14.   **Bond**.   The Liquidating Trustee shall not be required to post a bond to secure the proper performance of his duties and obligations under this Agreement.

3.15.   **Resignation**.   The Liquidating Trustee may resign as trustee of the Liquidating Trust by executing and delivering an instrument in writing to the Liquidating Trust Advisory Board and the Bankruptcy Court; **provided, however**, that (a) the Liquidating Trustee shall continue to serve, and shall not be relieved of any of the duties and obligations set forth herein, until such time as a Successor Trustee is appointed, and (b) the obligations set forth within **Section 3.17** of this Agreement shall be continuing and, notwithstanding the appointment of a Successor Trustee, the Liquidating Trustee shall not be relieved of his responsibility to fully and promptly comply with such obligations.   If the Liquidating Trustee resigns from his position hereunder, subject to a final accounting, he shall be entitled to all accrued unpaid fees, reimbursement, and other compensation to the extent incurred or arising or relating to events occurring before such resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the Successor Trustee.  The Liquidating Trustee shall also be entitled to all rights of indemnification provided in this Agreement.

3.16.   **Removal of Liquidating Trustee**.   The Liquidating Trustee appointed pursuant to the Plan, Confirmation Order and this Agreement may be removed for cause upon order of the Bankruptcy Court after notice and opportunity for a hearing.  If the Liquidating Trustee is removed for cause, such Liquidating Trustee shall not be entitled to any accrued but unpaid fees, reimbursements, or other compensation under this Agreement or otherwise.  For purposes of this Agreement, the term "**cause**" shall mean (a) the Liquidating Trustee's gross negligence, willful misconduct, or willful failure to perform [his/her] duties under the Plan, the Confirmation Order and this Agreement or (b) the Liquidating Trustee's misappropriation or embezzlement of any Liquidating Trust Assets or the proceeds thereof.  If the Liquidating Trustee is removed by the Bankruptcy Court other than for "**cause**", or is unwilling or unable to serve (a) by virtue of his inability to perform his duties under this Agreement due to death, illness, or other physical or

12

mental disability, or (b) for any other reason whatsoever other than for "**cause**," subject to a final accounting, the Liquidating Trust Administrator shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any Successor Trustee. The Liquidating Trustee shall also be entitled to all rights of indemnification provided in this Agreement.

      3.17.  **Obligations Upon Death, Resignation or Discharge**.  In the event of the death, resignation or discharge of the Liquidating Trustee, upon the appointment of a Successor Liquidating Trustee, the Liquidating Trustee and/or his representative(s) shall promptly: (a) execute and deliver to the Successor Liquidating Trustee all such documents, instruments and other writings as are reasonably requested by the Successor Liquidating Trustee to evidence the termination of the Liquidating Trustee as trustee of the Liquidating Trust; (b) execute and deliver to the Successor Liquidating Trustee all such documents, instruments and other writings as are reasonably requested by the Successor Liquidating Trustee to convey control of the Liquidating Trust Assets from the Liquidating Trustee to the Successor Liquidating Trustee; (c) deliver to the Successor Liquidating Trustee all documents, instruments, records, electronically stored data, and other written materials compiled by or at the direction of the Liquidating Trustee in connection with the Liquidating Trustee's administration of the Liquidating Trust; and (d) otherwise assist and cooperate with the Successor Liquidating Trustee in effecting the transfer of all obligations and functions of the Liquidating Trustee in relation to the Liquidating Trust to the Successor Liquidating Trustee.  Upon resignation or discharge, the Liquidating Trustee shall be entitled to apply to the Bankruptcy Court for the entry of an order discharging the Liquidating Trustee from further duties and obligations, resolving any open issues or disputes concerning the Liquidating Trustee's rights of exculpation and indemnity, and barring the assertion of any Claims or Causes of Action against the departing Liquidating Trustee (a "**Discharge and Bar Order**").  The Bankruptcy Court shall retain jurisdiction for the express purpose of considering and entering a Discharge and Bar Order.

      3.18.  **Tax Returns and Payment of Taxes**.

      3.18.1. *Tax Treatment of Liquidating Trust*.  For United States federal and applicable state income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust pursuant to and in accordance with the Plan shall be treated as a disposition of such assets directly to and for the benefit of the Beneficiaries. The Beneficiaries will be treated as the grantors and owners of the Liquidating Trust.  All earnings of the Liquidating Trust shall be currently taxable to the Beneficiaries in the year in which such earnings are realized. The Liquidating Trust is intended to qualify as a liquidating trust that is treated as a "grantor trust" for federal income tax purposes, and the Liquidating Trustee shall use his best efforts to operate and maintain the Liquidating Trust in compliance with Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulation Sections 1.671-4(a) and 301.7701-4(d) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service.

      3.18.2. *Returns*.  The Liquidating Trustee shall cause a Federal Employer Identification Number for the Liquidating Trust to be obtained and shall cause the annual income tax returns to be filed on the basis of a December fiscal year end.  The Liquidating Trustee shall take all steps necessary to ensure that any tax obligations imposed on the Liquidating Trust are paid.  To the extent necessary to satisfy this

Case 10-39796-svk   Doc 238   Filed 08/30/11   Page 121 of 190

requirement, the Liquidating Trustee, among other things, is hereby authorized to: (a) obtain a tax identification number for the Liquidating Trust; (b) communicate with the Internal Revenue Service and any relevant state and local taxing authorities on behalf of the Liquidating Trust; (c) make payment of taxes on behalf of the Liquidating Trust, which taxes shall be paid out of Trust Assets; and (d) file all applicable tax returns for the Liquidating Trust.

## ARTICLE IV
## RIGHTS, POWERS, AND DUTIES OF THE LIQUIDATION TRUST ADVISORY BOARD

4.1.     **Members**.

4.1.1. *Qualifications*.     Beneficiaries are qualified to serve on the Liquidating Trust Advisory Board.  Members of the Liquidating Trust Advisory Board may either be an individual or, in the event the holder of the Allowed Secured Claims and Allowed General Unsecured Claims is not an individual, a representative of the entity that holds the Allowed Secured Claim or Allowed General Unsecured Claims, as applicable.  The Liquidating Trust Advisory Board shall initially consist of three (3) Beneficiaries: (i) one (1) member selected by BNP Paribas; (ii) one (1) member selected by Ag Services of Wisconsin, LLC; and (iii) one (1) member selected by West Pointe Bank and approved by the Bankruptcy Court in the Confirmation Order.  If a member of the Liquidating Trust Advisory Board sells, transfers or assigns all of its Allowed Secured Claims or Allowed General Unsecured Claims, the member shall no longer be qualified to serve on the Liquidating Trust Advisory Board and shall be deemed to have immediately resigned from the Liquidating Trust Advisory Board.

4.1.2. *Successor Members*.     In the event of the death, resignation or disqualification of a member of the Liquidating Trust Advisory Board, the remaining members of the Liquidating Trust Advisory Board shall promptly elect a replacement member to the Liquidating Trust Advisory Board.  Any successor member of the Liquidating Trust Advisory Board must be a Beneficiary and must be willing to serve.  Upon the election of a successor member to the Liquidating Trust Advisory Board, the Liquidating Trust Advisory Board shall promptly notify the Liquidating Trustee of such election.

4.2.     **Function, Duties, and Responsibilities**.

4.2.1. *Advisory Responsibilities*.     The Liquidating Trust Advisory Board shall meet with the Liquidating Trustee upon such regular basis as the Liquidating Trust Advisory Board and the Liquidating Trustee deem appropriate.  The Liquidating Trust Advisory Board shall consult with and advise the Liquidating Trustee regarding the carrying out of his duties, including, without limitation:

     (i)     pursuit and resolution of claims and Causes of Action against third parties;

     (ii)     administration of the Liquidating Trust; and

     (iii)     distribution of dividends to Beneficiaries.

14

4.2.2.  *Review of Books and Records*.  The Liquidating Trust Advisory Board shall have the right to inspect the books and records of the Liquidating Trust upon reasonable request.

4.2.3.  *Removal of the Liquidating Trustee*.  The Liquidating Trust Advisory Board, in its sole discretion and by majority vote of the Liquidating Trust Advisory Board, may remove the Liquidating Trustee at any time.  The removal of the Liquidating Trustee by the Liquidating Trust Advisory Board shall not require approval by the Bankruptcy Court.

4.2.4.  *Appointment of the Successor Liquidating Trustee*.  In the event of the death, incompetency, resignation, or removal of the Liquidating Trustee, the Liquidating Trust Advisory Board shall appoint the Successor Trustee.  The Successor Trustee appointed under this Agreement shall execute, acknowledge, and deliver to the Liquidating Trust Advisory Board and to the retiring Liquidating Trustee an instrument accepting his appointment, and thereupon the Successor Trustee, without any further act, deed, or conveyance, shall become vested with all the rights, powers, trusts, and duties of the retiring Liquidating Trustee.

4.3.  **Quorum**.  A quorum for the purposes of a Liquidating Trust Advisory Board meeting shall be not less than two-thirds (2/3rds) of its members.  The Liquidating Trust Advisory Board may take no action unless a quorum is in attendance.

4.4.  **Duration**.  The Liquidating Trust Advisory Board shall remain in existence until ninety (90) days after the final Distributions are made to the Beneficiaries.

4.5.  **Compensation and Expenses**.  The members of the Liquidating Trust Advisory Board shall serve without compensation for their performance of services as members of the Liquidating Trust Advisory Board, but shall be entitled to reimbursement from the Liquidating Trust Assets for any reasonable expenses incurred in connection with their services on the Liquidating Trust Advisory Boards without further order of the Bankruptcy Court.

4.6.  **Selection and Compensation of Attorneys and Advisors**.  In the event that the Liquidating Trust Advisory Board has reason to believe, after reasonable investigation, that the Liquidating Trustee has taken actions, or failed to take actions, constituting gross negligence or willful misconduct in the administration of the Liquidating Trust, the Liquidating Trust Advisory Board shall be entitled (but not required) to select and employ an attorney or such other advisors to assist the Liquidating Trust Advisory Board in further investigating such actions and/or omissions by the Liquidating Trustee.  The reasonable fees and expenses incurred by the attorney or advisor employed by the Liquidating Trust Advisory Board shall be paid solely from the Liquidating Trust Assets without further order of the Bankruptcy Court.  The Liquidating Trust Advisory Board shall not be liable for any action taken or suffered by the Liquidating Trust Advisory Board in reliance upon the advice or opinions rendered by its professionals. Notwithstanding the foregoing, the Liquidating Trust Advisory Board shall be under no obligation to consult with attorneys and/or advisors, and its determination to not do so shall not result in the imposition of liability on the Liquidating Trust Advisory Board, its members and/or designees, unless such determination is based on willful misconduct or gross negligence.

4.7.  **Liability**.  Neither the Liquidating Trust Advisory Board, nor any of its members, designees, attorneys, agents, or representatives, or any of their respective employees, shall be liable for the act or omission of any other member, designee, attorney, agent, or representative

15

of the Liquidating Trust Advisory Board, nor shall any member of the Liquidating Trust Advisory Board be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Liquidating Trust Advisory Board, other than acts or omissions resulting from such member's willful misconduct or gross negligence.

4.8. **Third-Party Beneficiaries**. The Members of the Liquidating Trust Advisory Board shall be deemed to be third-party beneficiaries of this Agreement.

4.9. **Indemnification**. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Advisory Board and its members, designees, professionals, agents, and representatives (acting in such capacity) from all liabilities, losses, damages, claims, costs and expenses (including, without limitation, attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of these actions or omissions) with respect to the Liquidating Trust or the implementation or administration of the Plan; **provided**, **however**, that no indemnification will be made to such Persons for actions or omissions as a result of willful misconduct or gross negligence.

## ARTICLE V
## RIGHTS, POWERS AND DUTIES OF BENEFICIARIES

5.1. **Interests of Beneficiaries**. The Beneficiaries shall each have an undivided beneficial interest in the Liquidating Trust. The ownership of a beneficial interest in the Liquidating Trust shall not entitle any Beneficiary to: (a) claim title in or to any of the Liquidating Trust Assets; (b) call for a partition or division of any of the Liquidating Trust Assets, or (c) require an accounting, except as expressly and specifically required by the terms of this Agreement.

5.2. **Evidence of Beneficial Interest**. The beneficial interests of the Beneficiaries shall not be evidenced by any certificate, security, receipt, or other writing. The Liquidating Trustee shall at all times, however, maintain a register (the "**Registry**") reflecting the names and addresses of all Beneficiaries and their respective Allowed Secured Claims or Allowed General Unsecured Claims (other than those Claims that have been disallowed, extinguished or expunged by Final Order; if such Claims are disallowed, extinguished or expunged by Final Order, such Beneficiary shall no longer be a Beneficiary hereunder), based upon those claims filed of record in the Bankruptcy Cases as of the Distribution Record Date, as updated by information obtained in the ordinary course of administering the Liquidating Trust. The Liquidating Trustee may treat the Beneficiary in whose name the beneficial interests in the Liquidating Trust is recorded in the Registry as its owner for all purposes, including, without limitation, receiving Distributions.

5.3. **Exemption from Registration**. The parties hereto intend, and the Bankruptcy so found in the Confirmation Order, that the Beneficiaries' interests in the Liquidating Trust are not "securities" under applicable law, and thus are exempt from registration under applicable securities law. Should such interests be treated as securities, the parties intend for the exemption to registration provided by Section 1145 of the Bankruptcy Code to apply. Any subsequent transfer by a Beneficiary of its Beneficial interest in the Liquidating Trust is not exempt under Section 1145 of the Bankruptcy Code. Thus, any Beneficiary wishing to make such a transfer must consult its own securities counsel regarding the availability of a registration exemption, if any.

16

5.4.    **Transferability**.  Beneficial interests in the Liquidating Trust are only transferable upon written notification to the Liquidating Trustee of the proposed transfer, with the transfer to take effect no sooner than three business days after the Liquidating Trustee's receipt of such notice.  Without limiting the general applicability of the foregoing, if a beneficial interest in the Liquidating Trust is transferred, either voluntarily or involuntarily, the Liquidating Trustee shall be promptly provided with such information by Certified Mail as is sufficient to maintain the Registry required by **Section 5.2** of this Agreement.

5.5.    **Distribution to Beneficiaries**.  Distributions to Beneficiaries shall be governed by **Article XII** of the Plan.

5.6.    **Warranty of Entitlement**.    Each and every Beneficiary who receives a Distribution under this Trust warrants that: (a) such Beneficiary is authorized to accept the Distribution in consideration of his Allowed Equity Interest; and (b) there are no outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the Equity Interest asserted by such Beneficiary under the Plan or the Beneficiary's right to receive the Distribution.

5.7.    **Tax Identification Numbers**.    The Liquidating Trustee may require any Beneficiary to furnish to the Liquidating Trustee, (i) its employer or taxpayer identification number as assigned by the Internal Revenue Service, and (ii) such other information, records or documents necessary to satisfy the Liquidating Trustee's tax reporting obligations (including, without limitation, certificates of non-foreign status). The Liquidating Trustee may condition the payment of any Distribution to any Beneficiary upon receipt of such identification number and requested documents.

5.8.    **Effect of Death, Incapacity, or Bankruptcy of Beneficiary**.    The death, incapacity, or bankruptcy of a Beneficiary during the term of this Trust shall not terminate the Liquidating Trust, affect the rights and obligations of any other Beneficiary, or entitle the Beneficiary's representatives or creditors to seek an accounting, Distribution or partition of the Liquidating Trust Assets.

5.9.    **Conflicting Claims**.    If the Liquidating Trustee becomes aware of a disagreement or conflicting claims with respect to the Liquidating Trust Assets, the identity of the Beneficiaries, or any other issue or matter arising from or relating to the administration of the Liquidating Trust, or if he in good faith is in doubt as to any action which should be taken under this Trust, he shall have the absolute right to do any or all of the following:

(i)    to the extent of the disagreement or conflict, withhold or stop all further performance under this Agreement (save and except the safekeeping of the Liquidating Trust Assets) until he is satisfied that the disagreement or conflict have been fully and finally resolved;

(ii)    file a suit in interpleader or in the nature of interpleader in the Bankruptcy Court;

(iii)    obtain an order requiring all Persons and parties involved to litigate in the Bankruptcy Court their respective claims arising out of or in connection with this Trust; or

(iv)    seek any other appropriate relief or instruction from the Bankruptcy Court.

17

## ARTICLE VI
## MISCELLANEOUS

6.1.   **Interpretation**.  Whenever it appears appropriate from the context, each term stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section or clause contained in this Agreement unless the context requires otherwise.

6.2.   **Filing Documents**.  A copy of this Agreement and all amendments thereof shall be maintained in an office or residence of the Liquidating Trustee and shall be available for inspection by the Trust Advisory Board or any Beneficiary hereunder.

6.3.   **Privilege**.  The attorney-client privilege, work product doctrine or other privileges or immunities inuring to the benefit of the Debtors or attaching to documents or communications of the Debtors shall be transferred to the Liquidating Trust, without any waiver of such privileges or immunities.  The Liquidating Trustee is authorized to assert or waive any such privilege or doctrine, as necessary or appropriate for the administration of the Liquidating Trust, provided that, to the extent any such privilege or doctrine is waived in connection with information requested of any professional previously employed by the Debtors, the Liquidating Trustee agrees that such information request shall be made solely for the purpose of carrying out the Liquidating Trustee's duties hereunder, that the Liquidating Trustee shall act in good faith and shall use [his/her] best efforts to tailor as narrowly as possible any request so as not to be unduly invasive or burdensome to the professional upon whom the request is made.

6.4.   **Valuation of Liquidating Trust Assets**.  As soon as practicable after the Effective Date, the Liquidating Trustee, in reliance upon such professionals as the Liquidating Trustee may retain, may make a good faith valuation of the Liquidating Trust Assets; such valuation shall be made available from time to time, to the extent relevant as reasonably determined by the Liquidating Trustee in reliance on his professionals, and used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, and Beneficiaries) for all purposes, including, without limitation, federal income tax purposes.  Such valuation is at the sole option and discretion of the Liquidating Trustee, and there shall be no obligation or duty on the part of the Liquidating Trustee to make or procure such valuation.

6.5.   **Applicable Law**.  The Trust created by this Agreement shall be construed, regulated, and administered under the laws of the State of Wisconsin and the United States of America.

6.6.   **Forum for the Resolution of Disputes**.  All controversies, disputes or other contested matters concerning the administration of the Liquidating Trust, this Agreement, and enforcement of the provisions set forth in this Agreement shall be resolved and determined by the Bankruptcy Court, unless and to the extent that the Bankruptcy Court declines to exercise jurisdiction over same, in which case venue of any such controversy, dispute or other contested matter shall lie solely and exclusively in the City of Milwaukee, Milwaukee County, Wisconsin.

6.7.   **Amendment of the Agreement**.  After the Effective Date, this Agreement may only be amended or modified if: (a) a majority of the members of the Liquidating Trust Advisory Board authorize such action; and (b) such amendment or modification is approved by the Bankruptcy Court.

6.8. **Conflict of Provisions**. In the event that any provision of this Agreement conflicts with, or is in any way materially inconsistent with, the terms and conditions of the Plan or Confirmation Order, on the one hand, the terms and conditions of the Plan or Confirmation Order shall govern and control, and those terms and conditions shall be deemed incorporated herein by reference.

6.9. **Partial Invalidity**. If a provision of this Agreement shall for any reason be held invalid or unenforceable by any court, governmental agency, or arbitrator of competent jurisdiction, such invalidity or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if the invalid or unenforceable provision had never been part of the Agreement.

6.10. **Entire Agreement**. This Agreement (including, without limitation, the recitals), the Confirmation Order and the Plan constitute the entire agreement by and among the Parties hereto with respect to the subject matter hereof, and there are no representations, warranties, covenants, or obligations, except as set forth in this Agreement, the Confirmation Order, and the Plan. This Agreement, together with the Confirmation Order and the Plan, supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto relating to the subject matter hereof. Except as otherwise specifically provided in this Agreement, the Confirmation Order, or in the Plan, nothing in this Agreement is intended, nor shall be construed, to confer upon or give any Person other than the parties hereto, the Liquidating Trust Advisory Board and the Beneficiaries any rights or remedies under or by reason of this Agreement.

6.11. **No Waiver**. The failure or delay on the part of the Liquidating Trustee to exercise any right or remedy conferred upon him pursuant to this Agreement shall not affect such right or remedy, nor shall it constitute the Liquidating Trustee's waiver of such right or remedy. Similarly, the resort to one form of remedy by the Liquidating Trustee shall not constitute a waiver of any alternative remedies available to him under this Agreement.

6.12. **Relationship Created**. The only relationship created by this Trust is the trustee-beneficiary relationship between the Liquidating Trustee and the Beneficiaries. Nothing in this Agreement shall be construed to create any association, partnership, or joint venture between the Liquidating Trustee and the Beneficiaries, or their successors in interest.

6.13. **Counterparts**. This Agreement may be executed by electronic or facsimile signature, in any number of counterparts and by the different parties in separate counterparts, each of which when executed and delivered shall be an original document, but all of which counterparts shall together constitute one and the same instrument.

6.14. **Notices**. Unless otherwise expressly specified or permitted by the terms hereof, any notice, request, submission, instruction or other document to be given hereunder by a party shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (c) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

19

if to the Liquidating Trustee:

> Michael S. Polsky, Esq.
> Beck, Chaet, Bamberger & Polsky, S.C.
> Two Plaza East, Suite 1085
> 330 E. Kilbourn Avenue
> Milwaukee, WI 53202
> Phone: (414) 390-5935
> Fax: (414) 273-7786

If to the Liquidating Trust Advisory Board:

> Russell L. Munsch, Esq.
> Munsch Hardt Kopf & Harr, P.C.
> 3800 Lincoln Plaza
> 500 N. Akard Street
> Dallas, TX 75201
> Phone: (214) 855-7500
> Fax: (214) 855-7584

> Thomas M. Olejniczak, Esq.
> Liebmann, Conway, Olejniczak & Jerry, S.C.
> P.O. Box 23200
> Green Bay, WI 54305-3200
> Phone: (920) 437-0476
> Fax: (920) 437-2868

if to any Beneficiary:

> to such address as such Beneficiary has previously
> furnished in writing to the Debtors, the Bankruptcy
> Court, or the Liquidating Trustee.

6.15. **WAIVER OF JURY TRIAL**. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

6.16. **Exculpatory Provisions, Indemnities and Survival Thereof**. Whether or not expressly therein so provided, any and all exculpatory provisions, immunities and indemnities, and any limitations and negations of liability contained in this Agreement, in each case inuring to the benefit of the Liquidating Trustee or the Liquidating Trust Advisory Board, shall survive (i) the termination or revocation of this Agreement, (ii) as to any person who has served as Liquidating Trustee, the resignation or removal of such person as Liquidating Trustee, and (iii) as to any person who has served as a member of the Liquidating Trust Advisory Board, the resignation or removal of such person from the Liquidating Trust Advisory Board.

6.17. **Further Assurances**. Each Party hereto (and his respective successors and assigns) shall, upon the Liquidating Trustee's reasonable request, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments, and do or cause to be done, such further acts, as may be necessary to carry out the purposes of this

20

Agreement and to vest in the Liquidating Trustee the powers and duties contemplated hereunder.

6.18. **Retained Jurisdiction**.   As provided in the Plan, the Bankruptcy Court has retained jurisdiction over the Liquidating Trust, this Agreement, the Liquidating Trustee, and the Liquidating Trust Assets, including without limitation, the determination of all controversies and disputes arising under or in connection with the Liquidating Trust and this Agreement.   As provided in the Plan, and to the fullest extent permitted by applicable law, this jurisdiction shall be as broad and pervasive as would exist if the Liquidating Trustee were a trustee appointed under Chapter 7 of the Bankruptcy Code, and the Assets were property of the Estates in such Chapter 7 cases created under Section 541 of the Bankruptcy Code.

**IN WITNESS WHEREOF**, the undersigned have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

**LIQUIDATING TRUSTEE**:

By: _____
     Michael S. Polsky


**DEBTORS**:


_____
Paul E. Olsen, individually


_____
Cheryl R. Olsen, individually


_____
David A. Olsen, individually


_____
Becky S. Olsen, individually

6772721_2

21

**ADDENDUM 2**

**CAUSES OF ACTION**

1.    LITIGATION

| Caption of Suit and Case Number | Nature of Proceeding | Court or Agency and Location |
|---|---|---|
| J&D Construction, LLC vs. Olsen's Mill Inc., Olsen's Crop Service, Olsen Bros. Enterprises, LLP, M2 Lease Funds, and Paul and David Olsen; Case No. 08-cv-156 | Money Judgment | Grant County Circuit Court |
| Steven & Mary Spensley and Spensley Grain, Inc. vs. OMI et al; Case No. 07-cv-605 | Contract | Grant County Circuit Court |
| Paul E. Olsen et al. vs. AG Services of Wisconsin LLC; Case No. 2010CV002396 | Replevin | Winnebago County Circuit Court |
| Paul E. Olsen et al. vs. AG Services of Wisconsin LLC; Case No. 2010CV000685 | Replevin | Portage County Circuit Court |
| Paul Olsen et al. vs. Ag Services; Case No. 2010SC000555 | Small Claims Eviction | Waushara County Circuit Court |
| FCStone Financial Inc. et al. vs. Olsen Brothers Enterprises, LLP et al.; Case No. 09-cv-289 | Contract | Green Lake County Court |
| BNP Paribas v. Olsens' Mill, Inc.; Case No. 09-cv-025 | Receivership | Green Lake County Court |

2.    TRANSFERS

| Name of Transferee | Date | Describe Property Transferred and Value Received |
|---|---|---|
| Bankers' Bank 7700 Mineral Point Rd. Madison, WI 53717 | April 7, 2010 | Paula and David Olsen both settled with Bankers' Bank on the personal guarantee issue for $100k each |
| J&D Construction, LLC | May 5, 2010 | Paul and David settled the J&D breach of contract suit for $300k |
| US Grain Storage Systems, Inc. | June 2010 | Paul and David settled the US Grain suit for $200k |
| Vivadell Olsen | June 2010 | Transfer of lien for $200k loan within insider preference period |

3.    All of Debtors' Claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, Causes of Action arising under sections 502(d), 510, 542, 543, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

4.    In addition to the above, any and all other Claims, Causes of Action, proceedings, controversies, liabilities, obligations, rights, suits, damages, judgments, objections to Claims, benefits of subordination of Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or

hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

5.      Notwithstanding the confirmation of the Plan and the entry of the Confirmation Order, and notwithstanding any principle of res judicata or otherwise, and unless specifically and explicitly released, waived, compromised, or otherwise treated in this Plan the Debtors and the Estates retain any and all Claims, actions and Causes of Action held or assertable by the Debtors or their Estates immediately prior to entry of the Confirmation Order, all of which are transferred under this Plan to the Liquidating Trust, regardless of whether they are disclosed or specifically addressed in the Plan or Disclosure Statement, and regardless of whether such Claims, actions and Causes of Action are or were scheduled, filed, or asserted prior to the Confirmation Hearing, including, without limitation, all: (i) Claims and Causes of Action against any Creditor or person whatsoever, whether arising at law or in equity, and whether for affirmative, administrative or declaratory relief or to reduce any liability; (ii) defenses and affirmative defenses to Claims; (iii) setoffs and recoupments against any Claim, Creditor, or other person; (iv) rights to turnover, accounting contribution, indemnification, or reimbursement against any Creditor or other person; (v) rights arising or modified by this Plan (but only as so modified); (vi) rights to any tax refund; and (vii) Avoidance Actions.

## ADDENDUM 3

## CURE SCHEDULE

**Assumed Leases**

    (a)    Leases on the Milwaukee, Viroqua, Boscobel, Ripon, and Belmont Elevators.  Cure amount $0.

    (b)    Lease for the grain bin in Stevens Point.  Cure amount: $0.

    (c)    Lease for the personal property in Oshkosh.  Cure amount:  $0.

    (d)    Lease with M2 Leasing.  Cure amount:  $0.

**Assumed Contracts**

    (a)    Contract with Alliant.  Cure amount:  $0.

1048677

# ADDENDUM 4

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT** ("Purchase Agreement") is dated August 19, 2011, by and among **Paul E. and Cheryl Olsen and David and Becky Olsen** (collectively, the "Seller") and **Archer-Daniels-Midland** Company ("Buyer" or "ADM" and, together with the Seller, the "Parties").

WHEREAS, Paul E. and Cheryl Olsen and David and Becky Olsen are debtors and debtors-in-possession ("Debtors") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") and commenced voluntary proceedings (the "Chapter 11 Cases") on December 16, 2010 (the "Petition Date") by filing petitions for relief in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Bankruptcy Court");

WHEREAS, the Debtors own grain facilities and the underlying real estate in Viroqua, Belmont, Boscobel, Ripon, and Milwaukee, Wisconsin, as well as real estate in Waushara County known as the "Breathing Room Farm," the McGregor Shed in Auroraville, Wisconsin, ownership interests in the Ponderosa Partnership, and all associated machinery, equipment, fixtures, and personal property including, such property at locations in Oshkosh and Stevens Point, Wisconsin (collectively referred to herein as, and as scheduled on **Schedule 1.2**, the "Grain Facility Assets"); and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to buy from Seller, the Grain Facility Assets of the Debtors free and clear of all Claims, Encumbrances (other than Permitted Encumbrances) and Liabilities (as each term is defined herein) and upon the other terms and conditions set forth herein pursuant to the Creditors' Amended Plan of Reorganization for David A. and Becky S. Olsen, and Paul E. and Cheryl R. Olsen, proposed by AG Services of Wisconsin, LLC, Philmar, LLC, Olsen's Mill Acquisition Company, LLC, West Pointe Bank, BNP Paribas, as Administrative Agent, and the State of Wisconsin (the "Plan Proponents" and the "Plan" as to the plan itself); and

WHEREAS, certain assets are subject to Claims, Encumbrances and Liabilities, thus requiring the agreement of Debtors' creditors to agree to the release thereof in connection with this transaction.

NOW, THEREFORE, in consideration of the promises and respective covenants contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1. **SALE AND PURCHASE OF SUBJECT ASSETS.**

Subject to the terms and conditions hereof, Seller will sell, convey, assign, transfer, and deliver to Buyer at the Closing (as defined herein), and Buyer will purchase and accept at the Closing, all rights, title, and interest in all assets, properties, privileges, rights, interests, business,

1

K&E 19411689.16

receivables, inventory (including, without limitation, grain inventory), customer and vendor lists, and goodwill which are part of the Grain Facility Assets (excepting of the Excluded Assets (as defined herein), of every kind and description, personal and mixed, tangible and intangible, and wherever located on the terms and conditions of this Purchase Agreement and the Plan.

Prior to Closing, the Bankruptcy Court must enter an order that the sale of the Grain Facility Assets and related property shall be free and clear of all Claims, Liabilities, and Encumbrances (except with respect to Permitted Encumbrances). For purposes of this Purchase Agreement: (a) "Claims" shall mean claims, suits, proceedings, causes of action, Liabilities, losses, damages, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever; (b) "Encumbrances" shall mean all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Property or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting the title, current use, occupancy or operation of the Property or any part thereof or interest therein; (c) "Permitted Encumbrances" shall mean (i) the security interests associated with the Assumed Liabilities (as defined herein), (ii) any laws, rules, regulations, statutes or ordinances affecting the Grain Facility Assets and which do not, individually or in the aggregate, have a Material Adverse Effect (as defined herein) on the Grain Facility Assets, (iii) the Assumed Leases, and (iv) any easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto; and (d) "Liabilities" shall mean any debt, liability, commitment or other obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or not yet due) and including all costs, fees and expenses relating thereto.

Without limiting the generality of the foregoing, the Grain Facility Assets shall include all of Seller's right, title, and interest in and to the following:

1.1     Real Estate.  The real estate located at or near Viroqua, Boscobel, Belmont, Ripon, and Milwaukee; Waushara County; and Auroraville as legally described on **Schedule 1.1** (collectively, the "Real Estate");

1.2     Machinery, Equipment, and Other Personal Property.  All machinery, equipment, computers and accessories thereto, furniture, trade fixtures, utensils, signs, appliances, tools, forms, supplies, software (to the extent owned, if any), and other fixed assets and goods of the Grain Facility Assets, as of the date of this Purchase Agreement, including, without limitation, all of the material items of tangible personal property listed in **Schedule 1.2** attached hereto, but excluding any Excluded Assets;

1.3     Contracts.  Those Contracts (as hereinafter defined) of Seller related and pertaining to the Grain Facility Assets listed in **Schedule 1.3** (collectively, the "Assumed

2

Contracts"), incorporated herein by this reference, provided that the Assumed Contract shall not include any Contract that expires or is terminated prior to the Closing Date. Contracts shall be assumed pursuant to the confirmation of the Plan as of the Effective Date (as used in this Purchase Agreement, "Contract" means any unexpired agreement, license, lease for real or personal property, permit, arrangement, commitment, understanding, option rights, or agreement, whether written or oral, express or implied, contingent, fixed, or otherwise, to which Seller is a party or is bound, including agreements, option rights, or purchase orders with supplies or customers entered into in the ordinary course of business);

        1.4    **Licenses and Expenses.** All licenses and other similar rights from governmental authorities, including all prepaid licenses, prepaid expenses, and other similar rights (including, without limitation, all prepaid insurance) related and pertaining to the Grain Facility Assets.

        1.5    **Assumption of Certain Leases.** Those leases under which the Debtors are lessors relating to the **Grain Facility Assets as well as** any equipment leases under which the Debtors are lessees that the Seller will assume and assign to Buyer, and the Buyer will assume, as specifically listed in **Schedule 1.3** (the "Assumed Leases").

        1.6    Insurance Proceeds. All insurance, warranty and condemnation proceeds received prior to, on or after the Closing Date with respect to damage, non-conformance of or loss to the Grain Facility Assets incurred on or prior to the Closing Date (except to the extent such proceeds were re-invested in the Grain Facility Assets prior to Closing).

        1.7    **Accounts Receivable.** All accounts receivable, notes receivable, and other receivables (whether current or not current and whether due from affiliates or not) and including all amounts received with respect to any of the foregoing by any Seller after the Closing relating to the Grain Facility Assets.

        1.8   Deposits. All deposits, rebates, or allowances from customers, suppliers, or other business relations relating to the Grain Facility Assets.

        1.9    Intellectual Property. All Intellectual Property Rights (whether owned, licensed, or otherwise), **together with all income,** royalties, **damages, and** payments related thereto (including **any damages for past, present,** or future infringement or misappropriation), all rights to sue **in connection therewith, and all** copies and tangible embodiments thereof, in each case, relating to the Grain Facility Assets.

## 2.    EXCLUDED ASSETS

    Notwithstanding any other provision of this Purchase Agreement, the items set forth on **Schedule 1.4** (collectively, the "Excluded Assets") shall be excluded from the Grain Facility Assets and shall not be acquired by the Buyer pursuant to this Purchase Agreement.

K&E 19411689.16

3. **LIABILITIES AND OBLIGATIONS.**

Buyer does not assume any Claims, Liabilities, obligations or commitments of the Debtors, whether absolute or contingent, known or unknown, except as specifically set forth on the attached **Schedule 1.3** (collectively, the "Assumed Liabilities"). On and after the Closing, with respect to the Assumed Liabilities, Buyer agrees to pay all obligations required pursuant to section 365 of the Bankruptcy Code to cure any defaults related to such assumption to the extent such cure obligations are set forth on the attached **Schedule 1.3**.

Buyer's obligations under this Purchase Agreement are subject to Buyer's completion of, and satisfaction in all respects with, the results of its ongoing due diligence investigation of the business, assets, operations, properties, financial condition, contingent liabilities, prospects and material agreements related to the Grain Facility Assets.

4. **PURCHASE PRICE; PAYMENT; AND COURT APPROVAL.**

4.1  *Purchase Price for Grain Facility Assets.* **The purchase** price for the Grain Facility Assets (the "Purchase Price") shall be $15,846,839.00; <u>provided</u> that in no event shall ADM be required to increase such purchase price.

4.2  *Payment At Closing.* **At the Closing (as defined herein), Buyer shall pay the Purchase Price** to a liquidating trustee appointed by the Bankruptcy Court in the Chapter 11 Cases (the "Liquidating Trustee"), or such other party as may be designated by the Bankruptcy Court, by certified check or wire transfer of immediately available funds to the accounts specified by Seller. The proceeds of the Purchase Price shall promptly be distributed in accordance with the Plan.

4.3  *Allocation of Purchase Price.* The allocation of the Purchase Price among the Grain Facility Assets shall be determined after the conclusion of the auction for the Grain Facility Assets and shall be set forth on **Schedule 1.5** of this Purchase Agreement (as amended). Buyer and Seller shall jointly allocate the Purchase Price in accordance with Section 1060 of the Internal Revenue Code (the "Allocation") among the Grain Facility Assets. For purposes of the Allocation, the Purchase Price shall mean an amount equal to the Purchase Price for U.S. federal income tax purposes. Seller and Buyer agree to prepare and file an IRS Form 8594 or such other form or statement as may be required by applicable law, rule or regulation, and any comparable state or local income tax form, in a manner consistent with the Allocation. Seller and Buyer shall adhere to the Allocation for all tax-related purposes including any federal, foreign, state, county or local income and franchise tax return filed by them after the Closing Date (as defined herein), including the determination by Seller of taxable gain or loss on the sale of the Grain Facility Assets and the determination by Buyer of its tax basis with respect to the Grain Facility Assets. Neither Buyer nor Seller shall file any tax returns or, in a judicial or administrative proceeding, assert or maintain any tax reporting position that is inconsistent with this Purchase Agreement or the Allocation agreed to in accordance with this Purchase Agreement, unless required to do so by applicable law.

4.4  [Intentionally omitted].

4

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 136 of 190

4.5     Court Approval. This Purchase Agreement is subject to Bankruptcy Court approval, which the Plan Proponents shall promptly seek in connection with confirmation of the Plan and through the order confirming the Plan (the "Confirmation Order"). The Plan Proponents shall use their best efforts to cause the Bankruptcy Court to enter the Confirmation Order as soon as practicable after confirmation of the Plan, which Confirmation Order shall be reasonably acceptable to the Buyer. The Plan Proponents shall obtain the Bankruptcy Court's entry of an order approving the Break-Up Fee (as defined herein) by no later than August 19, 2011 (the "Break-Up Fee Order"), which Break-Up Fee Order shall be reasonably acceptable to the Buyer.

4.6     Auction. Buyer will be the stalking horse bidder (the "Stalking Horse Bidder") at an auction (the "Auction") to be conducted and supervised by the Honorable Susan V. Kelley, U.S. Bankruptcy Judge for the Eastern District of Wisconsin at the hearing on confirmation of the Plan (the "Confirmation Hearing") to be held at the Wisconsin Eastern District Federal Courthouse located at 517 East Wisconsin Avenue, Milwaukee, Wisconsin on August 26, 2011 (the "Auction Date"), pursuant to the auction procedures set forth in Section 7.3.2 of the Plan. Immediately after the Auction, the Bankruptcy Court will enter an order (the "Confirmation Order") confirming that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code as of the date thereof (the "Confirmation Date"). In the event that there are no other Qualified Bidders (as defined in the Plan) for the Grain Facility Assets, the Bankruptcy Court shall approve the sale to the Buyer without an auction and enter the Confirmation Order.

4.7     Breakup Fee. Buyer will be the Stalking Horse Bidder at the Auction. As set forth in Section 10.2(d), this Purchase Agreement shall be terminated if (a) a bid of an entity other than Buyer (or an affiliate of the Buyer) is the successful bid at the Auction for the Grain Facility Assets and (b) the Debtors or Liquidating Trustee closes a transaction with respect to all or substantially all of the Grain Facility Assets with any entity other than Buyer (or an affiliate of the Buyer). In the event that this Purchase Agreement is terminated pursuant to Section 10.2(d) and for no other reason, Buyer shall be entitled to a breakup fee from the closing of the sale of any of the Grain Facility Assets to any entity other than the Buyer (or an affiliate of the Buyer) of $475,000.00 (the "Breakup Fee") to compensate it for its participation in the process as the Stalking Horse Bidder; provided, however that the Breakup Fee shall not be due and payable if Buyer shall have breached any of its obligations, representations or warranties contained herein in any material respect. Payment of the Breakup Fee is the sole remedy of the Buyer and Buyer shall not have any other remedy or cause of action under or relating to this Purchase Agreement or under any applicable law. The obligation to make any payment on account of the Breakup Fee shall have administrative priority expense status, equal to all other administrative expense claims under Section 503(b) of the Bankruptcy Code, until such payment is made but shall be solely payable from the proceeds from the sale of the Grain Facility Assets and no other assets of the Debtors' estates. ADM shall be authorized to "credit bid" the amount of the Breakup Fee at the Auction.

5

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 137 of 190

## 5.    CLOSING

5.1    <u>Closing</u>. The completion of the purchase and sale of the Grain Facility Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of [_____] or such other location as agreed upon by the Seller, Plan Proponents and Buyer, commencing at 10:00 a.m. local time on a mutually agreed upon date no later than two (2) business days after the day upon which all of the conditions set forth under Section 9 (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) have been satisfied or, if permissible, waived by the Plan Proponents and/or the Buyer (as applicable), or on such other place, date and time as shall be mutually agreed upon in writing by the Plan Proponents, Buyer and the Seller (the day on which the Closing takes place being the "Closing Date").

5.2    <u>Documents to be Delivered by Seller</u>. At the Closing (except where indicated otherwise), Seller or the Plan Proponents will deliver to Buyer the following, in proper form for recording when appropriate:

(a)    a quit claim deed for the Real Estate, conveying and transferring to Buyer title to the Real Estate in substantially the form attached as **Exhibits A-G**;

(b)    a bill of sale and assignment conveying and transferring to Buyer title to the Grain Facility Assets (other than the Real Estate) in substantially the form attached as **Exhibit H** duly executed by the Seller; and

(c)    any other documentation as may be reasonably required to effectuate the transactions contemplated by this Purchase Agreement.

5.3    <u>Documents to be Delivered by Buyer</u>. At the Closing, Buyer will deliver to Seller, the following:

(a)    evidence of a consummated wire transfer to Seller in the amount of the Purchase Price pursuant to Section 4;

(b)    an assumption agreement relating to Buyer's assumption of the Assumed Liabilities in substantially the form attached as **Exhibit I** duly executed by the Buyer;

(c)    the officer's certificates required to be delivered pursuant to Sections 9.2(a)-(b); and

(d)    any other documentation as may be reasonably required to effectuate the transactions contemplated by this Purchase Agreement.

6

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 138 of 190

6.    REAL ESTATE.

6.1    Occupancy, Title and Possession. Occupancy and possession of the Real Estate shall be given to Buyer at the Closing. Title will be conveyed by quit claim deeds as provided in this Purchase Agreement.

6.2    Inspections. Seller has not obtained an environmental report related to the condition of the Real Property and does not intend to obtain any such report. Any known environmental conditions affecting the Real Property are set forth on **Schedule 1.6**. Buyer may obtain an environmental report or conduct environmental testing at its own expense. Seller does not recall any specific environmental conditions relating to the Real Estate other than as set forth on **Schedule 1.6**. Prior to the Closing Date, Seller shall permit Buyer's inspectors reasonable access during normal business hours to the Real Estate and other Grain Facility Assets upon reasonable prior notice; provided, however, Buyer agrees to restore the Real Estate and other Grain Facility Assets to its former condition existing prior to such inspections in all material respects after performing such inspections and will indemnify, defend and hold Seller harmless for any damages to the Real Estate or the other Grain Facility Assets arising from said inspections, said obligations of Buyer to survive the termination of this Purchase Agreement. Seller and Plan Proponents shall make available for Buyer's review, without charge, all plans and specifications, records, inventories, permits, and correspondence in the possession of Seller or the Plan Proponents relating to the mold, fungal growth, or hazardous substances, including, but not limited to, gasoline and heating oil, which are currently or which were previously located on the Real Estate.

7.    REPRESENTATIONS AND WARRANTIES OF SELLER.

The assets sold pursuant to this Purchase Agreement are "as is, where is," without any representations or warranties by the Sellers, the Debtors, the Plan Proponents, the Liquidating Trustee, or their respective lawyers, professionals or agents. Any protections to the Buyer are specified in the Plan and Confirmation Order.

Buyer represents and warrants that it has relied solely upon its own independent review, investigation, or inspection of any documents or assets in making its offer pursuant to this Purchase Agreement and has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the assets to be purchased or the completeness of any information provided in connection with the assets to be purchased, the Plan, the disclosure statement, the auction terms and procedures or the auction, except as expressly stated in this Purchase Agreement.

8.    REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer represents and warrants to Seller as follows (which representations and warranties shall not survive the Closing):

8.1    Organization. Buyer is a corporation organized, validly existing and in good standing under the laws of the state of Delaware, and has the requisite power and authority

7

K&E 19411689.16

to own, lease, and operate its properties, and to carry on its business as now being conducted, if any, except where the failure to have such power and authority would not, in the aggregate, have a material adverse effect on the business, operations, or financial condition thereof. *[Note: The term "Material Adverse Effect", as defined, only applies with respect to Seller and/or Grain Facility Assets, and does not apply with respect to Buyer.]*

      8.2   <u>Authority Concerning this Purchase Agreement</u>.  Buyer has the power and authority necessary to execute and deliver this Purchase Agreement and to consummate the transactions contemplated hereby and thereby.  This Purchase Agreement has been duly and validly executed and delivered by Buyer, and constitutes the legal, valid, and binding agreement of Buyer, and is enforceable against Buyer in accordance with its terms.

      8.3   <u>Funding of Transaction</u>.  Buyer has funds available in the amount of the Purchase Price to complete the purchase of the Grain Facility Assets and otherwise consummate the transactions contemplated by this Purchase Agreement, and the evidence that Buyer has previously furnished to the Bankruptcy Court and Seller regarding the availability of such funds does not misstate a material fact, or omit to state a material fact, necessary in order to make the statements contained therein not misleading.

      8.4   <u>Brokers; Transactions Costs</u>.  Buyer has not entered into nor will it enter into any contract, agreement, arrangement, or understanding with any person or entity which has or will result in the obligation of Seller to pay any finder's fee, brokerage commission, legal, accounting, or similar payment in connection with the transactions contemplated hereby.

## 9.   CONDITIONS TO CLOSING

      9.1   <u>Conditions to Each Party's Obligation</u>.  The Buyer and Seller's obligation to effect the Closing is subject to the satisfaction or the express written waiver of the Parties, at or prior to the Closing, of the following condition:

     (a)   that there shall be in effect no order of a court of competent jurisdiction prohibiting the Closing.

      9.2   <u>Conditions to Seller's Obligation</u>.  The Seller's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Seller), at or prior to the Closing, of each of the following additional conditions:

     (a)   No Breach of Representations and Warranties.  Except for any inaccuracy that has not had a material adverse effect on the ability of the Buyer to consummate the transactions contemplated by this Purchase Agreement or on the Seller, each representation and warranty contained in <u>Section 8</u> (disregarding all materiality qualifications contained therein) shall be true and correct (i) as if restated on and as of the Closing Date or (ii) if made as of a date specified therein, as of such date.  The Seller shall have received a certificate of the Buyer to such effect signed by a duly authorized officer thereof.

8

(b)    No Breach of Covenants. The covenants contained in this Purchase Agreement to be complied with by the Buyer on or before the Closing shall have been complied with and not been breached in any material respect. The Seller shall have received a certificate of the Buyer to such effect signed by a duly authorized officer thereof.

(c)    Closing Deliveries. Each of the deliveries required to be made to the Seller pursuant to <u>Section 5.3</u> shall have been so delivered.

    9.3    <u>Conditions to Buyer's Obligation.</u>The Buyer's obligation to effect the Closing shall be subject to the fulfillment (or express written waiver by the Buyer), at or prior to the Closing (except as otherwise stated), of each of the following additional conditions:

(a)    No Breach of Covenants. The covenants, obligations and agreements contained in this Purchase Agreement to be complied with by the Seller on or before the Closing shall not have been breached in any material respect.

(b)    No Material Adverse Effect. There shall not have occurred any changes, effects or circumstances constituting, or which would be reasonably likely to result in, individually or in the aggregate, a Material Adverse Effect. "Material Adverse Effect" shall mean any event, condition, development, or effect that individually or in the aggregate with all other events, conditions, developments, and effects, is materially adverse to (a) the Grain Facility Assets, or (b) the ability of Seller to perform their obligations under this Purchase Agreement; provided, however, that in both clauses (a) and (b) of this definition, none of the following shall be deemed in and of itself, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) the filing of the Chapter 11 Cases, (ii) changes in the economic condition generally or in the industries in which the Grain Facility Assets operate, except to the extent such changes have a disproportionate effect on the Grain Facility Assets, (iii) any change of law, statute, regulation, accounting standards or regulatory policy, and (iv) any actions specifically required to be taken pursuant to this Purchase Agreement

(c)    Assigned Contracts and Leases Approval. The Plan is confirmed that includes approval and authorization of the assumption and assignment of such Assumed Contracts and Assumed Leases with respect to which the Buyer and shall have provided the requisite adequate assurance.

(d)    Diligence. The completion by Buyer of due diligence that is typically undertaken in similar transactions including, but not necessarily limited to, further site visits by engineers and environmental consultants, environmental audits, a thorough review of all pending contracts, hedge positions, examination of inventories and the results of such due diligence investigation being satisfactory to Buyer in its sole and absolute discretion; provided, that the Buyer acknowledges and agrees that such due diligence review and investigation shall be completed with respect to (i) environmental matters, by no later than 10:00 a.m. (CDT) on August 30,

9

K&E 19411689.16

2011, and (ii) any other matter, by no later than 12:01 p.m. (CDT) on August 26, 2011.

(e)    [Intentionally left blank.]

(f)    Closing Deliveries. Each of the deliveries required to be made to Buyer pursuant to Section 5.2 shall have been so delivered.

(g)    Acquisition of OMAC Assets. All of the conditions to closing set forth in the Buyer's agreement to purchase from Olsen's Mill Acquisition Company, LLC ("OMAC") certain assets described therein (the "OMAC Business") shall have been satisfied or waived (other than any conditions that can only be satisfied as of the Closing, but subject to the satisfaction or waiver of such conditions) and both Buyer and OMAC are prepared to close the transaction for the OMAC Business, the closing of which transaction with OMAC shall occur contemporaneously with the Closing of the transaction contemplated by this Purchase Agreement or at a time mutually acceptable to the Buyer.

(h)    The Confirmation Order in a form that is agreeable to the Buyer being entered with terms that are consistent with this Purchase Agreement. The Confirmation Order shall have been entered in form reasonably acceptable to the Buyer, shall have become a final order (provided that, for the avoidance of doubt, the Buyer can waive the final order requirement), and shall, among other matters:

    i.    approve this Purchase Agreement and the consummation of the sale of the Grain Facility Assets upon the terms and subject to the conditions of this Purchase Agreement;

    ii.    find that, as of the Closing Date, the transactions contemplated by this Purchase Agreement effect a legal, valid, enforceable and effective sale and transfer of the Grain Facility Assets and shall vest the Buyer with title to the Grain Facility Assets free and clear of all Claims, Encumbrances (other than Permitted Encumbrances) and Liabilities;

    iii.    find that the consideration provided by the Buyer pursuant to this Purchase Agreement constitutes reasonably equivalent value and fair consideration for the Grain Facility Assets;

    iv.    (A) authorize the Seller to assume and assign to the Buyer each of the Assumed Contracts and Assumed Leases, (B) find that, as of the Closing Date, the Assumed Contracts and Assumed Leases will have been duly assigned to the Buyer in accordance with section 365 of the Bankruptcy Code and (C) order that any cure costs under the Assumed Contracts and Assumed Leases shall be paid by the Buyer as soon as practicable and in no event later than the date on which the Assumed Contract or Assumed Lease is deemed assumed and assigned in accordance with the Confirmation Order;

10

K&E 19411689.16

v.     find that the Buyer is a good faith purchaser of the Grain Facility Assets pursuant to Section 363(m) of the Bankruptcy Code;

vi.    find that the Buyer did not engage in any conduct that would cause or permit this Purchase Agreement or the consummation of the transaction hereunder to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code;

vii.   order that the Assumed Contracts and the Assumed Leases will be transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assumed Contract or Assumed Lease or any requirement of applicable law (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer;

viii.   find that the Plan Proponents gave due and proper notice of the transactions hereunder to each party entitled thereto;

ix.    find that the Buyer has satisfied any requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assumed Contracts and Assumed Leases and that the Buyer has guaranteed the obligations of any assign which has assumed each Assumed Contract and Assumed Lease;

x.     enjoin and forever bar the non-debtor party or parties to each Assumed Contract or Assumed Lease from asserting against the Buyer or any of the Grain Facility Assets: (A) any default, claim, liability or other cause of action existing as of the Closing Date whether asserted or not and (B) any objection to the assumption and assignment of such non-debtor party's Assumed Contract and Assumed Lease;

xi.    find that, to the extent permitted by applicable law, the Buyer is not a successor to any Seller or its bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any liability of a Seller and/or its bankruptcy estate, except as otherwise expressly provided in this Purchase Agreement;

xii.   make this Purchase Agreement expressly binding (based upon language reasonably satisfactory to the Buyer) upon any trustee in the event of conversion of any of the Chapter 11 Cases to chapter 7, appointment of a chapter 11 trustee in any of the Chapter 11 Cases, or transfer of venue of any of the Chapter 11 Cases to a bankruptcy court other than the Bankruptcy Court; and

xiii.   order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), the Confirmation Order is effective immediately upon entry.

K&E 19411689.16

Case 10-39796-svk   Doc 238   Filed 08/30/11   Page 143 of 190

## 10. TERMINATION

10.1 <u>Termination by Either the Buyer or the Seller</u>. This Purchase Agreement may be terminated at any time prior to the Closing as follows:

(a) by mutual written consent of the Sellers and the Purchaser;

(b) by either Party, upon written notice to the other, in the event of a material breach by such other Party of such other Party's representations, warranties, agreements or covenants set forth in this Purchase Agreement, which breach (i) would result in a failure of the conditions to Closing set forth in <u>Section 9.2</u> or <u>Section 9.3</u>, as applicable, and (ii) is not cured within seven days from receipt of a written notice from the non-breaching Party;

(c) by either Party, upon written notice to the other, if a government entity issues an order prohibiting the transactions contemplated hereby; or

(d) by either Party, upon written notice to the other, upon the entry of an order by the Bankruptcy Court authorizing a sale of any material portion of the Grain Facility Assets to a person other than the Buyer and the bid set forth in this Purchase Agreement is not designated as the Backup Bid (as defined in the bidding procedures approved in connection with the process for confirmation of the Plan).

10.2 <u>Termination by the Buyer</u>. This Purchase Agreement may be terminated at any time prior to the Closing by the Buyer, upon written notice to the Seller:

(a) if the Confirmation Order, in form and substance reasonably acceptable to the Buyer, has not been entered on or before August 31, 2011;

(b) if the Closing does not take place on or before September 15, 2011;

(c) [Intentionally omitted];

(d) if (i) a bid of an entity other than Buyer is the successful bid at the Auction for the Grain Facility Assets and (ii) the Debtors closes a transaction with respect to any material portion of the Grain Facility Assets with any entity other than Buyer (or an affiliate of the Buyer); or

(e) if any of the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the U.S. Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transaction provided for in this Purchase Agreement, or a trustee is appointed for the Seller and such trustee rejects the transaction contemplated by this Purchase Agreement.

10.3 <u>Limitation on Termination</u>. The right to terminate this Purchase Agreement pursuant to <u>Section 10.1(b)</u> and <u>Section 10.2(b)</u> shall not be available to any Party whose breach hereof has been the principal cause of, or has directly resulted in, the event or

K&E 19411689.16

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 144 of 190

condition purportedly giving rise to a right to terminate this Purchase Agreement under such clauses.

10.4    Effects of Termination. If this Purchase Agreement is terminated pursuant to Section 10.1 or Section 10.2, all further obligations of the Parties under or pursuant to this Purchase Agreement shall terminate without further liability of any Party to the other except for the provisions of Section 4.7 (Breakup Fee), Section 6.2 (Inspections) (with respect to the indemnification obligation to Seller), Section 10.4 (Effects of Termination), Section 11.1 (Binding on Successors and Liquidating Trustee), Section 11.7 (Successors and Assigns), Section 11.9 (Governing Law), Section 11.10 (Exclusive Jurisdiction), and Section 11.11 (Enforcement).

11.    GENERAL PROVISIONS

11.1    Binding on Successors and Liquidating Trustee. Once this Purchase Agreement (including the Schedules and Exhibits hereto) is approved by a final order of the Bankruptcy Court, it is expressly binding upon the Seller, Plan Proponents and their successors, including any liquidating trustee appointed by the Bankruptcy Court in the Chapter 11 Cases.

11.2    Entire Agreement. This Purchase Agreement (including the Schedules and Exhibits hereto) supersedes any other agreement, whether written or oral, that may have been made or entered into by any Party or any of their respective affiliates (or by any director, officer or representative thereof) relating to the matters contemplated hereby, except for any confidentiality or similar agreement between the Parties or their affiliates, which shall not be so superseded. This Purchase Agreement (together with the Exhibits and Schedules hereto) constitutes the entire agreement by and among the Parties with respect to the subject matter of this Purchase Agreement, and there are no agreements or commitments by or among such parties or their affiliates except as expressly set forth herein.

11.3    Amendment and Supplement. This Purchase Agreement may only be amended or supplemented by a written agreement of the Seller, Plan Proponents and Buyer. Any proposed material amendment or material supplement to this Purchase Agreement shall be subject to the approval of the Bankruptcy Court.

11.4    Severability. If any provision, clause or part of this Purchase Agreement or the application thereof under certain circumstances, is thought to be invalid, illegal or unenforceable in any respect under any applicable domestic or foreign statute, law, ordinance, rule or regulation, this Purchase Agreement shall be construed with the invalid, illegal or unenforceable provision, clause or part deleted, and the remainder of this Purchase Agreement, or the application of each provision, clause or part under other circumstances, shall not be affected thereby.

11.5    Waiver. The failure of the Seller or Buyer to insist, in any one or more instances, upon performance of any of the terms or conditions of this Purchase Agreement, shall not be construed as a waiver or relinquishment of any rights granted hereunder or the future performance of any such term, covenant or condition.

K&E 19411689.16

11.6   <u>Notices</u>. All notices and other communications required or permitted hereunder will be in writing and, unless otherwise provided in this Purchase Agreement, will be deemed to have been duly given when delivered in person or when dispatched by e-mail or one business day after having been dispatched by a nationally recognized overnight courier service to:

<u>If to the Seller</u>:

David A. and Becky S. Olsen
c/o Kerkman & Dunn
Attn: Jerome R. Kerkman and David J. Espin
757 North Broadway, Suite 300
Milwaukee, WI 53202-3612
Email: jkerkman@kerkmandunn.com and despin@kerkmandunn.com

And

Paul E. Olsen and Cheryl R. Olsen
c/o Kravit, Hovel & Krawczyk, S.C.
Attn: Stephen E. Kravit and Melissa S. Blair
825 N. Jefferson Street, Fl. 5
Milwaukee, WI 53202-3721
Email: kravit@kravitlaw.com and msb@kravitlaw.com

<u>If to the Buyer</u>:

Archer-Daniels-Midland Company
Attn: James Shafter
4666 Faries Parkway
Decatur, IL 62526

With copy to:

Kirkland & Ellis LLP
Attn: James H.M. Sprayregen, Ryan B. Bennett, and Richard J. Campbell
300 North LaSalle
Chicago, IL 60654
Email: james.sprayregen@kirkland.com, ryan.bennett@kirkland.com, and
    richard.campbell@kirkland.com

<u>If to the Plan Proponents</u>:

14

Russell L. Munsch
Munsch Hardt Kopf & Harr, PC
500 North Akard St.
Dallas, Tx 75201-6659
Email: rmunsch@munsch.com

11.7    Successors and Assigns.  This Purchase Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by any Party without the prior written consent of the other Party, and any such attempted assignment in violation of this Section 11.7 shall be void; provided that, without limiting Buyer's obligations hereunder, Buyer may assign its rights to acquire all or a portion of the Grain Facility Assets to an affiliate of Buyer without the prior written consent of any other Party.

11.8    Further Assurances.  From time to time, as and when requested by any Party, the other applicable Parties will execute and deliver, or cause to be executed and delivered, all such documents and instruments as may be reasonably necessary to effect the transactions contemplated by this Purchase Agreement.

11.9    Governing Law.  This Purchase Agreement shall be governed by and subject to the laws of the State of Wisconsin.

11.10    Exclusive Jurisdiction.  The Bankruptcy Court shall retain jurisdiction to enforce the terms of this Purchase Agreement and to decide any claims or disputes which may arise or result, or be connected with, this Purchase Agreement, any breach or default hereunder, or the transactions contemplated hereby.  All claims, actions, causes of action, suits and proceedings relating to the foregoing shall be filed and maintained only in the Bankruptcy Court and the Parties hereby consent to the jurisdiction of the Bankruptcy Court.

11.11    [Intentionally omitted.]

11.12    Counterparts; Facsimiles or Electronic Signatures.  This Purchase Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.  The exchange of copies of this Purchase Agreement and of signature pages by electronic mail or facsimile transmission shall constitute effective execution and delivery of this Purchase Agreement as to the Parties and may be used in lieu of the original Purchase Agreement for all purposes.

11.13    Titles and Headings.  Titles and headings to sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Purchase Agreement.

11.14    Passage of Title and Risk of Loss.  Legal title, equitable title and risk of loss with respect to the Grain Facility Assets will not pass to Buyer until such Grain Facility Assets are transferred at the Closing, which transfer, once it has occurred, will be deemed

15

effective for tax, accounting and other computational purposes as of 11:59 P.M. prevailing Central Time on the Closing Date.

      11.15  <u>Damages</u>.  Under no circumstances shall any Party be liable for punitive damages arising out of or in connection with this Purchase Agreement or the transactions contemplated hereby or any breach or alleged breach of any of the terms hereof.

      11.16  <u>Time is of the Essence</u>.  The parties agree that time is of the essence with respect to all provisions of this Purchase Agreement.

16

Case 10-39796-svk    Doc 238    Filed 08/30/11    Page 148 of 190

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Purchase Agreement as of the date first above written.

SELLER:

_____
Paul E. Olsen

_____
Cheryl Olsen

_____
David Olsen

_____
Becky Olsen

BUYER:

Archer-Daniels-Midland Company

By: _____

## SCHEDULE 1.1

## LEGAL DESCRIPTIONS OF REAL ESTATE

### Boscobel

Lot One (1) of Grant County Certified Survey Map No. 1351, as recorded in the Office of the Register of Deeds for Grant County, Wisconsin, on May 24, 2007 at 1:15 pm, in Volume 12 of Records, Page(s) 75, as Document No. 698557, being located in the NW 1/4 of the SE 1/4 of Section 33, T8N, R3W, Boscobel Township, Grant County, Wisconsin.

### Viroqua

Lot 2 of Certified Survey Map No. 755 recorded March 28, 2008 in Volume 9 of Certified Survey Maps, page 282-284 as Document No. 443167, being a part of the NE1/4 of the SW1/4 of Section 29, Township 13 North, Range 4 West, City of Viroqua, Vernon County, Wisconsin.

Formerly a part of Lots 1 and 4 of Certified Survey Map No. 609 recorded June 1, 2006 in Volume 8 of Certified Survey Maps, page 231-233 as Document No. 430786, being a part of the SE1/4 of the SW1/4 and part of the NE1/4 of the SW1/4 of Section 29, Township 13 North, Range 4 West, City of Viroqua, Vernon County, Wisconsin.

Formerly a part of Parcels 1, 2 and 3 of Certified Survey Map No. 232 recorded March 19, 2001 in Volume 5 of Certified Survey Maps, page 240-241 as Document No. 386375, being a part of the SE1/4 of the SW1/4 and the NE1/4 of the SW1/4 of Section 29, Township 13 North, Range 4 West, City of Viroqua, Vernon County, Wisconsin.

### Belmont

All that part of the North ½ of the SW¼ of Section 11, Town 3 North, Range 1 East of the 4th P.M., lying North and East of County Highway "G" (as it exists in 2008) and U.S. Highway "151" as described in Award of Damages recorded in Volume 227 of Deeds on Page 651 as Document No. 286606.

All that part of the NW¼ of the SE¼ of Section 11, Town 3 North, Range 1 East of the 4th P.M., lying North and West of County Highway "G" and U.S. Highway "151" (as it exists in 2008) as described in Award of Damages recorded in Volume 227 of Deeds on Page 651 as Document No. 286606.

EXCEPT:

All that portion of the above described real estate as contained in the following described parcel:

A parcel of land located in the SW¼ of the SE¼ and in the NW¼ of the SE¼ and in the NE¼ of the SW¼ of Section 11, Town 3 North, Range 1 East of the 4th P.M. described as follows:

Commencing at the Southwest corner of the SE¼ of said Section 11;

thence North 00°01'53" West, 660.92 feet along the West line of the SW¼ of the SE¼ of said Section 11;

thence South 89°45'15" East, 891.31 feet along the North line of the South ½ of the SW¼ of the SE¼ of said Section 11;

thence North 12°46'14" East, 410.48 feet to the point of beginning;

thence South 89°45'15" East, 333.70 feet to a point on the East line of the SW¼ of the SE¼ of said Section 11;

thence North 00°11'23" East, 1,582.08 feet to the Northeast corner of the NW¼ of the SE¼ of said Section 11;

thence North 89°45'23" West, 1,432.47 feet along the East-West quarter line of said Section 11;

thence South 19°37'38" East, 840.48 feet;

thence South 51°20'59" East, 688.08 feet;

thence South 36°51'12" East, 456.57 feet to the point of beginning.

The above described property is subject to an ingress and egress easement over the North 33 feet thereof.

Tax Parcel Number:   33-04-169.0;

33-04-170.0 (P)

33-04-174.1

Property Address:   County G

Belmont, WI 53510

---

Ripon

PARCEL 1:

That part of certified Survey map No. 5130 located in the Northwest Quarter of the Northeast Quarter (NW ¼ of NE ¼), the Northeast Quarter of the Northwest Quarter (NE ¼ of NW ¼) and the Southwest Quarter of the Northeast Quarter (SW ¼ of NE ¼), and an unplatted part of the

NE ¼ of NW 1/4 , all in Section Three (3), Township Fifteen (15) North, Range Fourteen (14) East, in the Town of Metomen, Fond du Lac County, Wisconsin, described as follows:

Commencing at the East quarter corner of said Section 3; thence North 89 deg. 58 min. 12 sec. West along the East-West quarter line of said Section 3, 1851.69 fee to the point of beginning; thence North 89 deg. 58 min. 12 sec. West along the East-West quarter line, 501.91 feet; thence North 19 deg. 03 min. 38 sec. West along the East line of certified Survey map No. 6993, 2261.81 feet; thence North 70 deg. 56 min. 22 sec. East 269.31 feet; thence South 19 deg. 03 min. 38 sec. East along the West line of Wisconsin and Southern Railroad, 2117.96 feet to the point of beginning.

PARCEL II:

Lot One (1) of Certified Survey Map No. 6993 as recorded in Vol. 49 Certified Survey Maps, Page 99, as Doc No. 862712, located in the Southwest Quarter of the Northeast Quarter (SW ¼ of NE ¼) and in the East half of the Northwest Quarter (E ½ of NW ¼), all in Section Three (3), Township Fifteen (15) North, Range Fourteen (14) East, in the Town of Metomen, Fond du Lac County, Wisconsin.

PARCEL III:
A 66 foot wide Eastment to CTH "KK" described as follows:

Commencing at the Northeast corner of Certified Survey Map No. 6993; thence North 89 deg. 55 min. 36 sec. East, 186.00 feet to the point of beginning; thence North 89 deg. 55 min. 36 sec. East along the South line of CTH "KK", 66.16 feet; thence South 04 deg. 00 min. 00 sec. East, 79.95 feet; thence South 17 deg. 00 min. 00 sec. East, 342.79 feet; thence South 70 deg. 56 min. 22 sec. West along the North line of Lot 2 of this Certified Survey Map, 66.04 feet; thence North 17 deg. 00 min. 00 sec. West, 352.68 feet; thence North 04 deg. 00 min. 00 sec. West 92.00 feet to the point of beginning of said Easement. All bearings referenced to the East-West quarter line of Section 3 recorded as North 89 deg. 58 min. 12 sec. West on Certified Survey Map No. 6993.

Property Address: W13134-6 County Road KK, Ripon, WI 549

## Waushara County

Breathing Room Farm

N1952 and N1784 State Road 49, Aurora, WI

Legal Description:

That part of the Southeast Quarter of the Northeast Quarter (SE ¼ NE ¼) of Section 7, Township 18 North, Range 13 East, Town of Aurora, Waushara County, Wisconsin, lying South of the Carey Canal and East of State Highway "49" EXCEPT the platted land in the Village of Auroraville.

Also EXCEPTING the following 4 described parcels:

1. Commencing at the Northeast corner of the Southeast Quarter of the Northeast Quarter (SE ¼ NE ¼) of Section 7, Township 18 North, Range 13 East; thence South 40 rods, more or less to the inlet canal known as the Carey Canal; thence West 28 rods, more or less, to the bend in said canal; thence West bearing Northerly along the center of said canal to its intersection with the North line of said forty; thence East to the point of beginning (being part of a parcel described in deed recorded in Volume 380 of Records, Page 203).

2. Part of the Southeast Quarter of the Northeast Quarter (SE ¼ NE ¼) of Section 7, Township 18 North, Range 13 East, described as follows: Beginning at a point 44 rods and 8 links West of the East Quarter corner of said Section; thence North 16.5° West 16 rods and 16 links; thence West 20 rods; thence South 16.5° East 16 rods and 16 links, thence East 20 rods to the place of beginning.

3. Commencing at the Southeast corner of Lot 121, First Addition to the Plat of the Village of Auroraville, thence Northeasterly to the Northeast corner of said lot; thence Southeasterly along the South lot line of Lot 120 of said Plat 12 rods to a point on the East line of Ann Street; thence Southwesterly 4 rods, thence Northwesterly 12 rods to the point of beginning.

4. Lands described in Certified Survey Map Number 2048, recorded in Volume 8 of Certified Survey Maps, page 96 as Document Number 294780.

The Southwest Quarter of the Northwest Quarter (SW ¼ NW ¼) of Section 8, Township 18 North, Range 13 East, Town of Aurora, Waushara County, Wisconsin, EXCEPT for parcels described in Volume 87 of Deeds, Page 65, Volume 196 of Records, Page 659 and Volume 270 of Records, Page 593.

The Southeast Quarter of the Northwest Quarter (SE ¼ NW ¼) of Section 8, Township 18 North, Range 13 East, Town of Aurora, Waushara County, Wisconsin, EXCEPT for that part sold to James and Richard Carey for a ditch or canal.

All that part of the Northeast Quarter of the Southwest Quarter (NE ¼ SE ¼) of Section 8, Township 18 North, Range 13 East, Town of Aurora, Waushara County, Wisconsin, located North of State Highway "21", EXCEPT that part used or a canal.
And EXCEPT that part conveyed for highway purposes in Volume 365 of Records, Page 168.

All part of the Southwest Quarter of the Southwest Quarter (SW ¼ SW ¼) of Section 8, Township 18 North, Range 13 East, Town of Aurora, Waushara County, lying North of State Highway "21" and East of State Highway "49", EXCEPT Lot 1 Certified Survey Map Number 905, recorded in Volume 4 of Certified Survey Maps, Page 1 as Document Number 235757.
All EXCEPT that part conveyed for highway purposes in Volume 351 of Records, Page 309.

All that part of the Northwest Quarter of the Southwest Quarter (NW ¼ SW ¼) of Section 8, Township 18 North, Range 13 East, Town of Aurora, Waushara County, Wisconsin lying East of State Highway "49", EXCEPT that part conveyed for highway purposes in Volume 351 of Records, Page 309.

All that part of the Southeast Quarter of the Southwest Quarter (SE ¼ SW ¼) of Section 8, Township 18, North, Range 13 East, Town of Aurora, Waushara County, Wisconsin, lying North and West of State Highway "21".

## SCHEDULE 1.2

1.    Belmont Grain Facility Assets as described as follows, and as depicted on Drawing J by the State of Wisconsin:

| Location | Section | Bin No. | Diameter | Cone? | Length | Width | Eleative Depth | Hopper or Floor | Zero Point | Add Bsl A/N | Extreme Depth | Bushels Per Foot | Base Pack % | + or - Top Cone | State Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7 | J | 1 | 150.00 | | | | 55.00 | | Top of Sidewall | | 55.00 | 14,205.33 | 10.0% | 9.00 | 1,000,000.61 |
| 7 | J | 2 | 99.00 | | | | 62.50 | | Top of Sidewall | | 62.50 | 5,113.93 | 10.0% | 5.40 | 331,952.20 |
| 7 | J | 3 | 42.00 | | | | 79.50 | | Top of Sidewall | | 79.50 | 1,113.70 | 10.0% | 2.32 | 100,490.21 |
| 7 | J | 4 | 15.00 | 4.00 | | | 31.40 | | Top of Sidewall | | 55.40 | 142.05 | 8.5% | 0.90 | 4,840.69 |

Less the items described in Schedule 1.2.1

2.    Viroqua Grain Facility Assets as described as follows, and as depicted on Drawing N by the State of Wisconsin:

| Location | Section | Bin No. | Diameter | Cone? | Length | Width | Eleative Depth | Hopper or Floor | Zero Point | Add Bsl A/N | Extreme Depth | Bushels Per Foot | Base Pack % | + or - Top Cone | State Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | N | 1 | 150.00 | | | | 55.00 | | Top of Sidewall | | 55.00 | 14,205.33 | 10.0% | 9.00 | 1,000,000.61 |
| 8 | N | 2 | 99.00 | | | | 62.50 | | Top of Sidewall | | 62.50 | 5,113.93 | 10.0% | 5.40 | 331,952.20 |
| 8 | N | 3 | 42.00 | | | | 79.50 | | Top of Sidewall | | 85.00 | 1,113.70 | 10.0% | 2.32 | 100,490.21 |
| 8 | N | 4 | 15.00 | 4.00 | | | 31.40 | | Top of Sidewall | | 55.40 | 142.05 | 8.5% | 0.90 | 4,840.69 |

Less the items described in Schedule 1.2.2

3.    Ripon Grain Facility Assets as described as follows, and as depicted on Drawing G by the State of Wisconsin:

| Location | Section | Bin No. | Diameter | Cone? | Length | Width | Eleative Depth | Hopper or Floor | Zero Point | Add Bsl A/N | Extreme Depth | Bushels Per Foot | Base Pack % | + or - Top Cone | State Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | G | 1 | 42.70 | | | | 59.30 | | Top of Sidewall | | 59.30 | 1,436.60 | 10.0% | 2.05 | 90,225.43 |
| 9 | G | 2 | 42.70 | | | | 58.30 | | Top of Sidewall | | 58.30 | 1,436.60 | 10.0% | 2.08 | 88,225.43 |
| 9 | G | 3 | 85.70 | | | | 64.00 | | Top of Sidewall | | 64.00 | 5,366.60 | 10.0% | 5.50 | 359,237.27 |
| 9 | G | 4 | 23.00 | | | | 57.13 | 2.47 | Top of Sidewall | | 64.60 | 345.70 | 7.5% | 1.48 | 21,752.94 |
| 9 | G | 5 | 23.43 | | | | 57.13 | 7.47 | Top of Sidewall | | 64.56 | 345.70 | 7.5% | 1.48 | 21,752.94 |
| 9 | G | 6 | 23.60 | | | | 65.13 | 1.50 | Top of Sidewall | | 66.75 | 357.82 | 7.8% | 1.43 | 20,666.67 |
| 9 | G | 7 | 23.40 | | | | 57.15 | 7.47 | Top of Sidewall | | 64.60 | 345.70 | 7.5% | 1.43 | 21,752.94 |
| 9 | G | 8 | 265.27 | F | | | 1.00 | | 0 - 1 foot | | 1.00 | 44,428.98 | 10.5% | 0.00 | 49,669.58 |
| 9 | G | 9 | 267.05 | F | | | 1.00 | | 1 - 2 foot | | 1.00 | 45,025.10 | 10.5% | 0.00 | 49,827.61 |
| 9 | G | 10 | 268.83 | F | | | 1.00 | | 2 - 3 foot | | 1.00 | 45,627.32 | 10.5% | 0.00 | 50,190.05 |
| 9 | G | 11 | 270.61 | F | | | 1.00 | | 3 - 4 foot | | 1.00 | 46,233.51 | 10.9% | 0.00 | 50,856.90 |
| 9 | G | 12 | 272.39 | F | | | 1.00 | | 4 - 5 foot | | 1.00 | 46,840.33 | 10.9% | 0.00 | 51,534.36 |
| 9 | G | 13 | 273.75 | F | | | 0.40 | | 5 - 5.4 foot | | 0.40 | 47,312.70 | 10.9% | 0.50 | 20,817.59 |
| 9 | G | 14 | 274.20 | | | | | | Cone | | 0.00 | 47,468.33 | 10.2% | 16.45 | 650,044.75 |
| 9 | G | 15 | 82.54 | | | | 64.00 | | Top of Sidewall | | 64.00 | 5,061.78 | 10.0% | 5.37 | 348,798.42 |
| 9 | G | 16 | 90.00 | | | | 85.50 | | Top of Sidewall | | 85.50 | 5,113.93 | 10.0% | 5.40 | 309,343.09 |

Less the items described in Schedule 1.2.3.

## SCHEDULE 1.2

4.  Boscobel Grain Facility Assets as described as follows, and as depicted on Drawing O by the State of Wisconsin:

| Location | Sector | Bin No. | Diameter | Cone? | Length | Width | Effective Depth | Hopper or Floor | Zero Point | Add Int Adj | Extreme Depth | Bushels Per Foot | Base Pack % | +or- Key Cone | State Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | O | 1 | 40.00 | | | | 62.25 | | Top of Sidewall | | 62.33 | 3,454.40 | 10.0% | 2.58 | 104,341.93 |
| 10 | O | 2 | 40.00 | | | | 62.50 | | Top of Sidewall | | 62.33 | 1,454.40 | 10.0% | 2.58 | 104,341.53 |
| 10 | O | 3 | 105.00 | | | | 83.00 | | Top of Sidewall | | 83.00 | 6,969.62 | 10.0% | 6.30 | 583,741.96 |
| 10 | O | 4 | 105.00 | | | | 83.00 | | Top of Sidewall | | 83.00 | 6,969.62 | 10.0% | 6.20 | 583,741.96 |

Less the items described in Schedule 1.2.4

5.  Milwaukee Grain Facility Assets described as follows, and depicted on Drawing M by the State of Wisconsin:

| Location | Sector | Bin No. | Diameter | Cone? | Length | Width | Effective Depth | Hopper or Floor | Zero Point | Add Int Adj | Extreme Depth | Bushels Per Foot | Base Pack % | +or- Key Cone | State Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | M | 1 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 2 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 3 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 4 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 5 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 11 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 12 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 13 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 14 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 15 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 21 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 22 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 23 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 24 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 25 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 31 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 32 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 33 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 34 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 35 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 41 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 42 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 43 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 44 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 45 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 51 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 52 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 53 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 54 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 55 | | N | 9.59 | 9.59 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,436.78 |
| 11 | M | 61 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 62 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 63 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 71 | 22.50 | N | | | 100.00 | | Top of Floor | | 100.00 | 560.56 | 9.0% | -3.56 | 58,929.91 |
| 11 | M | 72 | | N | 12.47 | 12.56 | 86.80 | | Top of Floor | | 86.80 | 64.69 | 8.0% | 0.00 | 8,731.01 |
| 11 | M | 73 | 22.50 | N | | | 100.00 | | Top of Floor | | 100.00 | 560.56 | 9.0% | -3.56 | 58,929.91 |
| 11 | M | 81 | 22.50 | N | | | 100.00 | | Top of Floor | | 100.00 | 560.56 | 9.0% | -3.56 | 58,929.91 |
| 11 | M | 92E | | N | 26.58 | 26.58 | 80.50 | | Top of Floor | | 80.50 | 384.31 | 7.5% | 0.00 | 37,442.20 |
| 11 | M | 92N | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,020.15 |
| 11 | M | 92 | 29.50 | N | | | 100.00 | | Top of Floor | | 100.00 | 560.56 | 9.0% | -3.56 | 58,929.91 |
| 11 | M | 92T | | N | 26.58 | 26.58 | 80.50 | | Top of Floor | | 80.50 | 384.31 | 7.5% | 0.00 | 37,442.20 |
| 11 | M | 92S | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,020.15 |
| 11 | M | 101 | 29.50 | N | | | 100.00 | | Top of Floor | | 100.00 | 560.56 | 9.0% | -3.56 | 58,929.91 |
| 11 | M | 102 | 29.50 | N | | | 100.00 | | Top of Floor | | 80.30 | 384.31 | 7.5% | 0.00 | 39,442.20 |
| 11 | M | 102E | | N | 26.58 | 26.58 | 80.50 | | Top of Floor | | 80.50 | 384.31 | 7.5% | 0.00 | 39,442.20 |
| 11 | M | 102S | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,020.15 |

(Milwaukee Grain Facility Assets cont'd)

| Location | Section | Bin No. | Diameter | Cone? | Length | Width | Elective Depth | Hopacos Floor | Zero Point | Aux Del Act | Extreme Depth | Bushels Per Foot | Black Pack % | Hst-Top Cone | Strike Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | M | 103 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 111 | 29.60 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 112? | | N | 39.59 | 20.39 | 90.30 | | Top of Floor | | 90.30 | 334.21 | 7.5% | 0.00 | 32,442.20 |
| 11 | M | 112R | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,059.15 |
| 11 | M | 113 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 121 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 122? | | N | 20.39 | 20.39 | 90.30 | | Top of Floor | | 90.30 | 334.21 | 7.5% | 0.00 | 32,442.20 |
| 11 | M | 122R | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,059.15 |
| 11 | M | 120 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 131 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 132? | | N | 20.39 | 20.39 | 90.30 | | Top of Floor | | 90.30 | 334.21 | 7.5% | 0.00 | 32,442.20 |
| 11 | M | 132R | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,059.15 |
| 11 | M | 133 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 141 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 142? | | N | 20.39 | 20.39 | 90.30 | | Top of Floor | | 90.30 | 334.21 | 7.5% | 0.00 | 32,442.20 |
| 11 | M | 142R | | N | 15.71 | 15.71 | 9.70 | | Top of Floor | | 9.70 | 198.40 | 7.0% | 0.00 | 2,059.15 |
| 11 | M | 143 | 29.80 | N | | | 100.00 | | Top of Floor | | 100.00 | 559.66 | 9.0% | -3.58 | 58,926.91 |
| 11 | M | 152 | | N | 19.67 | 10.06 | 88.50 | | Top of Floor | | 88.50 | 94.68 | 8.0% | 0.00 | 6,731.51 |
| 11 | M | 201 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 202 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 203 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 204 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 205 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 211 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 212 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 213 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 214 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 215 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 221 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 222 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 223 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 224 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 225 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 231 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 232 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 233 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 234 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 235 | | N | 9.58 | 9.58 | 82.70 | | Top of Floor | | 82.70 | 73.78 | 5.5% | 0.00 | 6,430.78 |
| 11 | M | 241 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 242 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | 243 | 22.50 | N | | | 79.20 | | Top of Floor | | 79.20 | 319.62 | 7.5% | -2.70 | 26,284.79 |
| 11 | M | | | N | | | 0.00 | | | | 0.00 | 0.00 | 0.0% | 0.00 | |
| 11 | M | 8 | | N | 59.76 | 59.76 | 76.00 | | Top of Floor | | 76.00 | 93.50 | 6.5% | 0.00 | 7,518.09 |
| 11 | M | 9 | | N | 59.76 | 59.76 | 76.00 | | Top of Floor | | 76.00 | 93.50 | 6.8% | 0.00 | 7,518.09 |
| 11 | M | 17 | | N | 9.17 | 9.18 | 69.00 | | Top of Floor | | 69.00 | 53.59 | 6.5% | 0.00 | 4,916.22 |
| 11 | M | 25 | | N | 6.41 | 6.35 | 76.00 | | Top of Floor | | 76.00 | 55.79 | 4.8% | 0.00 | 4,523.03 |
| 11 | M | | | N | | | | | | | 0.00 | 0.00 | 0.0% | 0.00 | 0.02 |
| 11 | M | L3 | | N | 15.50 | 15.50 | 28.30 | | Top of Floor | | 28.30 | 193.63 | 7.0% | 0.00 | 5,481.62 |
| 11 | M | L4 | | N | 15.11 | 13.70 | 26.30 | | Top of Floor | | 26.30 | 183.41 | 7.0% | 0.00 | 5,181.32 |
| 11 | M | L5 | | N | 13.50 | 15.50 | 29.00 | | Top of Floor | | 26.00 | 193.63 | 7.0% | 0.00 | 15,836.48 |
| 11 | M | L6 | | N | 15.11 | 15.10 | 28.30 | | Top of Floor | | 28.30 | 183.41 | 7.0% | 0.00 | 6,181.32 |
| 11 | M | L7 | | N | 12.30 | 12.35 | 26.30 | | Top of Floor | | 28.30 | 122.11 | 6.9% | 0.00 | 3,426.26 |
| 11 | M | L10 | | N | 10.76 | 10.76 | 28.30 | | Top of Floor | | 28.30 | 90.00 | 5.8% | 0.00 | 2,601.72 |
| 11 | M | L11 | | N | 10.92 | 10.92 | 26.35 | | Top of Floor | | 28.30 | 95.56 | 6.0% | 0.00 | 2,872.31 |
| 11 | M | L13 | | N | 10.57 | 10.56 | 28.50 | | Top of Floor | | 26.30 | 95.73 | 6.5% | 0.00 | 2,436.65 |
| 11 | M | L14 | | N | 10.71 | 10.71 | 28.30 | | Top of Floor | | 28.30 | 105.97 | 7.0% | 0.00 | 5,233.32 |
| 11 | M | L15 | | N | 10.76 | 10.76 | 28.30 | | Top of Floor | | 28.30 | 93.07 | 5.8% | 0.00 | 2,559.56 |
| 11 | M | L16 | | N | 10.74 | 10.76 | 28.30 | | Top of Floor | | 28.30 | 93.07 | 5.8% | 0.00 | 2,559.88 |
| 11 | M | L17 | | N | 10.76 | 10.76 | 28.36 | | Top of Floor | | 28.30 | 93.07 | 5.8% | 0.00 | 2,591.68 |
| 11 | M | L18 | | N | 10.76 | 10.76 | 28.30 | | Top of Floor | | 28.30 | 95.07 | 5.8% | 0.00 | 2,590.04 |
| 11 | M | L19 | | N | 10.76 | 10.76 | 24.30 | | Top of Floor | | 28.30 | 95.07 | 5.8% | 0.00 | 2,589.25 |
| 11 | M | L20 | | N | 10.76 | 10.76 | 26.30 | | Top of Floor | | 28.30 | 93.97 | 5.8% | 0.00 | 2,589.94 |
| 11 | M | L21 | | N | 10.76 | 10.76 | 26.30 | | Top of Floor | | 28.30 | 93.07 | 5.8% | 0.00 | 2,589.63 |
| 11 | M | L22 | | N | 10.76 | 10.76 | 28.00 | | Top of Floor | | 28.00 | 93.07 | 5.8% | 0.00 | 2,787.07 |

(Milwaukee Facility Assets cont'd)

| Location | Section | Bin No. | Diameter | Cone? | Length | Width | Effective Depth | Number of Floor | Zero Point | Add Det Adj | Extreme Depth | Bushels Per Foot | Base Pack % | Per Ton Cone | Side Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | M | 173 | | N | 13.76 | 19.76 | 28.00 | | Top of Floor | | 28.00 | 93.07 | 5.8% | 0.00 | 2,757.07 |
| 11 | M | L26 | | N | 12.76 | 19.76 | 27.00 | | Top of Floor | | 27.00 | 93.07 | 5.8% | 0.00 | 2,653.62 |
| 11 | M | 127 | | N | 91.01 | 10.76 | 27.00 | | Top of Floor | | 27.00 | 93.07 | 5.8% | 0.00 | 2,656.60 |
| 11 | M | 128 | | N | 10.76 | 10.76 | 20.50 | | Top of Floor | | 20.50 | 93.07 | 0.00 | 0.00 | 2,670.37 |
| 11 | M | | | | | | | | | | 0.00 | 0.00 | 0.0% | 0.00 | 0.00 |
| 11 | M | 92 | | N | 15.52 | 15.52 | 46.00 | | Top of Floor | | 46.00 | 121.83 | 7.0% | 0.00 | 8,530.25 |
| 11 | M | 93 | | N | 15.52 | 15.52 | 40.00 | | Top of Floor | | 46.00 | 103.83 | 7.0% | 0.00 | 8,530.28 |
| 11 | M | 7 | | N | 12.33 | 12.32 | 17.70 | | Top of Floor | | 17.70 | 122.11 | 8.6% | 0.00 | 2,031.85 |
| 11 | M | 10 | | N | 10.79 | 10.78 | 18.20 | | Top of Floor | | 18.20 | 93.50 | 8.8% | 0.00 | 1,830.03 |
| 11 | M | 11 | | N | 10.90 | 10.90 | 18.20 | | Top of Floor | | 18.20 | 95.26 | 8.0% | 0.00 | 4,948.28 |
| 11 | M | 13 | | N | 10.71 | 10.70 | 18.20 | | Top of Floor | | 18.20 | 92.12 | 5.8% | 0.00 | 1,773.62 |
| 11 | M | 14 | | N | 10.71 | 10.70 | 18.20 | | Top of Floor | | 16.20 | 90.12 | 5.8% | 0.00 | 1,773.62 |
| 11 | M | 18 | | N | 10.70 | 10.76 | 18.20 | | Top of Floor | | 16.20 | 93.07 | 5.8% | 0.00 | 1,792.10 |
| 11 | M | 16 | | N | 10.76 | 10.78 | 18.20 | | Top of Floor | | 18.20 | 93.07 | 5.8% | 0.00 | 1,792.10 |
| 11 | M | 17 | | N | 10.76 | 10.76 | 18.23 | | Top of Floor | | 18.20 | 93.07 | 5.8% | 0.00 | 1,792.10 |
| 11 | M | 18 | | N | 10.76 | 10.76 | 18.20 | | Top of Floor | | 18.20 | 93.07 | 5.8% | 0.00 | 1,792.10 |
| 11 | M | 19 | | N | 10.76 | 10.76 | 18.20 | | Top of Floor | | 16.20 | 93.07 | 5.8% | 0.00 | 1,792.10 |
| 11 | M | 20 | | N | 10.16 | 10.78 | 18.20 | | Top of Floor | | 18.20 | 93.07 | 5.8% | 0.00 | 1,792.10 |
| 11 | M | 21 | | N | 10.78 | 10.76 | 18.20 | | Top of Floor | | 18.20 | 93.42 | 5.8% | 0.00 | 1,788.76 |
| 11 | M | 22 | | N | 10.78 | 10.79 | 18.20 | | Top of Floor | | 18.20 | 93.42 | 5.8% | 0.00 | 1,038.18 |
| 11 | M | 23 | | N | 8.32 | 8.31 | 27.00 | | Top of Floor | | 27.00 | 55.59 | 4.3% | 0.00 | 1,522.64 |
| 11 | M | 24 | | N | 6.32 | 6.31 | 27.00 | | Top of Floor | | 27.00 | 59.68 | 4.3% | 0.00 | 1,672.64 |
| 11 | M | 26 | | N | 10.57 | 10.57 | 26.00 | | Top of Floor | | 26.00 | 89.81 | 5.8% | 0.00 | 2,470.59 |
| 11 | M | 37 | | N | 10.57 | 10.57 | 28.00 | | Top of Floor | | 28.00 | 89.81 | 5.8% | 0.00 | 2,470.52 |
| 11 | M | 29 | | N | 12.02 | 12.01 | 26.00 | | Top of Floor | | 26.00 | 122.01 | 6.5% | 0.00 | 3,055.24 |

Less the items described in Schedule 1.2.5.

6.     Stevens Point personal property described as follows:

| Location | Section | Bin No. | Diameter | Cone? | Length | Width | Effective Depth | Number of Floor | Zero Point | Add Det Adj | Extreme Depth | Bushels Per Foot | Base Pack % | Per Ton Cone | Side Licensed Capacity Bushels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | D | 1 | 89.70 | | | | 84.50 | | Top of Bottom | | 64.00 | 5,079.69 | 10.0% | 5.36 | 387,595.22 |
| 8 | D | 2 | 89.70 | | | | 64.00 | | Top of Bottom | | 84.00 | 5,079.69 | 10.0% | 5.36 | 387,595.22 |

7.     Oshkosh Personal Property as described as follows: an ethanol line, two (2) two million gallon tanks, dyke, railroad tracks and coverall building.

8.     Breathing Room Farm

9.     McGregor Shed

10.     Leases on the Viroqua, Boscobel, Ripon, Milwaukee and Belmont Grain Facility Assets

11.     Ownership Interest in Ponderosa Partnership

12.     Receivable Ag Services (100% interest)

# LOT 7

# BELMONT OWNED EQUIPMENT

# BELMONT OWNED EQUIPMENT
## LOT 7

| Asset Description | Make and/or Model # of Asset | Asset Serial # | Asset Location | Asset Condition |
|---|---|---|---|---|
| | Dickey John GAC2100 | 1716-32187 | Belmont | New Installation - Oct 08 |
| Grain Analysis Computer& Printer | Citizen Printer IDP3550 | 850226 | Belmont | New Installation - Oct 08 |
| | Seedburo 8805S | SS00671 | Belmont | New Installation - Oct 08 |
| FM Grading Scale | Intersystems - TP 531880 | 6081020713 | Belmont | New Installation - Oct 08 |
| Grain Sampling Probe and remote control station | | | | |
| Mechanical Pit-Type Concrete Deck Truck Scale and Instrumentation Package | Thurman 8110E | 7715-0051944-6DK | Belmont | New Installation - Oct 08 |
| | Weigh Terminal - Mettler Toledo IND 560 | | | |
| | Outdoor Scale (weight) Board / Control Light Station - SAI / MED450 | | | |
| | CPU - Nobilis - Core duo 2, 09/2008 | 1070798 | Belmont | New Installation - Oct 08 |
| "OneWeigh" Computer System | Monitor - Acer AL1716 F | ETLJ60C2887490331E4O4B | Belmont | New Installation - Oct 08 |
| | Printer - Lexmark - Multi-Form - 2500 Series | 8G-25733 | Belmont | New Installation - Oct 08 |
| | CPU - Nobilis - P4 | 730267 | Belmont | New Installation - Oct 08 |
| Office Administrator Computer | Monitor - Acer V193 | ETLB20802182405083420O | Belmont | New Installation - Oct 08 |
| | Printer- Brother MFC Fax, Copy, Scan - 7840W | U62064B8N126738 | Belmont | New Installation - Oct 08 |
| | CPU - Nobilis - P4 | 728413 | Belmont | New Installation - Oct 08 |
| Office Administrator Computer | Monitor - Acer 7471 | 50716 | Belmont | New Installation - Oct 08 |
| | Printer - HP Laser Jet 1020 Seires | CNB9142869 | | New Installation - Oct 08 |
| | CPU - Nobilis - P4 | | Belmont | Old System |
| Office Administrator Computer | Monitor Nobilis | | | Old System |
| | Printer - HP Laser Jet 4000 Seires | | | Old System |
| 2005 Pontiac | Pontiac Van | 1GMDV23E75D106284 | Belmont | Good |
| 1998 KENWORTH T-800 #121 | Kenworth Truck Semi Truck Day Cab | 1XKDDU9X2WJ756868 | Belmont | ?? |

# LOT 11

# VIROQUA
# OWNED
# EQUIPMENT

## VIROQUA OWNED EQUIPMENT
## LOT 11

| Asset Description | Make and/or Model # of Asset | Asset Serial # | Asset Location | Asset Condition |
|---|---|---|---|---|
| Grain Analysis Computer & Printer | Dickey John GAC2100 | 1640-11006 | Viroqua | New Installation - Aug 08 |
| | No Printer | | Viroqua | New Installation - Aug 08 |
| FM Grading Scale | Seedburo 880SS | SS00670 | Viroqua | New Installation - Aug 08 |
| Grain Sampling Probe and remote control station | Intersystems - TP 531880 | 06081020714 | Viroqua | New Installation - Aug 08 |
| Mechanical Pit-Type Concrete Deck Truck Scale and Instrumentation Package | Thurman 8110E | | Viroqua | New Installation - Aug 08 |
| | Weigh Terminal - Mettler ;Toledo IND 560 | 7715-0051942-6DK | Viroqua | |
| | Outdoor Score (weight) Board / Control Light Station - SAI / MED450 | | Viroqua | |
| "OneWeigh" Computer System | CPU - Nobilis - RTS1282 | 1050058 | Viroqua | New Installation - Aug 08 |
| | Monitor - Acer V193 | ETLCC020382302A554101 | Viroqua | |
| | Battery Backup ONN1900lcd | AGOM5357 | Viroqua | |
| | Scal Read-Out Hettler Toledo IND560 | 0051942-60k | Viroqua | |
| Office Administrator Computer | CPU - Nobilis - RTS 1282 | 1056902 | Viroqua | New Installation - Aug 08 |
| | Monitor - Acer V193 | ETIcc020382302a524101 | Viroqua | New Installation - Aug 08 |
| | Printer HP Laserjet P1006 | VND3F12497 | Viroqua | New Installation - Aug 08 |
| Operations Manager Computer | CPU Nobilis RTS-270 | 795284 | Viroqua | New Installation - Aug 08 |
| | Monitor - Acer VT17W71 | C0612V2139 | Viroqua | New Installation - Aug 08 |
| | Printer HP Laserjet 1320 | CNLF03980 | Viroqua | New Installation - Aug 08 |
| Office Administrator Copier | Brother MFC 7840w All In One. | V62064C8N-172572 | Viroqua | New Installation - Aug 08 |

# LOT 10

# RIPON/
# METOMEN
# OWNED
# EQUIPMENT

# RIPON/METOMEN OWNED EQUIPMENT
## LOT 10

| Asset Description | Make and/or Model # of Asset | Asset Serial # | Asset Location | Asset Condition |
|---|---|---|---|---|
| Manager's Desk | Front Office | NA | Ripon | Good |
| Electric Time Recorder | N/A | NA | Ripon | Good |
| Fax/Printer | Brother Multifunction Fax | NA | Ripon | Good |
| Radio System Antenna | NA | NA | Ripon | Good |
| (3) L-Shaped Desk | Main Office | NA | Ripon | Good |
| Router | Cisco | NA | Ripon | Good |
| Printer | HP Laser Jet P4014N | NA | Ripon | Good |
| Ticket Sender | NA | NA | Ripon | Good |
| Computer System | Nobilis Computer System Side Office w/ two 17" Monitors | NA | Ripon | Good |
| (2) Computer System | Nobilis Computer System Front & Back Office | NA | Ripon | Good |
| Phone System | NA | NA | Ripon | Good |
| Oneweigh System | Computer system | NA | Ripon | Good |
| Skid Loader | Bobcat S185 Skid Loader | 52S016885 | Ripon | Good |
| Auger | Fertel MX120 CSW | NA | Ripon | Good |
| Grain Covers | Canvas Tarps for Pit | NA | Ripon | Good |
| Grain Probe | Blue Grain Probe In Front Of Office | NA | Ripon | Good |
| Grain Dryer | MC Grain Dryer Model 3180 | NA | Ripon | Good |
| Dryer Silo w/conveyors | Brock Silo / Sweet Mfg Conveyors | NA | Ripon | Good |
| Pit - Outside Storage | Corn Pit Storage Location w/ Dam | NA | Ripon | Good |
| Building - Office/Shop | NA | NA | Ripon | Good |
| Concrete Pad | Concrete Corn Pad | NA | Ripon | Good |

# LOT 8

# BOSCOBEL OWNED EQUIPMENT

## BOSCOBEL OWNED EQUIPMENT

| Asset Description | Make and/or Model # of Asset | Asset Serial # | Asset Location | Asset Condition |
|---|---|---|---|---|
| Grain Sampling Probe and remote control station | Intersystems - TP 531860 | | Boscobel | New installation - Oct 07 |
| Mechanical Pit-Type Concrete Deck Truck Scale and Instrumentation Package | United Scale Hydraulic | | | New installation - Oct 07 |
| | Weigh Terminal - Mettler Toledo IND 560 | | Boscobel | New installation - Oct 07 |
| | Outdoor Score (weight) Board / Control Light Station - SAI / MED450 | | | New installation - Oct 07 |
| "OneWeigh" Computer System | CPU - Nobilis - Core duo 2, 09/2008 | ETL460C2867300A31 | Boscobel | New installation - Oct 07 |
| | Monitor - Acer AL1716 F | | Boscobel | New installation - Oct 07 |
| Plant Manager Office | CPU - Nobilis - P4 | ETL5604282727001 | Boscobel | New installation - Oct 07 |
| Plant Manager Office | Printer - Brother MFC Fax, Copy, Scan - 7840W | | Boscobel | New installation - Oct 07 |
| Office Administrator Computer | CPU - Nobilis - core duo 2, 09/2008 | ETL49083707260 | Boscobel | New installation - Oct 07 |
| | Printer - HP Laser Jet 1020 Series | | Boscobel | New installation - Oct 07 |
| OFFICE Administrator Fax | HP Office Jet Pro L7590 | MY91P120P4 | Boscobel | New installation - Oct 07 |
| Side Track | N/A | N/A | Boscobel | N/A |
| Scale Tower | N/A | N | Boscobel | N |
| Motorola 2 way Radios | 4 Motorola CP200 Radios | No Serial Number | Boscobel | |

| | | | |
|---|---|---|---|
| Track Mobil Whiting | Whiting Track Mobil Model 75 TM 1979 Behind Main Tower (Chevrolet Asset Tag 43929) | LGN75038 | Boscobel | Used Purchase |
| John Deere Tractor 2010 | John Deere Tractor 2010 Between Bins | R14802 | Boscobel | |
| Case Skid Loader | Model 1845C Outside West Side | JAF0283253 | Boscobel | |
| West Field Portable Auger | Westfield Portable Auger Model MK130-61 Outside West Side | 56456 | Boscobel | |
| Steinlite Grain Analysis Computer | Steinlite Model SL95 | 1690 | Boscobel | New installation - Oct 07 |
| Compudraft | Compudraft CD 4000 Model CD 4000 | 5181-d-1 | Boscobel | |
| Pontiac Van | 2005 Montana Van | 1GMDVZ3E75D106284 | Boscobel | 51979 Miles |

# LOT 9

# MILWAUKEE OWNED EQUIPMENT

## MILWAUKEE OWNED EQUIPMENT
### LOT 9

| Type | Asset Description | Make and/or Model # of Asset | Asset Serial # | Asset Location | Asset Condition |
|---|---|---|---|---|---|
| Equip/Furn/Fixture | Motorola BPR40 Portable Radios (6 Radios) | Motorola BPR40 | N/A | Milwaukee Facility | Good |
| Equip/Furn/Fixture | Computer System | Nobilus 1279 Tower HP LaserJet 1022 Printer Brother IntelliFax 2820 Fax Laptop Toshiba | N/A | Milwaukee Facility | All Good |
| Equip/Furn/Fixture | Garnet Probe | Intrasystems | N/A | Milwaukee Facility | Very Good |
| Equip/Furn/Fixture | Tripod Hoist- Electric Powered | 139-300K | N/A | Milwaukee Facility | Good |
| Equip/Furn/Fixture | Test Weight  Class-F 2500lbs | Bought from either Cream City Scale or United Scale | N/A | Milwaukee Facility | Good |
| Equip/Furn/Fixture | 1979 Trackmobile 75TM | Trackmobile | N/A | Milwaukee Facility | Fair |
| Equip/Furn/Fixture | Temperature Probe | HotSpot KE-200 | N/A | Milwaukee Facility | Good |
| Equip/Furn/Fixture Total | | | | | |
| R/E | Dust System (roof) | Carter Day | N/A | Milwaukee Facility | Fair |
| R/E | New Shop | N/A | N/A | Milwaukee Facility | Good |
| R/E | Signage | N/A | N/A | Milwaukee Facility | Good |
| R/E | Rehab West RR Track | N/A | N/A | Milwaukee Facility | |
| R/E | Rehab Grain Bins | N/A | N/A | Milwaukee Facility | |
| R/E | Grain Bin Roof Resurfacing | N/A | N/A | Milwaukee Facility | |

\* Pursuant to the Bankruptcy Court's Order of August 25, 2011, the items deemed to be fixtures are subject to the claims of the Landlord upon termination of the Milwaukee Lease.



AG SERVICES OF WISCONSIN, LLC

LICENSE #249456

RAK 9/25/09

FIRST CAPITOL DRIVE OR HWY G

N

1

3

PIT

4

898 FIRST CAPITOL DR.

2

SCALE

OFFICE

SECTION J

TO - PLATTEVILLE

U.S. HIGHWAY 151

SECTION J
898 FIRST CAPITAL DRIVE
BELMONT, WISCONSIN
(LAFAYETTE COUNTY)



TR 9-21-10

STATE HWY 23

FOND DU LAC

N

LIC. #24956GW

COUNTY ROAD KK

Ag Services of Wisconsin, LLC

RIPON

STATE HWY 44 / 49

MGR: "TEX"

office

scale

Agri-land Co-op

RR

7

6

5

4

1

2

9

3

10

8

nulie

SECTION A

RIPON WISCONSIN
Fond du Lac County
W 13134 CTY RD KK
SECTION G



RAK 9/25/09

LICENSE #249456

AG SERVICES OF WISCONSIN, LLC

HWY 61

6250 BORDEN RD

BOSCOBEL

HWY 133

OFFICE

SCALE

3

1

2

4

PIT

SECTION Q
6250 BORDEN RD
BOSCOBEL, WISCONSIN
(GRANT CO)

AG SERVICES OF WISCONSIN, LLC

LIC. #249546



APPROX 1/4 MILE TO 16TH ST

APPROX 1 MILE TO I-94

EAST WING

SECTION M

UPPER HEADHOUSE BINS

ZERO POINT: TOP OF

TANKS 71 AND 73

WEST WING

RAILROAD SIDING

SECTION M
LOCATION 12
335 S EMMBER LANE
MILWAUKEE 53201

LIC. #249646

AG SERVICES OF WISCONSIN, LLC

SECTION M
ZERO POINT: TOP OF FLOOR

BARGE AND SHIP SLIP

EAST WING



TANKS 61, 62, 63

RAILROAD SIDING

SECTION M
LOCATION 12
335 S EMMBER LANE
MILWAUKEE 53201



SECTION M
ZERO POINT: TOP OF FLOOR

SHIP AND BARGE SLIP

WEST WING

SCALE AND OFFICE

RAIL AND TRUCK DUMP

SECTION M
LOCATION 12
335 S EMMBER LANE
MILWAUKEE 53201

AG SERVICES OF WISCONSIN, LLC

LICENSE #249456

RAK 9/25/09



SECTION N
700 EAST POWER DR
VIROQUA, WISCONSIN
(VERNON COUNTY)

## SCHEDULE 1.3

## ASSUMED LIABILITIES

### Assumed Leases

(a)   Leases on the Milwaukee, Viroqua, Boscobel, Ripon, and Belmont Elevators.  Cure amount: $0.

(b)   Lease for the grain bin in Stevens Point.  Cure amount: $0.

(c)   Lease for the personal property in Oshkosh.  Cure amount: $0.

(d)   Lease with M2 Leasing.  Cure amount: $0.

### Assumed Contracts

(a)   Contract with Alliant.  Cure amount: $0.

## SCHEDULE 1.4

## EXCLUDED ASSETS

| |
|---|
| Apartment N2097 |
| Oxford Apartment |
| Almond Feedlot |
| Aurora Feed Mill and Dam |
| Town of Leon 17 AC |
| Huser Building |
| Amherst Shop |
| Sunflower Farm 1/6 Partnership Interest |
| Riverview Farm 1/3 Partnership Interest and Equipment (sprayer, tractor, mower, nitrogen side dress applicator, grain drill and telehandler skytrack) |
| School House Apartments |
| Corn and Bean Crops |
| 1977 Excaliber |

| |
|---|
| Utica Energy, LLC 45% Interest |
| Utica Industries, LLC (1/4/ interest) |
| Little Sprout Farms, LLC (40% interest) |
| Little Sprout Farms II, LLC (40% interest) |
| Accounts Receivable: Olsen's Mill Incorporated - $580,000 (100% interest) R. Digman - $20,000 (100% interest) Little Sprout Farms, LLC (100% interest) First National Bank of Platteville / Spensley lawsuit - $19,000 (100% |

| interest) |
| --- |
| Kirschner Equipment Rental - $2,500 (100%) interest |
| Willow Creek Farmland |
| Elizabeth St. Property |
| All Remaining Nonexempt Assets of the Debtors |

## SCHEDULE 1.5
## PURCHASE PRICE ALLOCATION

## SCHEDULE 1.6
## REAL ESTATE ENVIRONMENTAL DISCLOSURES

The environmental conditions relating to 920 R. West Bruce St., Milwaukee, Wisconsin, otherwise known as the Milwaukee Grain Facility, that were disclosed in a letter dated July 21, 2011 from the Wisconsin Department of Natural Resources that included the presence of diesel, petroleum, chlorinated solvents and metals contamination.

## EXHIBIT A

[Form of Viroqua Quit Claim Deed]

## EXHIBIT B

[Form of Belmont Quit Claim Deed]

## EXHIBIT C

[Form of Boscobel Quit Claim Deed]

## EXHIBIT D

[Form of Ripon Quit Claim Deed]

## EXHIBIT E

[Form of Milwaukee Quit Claim Deed]

## EXHIBIT F

[Form of Waushara County Quit Claim Deed]

## EXHIBIT G

[Form of Auroraville Quit Claim Deed]

## EXHIBIT H

[Form of Bill of Sale]

## EXHIBIT I

[Form of Assumption Agreement]

## ADDENDUM 5

## ASSET PURCHASE AGREEMENT

The Asset Purchase Agreement shall be the form used in the Stalking Horse Asset Purchase Agreement.